Louis R. (Skip) Miller (54141) (smiller@millerbarondess.com)
Amnon Z. Siegel (234981) (asiegel@millerbarondess.com)
Casey B. Sypek (291214) (csypek@millerbarondess.com)
David I. Bosko (304927) (dbosko@millerbarondess.com)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

Attorneys for Plaintiffs
Remy McCarthy, Kathleen Ryan-Blaufuss,
Cathleen Mills, Jason Reid, Khek Kuan, on
behalf of themselves and all others similarly situated

Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
2410 Camino Ramon, Suite 315
San Ramon, CA  94583
T:  925-543-2555
F:  925-369-0344

Attorneys for Plaintiffs
Rajdave Bhandari, Jevdet Rexhepi,
Stephen Kosareff, and Laura Kakish,
on behalf of themselves and all others
similarly situated

(Additional Counsel Listed at End of Document)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REMY MCCARTHY, KATHLEEN RYAN-BLAUFUSS, CATHLEEN MILLS, JASON REID, and KHEK KUAN, on behalf of themselves and all others similarly situated, | 18-cv-00201-JLS-KES |
| | **CONSOLIDATED MASTER COMPLAINT** |
| Plaintiffs, | |
| vs. | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and DOE DEFENDANTS 1-10, | |
| Defendants. | |



405615.1

1  JEVDET REXHEPI, STEPHEN
2  KOSAREFF and LAURA KAKISH,
   on behalf of themselves and all
3  others similarly situated,

          Plaintiffs,
4
5          vs.
6  TOYOTA MOTOR SALES USA,
7  INC., and DOES 1-10, inclusive,

8          Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



405615.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page

NATURE OF ACTION ..................................................................... 1

JURISDICTION AND VENUE ......................................................... 8

PARTIES ......................................................................................... 8

GENERAL ALLEGATIONS ........................................................... 13

 A. 1997: The Toyota Hybrid System is Used in the Prius ........ 13

 B. 2005: Toyota Discovers That Thermal Stress is Damaging the IGBTs ............................................................................... 15

 C. 2009: Toyota Boosts the Voltage in the Third-Generation Prius, Leading to Those Vehicles Suddenly and Unexpectedly Stalling at Highway Speeds ........................... 18

 D. 2014: Toyota Misrepresents the Efficacy of the Software "Re-Flash," Which Does Nothing to Prevent Thousands of IPMs from Having to be Replaced ...................................... 23

 E. 2018: Toyota Conducts a Second Recall of the More Than 800,000 Prius Hybrids That It Recalled in 2014 and 2015, Acknowledging That They Continued to Stall After the Software "Re-Flash" .............................................................. 32

 F. Toyota Subverts the Purpose of a Safety Recall by Replacing Defective IPMs Only After They Fail ................. 34

 G. Documented Post-Reflash IPM Failures ............................. 36

 H. An Ongoing Pattern of Fraud: Toyota's Fraudulent Concealment of Sudden Unintended Acceleration in Millions of Vehicles ......................................................... 43

STATUTES OF LIMITATION ......................................................... 47

CLASS-ACTION ALLEGATIONS ................................................... 49

CLAIMS FOR RELIEF ................................................................... 54

PRAYER OF RELIEF ..................................................................... 61

JURY DEMAND ............................................................................. 74



Plaintiffs Remy McCarthy, Kathleen Ryan-Blaufuss, Cathleen Mills, Jason Reid, Khek Kuan, Jevdet Rexhepi, Laura Kakish, and Stephen Kosareff, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

## NATURE OF ACTION

1.     Toyota is the largest car manufacturer in the world and the global leader in hybrid gasoline/electric-motor technology. To benefit its bottom line, it has concealed a serious safety defect in all 2010 through 2014 model-year Prius hybrid models ("Class Vehicles") that causes those vehicles to sharply and suddenly decelerate when the hybrid system enters so-called "fail-safe" (or "limp home") mode or stall suddenly and unexpectedly while being driven, creating a serious safety risk. This action is brought on behalf of Plaintiffs and all residents of the United States who own or lease a Class Vehicle, and who have owned or leased a Class Vehicle and paid to replace or repair an inverter assembly or one or more components thereof ("Class Members").

2.     Like other Toyota hybrid vehicles, Class Vehicles have a hybrid inverter assembly that contains an Intelligent Power Module ("IPM"), which has a boost converter that increases the operating voltage of the hybrid system as needed under "high-load" driving conditions (*e.g.,* accelerating on the freeway or ascending a steep grade)s), and an inverter that converts it from direct current (DC) to alternating current (AC) to turn the electric motors and to use in the generator. Conversely, it

1   converts AC generated by the electric motors and the generator into DC
2   to recharge the battery.

3       3.   As operating voltage increases, the current generates more
4   heat, which can destroy electronics, hence the inverter assembly also has
5   a dedicated cooling system.

6       4.   Toyota became aware that the inverters (and later, more
7   specifically, the IPMs) in its hybrid vehicles were malfunctioning and
8   failing as a result of thermal stress in 2005, shortly after it introduced
9   the Toyota Highlander and Lexus RX400 hybrid sport utility vehicles to
10  the U.S. market in the 2006 model year.

11      5.   Unlike the second-generation (2004-2009 model-year) Prius
12  hybrids, whose boost converter increased the maximum operating voltage
13  to 500 volts, the boost converter in the Highlander/RX400 SUVs
14  increased the maximum operating voltage in those vehicles to 650 volts.
15  By September 2005—only a few months after it began selling the 2006
16  model-year Highlander—Toyota received field reports that the inverter
17  assemblies in Highlanders were failing.

18      6.   During the year that followed, Toyota discovered that heat
19  fluctuations can crack the solder that attaches the transistors (known as
20  Insulated-Gate Bipolar Transistors or IGBTs) to the IPM's control board,
21  and that the cracks in the solder leave air voids that reduce its ability to
22  dissipate heat, which damages the transistors and causes the IPM to
23  malfunction and fail (hereinafter, the "IPM Defect").

24      7.   Notwithstanding its experience with the Highlander/RX400
25  hybrids, in 2009 Toyota modified the hybrid system in the third-
26  generation (2010 model-year) Prius hybrids by increasing the maximum
27  operating voltage from 500 to 650 volts, just as it had done with the
28  problematic Highlander/RX400 hybrids.

CONSOLIDATED MASTER COMPLAINT

8.     Meanwhile, Toyota kept silent about the IPM Defect in the Highlander/RX400 SUVs until complaints by owners of Highlander hybrids prompted the National Highway Traffic Safety Administration ("NHTSA") to open a defect investigation into the 2006 model-year Highlander in February 2011. Four months later (in June 2011), Toyota announced that it was conducting a safety recall of approximately 82,000 2006 and 2007 model-year Highlander and RX400 hybrids. Toyota told NHTSA that some of the transistors were "inadequately soldered" to the IPM control boards in those vehicles, that a damaged transistor could result in the vehicle suddenly decelerating or stalling while being driven, and that Toyota would replace the IPMs that had "suspect transistors."

9.     Just over two years later (in September 2013), Toyota advised NHTSA that it was conducting another safety recall, which involved 2006 through 2010 model-year Highlanders and 2006 through 2008 model-year RX400 hybrids, totaling approximately 130,000 vehicles. This time, however, Toyota actually addressed the IPM Defect. Toyota advised NHTSA that transistors were becoming damaged because the solder used to attach them to the IPM control board contained lead, which caused the solder to deteriorate when exposed to thermal stress, and that a damaged transistor could result in the vehicle suddenly decelerating or stalling while being driven. Accordingly, Toyota announced that it was replacing the defective IPMs with non-defective IPMs.

10.     Five months later, Toyota announced yet another safety recall involving the IPM Defect, this time in certain Class Vehicles. In February 2014, Toyota announced Safety Recall E0E, in which recalled over 700,000 2010-2014 model-year Prius hybrids because the transistors could be damaged due to exposure to thermal stress, which could result in the vehicle suddenly decelerating or stalling while being driven.

11. Toyota's statements in February 2014 acknowledged that the IPM Defect resulted from a physical deformity; that is, a ***hardware*** problem. sssdBut instead of replacing the IPMs, as it had in the Highlander/RX400 recalls, Toyota stated that it would correct the problem by modifying—or "re-flashing"—the electronic control module *software*, thereby saving thousands of dollars in repair costs for each of the 700,000 vehicles that were the subject of the recall.

12. Toyota's stated rationale for limiting the recall of Certain Class Vehicles to a software fix was false. According to Toyota, it determined that the problem in the recalled Priuses was software-related because the Prius V wagon, which was based on the same hybrid system, was ***not*** affected by the IPM Defect. But just 15 months later, Toyota announced Safety Recall F0R, in which it recalled over 100,000 ***Prius V*** wagons because IPM transistor damage in those vehicles could cause them to suddenly decelerate or stall while being driven—just like the other Class Vehicles it recalled in 2014, and just like the Highlander and RX400 hybrids that it recalled in 2011 and 2013.

13. Notwithstanding that its initial attempt to rationalize the problem as software-related was demonstrably false, Toyota ***still*** insisted that the software "re-flash" would correct the IPM Defect, without offering any explanation—much less any evidence—in support of that assertion. All the while, Toyota knew that the problem was a physical deformity which could never be fixed with a software remedy.

14. To date, Toyota has refused to replace the defective IPMs in Class Vehicles unless and until they have already failed, thereby undermining the very purpose of a safety recall—to ***prevent*** a safety risk ***before*** it injures or kills. Indeed, Toyota has admitted that it has replaced nearly 500 IPMs per month in Class Vehicles whose software has already

1  been "re-flashed," a replacement rate that is astronomical in light of the
2  fact that IPMs are designed to last for the life of the vehicle without the
3  need for service or replacement.

4      15.    Consequently, well over 800,000 vehicles in the United States
5  (including many Priuses that Toyota excluded from Safety Recall E0E
6  and Safety Recall F0R) continue to be affected by the IPM Defect because
7  Toyota has elected to put a Band-Aid on a gaping wound. Toyota's
8  decision to put cost concerns ahead of motor vehicle safety endangers
9  Prius drivers, passengers, and others who happen to be driving near
10 these vehicles when their hybrid systems fail.

11     16.    In October 2018, after Plaintiffs filed their intial complaints
12 alleging that Toyota has been covering up the IPM Defect for years,
13 Toyota announced yet another Prius recall, this time involving all of the
14 more than 800,0000 Class Vehicles it had recalled in 2014 and 2015. As
15 before, Toyota acknowledged that the problem that led to the recall
16 affected all 2010-2014 model-year Prius and all of the 2012-2015 model-
17 year Prius V hybrid vehicles, and Toyota readily admitted that it was
18 conducting the recall because those vehicles had a propensity to stall
19 while driving, thereby increasing the likelihood of a crash.

20     17.    Astoundingly, however, Toyota **still** refused to bear the cost
21 of replacing the defective IPMs with non-defective IPMs **before** those
22 IPMs actually fail. Instead, as it did before, Toyota conducted the Prius
23 recall in October 2018 to perform yet **another** software "re-flash."

24     18.    Put simply, this is simply another ruse to make it seem as
25 though Toyota is addressing an obvious problem—one that even Toyota
26 admits has resulted in the replacement of nearly 500 IPMs per month
27 **after** the "re-flash"—which is **enormous** in light of the fact that the IPM
28 is designed to last for the life of the vehicle without the need for service

or periodic replacement. Again, Toyota has known for more than a decade that the IPM Defect is a hardware problem, which may explain why Toyota chose to provide owners of more expensive Toyota Highlander and Lexus RX400 hybrids with replacement IPMs rather than a software "re-flash"—notwithstanding that the Prius and the Highlander/RX400 are based on the same Toyota Hybrid System and use the same "Techstream ECU Flash Programming Procedure."

19.   Regardless of the rationale that informed this decision, Toyota is once again trying to save money by pretending it is fixing the problem while not actually fixing anything. Despite multiple prior failed recalls, Toyota continues to refuse to address the IPM defect in hundreds of thousands of its hybrid vehicles.

20.   This is not the first time Toyota has employed this approach as a means of saving money at the expense of its customers' safety. For more than a year, Toyota concealed what it knew about what was causing sudden unintended acceleration in millions of other vehicles made by Toyota—***going so far as canceling plans to correct that problem and instructing its personnel to refrain from communicating about it in writing as a means of preventing NHTSA from discovering what Toyota actually knew about the problem***.

21.   After attending a meeting at which Toyota continued the sudden acceleration cover-up, a Toyota employee exclaimed "Idiots! Someone will go to jail if lies are repeatedly told. I can't support this." Two days later, Toyota recalled all the affected vehicles and ultimately admitted that it had lied to its customers, to federal regulators, and to Congress.

22.   Toyota was charged by the U.S. Department of Justice with criminal fraud under 18 U.S. Code § 1343, but escaped criminal

prosecution by entering into a Deferred Prosecution Agreement by which it paid a $1.2-billion fine to the U.S. government for hiding dangerous defects. Toyota also formally admitted that it had lied to regulators and the public about its efforts to correct the safety defects, and that it failed to timely notify regulators about the defects as required by federal law.

23.    "In 2014, U.S. District Judge William Pauley said the case presented a 'reprehensible picture of corporate misconduct' and expressed hope the government would ultimately hold responsible decision-makers at Toyota accountable. 'This, unfortunately, is a case that demonstrates that corporate fraud can kill, he said."[1]

24.    Toyota has claimed publicly that it had cleaned up its act and told customers that it would commit itself to their safety and would not conceal defects from them again.  That, too, was a lie.  Just one month before it entered into the Deferred Prosecution Agreement, Toyota perpetrated yet another fraud involving a safety defect—the one at issue in this case, which affects hundreds of thousands of Class Vehicles.

25.    Toyota's conduct constitutes fraud, violates federal law, California consumer protection stutes and common law, and constitutes breaches of applicable warranties.

26.    Clearly, Toyota did not learn its lesson. It is time to send a message to Toyota—by requiring it to replace the defective IPMs in Prius hybrids free of charge, by requiring it to compensate Class Members for their losses, and by awarding punitive damages—that its callous disregard of public safety is simply not acceptable.

---

[1] David Shepardson. "U.S. asks judge to dismiss Toyota acceleration case as monitoring ends." *Reuters* (Aug. 8, 2017). available at https://www.reuters.com/article/toyota-settlement-idUSL1N1KU0PP.



## JURISDICTION AND VENUE

27.    This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. section 1332, as amended in February 2005 by the Class Action Fairness Act ("CAFA"). CAFA jurisdiction is proper because

a.    the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs, the proposed class includes more than 100 members, more than one of whom reside in a state other than California; and

b.    Toyota has purposefully availed itself of the privilege of conducting business activities within the State of California, where Toyota is incorporated and where Toyota engaged in the unlawful conduct alleged in this Complaint.

28.    Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391, and California Civil Code section 1780(d), because the conduct alleged in this Complaint occurred in this judicial district.

## PARTIES

29.    Plaintiff Remy McCarthy is a citizen and resident of Ventura County, California.  Mr. McCarthy purchased his 2010 Toyota Prius at Claremont Toyota in August 2010, and he continues to own the vehicle. Mr. McCarthy's vehicle received the software "re-flash" under Safety Recall E0E. Had Mr. McCarthy known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

30.    Plaintiff Kathleen Ryan-Blaufuss is a citizen and resident of Los Angeles County, California.  Ms. Ryan purchased her 2010 Toyota Prius at Jimmy Vasser Toyota in Napa, California, in November 2009,

and she continues to own the vehicle.  Her vehicle received the software "re-flash" under Safety Recall E0E in June 2014.

31.    In January 2018, Ms. Ryan was driving 70 miles per hour in the fast lane on a major freeway in Los Angeles when her inverter failed. In a matter of seconds, her car decelerated from 70 miles per hour to 15 miles per hour.  Ms. Ryan had to maneuver the car through three lanes of traffic to the shoulder with limited power.  One California Highway Patrol officer, who witnessed the incident, told Ms. Ryan that she was lucky to be alive.  Ms. Ryan paid $189.00 to tow her Prius to Marina del Rey Toyota, where her vehicle was diagnosed with a failed inverter.

32.    The software "re-flash" also decreased the fuel efficiency of Ms. Ryan's vehicle.  After the software "re-flash," Ms. Ryan's car got approximately 40 miles per gallon (mpg), which is approximately 10 mpg less than prior to receiving the "re-flash." Had Ms. Ryan known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, she would not have purchased the vehicle or would have paid significantly less for its purchase.

33.    Plaintiff Cathleen Mills is a citizen and resident of San Diego County, California.  Ms. Mills purchased her 2011 Toyota Prius at Hoehn Honda in Carlsbad, California in August 2014, and she continues to own the vehicle.  Her vehicle had received the software "re-flash" under Safety Recall E0E in March 2014, prior to her purchase.

34.    Ms. Mills believes that her vehicle experienced decreased fuel efficiency.The vehicle gets an average of 40 mpg, which is less than what Toyota claims the Prius should get (Toyota claims 48 mpg highway and 50 to 51 mpg city).  Ms. Mills would not have purchased the vehicle had she known the inverter could fail at any time, or that it would be less fuel

-9-

efficient than Toyota represented.  These facts were concealed from her by Toyota.  Ms. Mills is afraid to drive on the freeway in her Prius, but she cannot afford to buy a different vehicle. Had Ms. Mills known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, she would not have purchased the vehicle or would have paid significantly less for its purchase.

35.  Plaintiff Jason Reid is a citizen and resident of Orange County, Florida.  Mr. Reid leased his 2010 Toyota Prius at Toyota of Orlando in November 2010 and subsequently purchased the vehicle at the end of the lease term. Mr. Reid continues to own the vehicle.  His vehicle received the software "re-flash" under Safety Recall E0E (when?). The software "re-flash" decreased the fuel efficiency of Mr. Reid's vehicle. Prior to the "re-flash," Mr. Reid's vehicle was averaging 54 miles per gallon.  After the "re-flash," Mr. Reid's vehicle now gets an average of 45 miles per gallon.  Had Mr. Reid known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

36.  Plaintiff Khek Kuan is a citizen and resident of San Bernardino County, California.  Mr. Kuan purchased his 2013 Prius V (date and place?).  Mr. Kuan's vehicle received the software "re-flash" under Safety Recall F0R.  The software "re-flash" decreased the fuel efficiency of Mr. Kuan's vehicle.  Prior to the "re-flash," Mr. Kuan's vehicle averaged a range of 420 miles on a full tank of gas.  After the "re-flash," Mr. Kuan's vehicle averages a range of 365 miles on a full tank of gas. Had Mr. Kuan known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature,

and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

37.    Plaintiff Jevdet Rexhepi is a resident of the County of Los Angeles, California, who purchased a new 2012 model-year Toyota Prius hybrid Prius hybrid from North Hills Hammer Toyota. The ECU software in Mr. Rexhepi's Prius was "re-flashed" pursuant to Safety Recall E0E. Had Mr. Rexhepi known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

38.    Plaintiff Steven Kosareff is a resident of the County of Los Angeles, California, who purchased a new 2010 model-year Toyota Prius hybrid from Santa Monica Toyota. The ECU software in Mr. Kosareff's Prius was "re-flashed" pursuant Safety Recall E0E. After the "re-flash," Mr. Kosareff noticed that his Prius seemed to be getting fewer miles to the gallon than it had before the "re-flash." When he checked his Prius's gas mileage, Mr. Kosareff discovered that it had gone from more than 50 miles per gallon to 40 miles per gallon after the "re-flash." Had Mr. Kosareff known what Toyota knew about the IPM Defect, and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

39.    Plaintiff Laura Kakish is a resident of the County of Los Angeles, California, who purchased a new 2010 model-year Toyota Prius hybrid from Longo Toyota. The ECU software in Ms. Kakish's Prius was "re-flashed" pursuant to Safety Recall E0E. After the "re-flash," Ms. Kakish noticed that her Prius got significantly less gas mileage than it did before the software was modified by Toyota.

-11-

40.     Ms. Kakish also experienced numerous stalling and "limp-home" events in her Prius. For example, while traveling in the right lane of the Orange freeway (State Route 57), Ms. Kakish's Prius suddenly went from over 70 miles per hour to 20 miles per hour and was nearly struck by a "big rig" that was entering the freeway. The truck began honking at her, but Ms. Kakish had no control of the speed of the vehicle.

41.     Ms. Kakish brought the vehicle to her local Toyota dealer, who told her nothing could be done about the problem because the issue could not be "duplicated" at the dealership. The Toyota dealer also suggested that Ms. Kakish may have caused the problem by putting the Prius in neutral (while driving on the freeway) or by depressing the gas and brake pedals simultaneously. Ms. Kakish had done neither—on that occasion or any of the others that involved similar stalling and "limp-home" events. Had Ms. Kakish known what Toyota knew about the IPM Defect, and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, she would not have purchased the vehicle or would have paid significantly less for its purchase.

42.     Defendant Toyota Motor Sales, U.S.A. ("Toyota US") is a California corporation with its principal place of business in Los Angeles County.  Toyota US is responsible for the manufacture, distribution and sale of all Toyota automobiles in the United States.

43.     Defendant Toyota Motor Corporation ("Toyota Japan") is a Japanese corporation with its headquarters in Japan.  Toyota Japan is the parent company of Toyota US and conducts business in this District.

44.     Toyota US and Toyota Japan are referred to collectively in this complaint as "Toyota."

45.     The names and capacities of DOE Defendants 1-10 are currently unknown to Plaintiffs.  Each of the DOE Defendants is legally

1  responsible for the unlawful acts alleged herein.

2      46.    At all relevant times, each defendant was acting as an agent
3  or employee of each of the other and was acting within the course or scope
4  of the agency with knowledge and consent of the other defendants.  Each
5  of the acts and omissions complained of were made known to, and ratified
6  by, each of the other defendants.

7                          **GENERAL ALLEGATIONS**

8  **A.   1997: THE TOYOTA HYBRID SYSTEM IS USED IN THE PRIUS**

9      47.    Toyota markets the Prius as an environmentally and
10  financially better alternative to conventional vehicles because it uses less
11  fuel and has lower emissions.  Customers buy and lease Toyota Priuses
12  not only because they emit less pollution than standard vehicles, but also
13  because of their fuel efficiency.

14      48.    With rising fuel prices and the subsidies available for
15  environmentally friendly vehicles, the number of hybrid vehicles on the
16  road is rising dramatically.  The Toyota Prius is the world's most popular
17  hybrid vehicle.  Because of the Prius' reputation, Toyota has become the
18  global leader in hybrid technology and fuel economy.

19      49.    The Toyota Hybrid System was developed for use in the first-
20  generation Toyota Prius hybrid vehicles sold in Japan in 1997 and
21  introduced to the U.S. market in the 2001 through the 2003 model years.[2]

22      50.    The first-generation Prius combined an electric motor
23  powered by a battery with a nominal voltage of 273.6 volts and an

24

25

26  _____

27      [2] A "model year" denotes the year that automakers attribute to the
annual production period of a particular model of vehicle. For example, a
2019 model-year vehicle can be one that is manufactured on or after
28  January 1, 2018.



internal combustion engine, both of which are connected to a conventional geared transmission.

51.    One of those critical parts is the hybrid inverter assembly, which contains an inverter that converts direct current (DC) to alternating current (AC) to turn the electric motors and to use in the generator. Conversely, the inverter converts AC generated by the electric motors and the generator into DC to recharge the battery.

52.    Toyota used the next iteration of the Toyota Hybrid System ("THS-II") in second-generation Prius hybrids (sold in the 2004 through 2009 model years). THS-II uses the same internal combustion engine as the first-generation Prius, but it employs a variable-voltage system that uses a boost converter to increase the operating voltage. Toyota describes this variable-voltage system as follows:

> THS-II uses a variable-voltage system that consists of a boost converter and inverter. The boost converter is used to boost the operating voltage of the system to a maximum voltage of DC 650V, and the inverter is used to convert the system voltage (direct current) into an alternating current. By using the variable-voltage system, the electrical loss associated with the supply of electric power at a smaller current is minimized, and MG1 and MG2 are driven at a high voltage. Thus, MG1 and MG2 are operated at high speeds and high outputs.

53.    The inclusion of a boost converter in second-generation Prius hybrids enabled Toyota to substantially reduce the size of the battery while generating more power than the battery that was used in first-generation Priuses by increasing the maximum voltage to 500 volts during "high-load" driving conditions, such as hard acceleration or ascending a long, steep grade.

## B.   2005: TOYOTA DISCOVERS THAT THERMAL STRESS IS DAMAGING IPM TRANSISTORS

54.   Toyota modified THS-II when it introduced the Toyota Highlander hybrid SUV and its corporate twin, the Lexus RX400 hybrid SUV, to the U.S. market in the 2006 model year. Whereas the boost converter in the second-generation Prius increased voltage to a maximum of 500 volts, the boost converter in the Highlander/RX400 hybrids increased the voltage to a maximum of **650** volts.

55.   It was not long before the IPM Defect began to manifest while these vehicles were being driven. In field reports, Toyota technicians described the problem in general terms, noting that the inverter assembly had failed without specifying the particular components within the inverter assembly (*i.e.,* the IPM and the transistors attached to its control board). For example, on September 19, 2005, a Toyota engineer issued a field report that explained that the inverter assembly had malfunctioned in a 2006 model-year Highlander hybrid, and that  the inverter assembly was replaced to correct the problem.

56.   Toyota continued to receive field reports concerning malfunctioning inverters in 2006 model-year Highlanders in 2006, 2007, 2008, 2009, and 2011. Each time, the inverter assembly was removed and replaced with a new inverter assembly. Toyota later confirmed "that **98% of the reports identify the hybrid inverter assembly as the causal component contributing to the subject failure mode [i.e., an engine stall or loss of power**]." (Emphasis added.)

57.   In 2005 and 2006, Toyota recognized internally that the heat generated in the inverter assembly was creating microscopic cracks (or "voids") in the solder, which prevented it from dissipating sufficient

-15-

amounts of heat and damged IPM transistors (*i.e.,* the IGBTs), which cause the vehicle to suddenly decelerate or stall while being driven.

58.    But Toyota did not disclose what it knew about thermal stress damaging the IPM transistors and causing stalling until after NHTSA opened a defect investigation on February 15, 2011. NHTSA's investigation was prompted by "32 complaints alleging incidents of engine stalling while driving in model year 2006 Toyota Highlander hybrid electric vehicles. ***Approximately two-thirds (21) of the incidents occurred at speeds of 40 miles per hour or more***." ODI Resume re PE 11-005 (dated Feb. 15, 2011) (emphasis added).

59.    In response to a formal Information Request dated April 29, 2011, Toyota advised NHTSA that it had received a field report in May 2007 concerning a Lexus RX400 whose engine had stalled in Japan, and that it discovered damage to the IPM transistors (IGBTs) when it inspected the inverter in that vehicle. Toyota also reported that it continued to assess the problem through December 2008 and "found that the heat release performance of the solder for the IGBTs had deteriorated" and "that cracks in the cross-section surface of the solder may have contributed to the deterioration of the heat release efficiency of the solder."

60.    Toyota admitted that nearly half the reports it received indicated that "there was an inverter and related component failure that reportedly led to a vehicle 'stall' or 'loss of power' while driving." Toyota also noted that IPM damage was likely to cause the vehicle to enter "fail-safe" mode, which would allow the vehicle to be driven at a reduced speed with power-assisted brakes and steering until the battery is discharged.

61.    Actually, when a Toyota hybrid enters "fail-safe" or "limp-home" mode, it unexpectedly decelerates, so that a vehicle traveling at 70 miles per hour on the freeway is suddenly traveling at approximately 20

-16-

miles per hour or slower. Moreover, Toyota also acknowledged that some drivers reported that their vehicle stalled completely and lost power-assisted steering and brakes.

62.    A vehicle entering "fail-safe" or "limp-home" mode creates or greatly increases a risk of a collision with another vehicle. For example, when a vehicle traveling in one of the middle or left lanes of a freeway suddenly decelerates from 70 to 20 miles per hour, there is a significant risk that the vehicle will be hit from behind by another vehicle not expecting such a sudden slow down.

63.    Moreover, if a vehicle suddenly loses speed while turning left on a two-way road, sudden deceleration while turning in front of oncoming traffic is likely to cause a crash as a result of the vehicle's inability to clear the intersection, as it would have if it had been able to maintain a safe speed.

64.    Yet another example of this dangerous condition is a car suddenly decelerating while entering a freeway. Normally, cars entering a freeway speed up to match the speed of vehicles already traveling on the freeway.  If the merging vehicle suddenly and unexpectedly loses speed, the risk of a rear-end collision is greatly increased.

65.    In a Defect Information Report it submitted to NHTSA on June 29, 2011, Toyota explained that it decided to conduct a safety recall of 2006 and 2007 model-year Highlander and RX400 hybrids because the IPM transistors are prone to damage by the heat generated under "high-load" driving conditions (*i.e.,* when the boost converter increases the operating voltage), and that damaged transistors can lead to a blown power-supply fuse that causes the hybrid system to fail, which results in the vehicle suddenly stalling on the roadway.

66.    In the same Defect Information Report, Toyota also represented that "[n]o other Toyota or Lexus vehicles use the same hybrid inverter as the subject vehicles." Yet, on September 4, 2013, Toyota issued a Defect Information Report in which it announced that it was conducting another safety recall of Highlander and RX400 hybrids due to precisely the same problem that led to the prior recall. The second recall was much more expansive than the first; it included 2006 through 2008 model-year Lexus RX400 hybrids and 2006 through 2010 Toyota Highlander hybrids.

67.    The Defect Information also contained a chronology of principal events, which stated that in August 2013 Toyota claimed that the use of lead in the solder attaching the transistors to the IPM was the root cause of the problem, and that the use of lead-free solder would solve it. Accordingly, Toyota announced that every Highlander/RX400 owner would be notified to return their vehicles to a Toyota or Lexus dealer for a cost-free IPM replacement.

**C.    2009: TOYOTA BOOSTS THE VOLTAGE IN THE THIRD-GENERATION PRIUS, LEADING TO THOSE VEHICLES SUDDENLY AND UNEXPECTEDLY STALLING AT HIGHWAY SPEEDS**

68.    Despite its awareness of the problems that the IPM Defect created in the Highlander and RX400 hybrids shortly after it began selling those vehicles in 2005, Toyota decided to boost the maximum operating voltage in the third-generation Prius (which began in the 2010 model year) from 500 to 650 volts, just as it did with the Highlander/RX400 hybrids. Yet Toyota said nothing about the IPM Defect to prosective purchasers and lessees of third-generation Prius hybrids.

69.    Instead, Toyota waited until February 2014—after virtually all 2010 through 2014 model-year Prius hybrids were already on the road— before it announced Safety Recall E0E and disclosed to federal regulators and prospective Class Members for the first time that certain Class

Vehicles were inordinately prone to suddenly decelerating or stalling while driving due to IPM failure.

70.    Even then, however, Toyota concealed material facts. Despite having spent years analyzing the effect of thermal stress on IPM transistors and determining that cracks in the solder were damaging the IPM transistors, Toyota knowingly misrepresented that the software "re-flash" solved the problem.

71.    The reason Toyota focused on software and avoided discussing hardware issues was simple: the average cost of replacing an IPM is approximately $3,000, hence replacing the IPMs in more than 700,000 Prius hybrids that were the subject of Safety Recall would have cost Toyota billions of dollars, whereas the software "re-flash" cost Toyota approximately $85 per vehicle.

72.    In the chronology it included in the February 2014 Defect Information Report it submitted to NHTSA, Toyota stated that it had received field reports during May 2011 through June 2012 that described vehicles with damaged IGBTs "losing power or entering fail-safe mode aloing with the illumination of warning lights[,]" but could not find any voids or cracks in the solder surrounding the damaged IGBTs.

73.    The following year (June 2012 through June 2013), Toyota admitted to NHTSA that it *did* find cracks in the solder attaching the IGBTs to the IPMs that were returned with field reports, but claimed that it was unable to find any aspect of the production process that could lead to the development of a solder crack and was unable to duplicate the damage to IGBTs in replication tests. And although Toyota found a solder crack and a deformed IPM transistor (*i.e.,* IGBT) "during bench testing simulating high-mileage and high-load operating conditions[,]" it told NHTSA that there were no conceivable circumstances in which a

-19-

1   damaged IGBT could result in a stalled vehicle:

2       Based on field information alleging sudden vehicle stoppage
3       while driving, Toyota revalidated the fail-safe logic design on
        the subject vehicles and could not identify any scenario in
4       which the vehicle would not enter a fail-safe mode when
        IGBT(s) used for operation of the boost converter became
5       damaged. . . .

6       74.    This was untrue. During the period described in this portion

7   of Toyota's chronology (June 2012 through June 2013), many Prius

8   drivers had already complained to NHTSA and elsewhere about sudden

9   and unexpected stalling.

10      75.    Nonetheless, It is notable that Toyota, as it had in 2005,

11  Toyota acknowledged thus recognized again, in the February 2014 Defect

12  Information Report to NHTSA, that the IPM Defect resulted in a

13  **physical** deformity:

14      [H]igher thermal stress could occur in specific IGBT's used for
        the operation of the boost converter, which is required during
15      high-load driving such as accelerating during highway
        driving. If this occurs, the IGBT could deform and eventually
16      result in damage to the IGBT(s), illuminating various
        warning lights on the instrument panel. In most cases, the
17      vehicle will enter a fail-safe mode, resulting in reduced motive
        power in which the vehicle can still be driven for certain
18      distances. In limited instances, the motor/generator ECU
        could reset, causing the hybrid system to shut down and
19      resulting in the vehicle stopping while being driven,
        increasing the risk of a crash.

20

21      76.    Toyota further admitted this physical deformity would

22  "eventually result in damage" to the system:  the vehicle would either (1)

23  enter limp-home (fail-safe) mode, or (2) shut down. Moreover, Toyota

24  admitted that a damaged IPM transistor (*i.e.,* IGBT) could also result in

25  the motor/generator control ECU being exposed to electrical transients

26  (*i.e.*, electrical surges at extremely high voltages), which could cause a

27  "specific microchip in the ECU to reset itself, resulting in the hybrid

28  system shutting down rather than going into fail-safe mode."

77.   Yet, after this occurred so frequently after the vehicles that were the subject of Safety Recalls E0E and F0R had had their ECU software "re-flashed," Toyota announced that in October 2018 that Toyota recalled all the more than 800,000-plus Prius hybrids that were the subject of those safety recalls in 2014 and 2015 had to be recalled again because they remained prone to IPM failure that Safety Recalls E0E and F0R, it focused on "re-flashing" the software rather than replacing the damaged IPM whose transistors were damaged by thermal stress, which that Toyota admitted wcould "result[] in the hybrid system shutting down rather than going into fail-safe mode."itself

78.   **Both** of the effects of IPM transistor damage—entering limp-home (*i.e.,* "fail-safe") mode and sudden hybrid system shutdown resulting in an unexpected stall—increase the risk of being involved in a crash, so applicable law requires that the underlying  cause of the proble had to be remedied under applicable law. For that reason, Toyota announced a voluntary recall for "both the motor/generator control ECU and the hybrid control ECU which will prevent damage to the IGBT and also prevent a hybrid system shutdown in the event of a motor/generator control module reset." *Id.*

79.   Toyota's February 2014 recall notification letter to its customers, Toyota  and its "Customer Frequently Asked Questions" letter represented that the "condition" that led to the recal—*i.e.,* IPM transistors in the inverter becoming damaged and causing the car to enter "limp-home" mode (which Toyota euphemistically and misleadingly characterizes as "fail-safe" mode) or to suddenly shut down and stall—would be remedied by a "software update."  This was false and Toyota knew it to be false when it made that and other, similar representations in connection with the Prius V recallthese representations.

80.     Toyota went on in the 2014 Defect Information Report to claim that, during the period from July 2013 through February 2014, it had "confirmed that Prius V vehicles, which use the same inverter assembly, *did not experience the same problems in the field on the boost converter and, from inspection of recovered in-use inverters, did not have cracks in the solder used in the IGBT's*." (Emphasis added.) Thus, Toyota told NHTSA that the ostensible difference in performance between the Prius and the Prius V wagon was attributable to the electronic control unit software that controls the amount of voltage the boost converter puts out.

81.     Toyota also falsely assured NHTSA that the vehicles it decided to recall were the only vehicles affected by the IPM Defect. Specifically, Toyota asserted in the February 2014 Defect Information Report concerning the Prius that "*[n]o other Toyota or Lexus vehicles use the same inverter assembly and software used to control the boost converter in the motor/generator electronic control unit (ECU) as the involved vehicles*." (Emphasis added.)

82.     But just over a year later (on July 15, 2015), Toyota issued a Defect Information Report pertaining to the IPM Defect in over 100,000 Prius V hybrids. There, Toyota description of the problem focuses on the voids in the solder used to attach the IGBTs to the IPM—the same issue on which Toyota had originally focused between 2005 and 2008:

> The inverter assembly is part of the hybrid system of the subject vehicle. Inside the inverter assembly is an Intelligent Power Module (IPM) which contains a control board equipped with transistors known as Insulated-Gate Bipolar Transistors (IGBT's). In a specific usage condition the software that controls *the boost converter in the IPM could cause microscopic voids to build up in the solder beneath the IGBTs used for the operation of the boost converter. If this occurs, the heat dissipation ability of the IGBT could be reduced, causing the IGBT to be damaged*. If



the IGBT is damaged, it could result in the illumination of various warning lights on the instrument panel. In most cases, the vehicle will enter a fail-safe mode, resulting in reduced motive power in which the vehicle can still be driven safely for certain distances. In limited instances, the motor/generator ECU could reset, causing the hybrid system to shut down and resulting in the vehicle stopping while being driven, increasing the risk of a crash.

(Emphasis added.)

**D.    2014: TOYOTA MISREPRESENTS THE EFFICACY OF THE SOFTWARE "RE-FLASH," WHICH DOES NOTHING TO PREVENT THOUSANDS OF IPMS FROM HAVING TO BE REPLACED**

83.    Toyota's assurance to NHTSA and Prius drivers that modifying—or "re-flashing"—the ECU software cured the IPM Defect was unfounded and baseless. Toyota offered no evidence that the IPM Defect was caused by software—much less that modifying the software could or would eliminate it—and for good reason: Toyota has admitted that Prius IPMs continue to fail at an astronomical rate of approximately *15 per day* even after the ECU software was "re-flashed."

84.    Moreover, in the "Customer Frequently Asked Questions" portion of the February 2014 recall notification letter to its customers, Toyota suggested that entering "fail-safe" (or "limp-home") mode posed little or no risk to motor vehicle safety. This was false and Toyota knew it to be false when it made these representations.

85.    Proposed Class Members continued to experience precisely the same problem before and after their vehicles' software was "re-flashed." As discussed above, after its ECU software was "re-flashed," Plaintiff  Ryan's Prius suddenly stalled while she was driving 70 miles per hour in the fast lane on a major freeway in Los Angeles, causing the vehicle to decelerate from 70 miles per hour to 15 miles per hour in a matter of seconds. As the California Highway Patrol officer who witnessed the incident told Ms. Ryan, she was lucky to be alive.

-23-

86.    Similarly, after her vehicle received the "re-flash," Plaintiff Kakish experienced numerous stalling events in her Prius, including one in which a large tractor-trailer came very close to colliding with her Prius when it suddenly stalled at 70 miles per hour on State Route 57. Yet, when Ms. Kakish brought the vehicle to her local Toyota dealer, she was told that nothing could be done about the problem because the dealer could not "duplicate" the issue at the dealership.

87.    Other Prius drivers have also confirmed that the software "re-flash" did not eliminate the IPM Defect. For example, two months after the initial Prius recall was announced, the owner of a 2013 model-year Prius complained to NHTSA that his vehicle stalled repeatedly *after* the software update was performed:

> THE CONTACT OWNS A 2013 TOYOTA PRIUS. THE CONTACT STATED THAT **AFTER THE VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN NUMBER: 14V053000 (HYBRID PROPULSION SYSTEM) THE VEHICLE STALLED CONTINUOUSLY.** BOTH MANUFACTURER AND DEALER HAVE BEEN MADE AWARE OF THE FAILURE. THE VEHICLE HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS 11,436.[3]

88.    Three months later (in July 2014), this complaint was submitted to NHTSA:

> **THE HYBRID INVERTER ASSEMBLY FAILED WHEN I TRIED TO ACCELERATE FROM A STOP ONTO A RURAL HIGHWAY. THIS OCCURRED APPROXIMATELY TWO MONTHS AFTER RECEIVING THE MOTOR GENERATOR ECU AND POWER MANAGEMENT ECU SOFTWARE UPDATE THAT WAS INTENDED TO PREVENT THIS TYPE OF FAILURE.** I WAS NOTIFIED OF THIS UPDATE/RECALL IN LATE MARCH 2014 AND HAD THE UPDATE COMPLETED AT A AUTHORIZED TOYOTA SERVICE CENTER.

---

[3] The complaints that follow were retrieved verbatim from NHTSA's database, where they appear in capital letters and are reprinted here without change, except for emphasis in bold, which has been added



-24-

CONSOLIDATED MASTER COMPLAINT

89.     In another complaint that was filed in July 2014, the driver of a 2010 model-year Prius that had the software update performed several months earlier went into limp-home mode while driving at 65 miles per hour:

> WAS TRAVELING ABOUT 65 MPH ON ROUTE 11 IN CT WHEN RED LIGHTS COME ON AND CAR SLOWS TO 20 MPH. PULLED TO SIDE OF ROAD AND CALLED AAA/TOWED TO HARTFORD TOYOTA IN HARTFORD CT. **FIRST TOLD IT WAS A HYBRID BATTERY THEN TOLD IT WAS THE INVERTER WHICH THEY SAID IS ON BACK ORDER. NOW I'M GETTING THE RUN AROUND FROM THE MAIN OFFICE IN CALIFORNIA. BROUGHT CAR IN FOR A RECALL ON SOFTWARE UPDATE IN FEB 2014** AND FROM WHAT I READ THIS MAY CAUSE THE INVERT TO FAIL THANKS FOR YOUR ATTENTION IN THIS MATTER.

90.     Similarly, the driver of a 2011 model-year Prius complained in February 2016 that his vehicle stalled suddenly (for a second time) while driving at 40 miles per hour, and that it stalled again after the software update was performed:

> **THE CONTACT OWNS A 2011 TOYOTA PRIUS. WHILE DRIVING 40 MPH, THE VEHICLE LOST POWER.** THE VEHICLE WAS ABLE TO BE RESTARTED. **THE FAILURE RECURRED TWICE. THE DEALER UPDATED THE SOFTWARE. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED.** THE VEHICLE WAS TAKEN TO THE DEALER A SECOND TIME WHERE THE TECHNICIAN STATED THAT THEY DID NOT HAVE THE CORRECT CODE FOR THE SOFTWARE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 60,000.

91.     In December 2015 another owner of a 2010 model-year Prius reported that the vehicle stalled after the software "reflash" had been performed:

> CHECK HYBRID SYSTEM CAR SHUTS OFF AND CAN NOT RESTART, TRIED SYSTEM RESET PER MANUAL BUT WOULD NOT CLEAR HYBRID. TOWED TO DEALER, DTC CODE 800, TECH SAID THIS WAS THE ONLY CODE, **HAD RECALL EOE REFLASH 04-14-2014** IPM

-25-

1  EXTENDED 15 YEARS. CAR WAS IN MOTION PER WIFE.
2  (IT HAD BEEN RAINING) THE DTC P3004800 POWER CABLE MALFUNCTION.

3  92.  In August 2014 the driver of a 2013 model-year Prius hybrid
4  complained that the vehicle was performing **worse** after it was
5  purportedly "fixed" by performing the software update:

6  **I HAD MY CAR UPDATED BY TOYOTA THEY SAID IT**
   **WAS A VOLUNTARY RECALL , EXACTLY AFTER THE**
7  **UPDATE I NOW GET 10-15 MILES LESS A GALLON**
   **AND MY VEHICLE HESITATES ON ACCELERATION**
8  **1-3 SECONDS**, I HAVE **BROUGHT THE CAR BACK 2**
   **TIMES AND WAS TOLD THAT THEY HAVEN'T HEARD**
9  **OF ANY COMPLAINTS ABOUT PROBLEMS AFTER**
   **THE UPDATE** I LEFT MY CAR WITH THEM BOTH TIMES
10 ON A FRIDAY AND PICKED UP ON A MONDAY THEY
   SAID THEY RECALIBRATED THE COMPUTER THE
11 FIRST TIME AND IT HAD BETTER MILEAGE UNTIL I
   FILLED UP AND RESET THE ODOMETER AND BACK TO
12 THE LESS MILEAGE AGAIN, 2ND TIME THEY SAID I
   NEEDED A FUEL SYSTEM CLEAN AND ANOTHER
13 THING, **I DID THEM BOTH AND NOTHING AGAIN NO**
   **CHANGE (THEY SAID IT MIGHT IMPROVE MY MILES**
14 **SOME)**. I HAVE BEEN ON SOCIAL NETWORK SITE
   PRIUS CHAT ETC. AND **OTHERS ARE EXPERIENCING**
15 **THE SAME THING AND MORE I FEEL LIKE IM**
   **GETTING A RUN AROUND WITH THEM (TOYOTA) IT**
16 **HAS COST ME ALMOST $500 TO GET NO WHERE,**
   **AND THE LOSS OF MILES IS COSTLY ALSO I OWN A**
17 **HYBRID AND FEELS LIKE IN DRIVING A STANDARD**
   **4 CYLINDER, THE ACCELERATION DELAY STARTED**
18 **ABOUT A MONTH AGO.** IM GONNA [*sic*] BRING IT BACK
   FOR BOTH PROBLEMS AND I EXPECT TO BE TOLD I
19 NEED SOMETHING ELSE (TUNE UP ETC) THAT WONT
   RESOLVE MY ISSUE THANK YOU.

20

21 93.  A similar report was submitted in June 2016, in which the
22 driver of a 2012 model-year Prius complained that his troubles began
23 **after** the software update was completed:

24 **AFTER TOYOTA POWER MANAGEMENT SOFTWARE**
   **RECALL INSTALLED "POWER MANAGEMENT**
25 **UPGRADE" SOFTWARE IN MY CAR I IMMEDIATELY**
   **EXPERIENCED SERIOUS PROBLEMS WITH MY**
26 **IGNITION / START OF HYBRID/GASOLINE ENGINE.**
   AFTER PRESSING IGNITION, I HAD TO WAIT 15 TO 20
27 MINUTES AND PRESS START BUTTON ON/OFF
   REPEATEDLY UNTIL THE GASOLINE ENGINE IGNITE
28 BUT HYBRID FAILED TO START. IT IS NOT NORMAL

-26-



BECAUSE A PRIUS HYBRID ENGINE STARTS FIRST NOT THE GASOLINE ENGINE. **TOYOTA HAS DISABLED SOME IMPORTANT FUNCTIONS IN ITS POWER MANAGEMENT RECALL SOFTWARE UPDATE THAT AFFECTS THE HYBRID ENGINE PERFORMANCE AND FAILURE TO START. I DRIVE MY PRIUS 3-4 TIMES A MONTH AND I DID NOT HAVE ANY PROBLEM BEFORE THE RECALL SOFTWARE UPGRADE** BECAUSE PRIUS OWNERS MANUAL CLEARLY SAYS THAT THE BATTERY WITH BE DISCONNECTED BY BATTERY SAVING FUNCTION WHEN YOUR CAR IS PARKED FOR LONG TIME, SEVERAL DAYS, WEEKS. . . .

94.    Prius drivers also complained that Toyota had refused to even "re-flash" their vehicles' software because they were not included in Safety Recall E0E or Safety Recall F0R. As it did in the Defect Information Reports that pertained to both Highlander/RX400 recalls and the first of the two Prius recalls, Toyota claimed that no other vehicles were affected by the IPM Defect other than those it chose to include in those recalls. Toyota made the same claim again in the July 2015 Defect Information Report concerning the Prius V, asserting that "[n]o other Toyota or Lexus vehicles use the same inverter assembly and software used to control the boost converter in the motor/generator control electronic control unit (ECU) as the involved vehicles [*i.e.,* the Prius V hybrids]."

95.    As before, this assertion was false. As revealed by NHTSA's database, Prius drivers complained that, after their vehicle stalled, they were told that the vehicle was not subject to repair because it was not included in the safety recall. For example, in a complaint that was submitted to NHTSA in July 2017, the driver of a 2013 model-year Prius complained that his vehicle had stalled and asked that the software update be performed, only to be refused because the vehicle was not among those included in the recall:



1    CAR LITERALLY STOPPED ON THE ROAD. IT WAS
2    TOWED TO TOYOTA OF RIVERSIDE, CA. **SAW THERE
     HAD BEEN A RECALL THAT THE PROBLEM WAS
     EXACTLY WHAT HAPPENED TO ME**.

3    **ASKED THE DEALER TO CHECK THE SOFTWARE AS
4    DESCRIBED IN THE RECALL. I WAS TOLD THAT
     APPLIED ONLY TO 2010-2012 VEHICLES, MINE IS A
5    2013. ASKED REPEATEDLY, REGARDLESS OF YEAR
     TO PLEASE CHECK THIS. I HAVE HUGE CONCERNS
6    DRIVING THIS CAR AS IT LEFT ME COMPLETELY
     STOPPED AND STRANDED, HAD I BEEN ON THE
7    FREEWAY, COULD HAVE BEEN FATAL.** FIRST I WAS
     TOLD IT WAS THE HYBRID BATTERIES HAD GONE BAD.
8    THEN THEY SAID IT WASN'T THE BATTERIES, IT WAS
     A FUSE FOR THE HYBRID BATTERY. EXPLAINED MY
9    CONCERNS THAT THIS COULD HAPPEN AGAIN IF IT
     TRULY WAS THE FUSE?? THEY SAID IT BECAME
10   DISCONNECTED DUE TO VIBRATION. HOW DO YOU
     DRIVE AND NOT HAVE SOME VIBRATION? ASKED IF IT
11   COULD HAPPEN AGAIN, THEY DIDN'T KNOW. **ASKED
     REPEATEDLY TO CHECK THE SOFTWARE AS
12   DESCRIBED IN THE RECALL. THEY SAID THEY HAD
     TOYOTA SAFETY INVOLVED AND THEY DID
13   EVERYTHING THEY REQUESTED OF THEM. THIS
     DID NOT INCLUDE CHECKING THE SOFTWARE AS I
14   REQUESTED, SO THEY WOULD NOT DO IT.** I ENDED
     UP DEALING WITH THE MANAGER, DANNY BRIGGS,
15   AND REQUESTED A COPY OF ALL THE ITEMS THAT
     HAD BEEN CHECKED AND DONE TO MY CAR. HE SAID
16   HE WOULD HAVE THIS FOR ME. WHEN WE PICKED UP
     THE CAR, THIS WAS NOT GIVEN TO ME. MET WITH
17   HIM, HE SAID THAT WAS ALL HE COULD DO. I TOLD
     HIM I WAS VERY UPSET, I FEEL LIKE I'M INVOLVED IN
18   A TOTAL "COVER UP" SO THEY WOULDN'T HAVE TO
     RECALL THE 2013 PRIUS' ALSO. I WAS TOLD I COULD
19   TRADE MY CAR IN THERE IF I DIDN'T FEEL IT WAS
     SAFE TO DRIVE. I HAD ASKED THEM TO CHANGE THE
20   OIL AND CHECK MY BRAKES, THEY DIDN'T DO IT. IT
     WAS LIKE THEY JUST WANTED TO GET ME OUT OF
21   THERE AND NOT DEAL WITH IT. **I HAVE NEVER
     CONTACTED YOUR AGENCY BEFORE, BUT FEEL
22   THAT THIS COULD END UP KILLING SOMEONE IF
     NOT CHECKED INTO**. THANK YOU.
23

24   96.    Other proposed Class Members whose Class Vehicles stalled
25   also reported that they were told their vehicles were excluded from the
26   recall after stalling. But they were also told that the stalls they
27   experienced in their Class Vehicle must have been caused by something
28

-28-
**CONSOLIDATED MASTER COMPLAINT**

other than the IPM Defect.

97.   For example, in July 2016, the driver of a 2012 model-year Prius stalled suddenly while driving at 65 miles per hour and was told that his Class Vehicle was excluded from the safety recalls and must have stalled because it ran out of gas—despite the fact that the vehicle had a full tank of gas:

> THE CONTACT OWNS A 2012 TOYOTA PRIUS. THE CONTACT STATED THAT **WHILE DRIVING AT 65 MPH, THE VEHICLE STALLED AS THE MASTER WARNING LIGHT ILLUMINATED**. THE VEHICLE WAS TOWED TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE AND STATED THAT THE ONLY CODE FOUND WAS RELATED TO LOW FUEL ALTHOUGH **THE VEHICLE HAD A FULL TANK OF FUEL**. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND MADE **THE CONTACT WAS MADE AWARE THAT THE VEHICLE WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V053000 (ELECTRICAL SYSTEM. HYBRID PROPULSION SYSTEM). THE VEHICLE WAS NOT REPAIRED**. THE FAILURE MILEAGE WAS 37,795.

98.   In April 2016 the driver of a 2012 model-year Prius complained that his Class Vehicle stalled repeatedly, but that the dealer denied the vehicle was stalling—even after being shown proof that it was—and refused to check the vehicle because it was not included in the recall:

> WHEN IN THE HIGH 80S+ OUTSIDE, MY 2012 PRIUS C, BOUGHT NEW, HAS NOT STARTED FROM IN A STOPPED POSITION, WITH ALL THE WARNING LIGHTS ON THE DASHBOARD ACTIVATING &, **MANY TIMES, THE HYBRID SYSTEM SHUTTING DOWN WHILE I'M TRYING TO EXIT A DRIVEWAY OR GARAGE, CITY STREET OR PARKING THE VEHICLE, CREATING A SUDDEN STALL & LEAVING ME IN THE PATH OF ONCOMING TRAFFIC. TOOK TO DEALERSHIP MANY TIMES & THEY INSIST MY CAR CAN'T BE DOING WHAT IT'S DOING BECAUSE THEY SEE NO CODES & IGNORE MY SCREENSHOTS, PICS & VIDEO. WHEN I ASK THEM WHY MY CAR HAS SAME "SYMPTOMS" AS OTHERS OF THE SAME MAKE, MODEL & YEAR, THEIR REPLY IS THAT MY SPECIFIC CAR HAS NOT BEEN RECALLED. THEY WILL NOT EVEN LOOK TO SEE IF THERE ARE PROBLEMS WITH THE SENSOR,**



**INVERTER OR SOFTWARE. MY CAR HAS ONLY 8700 MILES ON IT. I AM AFRAID TO DRIVE IT CAUSE I HAVE NO CLUE WHAT IT'S GOING TO DO & THE DEALERSHIP IS UNCONCERNED. IT SEEMS NEITHER THE NHTSA NOR TOYOTA GIVES A DAMN ABOUT SAFETY.** I THINK THE ISSUE IS THE SOFTWARE IN THE ELECTRONIC CONTROLS OF THE CAR, WITH CURRENT SETTINGS THAT COULD CREATE HEAT IN SOME OF THE TRANSISTORS. 2012 TOYOTA PRIUS ELECTRICAL SYSTEM: SOFTWARE, HYBRID PROPULSION SYSTEM: INVERTER NHTSA CAMPAIGN #14V053000. SUMMARY: IN THE AFFECTED VEHICLES, THE INTELLIGENT POWER MODULE (IPM) INSIDE THE INVERTER MODULE (A COMPONENT OF THE HYBRID SYSTEM) CONTAINS TRANSISTORS THAT MAY BECOME DAMAGED FROM HIGH OPERATING TEMPERATURES. IF THIS OCCURS, VARIOUS WARNING LAMPS WILL BE ILLUMINATED ON THE INSTRUMENT PANEL. CONSEQUENCE: THE VEHICLE MAY ENTER A FAIL-SAFE/LIMP-HOME MODE THAT LIMITS THE DRIVABILITY OF THE VEHICLE. THE HYBRID SYSTEM COULD ALSO SHUT DOWN COMPLETELY RESULTING IN A VEHICLE STALL, INCREASING THE RISK OF A CRASH. **JUST CAUSE MY SPECIFIC CAR WAS NOT INCLUDED IN THE RECALL DOESN'T MEAN IT SHOULDN'T HAVE BEEN WHEN IT IS DOING THE EXACT SAME THING THAT THE OTHER RECALLED CARS ARE DOING.**

99.     Similarly, in December 2017, the driver of a 2010 model-year Prius reported to NHTSA that the vehicle had stalled while driving and that its IPM had failed, but was not repaired because the vehicle was excluded from the recall:

THE CONTACT OWNS A 2010 TOYOTA PRIUS. THE CONTACT STATED THAT THE **VEHICLE EXPERIENCED A LOSS OF ENGINE POWER. THE CHECK HYBRID SYSTEM WARNING INDICATOR ILLUMINATED.** THE VEHICLE WAS TOWED TO TOYOTA OF GREENVILLE LOCATED AT 2686 LAURENS RD, GREENVILLE, SC WHERE IT WAS **DIAGNOSED AS AN IPM FAILURE AND THE INVERTER WOULD NEED TO BE REPLACED.** THE CONTACT REFERENCED NHTSA CAMPAIGN NUMBER: 14V053000 (HYBRID PROPULSION SYSTEM, ELECTRICAL SYSTEM) HOWEVER THE DEALER INFORMED THE CONTACT THE VIN WAS NOT INCLUDED. **THE VEHICLE WAS NOT REPAIRED.** THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 132,000.

-30-



100.  And in a report that was submitted to NHTSA in February 2016, a 2012 model-year Prius that was excluded from the safety recall stalled on a Southern California freeway, which resulted in an injury to the driver and the total loss of the vehicle. :

On Sunday evening, Dec 6, at around 8:30 p.m.I was driving south on Hwy 5 near Dana Point when my 2012 Prius suddenly lost power. When I pushed on the gas I heard beeps and I think lights flashed on the dashboard. The lights and electrical system worked, but it had no power. I immediately pressed on my emergency blinkers and pulled to the far right lane as I lost speed.

Along the edge of the road the shoulder was blocked by reddish small "poles" in the ground to prevent cars from pulling into that apparent construction area. Ahead I could see where they ended and figured I could coast that far, but when I got past the poles the shoulder was blocked by large cement barriers rather than a space to pull off. I coasted to a stop and pressed the start button several times but the car didn't start.

My main concern was behind me as I watched my rear vew mirror. I saw at least a dozen cars speed up to me from ?100 or so yards back, slowdown and swerve at the last minute to miss me. the traffic was heavy, but flowing along between 60 and 70 mph.

I think I was stopped there no more than a minute or two when I saw a set of headlights approaching and not slowing or swerving. I turned forward and sort of braced myself. I didn't hear any tire squeal as she hit me from the rear.

I don't know if I was out for maybe a couple of seconds but the car was pushed forward and the back caved in with the other drivers car a few feet behind my left with glass and car fragments scattered everywhere. The driver came up to me and asked if I was ok, and I asked her the same, and we thanked God we were ok.

101.  The Prius's owner repeatedly requested that Toyota inspect it and determine what caused the vehicle to stall. Toyota ignored those requests and, three months after the stalling incident, Toyota destroyed the vehicle.

1

2

**E.     TOYOTA SUBVERTS THE PURPOSE OF A SAFETY RECALL BY REPLACING DEFECTIVE IPMS ONLY AFTER THEY FAIL**

3

102.  In September 2013, Toyota acknowledged that the solder used

4

to attach the IPM transistors (*i.e.,* IGBTs) to the control board was still

5

cracking, which resulted in Toyota repeating and expanding its recall of

6

Highlander/RX400 hybrids for the purpose of replacing the defective

7

IPMs in those vehicles with IPMs that were assembled with non-

8

defective IPMs.  But Toyota failed to even mention the issue in the Defect

9

Information Reports it submitted to NHTSA in connection with Safety

10

Recalls E0E and F0R that it conducted in February 2014 and July 2015,

11

respectively. Instead, Toyota knowingly misrepresented that the ECU

12

software "re-flash" would eliminate the IPM Defect.

13

103.  In an apparent effort to keep complaints to a minimum as

14

IPMs continued to fail at an average rate of 15 per day ***after*** the "re-

15

flash," Toyota notified Prius drivers that, in its

16

17

18

19

20

> continuing efforts to ensure the best in customer satisfaction, Toyota is announcing a Warranty Enhancement Program to extend the warranty coverage for repairs related failure of the Intelligent Power Module (IPM). The vehicles covered under this Warranty Enhancement Program must first have Safety Recall E0E (launched in mid-February 2014) performed (if applicable).

21

104.  Toyota offered the same "Warranty Enhancement Program"

22

to customers who owned or leased a Prius V that was the subject of the

23

July 2015 safety recall (F0R).[4]

24

_____

25

[4] Toyota conditioned eligibility to participate in these "Warranty

26

Enhancement Programs" on the vehicle exhibiting specific Diagnostic Trouble Codes (DTC): P0A94, P324E, P3004, and/or P0A1A. Toyota instructed its dealers to refer to two of the same DTCs (P0A94 and

27

P90A1A) in connection with the Highlander/RX400 recalls. Moreover, all but one of these DTCs (P324E) also appear in the warranty data Toyota

28

collected to respond to the Information Requests NHTSA propounded in the Highlander stalling investigation (PE11-005).



105.  In keeping with its efforts to actively conceal the existence, nature, scope, and safety risks posed by the IPM Defect, Toyota falsely represented to Prius owners and lessees that, by "re-flashing" the ECU software, the "majority of vehicles will not experience failure of the IPM" and that Toyota was "offering the New Vehicle Warranty Extension to assure you that we stand behind our product."

106.  In other words, after falsely representing to Prius drivers that the ECU software modification eliminated the IPM Defect, Toyota cynically announced that it was extending the warranty that applied to IPMs as a means of ensuring "customer satisfaction."

107.  Toyota reinforced this message after the filing of the original Complaints were filed in the *Rexhepi* action in Los Angeles Superior Court (on January 31, 2018) and in the *McCarthy* action (on February 5, 2018), when it issued a bulletin to its dealers on February 6, 2018. There, Toyota advised its dealers that although they may read news reports that question the effectiveness of the software "remedy" employed in the Prius recalls, "Toyota believes that these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) *are the appropriate measures for customer safety and satisfaction*." (Emphasis added.) The bulletin went on to instruct dealers that, if they "are contacted by a Prius or Prius V driver concerned about these reports," *the dealers should "[e]xplain that the Safety Recall remedy addresses the safety defect.*" (Emphasis added.)

108.  Toyota knew these representations were false when it made them. Toyota's rationale for "re-flashing" the ECU software was predicated on the baseless contention that the Prius V hybrids did not suffer from the IPM Defect, which Toyota was forced to admit was false just over a year later when it recalled over 100,000 Prius V hybrids—

ostensibly to correct the IPM Defect. But even after it knew the rationale for deploying a software update to correct a hardware problem was erroneous, Toyota continued to represent to NHTSA and to its customers that software was the solution.

109. Toyota's purpose in making these representations was to ensure the effectiveness of its fraudulent concealment of the true nature and scope of the IPM Defect. Toyota knew at all relevant times that the software "re-flash" did not and could not correct the IPM Defect, and that the so-called "Warranty Enhancement Program" was merely a ruse to make it appear that Toyota was confident that the software "re-flash" actually solved the problem.

110. The false nature of these representations was demonstrated by the astronomically high replacement rate of IPMs in vehicles whose ECU software had been "re-flashed." Despite the ongoing failure of IPMs on a massive level, however, Toyota *still* refused to replace the defective IPMs with non-defective IPMs *before* they fail.

**F.    2018: TOYOTA CONDUCTS A SECOND RECALL OF THE MORE THAN 800,000 PRIUS HYBRIDS THAT IT RECALLED IN 2014 AND 2015, ACKNOWLEDGING THAT THEY CONTINUED TO STALL AFTER THE SOFTWARE "RE-FLASH"**

111. Despite its repeated representations that the software "re-flash" eliminated the IPM Defect, after this litigation was commenced Toyota was forced to admit that the vehicles that were the subject of Safety Recalls E0E and F0R continued to stall while driving.

112. Stalling events occurred so frequently after the vehicles had their ECU software "re-flashed" in connection with the safety recalls that, on October 4, 2018, Toyota announced it was recalling *all* of the more than 800,000 Class Vehicles that it had recalled in 2014 and 2015 because they remained prone to IPM failure, which could "result[] in the

1    hybrid system shutting down rather than going into fail-safe mode."

2        113.  Toyota's announcement to NHTSA and to the public (in a

3    separate press release issued on October 5, 2018) implied that it would

4    not have recalled those vehicles again if they had entered "fail-safe" mode

5    instead of stalling while being driven. This is deliberately false and

6    misleading.

7        114.  When the IPM transistors in a Toyota hybrid are damaged

8    due to thermal stress, the damaged transistor can result in a sudden and

9    unexpected system shutdown that causes the vehicle to stall.

10   Alternatively, the vehicle may decelerate and, if the battery has a

11   sufficient charge, continue driving at a reduced rate of speed  until the

12   battery dies.

13       115.  Toyota euphemistically and misleadingly characterizes this

14   condition as as "fail-safe" mode, implying that it somehow ensures the

15   safety of the vehicle's occupants (and those who happen to be driving near

16   the vehicle when the failure occurs). It does not. When a Toyota hybrid

17   enters "fail-safe" mode—or "limp-home" mode, as Toyota also refers to

18   the condition—the vehicle abruptly reduces its speed and prevents the

19   driver from accelerating.

20       116.  Thus, for example, if a Prius was being driven on the freeway

21   at the 70-mile-per-hour speed limit, entering "fail-safe" mode would

22   cause the vehicle to suddenly and unexpectedly decelerate to

23   approximately 20 miles per hour or less and the driver would be unable

24   to increase the speed of the vehicle beyond that limit, thereby drastically

25   increasing the likelihood of a crash. This is only one of many scenarios in

26   which the sudden decrease in speed and the inability to accelerate

27   endangers the lives of people who are in or around a Prius when its IPM

28   malfunctions or fails.

117. Moreover, the software "re-flash" made Class Vehicles perform more sluggishly, which created additional safety risks and reduced gas mileage. Nonetheless, Toyota refused to provide its customers with cost-free IPM replacements even after it was forced to admit publicly that, although recalled Class Vehicles received the ECU software "re-flash," those vehicles "may not enter a failsafe driving mode as intended. If this occurs, the vehicle could lose power and stall."

118. This renewed, massive recall was prompted only by the filing of the lawsuits that gave rise to this Consolidated Master Complaint. But even in 2018 Toyota still refuses to meaningfully address the problem. Rather than replacing the defective IPMs with non-defective IPMs, Toyota announced that it was offering yet another cheap, useless ECU software "reflash."

119. As Toyota is well aware, the IPM Defect would still pose a serious safety risk even if every Prius entered "fail-safe" mode. The hybrid system's ability to propel the vehicle is drastically reduced in fail-safe/limp-home mode and lasts only as long as the battery holds a charge; after that, the entire hybrid system shuts down completely. In short, "fail-safe" mode is not safe. Thus, rather than telling Class Members to continue to "limp" home, Toyota instructs customers to pull over to the side of the road immediately when the vehicle enters limp-home mode.

120. By refusing to replace defective IPMs until *after* they fail, Toyota has succeeded in circumventing the very purpose of a safety recall: Correcting a known safety issue *before* it results in conditions that can lead to serious injuries or fatalities.

## G. POST-REFLASH IPM FAILURES

121. Customers all over the country have experienced post-Safety Recall E0E or post-Safety Recall F0R IPM failures, and the number of

post-"re-flash" failures increase as the Class Vehicles age. The breadth and scope of the problem is staggering. Below are a few examples of dangerous IPM failures that have occurred based on reports from Toyota dealers, media accounts, internet posts, and consumer complaints, including these, publicly filed with NHTSA:

a.     In or about February 2011, a driver of a 2010 Prius experienced an IPM failure while driving on the interstate highway. Four different warning lights illuminated on the dashboard, and the vehicle lost power. The Prius had only 3,400 miles on it.

b.     In March 2013, a Toyota Prius driver experienced an inverter failure while attempting to accelerate onto a two-lane highway. The Prius emitted a loud sound, became unresponsive, could not gain additional speed, and the panel showed "Check Hybrid System." The driver had to act quickly to avoid traffic and pull on to the grass at the side of the road.

c.     In May 2013, a Toyota Prius driver experienced an IPM failure while driving about 35 miles per hour. The driver reported that the car decelerated to about 4 miles per hour in less than 5 seconds. The car limped about 50 feet before stopping completely; it had to be towed.

d.     In July 2013, a Toyota Prius driver experienced an IPM failure while driving in the middle lane of a surface street at about 30 miles per hour. The Prius slowed down and could not be accelerated. Once the driver was able to drift to the side of the road, the driver turned off the engine and tried to restart the car but was unable. The car had to be towed to a Toyota dealership.

e.     In February 2014, a Toyota Prius driver experienced an IPM failure while driving, and the car suddenly stopped. The dashboard was illuminated with "Check Hybrid System." The driver had the car

1    towed to the nearest Toyota dealer.

2        f.    In July 2014, a Toyota Prius driver experienced an IPM

3    failure while trying to accelerate from a stop onto a rural highway in

4    Northern California.  Approximately two months earlier, the driver had

5    received the software re-flash that Toyota claimed would prevent IPM

6    failures.

7        g.    In or about April 2015, another Toyota Prius driver

8    experienced an IPM failure while driving, causing the car to lose power.

9    The driver had the car towed to the nearest Toyota facility.

10       h.    In May 2015, another Toyota Prius driver experienced

11   an IPM failure while driving at highway speed.  "Check Hybrid System"

12   displayed on the dash, and the IPM had to be replaced.

13       i.    In December 2015, a Toyota Prius driver experienced an

14   IPM failure while traveling on a bridge at 30 miles per hour.  The Prius

15   decelerated to less than 20 miles per hour, at which speed the driver took

16   it to an independent repair shop.  The problem was diagnosed as an IPM

17   failure.

18       j.    In August 2016, a Toyota Prius driver experienced an

19   IPM failure while going from the right lane to the left lane on a highway

20   with two young children in the car.  The driver had to use the car's

21   hazards and pull through three lanes of high-speed traffic in order to get

22   to a breakdown lane next to an on ramp.  The driver evacuated the young

23   children and then waited in 90 degree heat for a tow truck.

24       k.    In September 2016, a Toyota Prius driver experienced

25   an IPM failure while driving approximately 50 miles per hour.  The

26   vehicle was towed to a dealership where it was determined that the

27   electrical system fried the inverter and shut down the system.

28

1    l.    In or about October 2015, a Toyota Prius driver

2    experienced an IPM failure while driving, causing her car to completely

3    stop working.

4    m.    In or about December 2015, another Toyota Prius driver

5    experienced an IPM failure while driving in the rain.  Although her car

6    had the software "re-flash" under Safety Recall E0E in April 2014, the

7    car lost power and would not restart.

8    n.    In or about January 2017, another Toyota Prius driver

9    experienced an IPM failure that caused his car to suddenly enter "limp-

10   home" mode while driving 65 miles per hour on a California highway.

11   o.    In July 2017, another Toyota Prius driver experienced

12   an IPM failure while driving on the freeway at about 70 miles per hour.

13   The "Check Hybrid System" light came on and the car lost power and

14   ability to accelerate.  The car lost speed and, within two minutes, came

15   to a complete shutdown.  The driver reported that the car could have

16   easily been rear ended had it not been able to move to the side of the

17   freeway quickly.

18   p.    In October 2017, Martha Anderson had a dangerous,

19   life-threatening experience while driving her Toyota Prius on a major

20   road.  Although her car had Safety Recall E0E completed in 2014 and

21   only had 31,222 miles on it, she experienced an IPM failure that caused

22   her car to shut down while driving.  The dashboard flashed with lights

23   telling her to turn off the engine and park the car immediately.  She lost

24   power and was lucky to avoid a crash.  She had her Prius towed to the

25   nearest Toyota dealer.[5]

26

27   [5] Photographs of Ms. Anderson's failed IPM, which show which
     show extensive damage due to overheating, are attached hereto as
28   **Exhibit A.**

q.     Ms. Anderson reported her story to CBS News and was featured in a nationwide television story about defective Prius IPMs, which aired on CBS Morning News on April 5, 2018: https://www.cbsnews.com/news/california-dealership-refuses-to-sell-certain-toyota-prius-models-over-safety-issues/.

r.     Plaintiff Ms. Ryan, whose IPM failure experience is described above, was also featured in that CBS Morning News story.  Ms. Ryan described her IPM failure, while driving on a busy Los Angeles freeway, as "terrifying" and stated that "it felt like someone pulled the emergency brake [on the car]."

s.     In August 2017, Margaret Long, driving her 2010 Prius in Florida, was seriously injured when she suddenly lost power on a busy four-lane highway and was rear-ended at about 55 mph, driving her car into the center median.

t.     In January 2018, another Toyota driver, Mrs. Lozado, experienced IPM failure in her 2012 Toyota Prius while driving approximately 50 miles per hour on a major road in Southern California.  This was after her car had Safety Recall E0E completed in 2014.  Her vehicle lost power, and the dashboard and airbag lights flashed.  She was able to avoid an accident but was too afraid to drive the car again, so she and her husband sold her Prius to CarMax.

u.     On March 29, 2018, two Priuses with IPM failures, both of which had previously received the E0E recall in 2014, were towed into the same Southern California Toyota dealership (Claremont Toyota) for service.  Both drivers reported the dashboard lighting up with "Check Hybrid System" and other warning lights as well as sudden, unexpected deceleration and power loss.  In addition to power loss, the vehicles also lost their antilock brakes, Brake Assist, Vehicle Stability Control, and

1    Traction Control systems, which occurs in the vast majority of vehicles
2    that experience post-E0E IPM failures.

3         v.    Tanya Carter, a 2011 Prius driver, previously had the
4    E0E reflash.  But in January 2018, she experienced an IPM failure while
5    driving on the freeway.  The vehicle shut down, lights on the dashboard
6    began flashing and her speed suddenly reduced to approximately 15 mph.
7    It was a horrific moment, according Ms. Carter.  She was lucky to be able
8    to coast off the freeway with no acceleration.  The vehicle had to be towed
9    in to Capistrano Toyota.  Ms. Carter does not feel safe driving the Prius
10   and when her child asks to drive one of the two cars, she directs her to
11   the Honda.

12        w.    Cecily Frank, a 2013 Prius V driver, previously had the
13   F0R reflash. On August 7, 2018, she and her mother were in the car,
14   accelerating on to an entrance to the 110 freeway in Los Angeles when
15   the car went into "limp-home" mode.  The vehicle decelerated to 5 miles
16   per hour, and she could not increase its speed.  She was lucky not to be
17   rear-ended, and pulled off into a pullout on the freeway, after which the
18   car completely shut down.  She and her mother were both terrified.  The
19   car had to be towed to a Toyota dealership in Glendale, where it was
20   confirmed that her inverter had failed. Ms. Frank had purchased her
21   Prius V new from Marina Del Rey Toyota in 2013.

22        122. Toyota has also learned about failed IPMs when it has
23   replaced them under Toyota's ZE3 and ZF5 "Warranty Enhancement"
24   programs under which it extended the original emissions warranty in
25   connection with Safety Recalls E0E and F0R.

26        123. IPM failure has also  been discussed extensively in online
27   forums, including PriusChat.com, which contains tens of thousands of
28   comments, many of which relate to the defective IPMs.

124. The issue has caught the attention of safety advocates, including those in Congress. Senator Jerry Moran, for example, chairman of the Senate Commerce Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, has begun looking into the Prius IPM failures.

125. Despite all of this, Toyota has still not issued a safety recall to replace the defective IPMs. Toyota's concealment of this safety defect has diminished the value of the vehicles and continues to endanger Toyota drivers, passengers, and others on the road.

126. Toyota has information about many other IPMs and inverters that have failed across the country because it has received thousands of manual allocation email requests for replacement parts from dealers when an IPM fails. Inverters or inverter component replacement parts are not kept in stock at Toyota dealerships. Rather, each time an IPM fails, Toyota requires its dealers to send an email to Toyota at Quality_Compliance@Toyota.com to request a new inverter or inverter component and explain the reason for the request (*e.g.*, IPM failure).

127. Shortly after Plaintiffs filed their original complaints were filed against Toyota, Toyota instructed its dealers to preserve all inverters and IPMs that they remove from recalled Prius hybrids and send them to Toyota or its third-party consulting firm, Exponent. Exponent's research has come under fire from critics, including engineers, attorneys and academics who say the company tends to deliver to clients the reports they need to mount a defense.[6] There are sound

---

[6] Exponent's "research" in defending tobacco companies was used to argue that secondhand smoke does not cause cancer. *See, e.g.,* Andrew Celani, "DeflateGate: NFL Hired Same Research Firm That Denied Secondhand Smoke Causes Cancer," *CBS Boston* (May 6, 2015), available



reasons for the opprobrium. For example, Toyota hired Exponent during the sudden unintended acceleration crisis, and Exponent provided an opinion that there was nothing wrong with Toyota vehicles. Exponent's paid-for opinion was directly contradicted by the formal admissions Toyota later made after being charged criminally with fraud and entering into a Deferred Prosecution Agreement with the U.S. Department of Justice.

**H.    AN ONGOING PATTERN OF FRAUD: TOYOTA'S FRAUDULENT CONCEALMENT OF SUDDEN UNINTENDED ACCELERATION IN MILLIONS OF VEHICLES[7]**

128. In 2007, Toyota became aware that sudden unintended acceleration was occurring in Toyota and Lexus vehicles, but the company insisted there was no need to recall those vehicles. Ex. B, App. C ¶¶ 16-19. Instead, Toyota negotiated an agreement with NHTSA by which Toyota would conduct a limited recall of the floor mats in certain Toyota Camry and Lexus ES350 vehicles, which Toyota claimed to have been the cause of sudden unintended accerlation incidents. *See id.* ¶ 19.

129.  Two years later, in August 2009, a California Highway Patrol officer and his family were on a San Diego freeway when the sudden unintended accerlation phenomenon occurred in the Lexus ES350 the officer was driving, which resulted in a crash that killed the entire family. *Id.* ¶¶ 9-10, 22; Debbi Baker, "CHP releases 911 call in officer's fiery crash," *The San Diego Union-Tribune* (Sept. 10, 2009), available at

---

at https://boston.cbslocal.com/2015/05/06/deflategate-nfl-hired-same-research-firm-that-denied-secondhand-smoke-causes-cancer/.

[7] The facts set forth herein pertaining to sudden unintended acceleration and the resulting investigation and criminal charges against Toyota are based on formal admissions Toyota made in Appendix C to a Deferred Prosecution Agreement into which Toyota entered with the United States Attorney for the Southern District of New York on March 19, 2014, a true and correct copy of which is attached hereto as **Exhibit B.**



http://www.sandiegouniontribune.com/sdut-bn10-911call-fatal-crash-2009sep10-htmlstory.html.

130.   On the same day the CHP officer and his family died, an internal memorandum describing a second cause of sudden unintended acceleration—sticking accelerator pedals or "sticky pedal"—was sent to a group located in Japan called "Customer Quality Engineering" (or "CQE-J"). *See* Ex. B, App. C ¶¶ 5, 23-24.[8] According to that memorandum, on August 4, 2009—more than three weeks before the involving the CHP officer—a dealer had reported a "critical" sudden unintended accerlation incident attributed to a "sticky pedal" in a Toyota Camry had occurred in Arizona, but Toyota failed to disclose what it knew to NHTSA. *Id.* ¶ 24. In addition, NHTSA's investigation revealed that Toyota had received

> [r]eports of the same sticky pedal problem in Europe in or about 2008 and early 2009, where the problem had become apparent earlier, reflected, among other things, instances of "uncontrolled acceleration" and unintended acceleration to "maximum RPM," and customer concern that the condition was "extremely dangerous."

*Id.* ¶ 26.

131.   Despite the extreme danger it posed and despite designating it internally as a problem of the highest priority, Toyota refused to acknowledge the existence of a defect and resisted conducting a recall until NHTSA threatened to open an investigation. *Id.* ¶¶ 27-35. Toyota then agreed to recall only eight vehicle models that NHTSA had identified as posing the greatest risk. *Id.* ¶¶ 33, 35-36.

---

[8] CQE-J was composed of a leadership group within Toyota that decided "whether and when to conduct recalls of Toyota and Lexus vehicles . . . ." *Id.* ¶ 5. Moreover, CQE-J "had regional arms responsible for monitoring vehicle quality issues in the 'field' (that is, for vehicles already on the road) in their respective regions" and that the regional arm responsible for monitoring field reports in the United States was located in Torrance, California. *Id.*



132. At the same time, however, Toyota engineers and CQE-J cancelled plans for design changes that had solved the sticky pedal problem in Europe in an effort to prevent NHTSA from discovering that the sticky pedal problem existed. *Id.* ¶¶ 37-38. For the same reason, Toyota also ordered its personnel to refrain from discussing the problem in writing and to cancel the design changes without leaving a "paper trail." *Id.* ¶¶ 38-39.

133. For months, Toyota fraudulently concealed from regulators and consumers the existence of the "sticky pedal" problem, the identity of the company that supplied the accelerator pedals that were causing the problem, and the true scope of the problem in terms of the models and number of vehicles that were affected by it. *Id.* ¶¶ 40-60. On January 19, 2010, Toyota gave a presentation to NHTSA in which it "downplayed the seriousness of reports of sticky pedal in Europe" after which a Toyota employee exclaimed "'Idiots! Someone will go to jail if lies are repeatedly told. I can't support this.'" *Id.* ¶ 61.

134. Two days later, Toyota submitted a Defect Information Report to NHTSA in which it announced that it was recalling every vehicle in which it had installed sticky accelerator pedals. *Id.* ¶ 61. Due to the life-threatening safety risk it posed, Toyota was ultimately forced to conduct a safety recall of millions of vehicles affected by the sudden unintended acceleration problem, and to issue a global "stop-sale" order that prevented the sale of millions of other vehicles that had yet to be sold by its dealers.

135. In the same Defect Information Report, however, Toyota represented to NHTSA that it had been receiving field reports about sticky pedals since October 2009—even though Toyota had actually been receiving those reports no later than August 2009. *Id.* Toyota then made

the same misrepresentations to Congress. *Id.* ¶ 62.

136.  Ultimately, Toyota was charged criminally as a result of the fraudulent conduct in which it engaged. Four years later, on March 19, 2014, Toyota entered into a Deferred Prosecution Agreement by which it agreed to admit the facts set forth above, to pay a $1.2 billion penalty, and to submit to an independent monitor to ensure that (a) its statements regarding motor vehicle safety were true and accurate; (b) it properly reported information relating to collisions occurring in its vehicles in the United States; and (c) it complied with its obligations under 49 C.F.R. Part 579 regarding the generation of field technical reports. *See generally* Ex. B at 1-6.

137.  In October 2017, the United States District Court Judge William H. Pauley III stated on the record that Toyota's misleading statements "represented a reprehensible picture of corporate misconduct." "Regrettably," Judge Pauley continued, "the payment of a $1.2 billion fine and the appointment of a monitor concluded the government's investigation into this tragic episode." Judge Pauley also expressed concern that Toyota and its executives were not held accountable for misleading the public and regulators.

138.  Judge Pauley concerns were well founded. On February 12, 2014, Toyota had engaged in precisely the same sort of fraudulent conduct that led to the Deferred Prosecution Agreement it had signed in March 2014. This time, Toyota issued a Defect Information Report in which it falsely represented that "re-flashing" the software in hundreds of thousands of Toyota Prius hybrid vehicles would correct their inordinate propensity to suddenly and unexpectedly stall at highway speeds.

139.  As discussed below, the Prius hybrids stall due to a defective hybrid system component becoming damaged as a result of exposure to thermal stress. And although the software "re-flash" allowed Toyota to avoid spending billions to replace the defective components, it did nothing to prevent those vehicles from suddenly and unexpectedly stalling at highway speeds.

## STATUTES OF LIMITATION

140.  Any applicable statutes of limitation have been tolled by Toyota's knowing and active concealment of the information it possessed about the true nature and characteristics of the defective IPMs it installed in Class Vehicles and by Toyota's false and misleading representations regarding Class Vehicles' safety and performance. Toyota has kept Plaintiffs and the members of the proposed class ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the proposed class could not reasonably have discovered information vital to their claims or what Toyota knew about any of the issues and facts described herein.

141.  Toyota was, and is, under a duty to disclose the true nature, purpose, and characteristics of the IPM Defect, which arises regardless of the existence of privity with Plaintiffs or members of the proposed class. *See*, *e.g.,* Cal. Civ. Code § 1711. Despite that duty, Toyota knowingly, affirmatively, and actively concealed the facts alleged herein, and the concealment is ongoing. Because, *inter alia*, Toyota took steps to conceal such information, Plaintiffs and members of the proposed class did not discover and could not have discovered these facts through the exercise of reasonable diligence.

142. For years, Toyota has marketed Class Vehicles as safe, efficient and environmentally-friendly, while concealing what it actually knows about the dangerous nature, cause, and scope of IPM Defect. Specifically, as alleged more fully above, prior to selling the very first Class Vehicles, Toyota knew that the IPM Defect has an inordinate propensity to put the occupants of Class Vehicles, as well as those who drive near Class Vehicles, at an inordinate and unacceptable risk of injury and death when Class Vehicles enter limp-home mode or stall. Toyota also knows that the software "re-flash" Toyota offered in conjunction with Safety Recall Nos. E0E and F0E served to mask the existence, nature, and scope of the IPM Defect and to allow Toyota to avoid the multi-billion-dollar cost of replacing defective IPMs in Class vehicles with non-defective IPMs.

143. More specifically, as alleged above, Toyota has been aware of the IPM Defect from the time it began selling the first Class Vehicles as a result of its experiences with the Highlander and RX400 hybrid vehicles and its access to multiple sources of other information not available to proposed Class Members, including but not limited to, pre-release testing of Class Vehicles, Failure Mode Effects Analyses (FMEAs) and other analytical tools.

144. Toyota had—and continues to have—a duty to disclose information about the existence and nature and scope of the IPM Defect to Class Members who purchased their Class Vehicles new or used by virtue of, *inter alia,* **(a)** Toyota's knowledge that proposed Class Members were not reasonably likely to discover the true facts about the existence, nature, and scope of IPM Defect because those material facts were known by and accessible only to Toyota; **(b)** Toyota's conduct and its active concealment of those facts from proposed Class Members and related

-48-

affirmative misrepresentations made by Toyota (including, but not limited to, "re-flashing" the ECU software as a means of masking the IPM Defect, representing that the "re-flash" would adequately address the IPM Defect, and lulling Class Members into a false sense of security); **(c)** Toyota's statutory and common-law obligations to disclose product defects to the consumers of those products;  and **(d)** because the IPM Defect is a material defect that jeopardizes proposed Class Members' safety.

145.  Based on the foregoing, Toyota is estopped from relying on any statutes of limitation in defense of this action. The causes of action alleged herein did or will accrue only upon discovery of the facts alleged herein and Toyota's fraudulent concealment thereof.

## **CLASS-ACTION ALLEGATIONS**

146.  Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated pursuant to the provisions of Federal Rule of Civil Procedure 23 and California Civil Code section 1781.

147.  Plaintiffs seek to represent a class composed of: **(a)** all residents of the United States who currently own or lease a Class Vehicle; and **(b)** all residents of the United States who formerly owned or leased a Class Vehicle and paid to replace or repair an IPM and/or inverter assembly in those vehicles.

148.  Plaintiffs also seek to represent three subclasses composed of all United States residents who own or have owned or leased a Class Vehicle **(a)** and are citizens of the State of California (the "California Subclass); **(b)** for personal or family (*i.e.,* non-business) use (the "CLRA Subclass") and **(c)** that Toyota included in the recall it announced in February 2014 and expanded in July 2015 and had its ECU software updated in connection with that recall (the "Recall Subclass").

149. Excluded from the class are the following:

a. Toyota, its subsidiaries, affiliates, officers, directors, and employees;

b. The judge assigned to preside over this action;

c. Persons who have claims for personal injuries as a result of the IPM Defect;

d. Persons who have filed separate, non-class legal actions against Toyota asserting consumer-fraud claims based on the IPM Defect in Class Vehicles; and

e. Persons who have pursued a claim and obtained a verdict against or settled with and validly released Toyota from individual claims substantially similar to those alleged in this Complaint with respect to Class Vehicles.

150. The proposed class comprises thousands of persons throughout the United States who own or lease, or have owned or leased, one or more Class Vehicles. The proposed class is, therefore, so numerous and geographically dispersed that joinder of all members in one action is impracticable, if not impossible.

151. As alleged more fully in paragraphs 29 through 139, above, Toyota has acted with respect to Plaintiffs and proposed Class Members in a manner generally applicable to each of them. There is a well-defined community of interest in the questions of law and fact involved, which affect all proposed Class Members. The questions of law and fact common to the class predominate over the questions that may affect individual proposed Class Members include, but are not limited to, the following:

a. whether Class Vehicles are affected by the IPM Defect;



b.      whether Toyota knew or reasonably should have known of the IPM Defect in Class Vehicles before it sold or leased them to proposed Class Members;

c.      whether Toyota knew or reasonably should have known that the IPM Defect is a safety hazard;

d.      whether Toyota actively concealed the IPM Defect from Plaintiffs and proposed Class Members;

e.      whether Toyota actively concealed material facts concerning the ECU software updates from Plaintiffs and proposed Class Members;

f.      whether the information Toyota concealed is material to prospective purchasers and lessees of Class Vehicles;

g.      whether Toyota wrongfully profited from causing the distribution and sale or lease of Class Vehicles under false pretenses, by failing to inform Plaintiffs and proposed Class Members about the IPM Defect;

h.      whether, under the circumstances alleged herein, Toyota wrongfully profited from the sale of replacement IPMs and/or hybrid inverter assemblies;

i.      whether Toyota's conduct, as alleged in this Complaint, constitutes fraudulent concealment;

j.      whether Toyota's conduct, as alleged in this Complaint, has violated the CLRA;

k.      whether Toyota's conduct, as alleged in this Complaint, has created an express warranty under California Commercial Code sections 2313 and/or 2314, which was then violated;

l.      whether Toyota's conduct, as alleged in this Complaint, violated the Song-Beverly Warranty Act;

1    m.    whether Toyota's conduct, as alleged in this Complaint,
2    violated the Magnusson-Moss Warranty Act;

3    n.    whether Toyota's conduct, as alleged in this Complaint,
4    constitutes an unlawful, fraudulent, and/or unfair business act or practice
5    under the UCL;

6    o.    whether Toyota's conduct, as alleged in this Complaint,
7    has led to its unjust enrichment;

8    p.    whether Toyota should be required to repair or replace
9    the IPMs in Class Vehicles or otherwise rectify the IPM Defect in those
10   vehicles;

11   q.    whether proposed Class Members are entitled to recover
12   statutory damages under the CLRA;

13   r.    whether proposed Class Members are entitled to recover
14   compensatory damages;

15   s.    whether proposed Class Members are entitled to an
16   award of restitution under the UCL; and

17   t.    whether Toyota's willful, fraudulent conduct warrants
18   the imposition of punitive damages.

19   152. The class is readily ascertainable, and prosecution as a class
20   action will eliminate the possibility of repetitious litigation and will provide
21   redress for claims too small to support the expense of individual, complex
22   litigation. Absent a class action, proposed Class Members will continue to
23   suffer losses, Toyota's violations of law will be allowed to proceed without
24   remedy, and Toyota will retain revenue as a result of its wrongdoing. A
25   class action, therefore, provides a fair and efficient method for adjudicating
26   this controversy.

27   153. Plaintiffs are asserting claims that are typical of the proposed
28   class in that Plaintiffs own a Class Vehicle; each of the two named

-52-

1   Plaintiffs is a "consumer" and a "buyer" as those terms are defined in the

2   CLRA and that Plaintiffs have lost "money" or "property" as a result of the

3   Toyota's conduct, as those terms are defined in the UCL.

4       154.  Plaintiffs will fairly and adequately represent and protect the

5   interests of the proposed class, and have no interests that are antagonistic

6   to or in conflict with those they seek to represent.

7       155. Plaintiffs have retained competent counsel who have

8   considerable experience and success in the prosecution of class actions

9   involving the sale of defective consumer products, including motor vehicles,

10  and other forms of complex litigation.

11      156.  In view of the complexity of the issues and the expense that an

12  individual proposed Class Member would incur if he or she attempted to

13  obtain relief from a large corporation such as Toyota, the claims of

14  individual proposed Class Members do not involve monetary amounts that

15  are sufficient to support separate actions.  Because of the size of individual

16  proposed Class Member's claims, no proposed Class Members could afford

17  to seek legal redress for the wrongs complained of in this Complaint.

18      157.  The prosecution of separate claims by individual proposed

19  Class Members would create a risk of inconsistent or varying adjudications

20  with respect to at least thousands of individual proposed Class Members,

21  which would, as a practical matter, dispose of the interests of the proposed

22  Class Members not parties to those separate actions, or would

23  substantially impair or impede their ability to protect their interests and

24  enforce their rights.

25      158.  The proposed class meets the requirements of Federal Rule of

26  Civil Procedure 23(b)(2) and 23(b)(3), and, to the extent applicable,

27  California Civil Code section 1781 and the cases construing and applying

28  both.

# CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF THE UCL
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

159.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

160.   By committing the acts and practices alleged in this Complaint, Toyota has violated the UCL (Bus. & Prof. Code §§ 17200-17209).  The UCL is a strict liability statute and it is not necessary to show that the defendant intended to injure or harm anyone.  Plaintiffs allege that Toyota violated the unlawful, fraudulent and/or unfair conduct elements of the UCL.

a.   **Unlawful Conduct**:  As a result of engaging in the conduct alleged in this Complaint**,** Toyota has violated the UCL's proscription against engaging in unlawful conduct—specifically, violations of any civil or criminal, federal, state or municipal, statutory, regulatory or court-made or local law—by virtue of, among others, Toyota's **(i)** fraudulent and deceitful conduct in violation of California Civil Code sections 1709 through 1711, as alleged herein, for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members and its violations of the CLRA (Civil Code sections 1770(a)(5), (a)(7), and (a)(14)), for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members; **(ii)** trespass to chattels and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFFA") and California Penal Code section 502, by exceeding any authorization Toyota may have had to modify the ECU software in connection with the safety recalls of Class Vehicles without disclosing material facts pertaining to the adverse

-54-

1   effects that modifying the ECU software would have on Class Vehicles;
2   **(iii)** violations of California Commercial Code section 2313, by falsely
3   representing "that the Safety Recall remedy addresses the safety defect,"
4   which Toyota made to Prius drivers via Toyota dealers, thereby making
5   that representation a material basis of the bargain and creating an
6   express warranty that Class Vehicles would perform in accordance with
7   those representations when they did not; **(iv)** violations of California
8   Commercial Code section 2314 by breaching the implied warranty of
9   merchantability; and **(v)** failure to comply with its obligations to remedy
10  safety defects pursuant to 49 U.S.C. sections 30118(c), 30120(a) and
11  30120(c), and 49 C.F.R. sections 573.5, 573.6, and 573.11.  Toyota made
12  inadequate repairs to Class Vehicles in violation of the Safety Act, which
13  requires Toyota to replace the vehicles or refund the purchase price less
14  depreciation.

15          b.   **Unfair Conduct**: Toyota has violated the UCL's
16  proscription against unfair conduct as a result of engaging in the
17  fraudulent and deceptive conduct alleged in this Complaint, which
18  violates the legislative policies underlying **(i)** the CLRA; **(ii)** the statutory
19  provisions against the commission of fraud; **(iii)** the CFFA; **(iv)** California
20  Penal Code section 502; and **(v)** the Transportation Recall Enhancement,
21  Accountability and Documentation ("TREAD") Act, as codified at 49
22  U.S.C. §§ 30101, 30112, 30115-30120. An "unfair" practice may be any
23  conduct that is deemed immoral, unethical, oppressive, unscrupulous or
24  substantially injurious to consumers.

25          c.   **Fraudulent Conduct**: Toyota has violated the UCL's
26  proscription against fraud as a result of engaging in the fraudulent and
27  deceitful conduct alleged in paragraphs 29 through 139, above.

28          161.  Toyota has engaged in unfair acts and practices based on the



-55-

acts and practices set forth in the Complaint, including the manufacture, sale, lease, and ineffective repair of vehicles with an inverter defect that causes vehicles to shut down while driving or enter into "limp-home" mode.   Defendants' failure, over a long period of time, to adequately disclose the inverter defect or adequately address it, caused and causes excessive, undue harm and risk to consumers.

162.   Defendants have engaged in unfair acts and practices because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with an inverter defect that causes vehicles to shut down while driving or enter into "limp-home" mode, and Defendants' failure, over a long period of time, to adequately disclose the defect or address it, offend public policy.

163.   Plaintiffs and proposed Class Members have suffered injury in fact and have lost money and functional property as a result of Toyota's actions, as alleged herein.

164.   Plaintiffs seek an order of this Court pursuant to section 17203 of the UCL, requiring Toyota: **(a)** to notify the proposed Class Members of the existence, nature, and scope of the IPM Defect in Class Vehicles; **(b)** to replace defective IPMs in Class Vehicles at its expense; and **(c)** to make full restitution of all monies wrongfully obtained directly or indirectly from Plaintiffs and the proposed Class Members as a result of the conduct described in this Complaint.

**SECOND CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**UNDER THE UNIFORM COMMERCIAL CODE**
**ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR,**
**ALTERNATIVELY, THE CALIFORNIA SUBCLASS**

165. Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

166. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class or, alternatively, on behalf of the California Sub-Class.

167. Plaintiffs and members of the Classes purchased or leased the Class Vehicles from Toyota by and through Toyota's authorized agents for retail sales, or were otherwise expected to be eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Toyota was a manufacturer, distributor, warrantor, and/or seller of Class Vehicles. Toyota knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

168. Toyota is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code.

169. With respect to leases, Toyota is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code.

170. The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

171. Toyota impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

172. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contained and contain an inherent defect in their

-57-

IPMs and inverter assemblies, key components in the Prius hybrid engine, at the time of sale or lease and thereafter, and therefore present an undisclosed safety hazard to drivers and occupants. This risk is present from the moment a Class Vehicle is turned on and whenever and wherever it is driven.

173. Toyota cannot disclaim its implied warranty as it knowingly sold or leased a defective product. Any attempt by Toyota to disclaim or limit the implied warranty of merchantability to its consumers is unconscionable and unenforceable in this case. Toyota's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the IPM Defect. The time limits contained in Toyota's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes. The time limitations contained in Toyota's warranty period were determined unilaterally by Toyota and unreasonable favored Toyota. A gross disparity in bargaining power existed between Toyota and members of the Classes, and Toyota knew or should have known that the Class Vehicles were defective at the time of the sale or lease and that the inverter defect posed a safety hazard.

174. Toyota was provided notice of its defective inverters by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Toyota acknowledged the inverter defect and its associated safety hazards in writing more than four years ago. Affording Toyota a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Toyota has known of and concealed the inverter defects and has refused to repair or replace the defective IPMs free of charge within a reasonable time.

175.  As a direct and proximate cause of Toyota's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

176.  Plaintiffs and members of the Classes have been excused from performance of any warranty obligations as a result of Toyota's conduct described herein.

### THIRD CLAIM FOR RELIEF
#### BREACH OF WARRANTY IN VIOLATION OF CAL. COMM. CODE § 2313
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

177.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

178.  Toyota has made affirmative representations of fact about 2010 through 2014 model-year Class Vehicles to Plaintiffs and the proposed Class Members who owned or leased those vehicles, including, but not limited to, statements that in a letter that accompanied the Safety Recall E0E notice (the "Recall Letter") that the defective performance of the IPMs in Class Vehicles would be corrected by updating the software in the Motor Generator Electronic Control Unit and Power Management Electronic Control Unit of their Class Vehicles. Toyota also announced, in a separate letter to Plaintiffs and the proposed Class Members, a "Warranty Enhancement Program" by which the warranty on IPMs in certain Class Vehicles to 15 years with no mileage limitation.

179.  In a bulletin that Toyota distributed to dealers on or about February 6, 2018, Toyota stated that "Toyota believes that *these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) are the appropriate measures for customer safety and satisfaction*." (Emphasis added.)

180. In the same bulletin, despite knowing that the software update did not eliminate the IPM Defect, Toyota instructed its dealers that *if they "are contacted by a Prius or Prius V driver concerned about these reports," they should "[e]xplain that the Safety Recall remedy addresses the safety defect.*" (Emphasis added.)

181. The statements Toyota made to Prius drivers were made a part of the basis of the bargain and created an express warranty that Class Vehicles would conform to those statements. Contrary to those statements, Toyota knew, but fraudulently concealed from Plaintiffs and proposed Class Members, that Class Vehicles were equipped with defective IPMs that create an unreasonable safety risk and the potential to cause Class Vehicles to use more fuel and release more exhaust emissions than Toyota represented they would. Toyota also knew that many Class Vehicles were affected by the IPM Defect, but excluded them from the recall of 2010 through 2014 model-year Class Vehicles that Toyota announced in February 2014 and expanded in July 2015.

182. Plaintiffs, through their counsel, took reasonable steps to notify Toyota that Class Vehicles were not as Toyota represented them in the Notice that Plaintiffs' counsel sent to Toyota (as described in paragraph 239, below).

183. Toyota failed to take reasonable steps to repair or otherwise rectify the IPM Defect.

184. As a direct and proximate cause of Toyota's breaches, Plaintiffs and members of the proposed class have been harmed in an amount to be determined at trial.   (Has this cured the defect in the express warranty claim that was addressed in the order?)

### FOURTH CLAIM FOR RELIEF
#### BREACH OF IMPLIED WARRANTY IN VIOLATION
#### OF CAL. COMM. CODE § 2314
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

185.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

186.  Plaintiffs assert this claim on behalf of themselves and the Nationwide Class or, alternatively, on behalf of the California and Florida Sub-Classes.

187.  Plaintiffs and members of the Classes purchased or leased the Class Vehicles from Toyota by and through Toyota's authorized agents for retail sales, or were otherwise expected to be eventual purchasers of the Class Vehicles when bought from a third party.  At all relevant times, Toyota was a manufacturer, distributor, warrantor, and/or seller of Class Vehicles.  Toyota knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

188.  Toyota is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code.

189.  With respect to leases, Toyota is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code.

190.  The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

191.  Toyota impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

192.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation.



The Class Vehicles contained and contain an inherent defect in their inverters, a key component in the Prius hybrid engine, at the time of sale or lease and thereafter, and therefore present an undisclosed safety hazard to drivers and occupants.  This risk is present from the moment a Class Vehicle is turned on and whenever and wherever it is driven.

193.  Toyota cannot disclaim its implied warranty as it knowingly sold or leased a defective product.  Any attempt by Toyota to disclaim or limit the implied warranty of merchantability to its consumers is unconscionable and unenforceable in this case.    Toyota's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect.  The time limits contained in Toyota's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  The time limitations contained in Toyota's warranty period were determined unilaterally by Toyota and unreasonable favored Toyota.   A gross disparity in bargaining power existed between Toyota and members of the Classes, and Toyota knew or should have known that the Class Vehicles were defective at the time of the sale or lease and that the inverter defect posed a safety hazard.

194. Toyota was provided notice of its defective inverters by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing.  Toyota acknowledged the inverter defect and its associated safety hazards in writing more than four years ago.   Affording Toyota a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Toyota has known of and concealed the inverter defects and has refused to repair or replace the defective inverters free of charge within a reasonable time.

195. As a direct and proximate cause of Toyota's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

196. Plaintiffs and members of the Classes have been excused from performance of any warranty obligations as a result of Toyota's conduct described herein.

197. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and by Toyota's fraudulent concealment.

### FIFTH CLAIM FOR RELIEF
#### VIOLATION OF THE SONG-BEVERLY WARRANTY ACT
#### (CAL. CIV. CODE § 1791, *et seq.*)
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

198. Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

199. Plaintiffs assert this claim on behalf of themselves and members of the California Sub-Class.

200. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

201. Defendants are "manufacturers" within the meaning of Cal. Civ. Code § 1791(j).

202. Defendants impliedly warranted to Plaintiffs that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

203. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a. Pass without objection in the trade under the contract description.



b.    Are fit for the ordinary purposes for which such goods are used.

c.    Are adequately contained, packaged, and labeled.

d.    Conform to the promises or affirmations of fact made on the container or label.

204.  The Class Vehicles would not pass without objection in the automotive trade because the Class Vehicles do not conform with federal and California standards, and were sold with an IPM Defect, as described above.

205.  The Class Vehicles are not fit for ordinary purposes for which they are used.

206.  The Class Vehicles are not adequately labeled because the labeling misrepresents that the vehicles are compliant with federal and California standards or fails to disclose such noncompliance.  The Class Vehicles are not adequately labeled because the labeling misrepresents their fuel efficiency.

207.  The Class Vehicles do not conform to the promises or affirmations of fact made on their label because their label misrepresents their fuel efficiency.

208.  Defendants' conduct deprived Plaintiffs of the benefit of their bargain, caused Plaintiffs to spend more on fuel for the Class Vehicles, and have caused the Class Vehicles to be worth less than what Plaintiffs paid.

209.  As a direct and proximate result of Defendants' conduct, Plaintiffs received goods whose condition substantially impairs their value. Plaintiffs have been damaged by the diminished value of the vehicles, the additional costs of fuel, the vehicles' malfunctioning, and actual and potential increased maintenance and repair costs.

210. Plaintiffs have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct.

211. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, but not limited to the purchase price of the Class Vehicles or the overpayment or diminution in value of the Class Vehicles, and attorney fees and costs.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE MAGNUSSON–MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

212. Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

213. Plaintiffs assert this claim on behalf of themselves and on behalf of the Nationwide Class, or, alternatively, on behalf of the California Sub-Class.

214. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

215. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

216. Plaintiffs are "consumers" under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

217. Defendants are "suppliers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4).

218. Defendants are "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(5).

219. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.



220. The Class Vehicles' had implied warranties within the meaning of 15 U.S.C. § 2301(7).

221. Defendants breached the implied warranties on the Class Vehicles as described above, including by not repairing or adjusting the defective IPMs; providing Class Vehicles not in merchantable condition and which present an unreasonable risk of sudden shut down or entering "limp-home" mode, and not fit for the ordinary purpose for which the Class Vehicles are used; providing Class Vehicles that were not fully operational, safe or reliable; and inadequately repairing and not curing defects and nonconformities once they were identified.

222. Plaintiffs have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and Defendants.

223. Privity is not required in this case because Plaintiffs are intended third-party beneficiaries of contracts between Defendants and their dealers. Plaintiffs are the intended beneficiaries of Toyota's implied warranties.

224. Affording Defendants an opportunity to cure their breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle, Defendants knew of the Class Vehicles' inability to perform as warranted and lower fuel efficiency based on the IPM Defect, but nonetheless failed to rectify the situation and/or disclose the IPM Defect. Defendants have still failed to rectify the situation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

225. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

226. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages and continue to suffer damages, including but not limited to the difference between the value of the vehicle paid and the actual value of the vehicle. Plaintiffs are entitled to legal and equitable relief against Defendants, including damages, costs, attorneys' fees, and other relief as appropriate. Plaintiffs, individually and on behalf of members of the Classes, seek all damages permitted by law.

## SEVENTH CLAIM FOR RELIEF
### FRAUDULENT CONCEALMENT
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

227. Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

228. As alleged more fully herein, at the time Toyota sold or leased Class Vehicles to Plaintiffs and proposed Class Members, Toyota knew they were equipped with defective IPMs.

229. At all times relevant herein, Toyota made misrepresentations of material fact to Plaintiffs and the other proposed Class Members as a means of concealing the true nature and scope of the IPM Defect, claiming that the stalled engines it was causing could be solved by a software update that Toyota would perform in the context of a sham recall that began in or about February 2014.

230. Toyota has concealed material facts from Plaintiffs and the other proposed Class Members, including but not limited to:

1        a.    the existence, nature, and scope of the IPM Defect;

2        b.    that updating the IPM software in Class Vehicles did not cure

3    the IPM Defect;

4        c.    that the IPM Defect could only be remedied by replacing the

5    IPM with a non-defective IPM; and

6        d.    that IPM concealed the foregoing facts from Plaintiffs and the

7    proposed Class Members as a means for Toyota to avoid the expense

8    involved with replacing IPM at no cost to the proposed Class Members.

9        231.  Toyota had a duty to disclose these facts by virtue of: **(a)**

10   Toyota's exclusive knowledge about the nature and scope of the IPM

11   Defect; **(b)** Toyota's  awareness that Plaintiffs and the proposed Class

12   Members were not reasonably likely to discover these facts; **(c)** Toyota's

13   active concealment of those facts from Plaintiffs and the proposed Class

14   Members (by, among other things, making the false representations

15   described above); and **(d)** Toyota's statutory and common-law obligations

16   to disclose material information to the consumers who own or formerly

17   owned Class Vehicles, as alleged herein. Plaintiffs and the proposed

18   Class Members would have acted differently had Toyota disclosed this

19   information to them and allowed them to make fully-informed decisions

20   before purchasing or leasing a Class Vehicle.

21       232.  The facts Toyota has concealed from Plaintiffs and the

22   proposed class are material and uniform in nature.

23       233.  Toyota made misrepresentations of material fact in an effort

24   to conceal the existence, nature, and scope of the IPM Defect and to

25   prevent proposed Class Members from becoming aware of the true nature

26   and scope of the IPM Defect. Plaintiffs and members of the proposed class

27   would have either purchased a different vehicle or paid significantly less

28   for their Class Vehicles had Toyota disclosed the facts it concealed from

-68-

1  them.

2    234.  As a proximate result of Toyota's concealment and suppression

3  of material facts, Plaintiffs and the proposed Class Members have

4  sustained damage by, among other things, paying more for their Class

5  Vehicle than they were actually worth; and bearing the cost of repairs or

6  purchasing replacement IPMs due to the IPM Defect.

7    235. Because Toyota engaged in the conduct alleged herein

8  deliberately and with willful and malicious intent, Plaintiffs and the

9  proposed Class Members are entitled to an award of punitive damages, the

10  total amount of which shall be proven at trial.

11  

**EIGHTH CLAIM FOR RELIEF**
**DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF THE CLRA**

12  **ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE CLRA SUBCLASS**

13    236.  Plaintiffs reallege and incorporate by reference each of the

14  allegations set forth in paragraphs 29 through 139, above.

15    237.  The acts and practices described in this Complaint were

16  undertaken by Toyota in connection with a "transaction" that was intended

17  to and did result in proscribed practices as a result of the sale or lease of a

18  motor vehicle to Plaintiffs, each of whom are a "consumer," as those terms

19  are defined in Civil Code sections 1761(d) (defining "consumer"), 1761(e)

20  (defining "transaction") and 1770(a) (describing "list of proscribed

21  practices"). Motor vehicles are "goods" as that term is defined in Civil Code

22  section 1761(a). Toyota's acts and practices, as alleged herin, violated, and

23  continue to violate, the CLRA in at least the following respects:

24      a.    representing that Class Vehicles have characteristics,

25  uses or benefits that they do not have, in violation of section 1770(a)(5) of

26  the CLRA;

27

28

b.      representing that Class Vehicles are of a particular standard, quality or grade when they are of another, in violation of section 1770(a)(7) of the CLRA; and

c.      representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law in violation section 1770(a)(14) of the CLRA.

238.   Plaintiffs seek and are entitled to equitable relief in the form of an order: **(a)** enjoining Toyota from continuing to engage in the deceptive business practices described in this Complaint; **(b)** requiring Toyota to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; **(c)** requiring Toyota to disgorge all ill-gotten gains flowing from the conduct described in this Complaint; and **(d)** requiring Toyota to provide public notice of the true nature and scope of the IPM Defect

239.   Pursuant to section 1782 of the CLRA, Plaintiffs notified Toyota in writing of the particular violations of section 1770 of the CLRA (the "Notice") and has demanded that Toyota correct, repair, replace, or otherwise rectify the IPM Defect on February 12 and July 16, 2018, by certified mail.

240.   Toyota has declined this opportunity, hence Plaintiffs seek actual, statutory, and punitive damages to which Plaintiff and the proposed class are entitled as a result of the IPM Defect in amounts to be proven at trial, including, but not limited to, costs incurred in connection with the replacement or repair of IPMs and inverters in Class Vehicles.

241.   Accordingly, Plaintiffs hereby seek an order requiring Toyota to: **(a)** to notify the proposed Class Members of the existence, nature, and scope of the IPM Defect in Class Vehicles; **(b)** to repair, replace, or otherwise rectify defective IPMs in Class Vehicles at its expense; and **(c)**

1   to make full restitution of all monies wrongfully obtained as a result of the

2   conduct described in this Complaint.

3   

**NINTH CLAIM FOR RELIEF**

**TRESPASS TO CHATTELS**

4   **ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED**

**RECALL SUBCLASS**

5

6   242.   Plaintiffs reallege and incorporate by reference the allegations

7   set forth in paragraphs 29 through 139, above.

8   243.   Plaintiffs and members of the proposed Recall Subclass own,

9   lease or have owned or leased one or more Class Vehicles. Toyota

10   exhorted Plaintiffs and each member of the proposed Recall Subclass to

11   update the ECU software in their Class Vehicles. Plaintiffs and members

12   of the proposed Recall Subclass complied with Toyota's exhortations in

13   that regard, unaware that the ECU software update did not eliminate

14   the safety risk that led to the recall and that Toyota had surreptitiously

15   included algorithms that caused the engines in Class Vehicles to become

16   sluggish and non-responsive, which created additional safety risks and

17   reduced gas mileage. Had Plaintiffs known that updating the ECU

18   software would have this effect, they would not have allowed Toyota to

19   install it or would have sought another way to address the IPM Defect.

20   244.   At no time did Toyota advise Plaintiffs or members of the

21   proposed Recall Subclass that the ECU software modification would not

22   actually eliminate the safety risks posed by the IPM Defect or that it may

23   adversely affect the performance of Class Vehicles. By effectuating such

24   modifications without the knowledge or consent of Plaintiffs or members

25   of the proposed Recall Subclass, Toyota intentionally trespassed on and

26   interfered with their Class Vehicles, which were the property of Plaintiffs

27   and members of the proposed Recall Subclass.

28

-71-

**CONSOLIDATED MASTER COMPLAINT**

245.  Toyota's trespass was the actual, direct, and proximate cause of injury to Plaintiffs and members of the proposed class by compromising the functionality of the ECUs in Class Vehicles to the point where it became difficult, if not impossible to use them for the ordinary purposes for which they were intended. Toyota has admitted that its surreptitious modification of the ECU software had specific effects on the performance of Class Vehicles), which has significantly impaired those Class Vehicles' condition, quality, and value.

246.  Plaintiffs are informed and believe that Toyota trespassed and interfered with Class Vehicles for the purpose of perpetuating its fraudulent concealment of the IPM Defect. Thus, Toyota knew and intended that its conduct would cause injury to Plaintiffs and members of the proposed class by adversely affecting the performance of Class Vehicles, but leaving them at inordinate risk of injury and death because the ECU software did not eliminate the IPM Defect. Thus, Plaintiffs and members of the proposed Recall Subclass were harmed as a direct result of Toyota's trespass and interference and without regard to the rights of Plaintiffs or members of the proposed Recall Subclass.

247.  As a result of Toyota's trespass to, and interference with, Class Vehicles, Plaintiffs and the members of the proposed class are entitled to recover actual damages in amounts to be determined at trial. And, because Toyota's conduct was malicious, oppressive and fraudulent, Plaintiffs and members of the proposed class are entitled to an award of punitive damages in an amount that will be determined at trial.

## TENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

248.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

249. By engaging in the conduct described in this Complaint, Toyota has been unjustly enriched by their sale of Class Vehicles by concealing the IPM Defect.

250. As a proximate result of Toyota's unlawful, fraudulent, and unfair conduct, Toyota has obtained revenues by which it has become unjustly enriched at Plaintiffs' and members of the proposed class's expense. Under the circumstances alleged herein, it would be unfair and inequitable for Toyota to retain the profits it has unjustly obtained at the expense of the Plaintiffs and the proposed class.

251. Accordingly, Plaintiffs seek an order: **(a)** requiring Toyota to replace defective IPMs in Class Vehicles at no cost to Plaintiffs and the Class Members; **(b)** establishing Toyota as constructive trustee of the funds that served to unjustly enrich it, together with interest during the period in which Toyota has retained such funds, **(c)** requiring Toyota to make full restitution of those funds to Plaintiffs and the Class Members in a manner to be determined by the Court; and **(d)** requiring Toyota to provide public notice of the true nature and scope of the IPM Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally, pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action.

2. For an award of equitable relief as follows: (a) requiring Toyota to replace all defective IPMs in Class Vehicles; (b) requiring Toyota to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; and (c) requiring Toyota to provide public notice of the true nature and scope of the IPM Defect.

3.     For damages sustained as a result of the IPM Defect in amounts to be proven at trial, including, but not limited to, costs incurred in connection with the replacement or repair of the IPM or hybrid inverter assembly in Class Vehicles.

4.     For an award of statutory damages.

5.     For an award of punitive damages.

6.     For an award of attorneys' fees pursuant to, *inter alia*, California Civil Code section 1780(d), California Code of Civil Procedure section 1021.5, and the common-fund doctrine.

7.     For an award of costs.

8.     For pre- and post-judgment interest on any amounts awarded.

9.     For such other relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury with respect to all issues so triable.

DATED:  November 19, 2018  **MILLER BARONDESS, LLP**

by   */s/ Louis R. (Skip) Miller*
Louis R. (Skip) Miller

Louis R. (Skip) Miller (54141)
(smiller@millerbarondess.com)
Amnon Z. Siegel (234981)
(asiegel@millerbarondess.com)
Casey B. Sypek (291214)
(csypek@millerbarondess.com)
David I. Bosko (304927)
(dbosko@millerbarondess.com)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

Paul R. Kiesel (119854)
kiesel@kiesel.law
Jeffrey A. Koncius (189803)
koncius@kiesel.law
Nicole Ramirez (279017)



-74-

1   ramirez@kiesel.law
    **KIESEL LAW LLP**
2   8648 Wilshire Boulevard
    Beverly Hills, CA 90211-2910
3   T: 310-854-4444
    F: 310-854-0812
4
    Attorneys for Plaintiffs
5   Remy McCarthy, Kathleen Ryan-Blaufuss,
    Cathleen Mills, Jason Reid, Khek Kuan, on
6   behalf of themselves and all others similarly
    situated
7

8   DATED:  November 19, 2018  **FAZIO | MICHELETTI LLP**

9   by___/s/ *Jeffrey L. Fazio*_____
                 Jeffrey L. Fazio
10
    Jeffrey L. Fazio (146043)
11  (jlf@fazmiclaw.com)
    Dina E. Micheletti (184141)
12  (dem@fazmiclaw.com)
    **FAZIO | MICHELETTI LLP**
13  2410 Camino Ramon, Suite 315
    San Ramon, CA  94583
14  T:   925-543-2555
    F:   925-369-0344
15
    Charles J. LaDuca (*pro hac vice*)
16  (charles@cuneolaw.com)
    **CUNEO GILBERT & LADUCA, LLP**
17  4725 Wisconsin Ave. NW, Suite 200
    Washington. D.C. 20016
18  T: 202-789-3960
    F: 202-789-1813
19
    Michael J. Flannery (196266)
20  (mflannery@cuneolaw.com)
    **CUNEO GILBERT & LADUCA, LLP**
21  7733 Forsyth Boulevard
    Suite 1675
22  St. Louis, MO  63105
    T: 314-226-1015
23
    William M. Audet (117456)
24  (waudet@audetlaw.com)
    Gwendolyn R. Giblin (181973)
25  (ggiblin@audetlaw.com)
    **AUDET & PARTNERS, LLP**
26  711 Van Ness Avenue, Suite 500
    San Francisco, CA 94102-3275
27  T: 415-568-2555
    F: 415-568-2556
28



**-75-**
**CONSOLIDATED MASTER COMPLAINT**

Donald R. Pepperman (109809)
(dpepperman@bakermarquart.com)
**BAKER & MARQUART LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
**T:** 424-652-7804
**F:** 424-652-7850

Attorneys for Plaintiffs
Rajdave Bhandari and Jevdet Rexhepi, on
behalf of themselves and all others
similarly situated

## L.R. 5-4.3.4(a)(2)(i) Certification:

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer of the document attests that concurrence in the filing of the document has been obtained from each of the other Signatories.

by    */s/ Jeffrey L. Fazio*
　　　　　　Jeffrey L. Fazio

-76-



EXHIBIT A













EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

March 19, 2014

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

**Re: Toyota Motor Corporation – Deferred Prosecution Agreement**

Dear Messrs. Johnson and Fishbein and Ms. Cantwell:

    Pursuant to our discussions and written exchanges, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant Toyota Motor Corporation ("Toyota"), under authority granted by its Board of Directors in the form of the written authorization attached as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement").

## The Criminal Information

    1.  Toyota consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging Toyota with committing wire fraud, in violation of Title 18, United States Code, Section 1343. A copy of the Information is attached as Exhibit B. This Agreement shall take effect upon its execution by both parties.

## Acceptance of Responsibility

    2.  Toyota admits and stipulates that the facts set forth in the Statement of Facts, attached as Exhibit C and incorporated herein, are true and accurate. In sum, Toyota admits that it misled U.S. consumers by concealing and making deceptive statements about two safety related issues affecting its vehicles, each of which caused a type of unintended acceleration.

## Financial Penalty

    3.  As a result of the conduct described in the Information and the Statement of Facts, Toyota agrees to pay to the United States $1.2 billion (the "Stipulated Financial Penalty") representing the financial penalty resulting from the offense described in the Information and Statement of Facts. Toyota agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Stipulated Financial Penalty is subject to civil forfeiture to the United States and that this Agreement, Information, and Statement of Facts

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against the Stipulated Financial Penalty, a copy of which is attached as Exhibit D hereto. By this Agreement, Toyota specifically waives service of said Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Stipulated Financial Penalty. Upon payment of the Stipulated Financial Penalty, Toyota shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. Toyota agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Financial Penalty and will not assist a third party in asserting any claim to the Stipulated Financial Penalty. Toyota agrees that the Stipulated Financial Penalty shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes. Toyota agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

4.      Toyota shall transfer $1.2 billion to the United States by no later than March 25, 2014 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office. If Toyota fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 10 and 11 below.

## Obligation to Cooperate

5.      Toyota has cooperated with this Office's criminal investigation and agrees to cooperate fully and actively with the Office, the Federal Bureau of Investigation ("FBI"), the Department of Transportation ("DOT"), the National Highway Traffic Safety Administration ("NHTSA"), and any other agency of the government designated by the Office regarding any matter relating to the Office's investigation about which Toyota has knowledge or information.

6.      It is understood that Toyota shall (a) truthfully and completely disclose all information with respect to the activities of itself and its subsidiaries Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMA), and Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), as well as with respect to the activities of officers, agents, and employees of Toyota, TMS, TMA, and TEMA, concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, FBI, DOT, NHTSA, and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of Toyota, TMS, TMA, and TEMA at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in Toyota's possession, custody or control as may be

2

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

requested by the Office, FBI, DOT, NHTSA, or designated law enforcement agency; (f) volunteer and provide to the Office any information and documents that come to Toyota's attention that may be relevant to the Office's investigation of this matter, any issue related to the Statement of Facts, and any issue that would fall within the scope of the duties of the independent monitor (the "Monitor") as set forth in paragraph 15; (g) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, FBI, DOT, NHTSA, or designated law enforcement agency, including but not limited to information and testimony concerning the conduct set forth in the Information and Statement of Facts; (h) bring to the Office's attention all criminal conduct by or criminal investigations of Toyota or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which Toyota's Board of Directors, senior management, or United States legal and compliance personnel are aware; (i) bring to the Office's attention any administrative or regulatory proceeding or civil action or investigation by any U.S. governmental authority that alleges fraud by Toyota; and (j) commit no crimes whatsoever under the federal laws of the United States subsequent to the execution of this Agreement. To the extent the provisions of this paragraph relate to information or attendance of personnel located in Japan, the parties to this Agreement acknowledge that the request, provision, or use of such information, or attendance of personnel, is subject to applicable laws and legal principles in Japan. In the event the Office determines that information it receives from Toyota pursuant to this provision should be shared with DOT and/or NHTSA, the Office may request that Toyota provide such information to DOT and/or NHTSA directly. Toyota will submit such information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. Nothing in this Agreement shall be construed to require Toyota to provide any information, documents or testimony protected by the attorney-client privilege, work product doctrine, or any other applicable privilege.

7.     Toyota agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 12 below. Toyota's obligation to cooperate is not intended to apply in the event that a prosecution against Toyota by this Office is pursued and not deferred.

**Deferral of Prosecution**

8.     In consideration of Toyota's entry into this Agreement and its commitment to: (a) accept and acknowledge responsibility for its conduct; (b) cooperate with the Office, FBI, DOT, NHTSA, and any other law enforcement agency designated by this Office; (c) make the payments specified in this Agreement; (d) comply with Federal criminal laws; and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of Toyota on the Information be deferred for three years from the date of the signing of this Agreement. Toyota shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States

3

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

9.       It is understood that this Office cannot, and does not, agree not to prosecute Toyota for criminal tax violations. However, if Toyota fully complies with the terms of this Agreement, no testimony given or other information provided by Toyota (or any other information directly or indirectly derived therefrom) will be used against Toyota in any criminal tax prosecution. In addition, the Office agrees that, if Toyota is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to Toyota of the Information filed against Toyota pursuant to this Agreement. Except in the event of a violation by Toyota of any term of this Agreement, the Office will bring no additional charges against Toyota, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than Toyota and its subsidiaries TMS, TMA, and TEMA. Toyota and the Office understand that the Agreement to defer prosecution of Toyota must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and Toyota are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 10.

10.      It is further understood that should the Office in its sole discretion determine based on facts learned subsequent to the execution of this Agreement that Toyota has: (a) knowingly given false, incomplete or misleading information to the Office, FBI, DOT, or NHTSA, either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, Toyota shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information, the Statement of Facts, or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of Toyota to the Office and/or FBI, DOT, or NHTSA at any time. In any such prosecution, no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period, excluding (a) any period subject to any prior or existing tolling agreement between the Office and Toyota and (b) the period from the execution of this Agreement until its termination. Toyota agrees to toll, and exclude from any calculation of time, the running of the applicable criminal statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 12 below. By this Agreement, Toyota expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any

4

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

constitutional, statutory, or other claim concerning pre-indictment delay.   Such waivers are knowing, voluntary, and in express reliance on the advice of Toyota's counsel.

11.   It is further agreed that in the event that the Office, in its sole discretion, determines that Toyota has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of Toyota to the Office, FBI, DOT, and/or NHTSA, including but not limited to the Statement of Facts, or any testimony given by Toyota or by any agent of Toyota before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against Toyota; and (b) Toyota shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of Toyota before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.   It is the intent of this Agreement to waive any and all rights in the foregoing respects.

12.   Toyota agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 8 above (or any extensions thereof) that Toyota has violated any provision of this Agreement, an extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

13.   Toyota, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.   Consistent with this provision, Toyota may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations.   Any such contradictory statement by Toyota, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and Toyota thereafter shall be subject to prosecution as specified in paragraphs 8 through 11, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 12, above. The decision as to whether any such contradictory statement will be imputed to Toyota for the purpose of determining whether Toyota has violated this Agreement shall be within the sole discretion of the Office.   Upon the Office's notifying Toyota of any such contradictory statement, Toyota may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office.   Toyota consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of Toyota or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

14.     Toyota agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 10 and 11 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 12. Toyota understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that Toyota has violated this Agreement, the Office shall provide notice to Toyota of that determination and provide Toyota with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by Toyota.

## **Independent Monitor**

15.     Toyota agrees to retain a Monitor upon selection by the Office and approval by the Office of the Deputy Attorney General, whose powers, rights and responsibilities shall be as set forth below.

(a).     <u>Jurisdiction, Powers, and Oversight Authority</u>.   To address issues related to the Statement of Facts and Information, the Monitor shall have the authorities and duties defined below. The scope of the Monitor's authority is to review and assess Toyota's policies, practices or procedures as set forth below, and is not intended to include substantive review of the correctness of any of Toyota's decisions relating to compliance with NHTSA's regulatory regime, including the National Traffic and Motor Vehicle Safety Act, its implementing regulations, and related policies.  Nor is it intended to supplant NHTSA's authority over decisions related to motor vehicle safety.

(1).     Review and assess whether Toyota's policies, practices, or procedures ensure that Toyota's public statements in the United States related to motor vehicle safety are true and accurate;

(2).     Review and assess the effectiveness of Toyota's policies, practices, or procedures for making information relating to accidents that take place in the United States available to Toyota's engineers, Toyota's chief quality officer for North America, and Toyota's regional product safety executive for North America; and

(3).     Review and assess whether Toyota's policies, practices, or procedures regarding the generation of field technical reports – as opposed to other internal reporting mechanisms, including, but not limited to, the "intra-company communication" – in the United States ensure compliance with 49 C.F.R. Part 579.

It is the intent of this Agreement that the provisions regarding the Monitor's jurisdiction, powers, and oversight authority and duties be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to Toyota's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. Toyota shall adopt all

6

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

recommendations submitted by the Monitor unless Toyota objects to any recommendation and the Office agrees that adoption of such recommendation should not be required.

(b). <u>Access to Information</u>. The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as necessary to be fully informed about those operations of Toyota within or relating to his or her jurisdiction. To that end, the Monitor shall have:

(1). Access to, and the right to make copies of, any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of Toyota and its subsidiaries TMS, TMA, and TEMA, and of officers, agents, and employees of Toyota, TMS, TMA, and TEMA, within or relating to his or her jurisdiction that are located in the United States. To the extent the Monitor believes such information from Japan is reasonably necessary, Toyota will make its best efforts to request the information and make it available to the Monitor in the United States consistent with applicable laws and legal principles in Japan; and

(2). The right to interview any officer, employee, agent, or consultant of Toyota, TMS, TMA, and TEMA conducting business in or present in the United States and to participate in any meeting in the United States concerning any matter within or relating to the Monitor's jurisdiction.

To the extent that the Monitor seeks access to information contained within privileged documents or materials, Toyota shall use its best efforts to provide the Monitor with the information without compromising the asserted privilege.

(c). <u>Confidentiality</u>.

(1). The Monitor shall maintain the confidentiality of any non-public information entrusted or made available to the Monitor. The Monitor shall share such information only with the Office and FBI. The Monitor may also determine that such information should be shared with DOT and/or NHTSA. In the event of such a determination, the Monitor may request that Toyota provide the subject information directly to DOT and/or NHTSA. Toyota will submit such information to DOT or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.

(2). The Monitor shall sign a non-disclosure agreement with Toyota prohibiting disclosure of information received from Toyota to anyone other than to the Office, FBI, DOT, or NHTSA, and anyone hired by the Monitor. Within thirty days after the end of the Monitor's term, the Monitor shall either return anything obtained from Toyota, or certify that such information has been destroyed. Anyone hired by the Monitor shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this sub-paragraph.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

      (d).   <u>Hiring Authority</u>.  The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Monitor's duties.

      (e).   <u>Implementing Authority</u>.  The Monitor shall have the authority to take any other actions in the United States that are necessary to effectuate the Monitor's oversight and monitoring responsibilities.

      (f).   <u>Miscellaneous Provisions</u>.

      (1).   <u>Term</u>.  The Monitor's authority set forth herein shall extend for a period of three years from the commencement of the Monitor's duties, except that (a) in the event the Office determines during the period of the Monitorship (or any extensions thereof) that Toyota has violated any provision of this Agreement, an extension of the period of the Monitorship may be imposed in the sole discretion of the Office, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of the Agreement; and (b) in the event the Office, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, the Office may shorten the period of the Monitorship.

      (2).   <u>Selection of the Monitor</u>.  The Office shall consult with Toyota, including soliciting nominations from Toyota, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible.  In the event that the Office is unable to select a Monitor acceptable to Toyota, the Office shall have the sole right to select a monitor (and any replacement Monitors, if required. To ensure the integrity of the Monitorship, the Monitor must be independent and objective and the following persons shall not be eligible as either a Monitor or an agent, consultant or employee of the Monitor: (a) any person previously employed by Toyota; or (b) any person who has been directly adverse to Toyota in any proceeding.  The selection of the Monitor must be approved by the Deputy Attorney General.

      (3).   <u>Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting</u>.  Toyota shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor.  Within 10 days of the commencement of the Monitor's duties, Toyota shall advise employees of its subsidiaries TMS, TMA, and TEMA in writing of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, the toll-free number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of Toyota shall be penalized in any way for providing information to the Monitor.  In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to Toyota's compliance office in the United States or the Monitor.  The

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional toll-free number is required.

(4).   Reports to the Office.  The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions taken in response to correspondence or telephone calls.  If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to the Office. The Monitor should, at his or her option, refer any potentially illegal or unethical conduct to Toyota's compliance office.  The Monitor may report to the Office whenever the Monitor deems fit but, in any event, shall file a written report not less often than every four months regarding: the Monitor's activities; whether Toyota is complying with the terms of this Agreement; and any changes that are necessary to foster Toyota's compliance with any applicable laws, regulations and standards related to the Monitor's jurisdiction as set forth in paragraph 15(a).  Such periodic written reports are to be provided to Toyota and the Office.  The Office may, in its sole discretion, provide to FBI all or part of any such periodic written report, or other information provided to the Office by the Monitor.  The Office may also determine that all or part of any such periodic report, or other information provided to the Office by the Monitor, be provided to DOT and/or NHTSA.  In the event of such a determination, the Office may request that Toyota transmit such report, part of a report, and/or non-public information to DOT and/or NHTSA directly.  Toyota will submit such report, part of a report, and/or non-public information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.  Toyota may provide all or part of any periodic written reports to NHTSA or other federal agencies or governmental entities.  Should the Monitor determine that it appears that Toyota has violated any law, has violated any provision of this Agreement, or has engaged in any conduct that could warrant the modification of his or her jurisdiction, the Monitor shall promptly notify the Office, and when appropriate, Toyota.

(5).   Cooperation with the Monitor.  Toyota and all of its officers, directors, employees, agents, and consultants, and all of the officers, directors, employees, agents, and consultants of Toyota's subsidiaries TMS, TMA, and TEMA shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties provided in this Agreement and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties.  Failure of any Toyota, TMS, TMA, or TEMA officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

(6).   Compensation and Expenses.  Although the Monitor shall operate under the supervision of the Office, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by Toyota.  The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly

9

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

rates. Toyota shall pay bills for compensation and expenses promptly, and in any event within 30 days. In addition, within one week after the selection of the Monitor, Toyota shall make available, at either TMS, TMA or TEMA, office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

(7).   Indemnification.   Toyota shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

(8).   No Affiliation.  The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of Toyota.

### Limits of this Agreement

16.   It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by Toyota or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of Toyota, and Toyota's compliance with its obligations under this Agreement.

### Public Filing

17.   Toyota and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

18.   The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

19.   This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

### Integration Clause

20.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between Toyota and the Office. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, Toyota's attorneys, and a duly authorized representative of Toyota.

PREET BHARARA
United States Attorney
Southern District of New York

By:   *Bonnie Jonas*

BONNIE JONAS
SARAH E. MCCALLUM
Assistant United States Attorneys

*Richard Zabel / B*

RICHARD B. ZABEL
Deputy United States Attorney

Accepted and agreed to:

Christopher P. Reynolds
General Counsel and Chief Legal Officer,
Toyota Motor North America, Inc.
Group Vice President,
Toyota Motor Sales U.S.A., Inc.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
Attorneys for TOYOTA

11

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

## Integration Clause

20.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between Toyota and the Office. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, Toyota's attorneys, and a duly authorized representative of Toyota.

PREET BHARARA
United States Attorney
Southern District of New York

By:    *Bonnie Jonas / S McCallum*

BONNIE JONAS
SARAH E. MCCALLUM
Assistant United States Attorneys

*Richard Zabel / B*

RICHARD B. ZABEL
Deputy United States Attorney

Accepted and agreed to:

_____

Christopher P. Reynolds
General Counsel and Chief Legal Officer,
Toyota Motor North America, Inc.
Group Vice President,
Toyota Motor Sales U.S.A., Inc.

*James E. Johnson*

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
Attorneys for TOYOTA

11

# Exhibit

# A

## CERTIFICATE OF CORPORATE APPROVAL

I, Nobuyori Kodaira, Representative Director and Executive Vice President of Toyota Motor Corporation, hereby certify that:

1.      On March 19, 2014, a meeting was held of the Board of Directors of Toyota Motor Corporation.   I am a member of the Board and attended the meeting.

2.      At the March 19, 2014 meeting, the Board approved Toyota Motor Corporation's entry into a Deferred Prosecution Agreement with the Office of the United States Attorney for the Southern District of New York ("Agreement") and authorized all necessary steps to be taken to effectuate and finalize the Agreement.   The approval has not been amended or revoked in any respect and remains in full force and effect.

3.      Under the Japanese Companies Act, each Representative Director is authorized to carry out the directions of the Board.   In this case, I, as one of the Representative Directors, am authorized to carry out the directions of the Board.

4.      I hereby delegate and authorize Christopher P. Reynolds, Chief Legal Officer and General Counsel of Toyota Motor North America, Inc., and Group Vice President of Toyota Motor Sales, U.S.A., Inc., to execute and deliver the Agreement in the name and on behalf of Toyota Motor Corporation.

IN WITNESS WHEREOF, I have signed this Certificate of Corporate Approval on March 19, 2014.

Nobuyori Kodaira
Representative Director and
Executive Vice President
Toyota Motor Corporation

# Exhibit
# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :        INFORMATION

       -v.-                                 :

                                         14 Cr. ___

TOYOTA MOTOR CORPORATION,                    :

          Defendant.                        :

- - - - - - - - - - - - - - - - - -x

## COUNT ONE
### (Wire Fraud)

       The United States Attorney charges:

       1.    TOYOTA MOTOR CORPORATION ("TOYOTA") is an automotive company headquartered in Toyota City, Japan. Assisted by its subsidiaries and affiliates worldwide, TOYOTA designs, manufactures, assembles, and sells Toyota and Lexus brand vehicles.  For the fiscal year ending March 31, 2010, TOYOTA's revenues from its automotive business were 17.2 trillion Japanese yen (approximately $184 billion), and its second largest market, with approximately 29% of its worldwide sales, was North America.

       2.    TOYOTA is responsible for unlawful activities committed by certain TOYOTA employees that resulted in misrepresentations and the hiding of information from the public.  As evidenced in part by internal company documents, individual employees not only made misleading public statements

to TOYOTA's consumers, but also concealed from TOYOTA's regulator one safety-related issue (a problem with accelerators getting stuck at partially depressed levels, referred to as "sticky pedal") and minimized the scope of another (accelerators becoming entrapped at fully or near-fully depressed levels by improperly secured or incompatible floor mats, referred to as "floor mat entrapment").

3.   Contrary to public statements that TOYOTA made in late 2009 saying it had "addressed" the "root cause" of unintended acceleration through a limited safety recall addressing floor mat entrapment, TOYOTA had actually conducted internal tests revealing that certain of its unrecalled vehicles bore design features rendering them just as susceptible to floor mat entrapment as some of the recalled vehicles.  And only weeks before these statements were made, individuals within TOYOTA had taken steps to hide from its regulator another type of unintended acceleration in its vehicles, separate and apart from floor mat entrapment: the sticky pedal problem.

4.   When, in early 2010, TOYOTA finally conducted safety recalls to address the unintended acceleration issues it had concealed, TOYOTA provided to the American public, its U.S. regulator, and the United States Congress an inaccurate timeline of events that made it appear as if TOYOTA had acted to remedy

the sticky pedal problem within approximately 90 days of discovering it.

## Statutory Allegations

5.    From at least in or about the fall of 2009 up to and including at least in or about March 2010, in the Southern District of New York and elsewhere, TOYOTA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted and aid and abet the transmission, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TOYOTA defrauded U.S. consumers into purchasing its products by concealing information and making misleading statements about unintended acceleration in Toyota and Lexus brand vehicles, as described in paragraphs 2 through 4 above.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

6.    As a result of committing the offense alleged in Count One of this Information, TOYOTA, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

<u>Substitute Asset Provision</u>

7.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

above forfeitable property.


(Title 18, United States Code, Sections 981 and 982; Title 21
United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

*Preet Bharara*

PREET BHARARA
United States Attorney

# Exhibit C

Statement of Facts

1.     TOYOTA MOTOR CORPORATION ("TOYOTA") is an automotive company headquartered in Toyota City, Japan. Assisted by its subsidiaries and affiliates worldwide, TOYOTA designs, manufactures, assembles, and sells Toyota and Lexus brand vehicles. For the fiscal year ending March 31, 2010, TOYOTA's revenues from its automotive business were 17.2 trillion Japanese yen (approximately $184 billion), and its second largest market, with approximately 29% of its worldwide sales, was North America.

2.     As set forth in more detail below, TOYOTA is responsible for unlawful activities committed by certain employees that resulted in circumstances in which information was hidden from the public. As evidenced in part by internal company documents, individual employees not only made misleading public statements to TOYOTA's consumers, but also concealed from TOYOTA's regulator one safety-related issue (a problem with accelerators getting stuck at partially depressed levels, referred to as "sticky pedal") and minimized the scope of another (accelerators becoming entrapped at fully or near-fully depressed levels by improperly secured or incompatible floor mats, referred to as "floor mat entrapment").

3.     Contrary to public statements that TOYOTA made in late 2009 saying it had "addressed" the "root cause" of unintended acceleration through a limited safety recall addressing floor mat entrapment, TOYOTA had actually conducted internal tests revealing that certain of its unrecalled vehicles bore design features rendering them just as susceptible to floor mat entrapment as some of the recalled vehicles. And only weeks before these statements were made, individuals within TOYOTA had taken steps to hide from its regulator another type of unintended acceleration in its vehicles, separate and apart from floor mat entrapment: the sticky pedal problem.

4.     According to a January 2010 report of a discussion following a meeting between TOYOTA and its regulator, one Toyota employee was said to exclaim, "Idiots! Someone will go to jail if lies are repeatedly told. I can't support this."

### TOYOTA and Related Entities

5.     At least through February 2010, decisions about whether and when to conduct recalls of Toyota and Lexus vehicles were made by the leadership of a group within TOYOTA called "Customer Quality Engineering," which was centered in Japan and sometimes referred to as "CQE-J." Customer Quality Engineering had regional arms responsible for monitoring vehicle quality issues in the "field" (that is, for vehicles already on the road) in their respective regions. These regional arms regularly reported field issues and results of vehicle inspections and testing to CQE-J. The U.S. regional arm, located in Torrance, California, was called "CQE-LA." Technically, CQE-LA was part of Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), an entity that is a wholly-owned subsidiary of TOYOTA headquartered in Kentucky and principally responsible for North American manufacturing of Toyota and Lexus vehicles. In practice, CQE-LA staff reported to CQE-J's leadership.

6.     Toyota Motor Sales, U.S.A., Inc. ("TMS") is an entity that is a wholly-owned subsidiary of TOYOTA and headquartered in Torrance, California. It is responsible for sales and marketing of Toyota and Lexus brand vehicles in the United States.

7.      Toyota Motor North America, Inc. ("TMA") is an entity that is a wholly-owned subsidiary of TOYOTA with offices in New York, New York, and Washington, D.C. The Washington office was responsible for reporting to and interacting with TOYOTA's U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA").

<u>Overview of the Unlawful Conduct</u>

8.      From the fall of 2009 through March 2010, TOYOTA misled U.S. consumers by concealing and making deceptive statements about two safety-related issues affecting its vehicles, each of which caused a type of unintended acceleration.

9.      In the fall of 2009, TOYOTA faced intense public concern and scrutiny over the safety of its vehicles after a widely-publicized August 28, 2009 accident in San Diego, California that killed a family of four. A Lexus dealer had improperly installed an unsecured, incompatible rubber floor mat (an "all weather floor mat" or "AWFM") into the Lexus ES350 in which the family was traveling, and that AWFM entrapped the accelerator at full throttle. A 911 emergency call made from the out-of-control vehicle, which was speeding at over 100 miles per hour, reported, "We're in a Lexus . . . and we're going north on 125 and our accelerator is stuck . . . there's no brakes . . . we're approaching the intersection . . . Hold on . . . hold on and pray . . . pray." The call ended with the sound of the crash that killed everyone in the vehicle.

10.     Against the backdrop of the San Diego accident, press reports of other unintended acceleration incidents in Toyota and Lexus vehicles, and intensified scrutiny from NHTSA, TOYOTA agreed to NHTSA's request in or about September 2009 to recall eight of its U.S. models for floor mat entrapment susceptibility. Meanwhile and thereafter, from the fall of 2009 through January 2010, TOYOTA misleadingly assured customers that it had "addressed the root cause" of unintended acceleration in its U.S.-sold vehicles by conducting this recall. In truth, the recall TOYOTA had conducted (a) left unaddressed the Corolla, the Highlander, and the Venza, which shared design features similar to the models that were recalled for floor mat entrapment, and (b) left unaddressed a second type of unintended acceleration: the sticky pedal problem.

11.     TOYOTA made these misleading statements and undertook these acts of concealment as part of efforts to defend its brand image in the wake of the fatal San Diego accident and the ensuing onslaught of critical press.

12.     When, in early 2010, TOYOTA finally conducted safety recalls to address the unintended acceleration issues it had concealed, TOYOTA provided to the American public, NHTSA, and Congress an inaccurate timeline of events that made it appear as if TOYOTA had acted to remedy the sticky pedal problem within approximately 90 days of discovering it.

<u>Background to the Unlawful Conduct</u>

13.     TOYOTA is required to disclose to NHTSA if it "learns [a] vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." "Motor vehicle safety" is defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . . and against unreasonable risk of death or injury in an accident." 49 U.S.C. §§ 30118(c)(1); 30102(a)(8). Such disclosure must be "submitted not more than 5 working days after a defect in a vehicle or item of equipment has

2

been determined to be safety related" (the "Defect Disclosure Regulation"). See 49 U.S.C. § 30118(c) and 49 C.F.R.§ 573.6.

14.     The required disclosure is to be made by filing a "Defect Information Report," or "DIR."

15.     Although TOYOTA is not required to notify NHTSA of any engineering and design changes it made to Toyota and Lexus models sold in the United States, it is required to file a DIR for any safety-related defect addressed by such an engineering and/or design change.

<u>Events Prior to 2009: Floor Mat Entrapment</u>

16.     In or about the fall of 2007, TOYOTA successfully avoided a potential vehicle recall to address floor mat entrapment in certain Toyota and Lexus brand vehicles.

17.     In 2007, following a series of reports alleging unintended acceleration in Toyota and Lexus vehicles, NHTSA opened a defect investigation into the Lexus ES350 model (the vehicle that was subsequently involved in the tragic 2009 San Diego accident), and identified several other Toyota and Lexus models it believed might likewise be defective. Floor mat entrapment can pose a high risk to human life and safety because, when unsecured or incompatible, the AWFM can entrap the accelerator pedal and it can result in high speed, uncontrolled acceleration.

18.     Throughout the summer and fall of 2007, TOYOTA denied the need for any vehicle-based recall related to floor mat entrapment. TOYOTA resisted a recall even though an internal investigation being conducted at the time revealed that certain Toyota and Lexus models, including most of the ones that NHTSA had identified as potentially problematic, had some design features, including an absence of clearance between a fully depressed accelerator pedal and the vehicle floor, that rendered entrapment of the pedal by an unsecured or incompatible AWFM more likely. TOYOTA did not share these results with NHTSA.

19.     In or about September 2007, having kept to itself the results of some of its initial internal investigation related to floor mat entrapment, TOYOTA negotiated with NHTSA a limited recall of 55,000 AWFMs that had been designed for the ES350 and Camry. There was no recall of or fix to the vehicles themselves, just the limited recall of AWFMs. Inside TOYOTA, the limited recall was touted as a major victory in a contemporaneous email: "had the agency . . . pushed for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100 million + in unnecessary costs."

20.     Shortly after TOYOTA announced its AWFM recall, TOYOTA engineers studying floor mat entrapment revised TOYOTA's internal design guidelines to provide for, among other things, a minimum clearance of 10 millimeters between a fully depressed accelerator pedal and the floor. Engineers also determined that newly designed models would have to undergo vehicle-based tests using unsecured genuine AWFMs to determine whether they had appropriate resistance to floor mat entrapment.

21.     The determination was made, however, that these revised guidelines and procedures would apply only in circumstances where a model was receiving a "full model redesign" – a redesign to which each Toyota and Lexus model was subjected approximately once

3

every three to five years. As a result, even after the revised guidelines had been adopted internally, many new vehicles produced and sold by TOYOTA were not subject to TOYOTA's 2007 guidelines.

Events Immediately Preceding the<br/>2009 Floor Mat Entrapment Recall

22.     As described above, on August 28, 2009, the driver and three passengers of an ES350 sedan fitted with an AWFM intended for another, larger Lexus sport utility vehicle model were killed in an accident resulting from floor mat entrapment in San Diego, California. The accelerator pedal in this vehicle, the tip of which was designed to reach the floor when fully depressed, got trapped under the ill-fitting, incompatible AWFM and could not be freed. The ES350 vehicle did not have a brake override system, which, under certain circumstances, may provide an additional safety benefit by closing the throttle upon firm and steady application of the brake pedal.

23.     On or about the same day the San Diego accident occurred, staff at CQE-LA in Torrance, California, sent a memorandum to CQE-J identifying as "critical" an "unintended acceleration" issue separate and apart from floor mat entrapment that had manifested itself in an accelerator pedal of a Toyota Matrix vehicle in Arizona. The condition, called "sticky pedal," had already arisen in the European market, and entailed the accelerator pedal "sticking" in a partially depressed position.

24.     Sticky pedal, a phenomenon affecting pedals manufactured by a U.S. company ("A-Pedal Company") and installed in some Toyota brand vehicles in North America as well as Europe, resulted from the use of a plastic material inside the pedals that could under certain circumstances result in the accelerator pedal becoming mechanically stuck in a partially depressed position. The pedals incorporating this plastic were installed in, among other models, the Camry, the Matrix, the Corolla, and the Avalon sold in the United States.

25.     The August 2009 report about the "critical" sticky pedal issue in the Arizona Matrix was not the only report of the condition that TOYOTA received from U.S. technicians in the field in the summer of 2009. On or about August 4, 2009, a dealer technician made a similar report about a pedal in a Camry vehicle.

26.     Reports of the same sticky pedal problem in Europe in or about 2008 and early 2009, where the problem had become apparent earlier, reflected, among other things, instances of "uncontrolled acceleration" and unintended acceleration to "maximum RPM," and customer concern that the condition was "extremely dangerous."

27.     In or about early 2009, TOYOTA circulated to European Toyota distributors information about the sticky pedal problem and instructions for addressing the problem if it presented itself in a customer's vehicle. These instructions identified the issue as "Sudden RPM increase/vehicle acceleration due to accelerator pedal sticking," and stated that should a customer complain of pedal sticking, the pedal should be replaced with pedals manufactured by a company other than A-Pedal Company.

4

28.     Contemporaneous documents internal to TOYOTA reflect at least a preliminary assessment by CQE engineers that the sticky pedal problem, as manifested in the above-described European reports, was a "defect" that was "[i]mportant in terms of safety because of the possibility of accidents." TOYOTA did not then inform its U.S. regulators or conduct a recall. Beginning in or about the spring of 2009, TOYOTA quietly directed A-Pedal Company to change the pedals in new productions of affected models in Europe, and to plan for the same design changes to be rolled out in the United States beginning in the fall of 2009. The design change was to substitute the plastic used in the affected pedal models with another material and to change the length of the friction lever in the pedal.

29.     By no later than September 2009, TOYOTA recognized internally that the sticky pedal problem posed a risk of a type of unintended acceleration – or "overrun," as Toyota sometimes called it – in many of its U.S. vehicles. A September 2009 presentation made by a CQE-LA manager to TOYOTA executives gave a "current summary of O/R [overrun] types in NA market" that listed the three confirmed types as: "mat interference" (*i.e.*, floor mat entrapment), "material issue" (described as "pedal stuck and . . . pedal slow return/deformed"), and "simultaneous pedal press" by the consumer. The presentation further listed the models affected by the "material issue" as including "Camry, Corolla, Matrix, Avalon."

30.     On or about September 9, 2009, a TMS employee who was concerned about the sticky pedal problem in the United States and believed that TOYOTA should address the problem, prepared a "Market Impact Summary" listing (in addition to the August 2009 Matrix and Camry) 39 warranty cases that he believed involved potential manifestations of the sticky pedal problem. This document was circulated to TOYOTA engineers and was later sent to members of CQE-J, and designated the sticky pedal problem as priority level "A," the highest level.

31.     On or about September 17, 2009, TOYOTA reproduced sticky pedal in a pedal recovered from a U.S. vehicle.

32.     After the August 2009 fatal floor mat entrapment accident in San Diego, several articles critical of TOYOTA appeared in U.S. newspapers. The articles reported instances of TOYOTA customers allegedly experiencing unintended acceleration and the authors accused TOYOTA of, among other things, hiding defects related to unintended acceleration.

33.     Meanwhile, following the San Diego floor mat entrapment accident, NHTSA identified customer complaints that it believed were potentially related to floor mat entrapment. Based principally on complaint data that the agency had itself collected, NHTSA identified eight vehicle models it believed posed an unreasonable risk of floor mat entrapment and should be recalled.

<u>TOYOTA's Negotiations with NHTSA About Floor Mat Entrapment</u>

34.     As it had in 2007, TOYOTA initially resisted NHTSA's recall suggestions. CQE-J prescribed and followed a negotiating position with NHTSA with respect to floor mat entrapment consisting of: (a) a refusal to declare a vehicle defect of any kind, and (b) an effort to narrow the class of vehicles that would be subject to the recall.

5

35.    During a meeting on September 25, 2009 NHTSA requested that TOYOTA immediately file a DIR with respect to AWFM entrapment risk in eight specific models, with the understanding that remedial action for each affected model would be negotiated in the ensuing months. NHTSA stated that it would open an investigation if TOYOTA declined the request. On or about September 28, 2009, TOYOTA notified NHTSA that it agreed to file the DIR. That document, filed on or about October 5, 2009, identified as the "affected" models just the eight that NHTSA had specified.

36.    Shortly before TOYOTA filed its DIR, NHTSA asked TOYOTA to disclose to the agency "any production changes" that had "been made to pedal geometry." NHTSA had expressed to TOYOTA its view that design features related to pedal geometry – including clearance between the fully depressed pedal and the floor – were important factors in evaluating floor mat entrapment. NHTSA also asked TOYOTA whether it had "a metric for determining which vehicles" to include in the floor mat entrapment recall. TOYOTA did not, at this time, respond to these requests.

## Cancellation and Suspension of Sticky Pedal Design Change

37.    As noted, TOYOTA had developed internal plans to implement design changes for all A-Pedal-Company-manufactured pedals in U.S. Toyota models to address, on a going-forward basis, the still-undisclosed sticky pedal problem that had already been resolved for new vehicles in Europe. As of the date of NHTSA's request for information about "pedal geometry" in connection with the floor mat entrapment recall, implementation of these pedal design changes had not yet begun in the United States. On or about October 5, 2009, TOYOTA engineers issued to A-Pedal Company the first of the design change instructions intended to prevent sticky pedal in the U.S. market. This was described internally as an "urgent" measure to be implemented on an "express" basis, as a "major" change – meaning that the part number of the subject pedal was to change, and that all inventory units with the old pedal number should be scrapped.

38.    On or about October 21, 2009, however, engineers at TOYOTA and the leadership of CQE-J decided to cancel the design change instruction that had already been issued and to suspend all remaining design changes planned for A-Pedal Company pedals in U.S. models. TEMA employees who had been preparing for implementation of the changes were instructed, orally, to alert the manufacturing plants of the cancellation. They were also instructed not to put anything about the cancellation in writing. A-Pedal Company itself would receive no written cancellation at this time; instead, contrary to TOYOTA's own standard procedures, the cancellation was to be effected without a paper trail.

39.    TOYOTA decided to suspend the pedal design changes in the United States, and to avoid memorializing that suspension, in order to prevent NHTSA from learning about the sticky pedal problem.

## TOYOTA's Internal Entrapment Investigation

40.    Meanwhile, in the fall of 2009, as had occurred in 2007, TOYOTA undertook an internal investigation of floor mat entrapment. That investigation revealed, among other things, the following, some of which echoed the findings from two years prior:

6

a.     All but one of the eight models that NHTSA had identified were designed with 10 millimeters or less of clearance between a fully depressed accelerator pedal and a vehicle floor. Two unrecalled models, the Corolla, one of the best-selling Toyota vehicles in the United States, and the Venza, had 0 millimeters' clearance. One contemporaneous document summarizing measurement and testing data and evaluating the relationship of certain design features to floor mat entrapment contained the following notation related to these clearance measurements: "10 [millimeters] or less is high risk."

b.     When CQE-LA engineers subjected Toyota and Lexus models to testing in which an AWFM was unhooked from its secured position and moved forward by hand in small increments, all but one of the eight models that NHTSA had identified experienced entrapment with the AWFM intended for that model. In the eighth model, the Prius, a compatible AWFM did not trap the pedal. The AWFM used in that particular testing was a recent model that had benefited from a 2006 design change to address floor mat entrapment susceptibility.

c.     A notation contained on a CQE-LA document summarizing the testing results (the "Score Chart") for three Toyota models (the Corolla, the Camry, and the Avalon) and two Lexus models (one of which was the ES350) read as follows for each of these models: "The shape of floor underneath A pedal is concave shape and a mat may become bent and easily retained." CQE-LA presented its Score Chart to a senior Toyota executive in mid-October 2009.

d.     A CQE-LA engineer involved in the floor mat entrapment testing reported to CQE-J that among the three "worse" vehicles was the Corolla, a model not among those that NHTSA had identified as the potential subjects of a recall.

e.     On or about October 27, 2009, TOYOTA engineers in Japan circulated to CQE-J a chart showing that the Corolla had the lowest rating for floor mat entrapment under that analysis.

f.     An internal memorandum prepared by a CQE-J leader on or about November 12, 2009 stated: "In the competitor benchmarkings conducted at TMS and CQE-LA, Toyota vehicles tended to have more models that use pedal tips as stoppers [and therefore tend to have zero clearance from the floor], and from the viewpoint of robustness for improper mat use, we would have to say that it is inferior compared to other companies."

41.     TOYOTA did not inform NHTSA of its internal analyses concerning models not among those identified by NHTSA, which showed that the top-selling Corolla, the Highlander, and the Venza shared design features similar to several of the eight models for which NHTSA had requested a recall.

<u>Misleading Disclosures to NHTSA About Sticky Pedal</u>

42.     Throughout the fall of 2009, following reports in August of sticky pedals in a Matrix and a Camry, and following reproduction of the problem by TOYOTA in a pedal from a U.S. vehicle on or about September 17, 2009, as referenced above, TOYOTA became aware of other manifestations of the problem in the United States.

43.     In or about late September 2009, TMS employees received a report of sticky pedal in a Corolla. TMS urged CQE-LA to do something about the issue. Then, in or about October 2009, TMS received three more such reports in U.S. Corolla vehicles, and dispatched technicians to prepare "field technical reports" (or "FTRs") documenting the incidents. In or about November 2009, senior executives at TMS learned of these three reports.

44.     On or about November 12, 2009, the leadership of CQE-J discussed a plan to disclose the sticky pedal problem to NHTSA. CQE-J's leadership was aware at this time not only of the three Corolla FTRs but also of a problem with the Matrix in August 2009. It was also familiar with the sticky pedal problem in Europe, the design changes that had been implemented there, and the cancellation and suspension of similar planned design changes in the United States. Knowing all of this, CQE-J's leadership decided that (a) it would not disclose the September 2009 Market Impact Summary to NHTSA; (b) if any disclosure were to be made to NHTSA, it would be limited to a disclosure that there were some reports of unintended acceleration apparently unrelated to floor mat entrapment; and (c) NHTSA should be told that TOYOTA had made no findings with respect to the sticky pedal problem reflected in the Corolla FTRs, and that the investigation of the problem had just begun.

45.     On or about November 17, 2009, before TOYOTA had negotiated with NHTSA a final set of remedies for the eight models encompassed by the floor mat entrapment recall, TOYOTA informed NHTSA of the three Corolla FTRs and several other FTRs reporting unintended acceleration in Toyota model vehicles equipped with pedals manufactured by A-Pedal Company. In TOYOTA's disclosure to NHTSA, TOYOTA did not reveal its understanding of the sticky pedal problem as a type of unintended acceleration, nor did it reveal the problem's manifestation and the subsequent design changes in Europe, the planned, cancelled, and suspended design changes in the United States, the August 2009 Camry and Matrix vehicles that had suffered sticky pedal, the September 2009 Corolla with a similar problem, or the September 2009 Market Impact Summary.

46.     In truth, the cause of the issue reflected in the three Corolla FTRs from October 2009 was the same sticky pedal problem that had arisen and been addressed on a going-forward basis in Europe, about which NHTSA remained unaware.

47.     In contrast to its public comments in early November 2009 that there was "*no evidence to support*" theories concerning "other causes of unintended acceleration" in its vehicles beyond floor mat entrapment, on or about November 17, 2009, a CQE-J employee wrote an email to a leader of CQE-J stating: "We have been trying to approach the floor mat issue by treating it as a problem caused by the all weather floor mat interfering with the pedal; however, our understanding is that we can no longer separate this problem from the [A-Pedal Company] problem that just began to surface." He went on: "[I]t has become increasingly difficult to take the position that 'the only problems in the return of the gas pedal we have confirmed are related to interference with the floor mat.' Therefore, we are in a subtle situation as to how much we can emphasize the 'floor mat problems' as the top leaders meet with NHTSA and whether we can get NHTSA to agree with our position."

48.     Despite this November 17, 2009 email, TOYOTA took no further steps to disclose to NHTSA what it knew about sticky pedal. In fact, at a meeting on November 24, 2009

between NHTSA and TOYOTA executives about the floor mat entrapment recall, the sticky pedal problem went unmentioned.

### TOYOTA's Misleading Statements and Acts of Concealment Following Announcement of the Floor Mat Entrapment Remedies

49.     On or about November 25, 2009, TOYOTA, through TMS, announced its floor mat entrapment resolution with NHTSA. In a press release that had been approved by TOYOTA, TMS assured customers: "The safety of our owners and the public is our utmost concern and Toyota has and will continue to thoroughly investigate and take appropriate measures to address any defect trends that are identified." A TMS spokesperson stated during a press conference the same day, "We're very, very confident that we have addressed this issue."

50.     In truth, the issue of unintended acceleration had not been "addressed" by the remedies announced. A-Pedal Company pedals which could experience stickiness were still on the road and still, in fact, being installed in newly-produced vehicles. And the best-selling Corolla, the Highlander, and the Venza—which had some design features similar to models that had been included in the earlier floor mat entrapment recall—were not being "addressed" at all. One of the vehicle-based remedies that TOYOTA agreed to implement in the eight models subject to the floor mat entrapment recall was a "cut" of the accelerator pedal to improve clearance from the floor. TOYOTA had been concerned throughout much of the fall of 2009 that NHTSA would require TOYOTA to offer replacement pedals to owners of the subject vehicles as part of the recall, and further require that such replacement pedals be made available as early as January 2010.

51.     On or about November 26, 2009, CQE-J issued a directive to engineers at TOYOTA not to implement any design improvements for the North American market related to floor mat entrapment in models other than the eight subject to the recall unless the subject model was already undergoing a full model redesign. The justification offered for the directive was that design changes would "most likely mislead the concerned authorities and consumers and such to believe **that we have admitted having defective vehicles**." (Emphasis in original).

52.     On or about December 10, 2009, only after the floor mat entrapment recall remedy had been fully negotiated with NHTSA and announced to the public, TOYOTA finally issued to A-Pedal Company renewed pedal design change instructions to address sticky pedal in newly produced vehicles in the United States. Whereas the single design change instruction that had issued for the U.S. market on or about October 5, 2009 (and then been cancelled on or about October 21, 2009) had called for a "major" change that would have entailed scrapping of old parts, the new design change instructions were issued as "minor" changes – a designation that entailed no part number change and allowed for use of old, defective parts until inventory was exhausted. TOYOTA engineers decided to characterize the changes as minor to prevent their detection by NHTSA. The newly issued design change instructions were to go into effect in or about mid-January 2010, around the same time that TOYOTA would be implementing pedal design changes for models encompassed by the floor mat entrapment recall.

53.     At or about the same time that TOYOTA was issuing renewed design change instructions to remedy sticky pedal in newly produced U.S. vehicles, CQE-J instructed TMS that issuance of a "technical service bulletin" to Toyota dealers alerting them to the sticky pedal

problem and explaining how it should be remedied for vehicles in the field was "not permitted." Under NHTSA regulations, any such communication would have to have been disclosed to NHTSA.

54.     On or about December 10, 2009, the date upon which TOYOTA issued renewed design change instructions for sticky pedal in the United States, a statement appeared on TMS's website, in response to a *Los Angeles Times* editorial dated December 5, 2009. Toyota asserted misleadingly, that "[b]ased on the comprehensive investigation and testing, we are highly confident that we have addressed the root cause of unwanted acceleration – the entrapment of the accelerator pedal."

55.     In truth, TOYOTA had not "addressed the root cause of unwanted acceleration." TOYOTA had not recalled the Corolla, the Highlander and the Venza, which shared design features similar to the models that had been the subject of the recall.

56.     Again, on or about December 23, 2009, TOYOTA responded to media accusations that it was continuing to hide defects in its vehicles by authorizing TMS to publish the following misleading statements on TMS's website: "Toyota has absolutely not minimized public awareness of any defect or issue with respect to its vehicles. Any suggestion to the contrary is wrong and borders on irresponsibility. We are confident that the measures we are taking address the root cause and will reduce the risk of pedal entrapment."

57.     These statements were misleading because TOYOTA had "minimized public awareness of" both sticky pedal and floor mat entrapment. Further, the measures TOYOTA had taken did not "address the root cause" of unintended acceleration, because TOYOTA had not yet issued a sticky pedal recall and had not yet recalled the Corolla, the Venza, or the Highlander for floor mat entrapment.

### TOYOTA Is Forced to Disclose Sticky Pedal

58.     By in or about early January 2010, TOYOTA had received additional reports of sticky pedal in the United States. The news media, meanwhile, was reporting two incidents of unintended acceleration in Toyota vehicles apparently unrelated to floor mat entrapment. One news outlet in particular was preparing to run a feature about an Avalon vehicle in New Jersey that had experienced what appeared to be sticky pedal three times but had not been involved in an accident.

59.     On or about January 16, 2010, TOYOTA finally disclosed to NHTSA that TOYOTA had recently begun implementing design changes to prevent sticky pedal in the United States, and that, in fact, TOYOTA had implemented the same changes to European pedals many months before in response to reports of "uncontrolled acceleration" and unintended acceleration to "maximum RPM."

### TOYOTA's Misleading Statements to NHTSA in January 2010

60.     On or about January 19, 2010, representatives of TOYOTA, including executives from TMS and TMA, delivered to NHTSA representatives in Washington, D.C. a presentation that had been developed in large part by the leadership and staff of CQE-J. One of the chronologies used for this presentation purported to present a history of sticky pedal reports in

the United States. It omitted any reference to the August 2009 sticky pedals in the Camry and the
Matrix, the September 2009 Corolla, and the September 2009 Market Impact Summary. It also
stated that TOYOTA began arrangements to implement design changes for sticky pedal in the
U.S market in January 2010 after sticky pedal was reproduced in December 2009. In fact,
TOYOTA began considering design changes to address sticky pedal in or about spring 2009,
which ultimately were to be implemented in the United States; TOYOTA had also reproduced
sticky pedal in a pedal recovered from a U.S. vehicle no later than September 17, 2009.

61.     The presentation that TOYOTA gave to NHTSA on January 19, 2010
downplayed the seriousness of reports of sticky pedal in Europe. When, after the presentation, a
TOYOTA employee who attended the presentation reviewed the actual reports from Europe, and
saw that they included such phrases as "'out of control'" and "'safety issue,'" he was said to
exclaim "Idiots! Someone will go to jail if lies are repeatedly told. I can't support this."

62.     On or about January 21, 2010, TOYOTA filed a DIR in which it recalled all
vehicles in the United States fitted with the accelerator pedals from A-Pedal Company that could
experience a sticky pedal. In that filing, TOYOTA stated that it had begun receiving "field
technical information" from the U.S. market about sticky pedal in "October 2009." In truth,
TOYOTA had received information no later than in or about August 2009 and, in October 2009,
had *cancelled* the U.S. fix for the sticky pedal problem so as to avoid its disclosure to NHTSA.

TOYOTA Recalls the Corolla, the Highlander, and the
Venza For Floor Mat Entrapment

63.     Also on or about January 21, 2010, NHTSA informed TOYOTA that it had
received additional complaints suggesting possible floor mat entrapment in vehicles that had not
been recalled in 2009, including the Corolla. Rather than have NHTSA open an investigation,
TOYOTA immediately agreed to "amend" its 2009 DIR to add the Corolla, the Highlander, and
the Venza to the recall. As one leader of CQE-J explained internally in justifying his decision to
so readily agree to this amendment: "Is it really in our best interest to report, 'We found a
problem' after conducting an inspection? Or maybe we won't say, 'We found a problem' but if
we say, 'Everything is the same as Camry, etc.', they may come after us by saying 'Why didn't
you report when we agreed last time? Considering the background that we have been cornered
with regard to the [A-Pedal Company] issue [*i.e.*, sticky pedal], I think they might assert we have
been hiding something. Don't you think so?"

TOYOTA's Statements to the Public and Congress
About Its Knowledge Timeline

64.     In or about late January and early February 2010, TOYOTA, based on talking
points approved by TOYOTA executives and distributed to TOYOTA's U.S. personnel, made
several public statements that asserted, misleadingly, that the "fall of 2009" or "October 2009"
was the first time TOYOTA learned of sticky pedal in the United States when in fact TOYOTA
had received reports of sticky pedal in August 2009. For example, TOYOTA told a reporter on or
about January 25, 2010 that "[i]solated reports of sticky accelerator pedals have only recently
come to light, in the fall of 2009 to be a little more precise." Later, TOYOTA told the public it
first discovered sticky pedal in the United States after the floor mat recall and that it had started
investigating the problem in October 2009. TOYOTA further claimed that it had moved quickly

11

to investigate and fix the sticky pedal problem within 90 days of TOYOTA's discovery of the problem. During this time period, TOYOTA also acknowledged that sticky pedal, though "rare," was "a grave safety concern."

65.    TOYOTA made inaccurate statements during the course of an investigation initiated by the United States Congress in or about late January 2010. Consistent with the talking points described above, but contrary to certain internal documents that TOYOTA had itself produced to Congress among thousands of other documents, TOYOTA repeated to Congress that it became aware of sticky pedal in the United States in October 2009, when in fact it had been investigating sticky pedal in the United States since no later than August 2009.

### TOYOTA Admits Earlier Knowledge

66.    On or about February 16, 2010, NHTSA opened inquiries into the timeliness of the recalls that TOYOTA had conducted to address floor mat entrapment and sticky pedal in 2007, 2009, and 2010.

67.    On or about March 25, 2010, in response to NHTSA's inquiries, TOYOTA submitted a timeline of events that listed, among other sticky pedal incidents in the United States, the August 2009 Camry and Matrix incidents.

# Exhibit D

PREET BHARARA
United States Attorney for the
Southern District of New York

By:    SHARON COHEN LEVIN
        Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-1060

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

                        :

          -v.-            :        VERIFIED CIVIL COMPLAINT

                        :        14 Civ.

$1,200,000,000 IN UNITED STATES    :
CURRENCY,

                        :

          Defendant-in-rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorney Preet Bharara, United States

Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.  **JURISDICTION AND VENUE**

        1.      This action is brought pursuant to Title 18, United States Code, Section 981

by the United States of America seeking the forfeiture of approximately $1,200,000,000 in United

States currency (the "Defendant Funds" or the "defendant-in-rem").

        2.      This Court has jurisdiction pursuant to Title 28, United States Code, Section

1355.

        3.      Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A)

because certain actions and omissions giving rise to forfeiture took place in the Southern District

of New York and pursuant to Title 28, United States Code, Section 1395 because the defendant-in-rem has been transferred to the Southern District of New York.

4.     The Defendant Funds constitute property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Sections 1343 and 2, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## II.  PROBABLE CAUSE FOR FORFEITURE

5.     Toyota Motor Corporation ("Toyota"), an automotive company headquartered in Toyota City, Japan, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia*, Toyota agreed to forfeit a total of $1.2 billion , *i.e.*, the Defendant Funds, to the United States.   The Defendant Funds represent proceeds of Toyota's wire fraud offense.   The Deferred Prosecution Agreement, with the accompanying Statement of Facts and Information to be filed, is attached as Exhibit A and incorporated herein.

## III.  CLAIM FOR FORFEITURE

6.     Incorporated herein are the allegations contained in paragraphs one through five of this Verified Complaint.

7.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, any offense listed under Title 18,

United States Code, Section 1961(1).   Section 1961(1) lists, among other offenses, violations of Title 18, United States Code, Sections 1343 (relating to wire fraud).

9.     By reason of the foregoing, the defendant-in-rem is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), because there is probable cause to believe that the defendant-in-rem constitutes property derived from wire fraud, in violations of Title 18, United States Code, Sections 1343.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       March 19, 2014

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By:     _____

SHARON COHEN LEVIN
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-1060

## VERIFICATION

STATE OF NEW YORK         )
COUNTY OF NEW YORK      :
SOUTHERN DISTRICT OF NEW YORK  )

BRIAN O'HARA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Title 18, United States Code.

BRIAN O'HARA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
19th day of March, 2014

NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2014_

4