Louis R. (Skip) Miller (54141) (smiller@millerbarondess.com)
Amnon Z. Siegel (234981) (asiegel@millerbarondess.com)
Casey B. Sypek (291214) (csypek@millerbarondess.com)
David I. Bosko (304927) (dbosko@millerbarondess.com)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

Attorneys for Plaintiffs
Remy McCarthy, Kathleen Ryan-Blaufuss,
Cathleen Mills, Jason Reid, Khek Kuan, on
behalf of themselves and all others similarly situated

Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
2410 Camino Ramon, Suite 315
San Ramon, California  94583
T: (925) 543-2555
F: (925) 369-0344

Attorneys for Plaintiffs
Rajdave Bhandari, Jevdet Rexhepi,
Stephen Kosareff, and Laura Kakish,
on behalf of themselves and all others
similarly situated

(Additional Counsel Listed at End of Document)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REMY MCCARTHY, KATHLEEN RYAN-BLAUFUSS, CATHLEEN MILLS, JASON REID, and KHEK KUAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and DOE DEFENDANTS 1-10,<br><br>Defendants. | **8:18-cv-00201-JLS-KES**<br><br>**CONSOLIDATED MASTER COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Assigned to the Honorable Josephine L. Staton and Honorable Karen E. Scott |

406120.2

1  JEVDET REXHEPI, STEPHEN
   KOSAREFF and LAURA KAKISH,
2  on behalf of themselves and all
   others similarly situated,

3

4          Plaintiffs,

5

6          v.

7  TOYOTA MOTOR SALES USA,
   INC., and DOES 1-10, inclusive,

8

9          Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



406120.2

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION .................................................................. 1

JURISDICTION AND VENUE ...................................................... 8

PARTIES ...................................................................................... 8

GENERAL ALLEGATIONS ........................................................ 13

A.    1997:  The Toyota Hybrid System Is Used in the Prius ............... 13

B.    2005:  Toyota Discovers that Thermal Stress Is Damaging the IPM Transistors ............................................................. 15

C.    2009:  Toyota Boosts the Voltage in the Third-Generation Prius, Leading to Those Vehicles Suddenly and Unexpectedly Stalling at Highway Speeds ................................... 18

D.    2014:  Toyota Misrepresents the Efficacy of the Software "Re-Flash," Which Does Nothing to Prevent Thousands of IPMs from Having to Be Replaced ................................... 23

E.    2018:  Toyota Subverts the Purposes of a Safety Recall by Replacing Defective IPMs Only after They Fail ............................ 33

F.    2018:  Toyota Conducts a Second Recall of the 800,000-Plus Prius Hybrids that It Recalled in 2014 and 2015, Acknowledging that They Continue to Stall after the Software "Re-Flash" ......................................................... 36

G.    Post-Reflash IPM Failures ................................................... 38

H.    An Ongoing Pattern of Fraud:  Toyota's Fraudulent Concealment of Sudden Unintended Acceleration in Millions of Vehicles ........................................................... 45

STATUTES OF LIMITATION ...................................................... 49

CLASS-ACTION ALLEGATIONS ............................................... 51

CLAIMS FOR RELIEF ................................................................ 56

PRAYER FOR RELIEF ............................................................... 74

JURY DEMAND .......................................................................... 75

Plaintiffs Remy McCarthy, Kathleen Ryan-Blaufuss, Cathleen Mills, Jason Reid, Khek Kuan, Jevdet Rexhepi, Laura Kakish, and Stephen Kosareff, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

## NATURE OF ACTION

1.     Toyota is the largest car manufacturer in the world and the global leader in hybrid gasoline/electric-motor technology. To benefit its bottom line, it has concealed a serious safety defect in all 2010 through 2014 model-year Prius hybrid models ("Class Vehicles") that causes those vehicles to sharply and suddenly decelerate when the hybrid system enters so-called "fail-safe" (or "limp home") mode or stall suddenly and unexpectedly while being driven, creating a serious safety risk. This action is brought on behalf of Plaintiffs and all residents of the United States who own or lease a Class Vehicle, and who have owned or leased a Class Vehicle and paid to replace or repair an inverter assembly or one or more components thereof ("Class Members").

2.     Like other Toyota hybrid vehicles, Class Vehicles have a hybrid inverter assembly that contains an Intelligent Power Module ("IPM"), which has a boost converter that increases the operating voltage of the hybrid system as needed under "high-load" driving conditions (*e.g.,* accelerating on the freeway or ascending a steep grade)s, and an inverter that converts it from direct current (DC) to alternating current (AC) to turn the electric motors and to use in the

generator. Conversely, it converts AC generated by the electric motors and the generator into DC to recharge the battery.

3.     As operating voltage increases, the current generates more heat, which can destroy electronics, hence the inverter assembly also has a dedicated cooling system.

4.     Toyota became aware that the inverters (and later, more specifically, the IPMs) in its hybrid vehicles were malfunctioning and failing as a result of thermal stress in 2005, shortly after it introduced the Toyota Highlander and Lexus RX400 hybrid sport utility vehicles to the U.S. market in the 2006 model year.

5.     Unlike the second-generation (2004-2009 model-year) Prius hybrids, whose boost converter increased the maximum operating voltage to 500 volts, the boost converter in the Highlander/RX400 SUVs increased the maximum operating voltage in those vehicles to 650 volts. By September 2005—only a few months after it began selling the 2006 model-year Highlander—Toyota received field reports that the inverter assemblies in Highlanders were failing.

6.     During the year that followed, Toyota discovered that heat fluctuations can crack the solder that attaches the transistors (known as Insulated-Gate Bipolar Transistors or IGBTs) to the IPM's control board, and that the cracks in the solder leave air voids that reduce its ability to dissipate heat, which damages the transistors and causes the IPM to malfunction and fail (hereinafter, the "IPM Defect").

7.     Notwithstanding its experience with the Highlander/RX400 hybrids, in 2009 Toyota modified the hybrid system in the third-generation (2010 model-year) Prius hybrids by increasing the maximum operating voltage from 500 to 650 volts, just as it had done with the problematic Highlander/RX400 hybrids.

8.      Meanwhile, Toyota kept silent about the IPM Defect in the Highlander/RX400 SUVs until complaints by owners of Highlander hybrids prompted the National Highway Traffic Safety Administration ("NHTSA") to open a defect investigation into the 2006 model-year Highlander in February 2011. Four months later (in June 2011), Toyota announced that it was conducting a safety recall of approximately 82,000 2006 and 2007 model-year Highlander and RX400 hybrids. Toyota told NHTSA that some of the transistors were "inadequately soldered" to the IPM control boards in those vehicles, that a damaged transistor could result in the vehicle suddenly decelerating or stalling while being driven, and that Toyota would replace the IPMs that had "suspect transistors."

9.      Just over two years later (in September 2013), Toyota advised NHTSA that it was conducting another safety recall, which involved 2006 through 2010 model-year Highlanders and 2006 through 2008 model-year RX400 hybrids, totaling approximately 130,000 vehicles. This time, however, Toyota actually addressed the IPM Defect. Toyota advised NHTSA that transistors were becoming damaged because the solder used to attach them to the IPM control board contained lead, which caused the solder to deteriorate when exposed to thermal stress, and that a damaged transistor could result in the vehicle suddenly decelerating or stalling while being driven. Accordingly, Toyota announced that it was replacing the defective IPMs with non-defective IPMs.

10.     Five months later, Toyota announced yet another safety recall involving the IPM Defect, this time in certain Class Vehicles. In February 2014, Toyota announced Safety Recall E0E, in which it recalled over 700,000 2010-2014 model-year Prius hybrids because the

transistors could be damaged due to exposure to thermal stress, which could result in the vehicle suddenly decelerating or stalling while being driven.

11.     Toyota's statements in February 2014 acknowledged that the IPM Defect resulted from a physical deformity; that is, a ***hardware*** problem. But instead of replacing the IPMs, as it had in the Highlander/RX400 recalls, Toyota stated that it would correct the problem by modifying—or "re-flashing"—the electronic control module *software*, thereby saving thousands of dollars in repair costs for each of the 700,000 vehicles that were the subject of the recall.

12.     Toyota's stated rationale for limiting the recall of Certain Class Vehicles to a software fix was false. According to Toyota, it determined that the problem in the recalled Priuses was software-related because the Prius V wagon, which was based on the same hybrid system, was ***not*** affected by the IPM Defect. But just 15 months later, Toyota announced Safety Recall F0R, in which it recalled over 100,000 ***Prius V*** wagons because IPM transistor damage in those vehicles could cause them to suddenly decelerate or stall while being driven—just like the other Class Vehicles it recalled in 2014, and just like the Highlander and RX400 hybrids that it recalled in 2011 and 2013.

13.     Notwithstanding that its initial attempt to rationalize the problem as software-related was demonstrably false, Toyota ***still*** insisted that the software "re-flash" would correct the IPM Defect, without offering any explanation—much less any evidence—in support of that assertion. All the while, Toyota knew that the problem was a physical deformity which could never be fixed with a software remedy.

14.     To date, Toyota has refused to replace the defective IPMs in

Class Vehicles unless and until they have already failed, thereby undermining the very purpose of a safety recall—to **prevent** a safety risk **before** it injures or kills. Indeed, Toyota has admitted that it has replaced nearly 500 IPMs per month in Class Vehicles whose software has already been "re-flashed," a replacement rate that is astronomical in light of the fact that IPMs are designed to last for the life of the vehicle without the need for service or replacement.

15.     Consequently, well over 800,000 vehicles in the United States (including many Priuses that Toyota excluded from Safety Recall E0E and Safety Recall F0R) continue to be affected by the IPM Defect because Toyota has elected to put a Band-Aid on a gaping wound. Toyota's decision to put cost concerns ahead of motor vehicle safety endangers Prius drivers, passengers, and others who happen to be driving near these vehicles when their hybrid systems fail.

16.     In October 2018, after Plaintiffs filed their initial complaints alleging that Toyota has been covering up the IPM Defect for years, Toyota announced yet another Prius recall, this time involving all of the 800,000-plus Class Vehicles it had recalled in 2014 and 2015. As before, Toyota acknowledged that the problem that led to the recall affected all 2010-2014 model-year Prius and all of the 2012-2015 model-year Prius V hybrid vehicles, and Toyota readily admitted that it was conducting the recall because those vehicles had a propensity to stall while driving, thereby increasing the likelihood of a crash.

17.     Astoundingly, however, Toyota **still** refused to bear the cost of replacing the defective IPMs with non-defective IPMs **before** those IPMs actually fail. Instead, as it did before, Toyota conducted the Prius recall in October 2018 to perform yet **another** software "re-flash."

18.     This is simply another ruse to make it seem as though

Toyota is addressing an obvious problem—one that even Toyota admits has resulted in the replacement of nearly 500 IPMs per month *after* the "re-flash"—which is *enormous* in light of the fact that the IPM is designed to last for the life of the vehicle without the need for service or periodic replacement. Again, Toyota has known for more than a decade that the IPM Defect is a hardware problem, which may explain why Toyota chose to provide owners of more expensive Toyota Highlander and Lexus RX400 hybrids with replacement IPMs rather than a software "re-flash"—notwithstanding that the Prius and the Highlander/RX400 are based on the same Toyota Hybrid System and use the same "Techstream ECU Flash Programming Procedure."

19.    Regardless of the rationale that informed this decision, Toyota is once again trying to save money by pretending it is fixing the problem while not actually fixing anything. Despite multiple prior failed recalls, Toyota continues to refuse to address the IPM defect in hundreds of thousands of its hybrid vehicles.

20.    This is not the first time Toyota has employed this approach as a means of saving money at the expense of its customers' safety. For more than a year, Toyota concealed what it knew about what was causing sudden unintended acceleration in millions of other vehicles made by Toyota—*going so far as canceling plans to correct that problem and instructing its personnel to refrain from communicating about it in writing as a means of preventing NHTSA from discovering what Toyota actually knew about the problem*.

21.    After attending a meeting at which Toyota continued the sudden acceleration cover-up, a Toyota employee exclaimed "Idiots! Someone will go to jail if lies are repeatedly told. I can't support this."

Two days later, Toyota recalled all the affected vehicles and ultimately admitted that it had lied to its customers, federal regulators, and Congress.

22.     Toyota was charged by the U.S. Department of Justice with criminal fraud under 18 U.S. Code § 1343, but escaped criminal prosecution by entering into a Deferred Prosecution Agreement by which it paid a $1.2-billion fine to the U.S. government for hiding dangerous defects. Toyota also formally admitted that it had lied to regulators and the public about its efforts to correct the safety defects, and that it failed to timely notify regulators about the defects as required by federal law.

23.     "In 2014, U.S. District Judge William Pauley said the case presented a 'reprehensible picture of corporate misconduct' and expressed hope the government would ultimately hold responsible decision-makers at Toyota accountable. 'This, unfortunately, is a case that demonstrates that corporate fraud can kill, he said."[1]

24.     Toyota claimed publicly that it had cleaned up its act and told customers that it would commit itself to their safety and would not conceal defects from them again.  That, too, was a lie.  Just one month before it entered into the Deferred Prosecution Agreement, Toyota perpetrated yet another fraud involving a safety defect—the one at issue in this case, which affects hundreds of thousands of Class Vehicles.

25.     Toyota's conduct constitutes fraud; violates federal law,

---

[1] David Shepardson, "U.S. asks judge to dismiss Toyota acceleration case as monitoring ends," *Reuters* (Aug. 8, 2017), available at https://www.reuters.com/article/toyota-settlement-idUSL1N1KU0PP.

1  California consumer protection statutes and common law; and
2  constitutes breaches of applicable warranties.

3      26.    Clearly, Toyota did not learn its lesson. It is time to send a
4  message to Toyota—by requiring it to replace the defective IPMs in
5  Prius hybrids free of charge, by requiring it to compensate Class
6  Members for their losses, and by awarding punitive damages—that its
7  callous disregard of public safety is simply not acceptable.

8  <div align="center">**JURISDICTION AND VENUE**</div>

9      27.    This Court has diversity jurisdiction over the claims asserted
10  herein on behalf of a nationwide class pursuant to 28 U.S.C. section
11  1332, as amended in February 2005 by the Class Action Fairness Act
12  ("CAFA"). CAFA jurisdiction is proper because:

13      a.    The amount in controversy in this class action exceeds
14  five million dollars, exclusive of interest and costs; the proposed class
15  includes more than 100 members, more than one of whom reside in a
16  state other than California; and

17      b.    Toyota has purposefully availed itself of the privilege of
18  conducting business activities within the State of California, where
19  Toyota is incorporated and where Toyota engaged in the unlawful
20  conduct alleged in this Complaint.

21      28.    Venue is proper in this judicial district pursuant to 28 U.S.C.
22  section 1391, and California Civil Code section 1780(d), because the
23  conduct alleged in this Complaint occurred in this judicial district.

24  <div align="center">**PARTIES**</div>

25      29.    Plaintiff Remy McCarthy is a citizen and resident of Ventura
26  County, California. Mr. McCarthy purchased his 2010 Toyota Prius at
27  Claremont Toyota in August 2010, and he continues to own the vehicle.
28  Mr. McCarthy's vehicle received the software "re-flash" under Safety

<div align="center">-8-</div>

1  Recall E0E. Had Mr. McCarthy known what Toyota knew about the
2  IPM Defect and that it had "re-flashed" the ECU software to conceal its
3  existence, nature, and scope, he would not have purchased the vehicle
4  or would have paid significantly less for its purchase.

5      30.    Plaintiff Kathleen Ryan-Blaufuss is a citizen and resident of
6  Los Angeles County, California. Ms. Ryan purchased her 2010 Toyota
7  Prius at Jimmy Vasser Toyota in Napa, California, in November 2009,
8  and she continues to own the vehicle. Her vehicle received the software
9  "re-flash" under Safety Recall E0E in June 2014.

10      31.    In January 2018, Ms. Ryan was driving 70 miles per hour in
11  the fast lane on a major freeway in Los Angeles when her inverter
12  failed. In a matter of seconds, her car decelerated from 70 miles per
13  hour to 15 miles per hour. Ms. Ryan had to maneuver the car through
14  three lanes of traffic to the shoulder with limited power. One California
15  Highway Patrol officer who witnessed the incident told Ms. Ryan that
16  she was lucky to be alive. Ms. Ryan paid $189.00 to tow her Prius to
17  Marina del Rey Toyota, where her vehicle was diagnosed with a failed
18  inverter.

19      32.    The software "re-flash" also decreased the fuel efficiency of
20  Ms. Ryan's vehicle. After the software "re-flash," Ms. Ryan's car got
21  approximately 40 miles per gallon (mpg), which is approximately 10
22  mpg less than prior to receiving the "re-flash." Had Ms. Ryan known
23  what Toyota knew about the IPM Defect and that it had "re-flashed" the
24  ECU software to conceal its existence, nature, and scope, she would not
25  have purchased the vehicle or would have paid significantly less for its
26  purchase.

27      33.    Plaintiff Cathleen Mills is a citizen and resident of San
28  Diego County, California. Ms. Mills purchased her 2011 Toyota Prius

at Hoehn Honda in Carlsbad, California in August 2014, and she continues to own the vehicle.  Her vehicle had received the software "re-flash" under Safety Recall E0E in March 2014, prior to her purchase.

34.   Ms. Mills believes that her vehicle experienced decreased fuel efficiency. The vehicle gets an average of 40 mpg, which is less than what Toyota claims the Prius should get (Toyota claims 48 mpg highway and 50 to 51 mpg city).  Ms. Mills would not have purchased the vehicle had she known the inverter could fail at any time, or that it would be less fuel efficient than Toyota represented.  These facts were concealed from her by Toyota.  Ms. Mills is afraid to drive on the freeway in her Prius, but she cannot afford to buy a different vehicle. Had Ms. Mills known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, she would not have purchased the vehicle or would have paid significantly less for its purchase.

35.   Plaintiff Jason Reid is a citizen and resident of Orange County, Florida.  Mr. Reid leased his 2010 Toyota Prius at Toyota of Orlando in November 2010 and subsequently purchased the vehicle at the end of the lease term. Mr. Reid continues to own the vehicle.  His vehicle received the software "re-flash" under Safety Recall E0E.  The software "re-flash" decreased the fuel efficiency of Mr. Reid's vehicle. Prior to the "re-flash," Mr. Reid's vehicle was averaging 54 miles per gallon.  After the "re-flash," Mr. Reid's vehicle now gets an average of 45 miles per gallon.  Had Mr. Reid known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

36.   Plaintiff Khek Kuan is a citizen and resident of San

Bernardino County, California.  Mr. Kuan purchased his 2013 Prius V. Mr. Kuan's vehicle received the software "re-flash" under Safety Recall F0R.  The software "re-flash" decreased the fuel efficiency of Mr. Kuan's vehicle.  Prior to the "re-flash," Mr. Kuan's vehicle averaged a range of 420 miles on a full tank of gas.  After the "re-flash," Mr. Kuan's vehicle averages a range of 365 miles on a full tank of gas.  Had Mr. Kuan known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

37.    Plaintiff Jevdet Rexhepi is a resident of the County of Los Angeles, California, who purchased a new 2012 model-year Toyota Prius hybrid Prius hybrid from North Hills Hammer Toyota. The ECU software in Mr. Rexhepi's Prius was "re-flashed" pursuant to Safety Recall E0E. Had Mr. Rexhepi known what Toyota knew about the IPM Defect and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

38.    Plaintiff Steven Kosareff is a resident of the County of Los Angeles, California, who purchased a new 2010 model-year Toyota Prius hybrid from Santa Monica Toyota. The ECU software in Mr. Kosareff's Prius was "re-flashed" pursuant Safety Recall E0E. After the "re-flash," Mr. Kosareff noticed that his Prius seemed to be getting fewer miles to the gallon than it had before the "re-flash." When he checked his Prius's gas mileage, Mr. Kosareff discovered that it had gone from more than 50 miles per gallon to 40 miles per gallon after the "re-flash." Had Mr. Kosareff known what Toyota knew about the IPM Defect, and that it had "re-flashed" the ECU software to conceal its

existence, nature, and scope, he would not have purchased the vehicle or would have paid significantly less for its purchase.

39.    Plaintiff Laura Kakish is a resident of the County of Los Angeles, California, who purchased a new 2010 model-year Toyota Prius hybrid from Longo Toyota. The ECU software in Ms. Kakish's Prius was "re-flashed" pursuant to Safety Recall E0E. After the "re-flash," Ms. Kakish noticed that her Prius got significantly less gas mileage than it did before the software was modified by Toyota.

40.    Ms. Kakish also experienced numerous stalling and "limp-home" events in her Prius. For example, while traveling in the right lane of the Orange freeway (State Route 57), Ms. Kakish's Prius suddenly went from over 70 miles per hour to 20 miles per hour and was nearly struck by a "big rig" that was entering the freeway. The truck began honking at her, but Ms. Kakish had no control of the speed of the vehicle.

41.    Ms. Kakish brought the vehicle to her local Toyota dealer, who told her nothing could be done about the problem because the issue could not be "duplicated" at the dealership. The Toyota dealer also suggested that Ms. Kakish may have caused the problem by putting the Prius in neutral (while driving on the freeway) or by depressing the gas and brake pedals simultaneously. Ms. Kakish had done neither—on that occasion or any of the others that involved similar stalling and "limp-home" events. Had Ms. Kakish known what Toyota knew about the IPM Defect, and that it had "re-flashed" the ECU software to conceal its existence, nature, and scope, she would not have purchased the vehicle or would have paid significantly less for its purchase.

42.    Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota US") is a California corporation with its principal place of business in Plano,



1  Texas.  Toyota US is responsible for the manufacture, distribution and
2  sale of all Toyota automobiles in the United States.

3      43.    Defendant Toyota Motor Corporation ("Toyota Japan") is a
4  Japanese corporation with its headquarters in Japan.  Toyota Japan is
5  the parent company of Toyota US and conducts business in this
6  District.

7      44.    Toyota US and Toyota Japan are referred to collectively in
8  this Complaint as "Toyota."

9      45.    The names and capacities of DOE Defendants 1-10 are
10 currently unknown to Plaintiffs.  Each of the DOE Defendants is legally
11 responsible for the unlawful acts alleged herein.

12     46.    At all relevant times, each defendant was acting as an agent
13 or employee of each of the other and was acting within the course or
14 scope of the agency with knowledge and consent of the other
15 defendants.  Each of the acts and omissions complained of were made
16 known to, and ratified by, each of the other defendants.

17 ## GENERAL ALLEGATIONS

18 **A.   1997: THE TOYOTA HYBRID SYSTEM IS USED IN THE PRIUS**

19     47.    Toyota markets the Prius as an environmentally and
20 financially better alternative to conventional vehicles because it uses
21 less fuel and has lower emissions.  Customers buy and lease Toyota
22 Priuses not only because they emit less pollution than standard
23 vehicles, but also because of their fuel efficiency.

24     48.    With rising fuel prices and the subsidies available for
25 environmentally friendly vehicles, the number of hybrid vehicles on the
26 road is rising dramatically.  The Toyota Prius is the world's most
27 popular hybrid vehicle.  Because of the Prius's reputation, Toyota has
28 become the global leader in hybrid technology and fuel economy.

<div align="center">-13-</div>



49.   The Toyota Hybrid System was developed for use in the first-generation Toyota Prius hybrid vehicles sold in Japan in 1997 and introduced to the U.S. market in the 2001 through the 2003 model years.[2]

50.   The first-generation Prius combined an electric motor powered by a battery with a nominal voltage of 273.6 volts and an internal combustion engine, both of which are connected to a conventional geared transmission.

51.   One of those critical parts is the hybrid inverter assembly, which contains an inverter that converts direct current (DC) to alternating current (AC) to turn the electric motors and to use in the generator. Conversely, the inverter converts AC generated by the electric motors and the generator into DC to recharge the battery.

52.   Toyota used the next iteration of the Toyota Hybrid System ("THS-II") in second-generation Prius hybrids (sold in the 2004 through 2009 model years). THS-II uses the same internal combustion engine as the first-generation Prius, but it employs a variable-voltage system that uses a boost converter to increase the operating voltage. Toyota describes this variable-voltage system as follows:

> THS-II uses a variable-voltage system that consists of a boost converter and inverter. The boost converter is used to boost the operating voltage of the system to a maximum voltage of DC 650V, and the inverter is used to convert the system voltage (direct current) into an alternating current. By using the variable-voltage system, the electrical loss associated with the

---

[2] A "model year" denotes the year that automakers attribute to the annual production period of a particular model of vehicle. For example, a 2019 model-year vehicle can be one that is manufactured on or after January 1, 2018.

FAZIO | MICHELETTI LLP
Attorneys

supply of electric power at a smaller current is minimized, and MG1 and MG2 are driven at a high voltage. Thus, MG1 and MG2 are operated at high speeds and high outputs.

53.   The inclusion of a boost converter in second-generation Prius hybrids enabled Toyota to substantially reduce the size of the battery while generating more power than the battery that was used in first-generation Priuses by increasing the maximum voltage to 500 volts during "high-load" driving conditions, such as hard acceleration or ascending a long, steep grade.

**B.   2005: TOYOTA DISCOVERS THAT THERMAL STRESS IS DAMAGING IPM TRANSISTORS**

54.   Toyota modified THS-II when it introduced the Toyota Highlander hybrid SUV and its corporate twin, the Lexus RX400 hybrid SUV, to the U.S. market in the 2006 model year. Whereas the boost converter in the second-generation Prius increased voltage to a maximum of 500 volts, the boost converter in the Highlander/RX400 hybrids increased the voltage to a maximum of **650** volts.

55.   It was not long before the IPM Defect began to manifest while these vehicles were being driven. In field reports, Toyota technicians described the problem in general terms, noting that the inverter assembly had failed without specifying the particular components within the inverter assembly (*i.e.,* the IPM and the transistors attached to its control board). For example, on September 19, 2005, a Toyota engineer issued a field report that explained that the inverter assembly had malfunctioned in a 2006 model-year Highlander hybrid, and that  the inverter assembly was replaced to correct the problem.

56.   Toyota continued to receive field reports concerning

malfunctioning inverters in 2006 model-year Highlanders in 2006, 2007, 2008, 2009, and 2011. Each time, the inverter assembly was removed and replaced with a new inverter assembly. Toyota later confirmed "that **98% of the reports identify the hybrid inverter assembly as the causal component contributing to the subject failure mode [i.e., an engine stall or loss of power**]." (Emphasis added.)

57.    In 2005 and 2006, Toyota recognized internally that the heat generated in the inverter assembly was creating microscopic cracks (or "voids") in the solder, which prevented it from dissipating sufficient amounts of heat and damaged IPM transistors (*i.e.,* the IGBTs), which cause the vehicle to suddenly decelerate or stall while being driven.

58.    But Toyota did not disclose what it knew about thermal stress damaging the IPM transistors and causing stalling until after NHTSA opened a defect investigation on February 15, 2011. NHTSA's investigation was prompted by "32 complaints alleging incidents of engine stalling while driving in model year 2006 Toyota Highlander hybrid electric vehicles. *Approximately two-thirds (d^p21) of the incidents occurred at speeds of 40 miles per hour or more*." ODI Resume re PE 11-005 (dated Feb. 15, 2011) (emphasis added).

59.    In response to a formal Information Request dated April 29, 2011, Toyota advised NHTSA that it had received a field report in May 2007 concerning a Lexus RX400 whose engine had stalled in Japan, and that it discovered damage to the IPM transistors (IGBTs) when it inspected the inverter in that vehicle. Toyota also reported that it continued to assess the problem through December 2008 and "found that the heat release performance of the solder for the IGBTs had deteriorated" and "that cracks in the cross-section surface of the solder may have contributed to the deterioration of the heat release efficiency of

-16-

the solder."

60.    Toyota admitted that nearly half the reports it received indicated that "there was an inverter and related component failure that reportedly led to a vehicle 'stall' or 'loss of power' while driving." Toyota also noted that IPM damage was likely to cause the vehicle to enter "fail-safe" mode, which would allow the vehicle to be driven at a reduced speed with power-assisted brakes and steering until the battery is discharged.

61.    Actually, when a Toyota hybrid enters "fail-safe" or "limp-home" mode, it unexpectedly decelerates, so that a vehicle traveling at 70 miles per hour on the freeway is suddenly traveling at approximately 20 miles per hour or slower. Moreover, Toyota also acknowledged that some drivers reported that their vehicle stalled completely and lost power-assisted steering and brakes.

62.    A vehicle entering "fail-safe" or "limp-home" mode creates or greatly increases a risk of a collision with another vehicle. For example, when a vehicle traveling in one of the middle or left lanes of a freeway suddenly decelerates from 70 to 20 miles per hour, there is a significant risk that the vehicle will be hit from behind by another vehicle not expecting such a sudden slow-down.

63.    Moreover, if a vehicle suddenly loses speed while turning left on a two-way road, sudden deceleration while turning in front of oncoming traffic is likely to cause a crash as a result of the vehicle's inability to clear the intersection, as it would have if it had been able to maintain a safe speed.

64.    Yet another example of this dangerous condition is a car suddenly decelerating while entering a freeway. Normally, cars entering a freeway speed up to match the speed of vehicles already traveling on the freeway.    If the merging vehicle suddenly and unexpectedly loses

-17-



speed, the risk of a rear-end collision is greatly increased.

65. In a Defect Information Report it submitted to NHTSA on June 29, 2011, Toyota explained that it decided to conduct a safety recall of 2006 and 2007 model-year Highlander and RX400 hybrids because the IPM transistors are prone to damage by the heat generated under "high-load" driving conditions (*i.e.,* when the boost converter increases the operating voltage), and that damaged transistors can lead to a blown power-supply fuse that causes the hybrid system to fail, which results in the vehicle suddenly stalling on the roadway.

66. In the same Defect Information Report, Toyota also represented that "[n]o other Toyota or Lexus vehicles use the same hybrid inverter as the subject vehicles." Yet, on September 4, 2013, Toyota issued a Defect Information Report in which it announced that it was conducting another safety recall of Highlander and RX400 hybrids due to precisely the same problem that led to the prior recall. The second recall was much more expansive than the first; it included 2006 through 2008 model-year Lexus RX400 hybrids and 2006 through 2010 Toyota Highlander hybrids.

67. The Defect Information also contained a chronology of principal events, which stated that in August 2013 Toyota claimed that the use of lead in the solder attaching the transistors to the IPM was the root cause of the problem, and that the use of lead-free solder would solve it. Accordingly, Toyota announced that every Highlander/RX400 owner would be notified to return their vehicles to a Toyota or Lexus dealer for a cost-free IPM replacement.

CONSOLIDATED MASTER COMPLAINT

**C.    2009:  TOYOTA BOOSTS THE VOLTAGE IN THE THIRD-GENERATION PRIUS, LEADING TO THOSE VEHICLES SUDDENLY AND UNEXPECTEDLY STALLING AT HIGHWAY SPEEDS**

68.    Despite its awareness of the problems that the IPM Defect created in the Highlander and RX400 hybrids shortly after it began selling those vehicles in 2005, Toyota decided to boost the maximum operating voltage in the third-generation Prius (which began in the 2010 model year) from 500 to 650 volts, just as it did with the Highlander/RX400 hybrids. Yet Toyota said nothing about the IPM Defect to prospective purchasers and lessees of third-generation Prius hybrids.

69.    Instead, Toyota waited until February 2014—after virtually all 2010 through 2014 model-year Prius hybrids were already on the road— before it announced Safety Recall E0E and disclosed to federal regulators and prospective Class Members for the first time that certain Class Vehicles were inordinately prone to suddenly decelerating or stalling while driving due to IPM failure.

70.    Even then, however, Toyota concealed material facts. Despite having spent years analyzing the effect of thermal stress on IPM transistors and determining that cracks in the solder were damaging the IPM transistors, Toyota knowingly misrepresented that the software "re-flash" solved the problem.

71.    The reason Toyota focused on software and avoided discussing hardware issues was simple: the average cost of replacing an IPM is approximately $3,000, hence replacing the IPMs in more than 700,000 Prius hybrids that were the subject of Safety Recall would have cost Toyota billions of dollars, whereas the software "re-flash" cost Toyota approximately $85 per vehicle.

-19-

72.  In the chronology it included in the February 2014 Defect Information Report it submitted to NHTSA, Toyota stated that it had received field reports during May 2011 through June 2012 that described vehicles with damaged IGBTs "losing power or entering fail-safe mode along with the illumination of warning lights[,]" but could not find any voids or cracks in the solder surrounding the damaged IGBTs.

73.  The following year (June 2012 through June 2013), Toyota admitted to NHTSA that it *did* find cracks in the solder attaching the IGBTs to the IPMs that were returned with field reports, but claimed that it was unable to find any aspect of the production process that could lead to the development of a solder crack and was unable to duplicate the damage to IGBTs in replication tests. And although Toyota found a solder crack and a deformed IPM transistor (*i.e.,* IGBT) "during bench testing simulating high-mileage and high-load operating conditions[,]" it told NHTSA that there were no conceivable circumstances in which a damaged IGBT could result in a stalled vehicle:

> Based on field information alleging sudden vehicle stoppage while driving, Toyota revalidated the fail-safe logic design on the subject vehicles and could not identify any scenario in which the vehicle would not enter a fail-safe mode when IGBT(s) used for operation of the boost converter became damaged. . . .

74.  This was untrue. During the period described in this portion of Toyota's chronology (June 2012 through June 2013), many Prius drivers had already complained to NHTSA and elsewhere about sudden and unexpected stalling.

75.  It is notable that, in the February 2014 Defect Information Report to NHTSA, Toyota recognized again, as it had in 2005, that the IPM Defect resulted in a *physical* deformity:



> [H]igher thermal stress could occur in specific IGBT's used for the operation of the boost converter, which is required during high-load driving such as accelerating during highway driving. If this occurs, the IGBT could deform and eventually result in damage to the IGBT(s), illuminating various warning lights on the instrument panel. In most cases, the vehicle will enter a fail-safe mode, resulting in reduced motive power in which the vehicle can still be driven for certain distances. In limited instances, the motor/generator ECU could reset, causing the hybrid system to shut down and resulting in the vehicle stopping while being driven, increasing the risk of a crash.

76.     Toyota further admitted this physical deformity would "eventually result in damage" to the system: the vehicle would either (1) enter limp-home (fail-safe) mode, or (2) shut down. Moreover, Toyota admitted that a damaged IPM transistor (*i.e.,* IGBT) could also result in the motor/generator control ECU being exposed to electrical transients (*i.e.*, electrical surges at extremely high voltages), which could cause a "specific microchip in the ECU to reset itself, resulting in the hybrid system shutting down rather than going into fail-safe mode."

77.     Yet, after this occurred so frequently after the vehicles that were the subject of Safety Recalls E0E and F0R had their ECU software "re-flashed," in October 2018 Toyota announced that all the 800,000-plus Prius hybrids that were the subject of Safety Recalls E0E and had to be recalled again because they remained prone to IPM failure.

78.     ***Both*** of the effects of IPM transistor damage—entering limp-home (*i.e.,* "fail-safe") mode and sudden hybrid system shutdown resulting in an unexpected stall—increase the risk of being involved in a crash, so applicable law requires that the underlying cause of the problem had to be remedied under applicable law. For that reason, Toyota announced a voluntary recall for "both the motor/generator control ECU and the hybrid control ECU which will prevent damage to

-21-

the IGBT and also prevent a hybrid system shutdown in the event of a motor/generator control module reset." *Id.*

79.   Toyota's February 2014 recall notification letter to its customers and its "Customer Frequently Asked Questions" represented that the "condition" that led to the recall—*i.e.,* IPM transistors in the inverter becoming damaged and causing the car to enter "limp-home" mode (which Toyota euphemistically and misleadingly characterizes as "fail-safe" mode) or to suddenly shut down and stall—would be remedied by a "software update."  This was false and Toyota knew it to be false when it made that and other, similar representations in connection with the Prius V recalls.

80.   Toyota went on in the 2014 Defect Information Report to claim that, during the period from July 2013 through February 2014, it had "confirmed that Prius V vehicles, which use the same inverter assembly, ***did not experience the same problems in the field on the boost converter and, from inspection of recovered in-use inverters, did not have cracks in the solder used in the IGBT's***." (Emphasis added.) Thus, Toyota told NHTSA that the ostensible difference in performance between the Prius and the Prius V wagon was attributable to the electronic control unit software that controls the amount of voltage the boost converter puts out.

81.   Toyota also falsely assured NHTSA that the vehicles it decided to recall were the only vehicles affected by the IPM Defect. Specifically, Toyota asserted in the February 2014 Defect Information Report concerning the Prius that "***[n]o other Toyota or Lexus vehicles use the same inverter assembly and software used to control the boost converter in the motor/generator electronic control unit (ECU) as the involved vehicles***." (Emphasis added.)

-22-

82.   But just over a year later (on July 15, 2015), Toyota issued a Defect Information Report pertaining to the IPM Defect in over 100,000 Prius V hybrids. There, Toyota's description of the problem focuses on the voids in the solder used to attach the IGBTs to the IPM—the same issue on which Toyota had originally focused between 2005 and 2008:

> The inverter assembly is part of the hybrid system of the subject vehicle. Inside the inverter assembly is an Intelligent Power Module (IPM) which contains a control board equipped with transistors known as Insulated-Gate Bipolar Transistors (IGBT's). In a specific usage condition the software that controls ***the boost converter in the IPM could cause microscopic voids to build up in the solder beneath the IGBTs used for the operation of the boost converter. If this occurs, the heat dissipation ability of the IGBT could be reduced, causing the IGBT to be damaged***. If the IGBT is damaged, it could result in the illumination of various warning lights on the instrument panel. In most cases, the vehicle will enter a fail-safe mode, resulting in reduced motive power in which the vehicle can still be driven safely for certain distances. In limited instances, the motor/generator ECU could reset, causing the hybrid system to shut down and resulting in the vehicle stopping while being driven, increasing the risk of a crash.

(Emphasis added.)

**D.   2014: TOYOTA MISREPRESENTS THE EFFICACY OF THE SOFTWARE "RE-FLASH," WHICH DOES NOTHING TO PREVENT THOUSANDS OF IPMS FROM HAVING TO BE REPLACED**

83.   Toyota's assurance to NHTSA and Prius drivers that modifying—or "re-flashing"—the ECU software cured the IPM Defect was unfounded and baseless. Toyota offered no evidence that the IPM Defect was caused by software—much less that modifying the software could or would eliminate it—and for good reason: Toyota has admitted that Prius IPMs continue to fail at an astronomical rate of approximately ***15 per day*** even after the ECU software was "re-

-23-



flashed."

84. Moreover, in the "Customer Frequently Asked Questions" portion of the February 2014 recall notification letter to its customers, Toyota suggested that entering "fail-safe" (or "limp-home") mode posed little or no risk to motor vehicle safety. This was false and Toyota knew it to be false when it made these representations.

85. Proposed Class Members continued to experience precisely the same problem before and after their vehicles' software was "re-flashed." As discussed above, after its ECU software was "re-flashed," Plaintiff Ryan's Prius suddenly stalled while she was driving 70 miles per hour in the fast lane on a major freeway in Los Angeles, causing the vehicle to decelerate from 70 miles per hour to 15 miles per hour in a matter of seconds. As the California Highway Patrol officer who witnessed the incident told Ms. Ryan, she was lucky to be alive.

86. Similarly, after her vehicle received the "re-flash," Plaintiff Kakish experienced numerous stalling events in her Prius, including one in which a large tractor-trailer came very close to colliding with her Prius when it suddenly stalled at 70 miles per hour on State Route 57. Yet, when Ms. Kakish brought the vehicle to her local Toyota dealer, she was told that nothing could be done about the problem because the dealer could not "duplicate" the issue at the dealership.

87. Other Prius drivers have also confirmed that the software "re-flash" did not eliminate the IPM Defect. For example, two months after the initial Prius recall was announced, the owner of a 2013 model-year Prius complained to NHTSA that his vehicle stalled repeatedly *after* the software update was performed:

> THE CONTACT OWNS A 2013 TOYOTA PRIUS.
> THE CONTACT STATED THAT AFTER THE
> VEHICLE WAS SERVICED UNDER NHTSA



CAMPAIGN NUMBER: 14V053000 (HYBRID PROPULSION SYSTEM) THE VEHICLE STALLED CONTINUOUSLY. BOTH MANUFACTURER AND DEALER HAVE BEEN MADE AWARE OF THE FAILURE. THE VEHICLE HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS 11,436.[3]

88.   Three months later (in July 2014), this complaint was submitted to NHTSA:

THE HYBRID INVERTER ASSEMBLY FAILED WHEN I TRIED TO ACCELERATE FROM A STOP ONTO A RURAL HIGHWAY. THIS OCCURRED APPROXIMATELY TWO MONTHS AFTER RECEIVING THE MOTOR GENERATOR ECU AND POWER MANAGEMENT ECU SOFTWARE UPDATE THAT WAS INTENDED TO PREVENT THIS TYPE OF FAILURE. I WAS NOTIFIED OF THIS UPDATE/RECALL IN LATE MARCH 2014 AND HAD THE UPDATE COMPLETED AT A AUTHORIZED TOYOTA SERVICE CENTER.

89.   In another complaint that was filed in July 2014, the driver of a 2010 model-year Prius that had the software update performed several months earlier went into limp-home mode while driving at 65 miles per hour:

WAS TRAVELING ABOUT 65 MPH ON ROUTE 11 IN CT WHEN RED LIGHTS COME ON AND CAR SLOWS TO 20 MPH. PULLED TO SIDE OF ROAD AND CALLED AAA/TOWED TO HARTFORD TOYOTA IN HARTFORD CT. **FIRST TOLD IT WAS A HYBRID BATTERY THEN TOLD IT WAS THE INVERTER WHICH THEY SAID IS ON BACK ORDER. NOW I'M GETTING THE RUN AROUND FROM THE MAIN OFFICE IN CALIFORNIA.** **BROUGHT CAR IN FOR A RECALL ON SOFTWARE UPDATE IN FEB 2014** AND FROM WHAT I READ THIS MAY CAUSE THE

---

[3] The complaints that follow were retrieved verbatim from NHTSA's database, where they appear in capital letters and are reprinted here without change, except for emphasis in bold, which has been added.



INVERT TO FAIL THANKS FOR YOUR
ATTENTION IN THIS MATTER.

90.   Similarly, the driver of a 2011 model-year Prius complained in February 2016 that his vehicle stalled suddenly (for a second time) while driving at 40 miles per hour, and that it stalled again after the software update was performed:

> THE CONTACT OWNS A 2011 TOYOTA PRIUS.
> WHILE DRIVING 40 MPH, THE VEHICLE
> LOST POWER. THE VEHICLE WAS ABLE TO
> BE RESTARTED. THE FAILURE RECURRED
> TWICE. THE DEALER UPDATED THE
> SOFTWARE. THE VEHICLE WAS REPAIRED;
> HOWEVER, THE FAILURE RECURRED. THE
> VEHICLE WAS TAKEN TO THE DEALER A
> SECOND TIME WHERE THE TECHNICIAN
> STATED THAT THEY DID NOT HAVE THE
> CORRECT CODE FOR THE SOFTWARE. THE
> VEHICLE WAS NOT REPAIRED. THE
> MANUFACTURER WAS NOTIFIED. THE
> APPROXIMATE FAILURE MILEAGE WAS
> 60,000.

91.   In December 2015 another owner of a 2010 model-year Prius reported that the vehicle stalled after the software "reflash" had been performed:

> CHECK HYBRID SYSTEM CAR SHUTS OFF
> AND CAN NOT RESTART, TRIED SYSTEM
> RESET PER MANUAL BUT WOULD NOT
> CLEAR HYBRID. TOWED TO DEALER, DTC
> CODE 800, TECH SAID THIS WAS THE ONLY
> CODE, **HAD RECALL EOE REFLASH 0**4-14-
> **2014** IPM EXTENDED 15 YEARS. CAR WAS IN
> MOTION PER WIFE. (IT HAD BEEN RAINING)
> THE DTC P3004800 POWER CABLE
> MALFUNCTION.

92.   In August 2014 the driver of a 2013 model-year Prius hybrid complained that the vehicle was performing *worse* after it was purportedly "fixed" by performing the software update:

> **I HAD MY CAR UPDATED BY TOYOTA
> THEY SAID IT WAS A VOLUNTARY
> RECALL , EXACTLY AFTER THE UPDATE I**

-26-



NOW GET 10-15 MILES LESS A GALLON AND MY VEHICLE HESITATES ON ACCELERATION 1-3 SECONDS. I HAVE BROUGHT THE CAR BACK 2 TIMES AND WAS TOLD THAT THEY HAVEN'T HEARD OF ANY COMPLAINTS ABOUT PROBLEMS AFTER THE UPDATE I LEFT MY CAR WITH THEM BOTH TIMES ON A FRIDAY AND PICKED UP ON A MONDAY THEY SAID THEY RECALIBRATED THE COMPUTER THE FIRST TIME AND IT HAD BETTER MILEAGE UNTIL I FILLED UP AND RESET THE ODOMETER AND BACK TO THE LESS MILEAGE AGAIN, 2ND TIME THEY SAID I NEEDED A FUEL SYSTEM CLEAN AND ANOTHER THING, **I DID THEM BOTH AND NOTHING AGAIN NO CHANGE (THEY SAID IT MIGHT IMPROVE MY MILES SOME).** I HAVE BEEN ON SOCIAL NETWORK SITE PRIUS CHAT ETC. AND **OTHERS ARE EXPERIENCING THE SAME THING AND MORE I FEEL LIKE IM GETTING A RUN AROUND WITH THEM (TOYOTA) IT HAS COST ME ALMOST $500 TO GET NO WHERE, AND THE LOSS OF MILES IS COSTLY ALSO I OWN A HYBRID AND FEELS LIKE IN DRIVING A STANDARD 4 CYLINDER, THE ACCELERATION DELAY STARTED ABOUT A MONTH AGO.** IM GONNA [*sic*] BRING IT BACK FOR BOTH PROBLEMS AND I EXPECT TO BE TOLD I NEED SOMETHING ELSE (TUNE UP ETC) THAT WONT RESOLVE MY ISSUE THANK YOU.

93.   A similar report was submitted in June 2016, in which the driver of a 2012 model-year Prius complained that his troubles began ***after*** the software update was completed:

AFTER TOYOTA POWER MANAGEMENT SOFTWARE RECALL INSTALLED "POWER MANAGEMENT UPGRADE" SOFTWARE IN MY CAR I IMMEDIATELY EXPERIENCED SERIOUS PROBLEMS WITH MY IGNITION / START OF HYBRID/GASOLINE ENGINE. AFTER PRESSING IGNITION, I HAD TO WAIT 15 TO 20 MINUTES AND PRESS START BUTTON ON/OFF REPEATEDLY UNTIL THE GASOLINE ENGINE IGNITE BUT HYBRID FAILED TO START. IT IS NOT NORMAL BECAUSE A PRIUS HYBRID ENGINE STARTS FIRST NOT THE GASOLINE ENGINE. TOYOTA HAS DISABLED SOME IMPORTANT FUNCTIONS IN ITS POWER

-27-



**MANAGEMENT RECALL SOFTWARE UPDATE THAT AFFECTS THE HYBRID ENGINE PERFORMANCE AND FAILURE TO START. I DRIVE MY PRIUS 3-4 TIMES A MONTH AND I DID NOT HAVE ANY PROBLEM BEFORE THE RECALL SOFTWARE UPGRADE** BECAUSE PRIUS OWNERS MANUAL CLEARLY SAYS THAT THE BATTERY WITH BE DISCONNECTED BY BATTERY SAVING FUNCTION WHEN YOUR CAR IS PARKED FOR LONG TIME, SEVERAL DAYS, WEEKS. . . .

94.    Prius drivers also complained that Toyota had refused to even "re-flash" their vehicles' software because they were not included in Safety Recall E0E or Safety Recall F0R. As it did in the Defect Information Reports that pertained to both Highlander/RX400 recalls and the first of the two Prius recalls, Toyota claimed that no other vehicles were affected by the IPM Defect other than those it chose to include in those recalls. Toyota made the same claim again in the July 2015 Defect Information Report concerning the Prius V, asserting that "[n]o other Toyota or Lexus vehicles use the same inverter assembly and software used to control the boost converter in the motor/generator control electronic control unit (ECU) as the involved vehicles [*i.e.,* the Prius V hybrids]."

95.    As before, this assertion was false. As revealed by NHTSA's database, Prius drivers complained that, after their vehicle stalled, they were told that the vehicle was not subject to repair because it was not included in the safety recall. For example, in a complaint that was submitted to NHTSA in July 2017, the driver of a 2013 model-year Prius complained that his vehicle had stalled and asked that the software update be performed, only to be refused because the vehicle was not among those included in the recall:

CAR LITERALLY STOPPED ON THE ROAD. IT WAS TOWED TO TOYOTA OF RIVERSIDE, CA. **SAW THERE HAD BEEN A RECALL THAT THE PROBLEM WAS EXACTLY WHAT HAPPENED TO ME**.

**ASKED THE DEALER TO CHECK THE SOFTWARE AS DESCRIBED IN THE RECALL. I WAS TOLD THAT APPLIED ONLY TO 2010-2012 VEHICLES, MINE IS A 2013. ASKED REPEATEDLY, REGARDLESS OF YEAR TO PLEASE CHECK THIS. I HAVE HUGE CONCERNS DRIVING THIS CAR AS IT LEFT ME COMPLETELY STOPPED AND STRANDED, HAD I BEEN ON THE FREEWAY, COULD HAVE BEEN FATAL.** FIRST I WAS TOLD IT WAS THE HYBRID BATTERIES HAD GONE BAD. THEN THEY SAID IT WASN'T THE BATTERIES, IT WAS A FUSE FOR THE HYBRID BATTERY. EXPLAINED MY CONCERNS THAT THIS COULD HAPPEN AGAIN IF IT TRULY WAS THE FUSE?? THEY SAID IT BECAME DISCONNECTED DUE TO VIBRATION. HOW DO YOU DRIVE AND NOT HAVE SOME VIBRATION? ASKED IF IT COULD HAPPEN AGAIN, THEY DIDN'T KNOW. **ASKED REPEATEDLY TO CHECK THE SOFTWARE AS DESCRIBED IN THE RECALL. THEY SAID THEY HAD TOYOTA SAFETY INVOLVED AND THEY DID EVERYTHING THEY REQUESTED OF THEM. THIS DID NOT INCLUDE CHECKING THE SOFTWARE AS I REQUESTED, SO THEY WOULD NOT DO IT.** I ENDED UP DEALING WITH THE MANAGER, DANNY BRIGGS, AND REQUESTED A COPY OF ALL THE ITEMS THAT HAD BEEN CHECKED AND DONE TO MY CAR. HE SAID HE WOULD HAVE THIS FOR ME. WHEN WE PICKED UP THE CAR, THIS WAS NOT GIVEN TO ME. MET WITH HIM, HE SAID THAT WAS ALL HE COULD DO. I TOLD HIM I WAS VERY UPSET, I FEEL LIKE I'M INVOLVED IN A TOTAL "COVER UP" SO THEY WOULDN'T HAVE TO RECALL THE 2013 PRIUS' [*sic*] ALSO. I WAS TOLD I COULD TRADE MY CAR IN THERE IF I DIDN'T FEEL IT WAS SAFE TO DRIVE. I HAD ASKED THEM TO CHANGE THE OIL AND CHECK MY BRAKES, THEY DIDN'T DO IT. IT WAS LIKE THEY JUST WANTED TO GET ME OUT OF THERE AND NOT DEAL WITH IT. **I HAVE NEVER CONTACTED YOUR AGENCY BEFORE, BUT FEEL THAT THIS COULD END UP KILLING SOMEONE IF NOT**

-29-



**CHECKED INTO**. THANK YOU.

96.   Other proposed Class Members whose Class Vehicles stalled also reported that they were told their vehicles were excluded from the recall after stalling. But they were also told that the stalls they experienced in their Class Vehicle must have been caused by something other than the IPM Defect.

97.   For example, in July 2016, the driver of a 2012 model-year Prius stalled suddenly while driving at 65 miles per hour and was told that his Class Vehicle was excluded from the safety recalls and must have stalled because it ran out of gas—despite the fact that the vehicle had a full tank of gas:

> THE CONTACT OWNS A 2012 TOYOTA PRIUS. THE CONTACT STATED THAT **WHILE DRIVING AT 65 MPH, THE VEHICLE STALLED AS THE MASTER WARNING LIGHT ILLUMINATED**. THE VEHICLE WAS TOWED TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE AND STATED THAT THE ONLY CODE FOUND WAS RELATED TO LOW FUEL ALTHOUGH **THE VEHICLE HAD A FULL TANK OF FUEL**. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND MADE **THE CONTACT WAS MADE AWARE THAT THE VEHICLE WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 14V053000 (ELECTRICAL SYSTEM. HYBRID PROPULSION SYSTEM). THE VEHICLE WAS NOT REPAIRED**. THE FAILURE MILEAGE WAS 37,795.

98.   In April 2016 the driver of a 2012 model-year Prius complained that his Class Vehicle stalled repeatedly, but that the dealer denied the vehicle was stalling—even after being shown proof that it was—and refused to check the vehicle because it was not included in the recall:

> WHEN IN THE HIGH 80S+ OUTSIDE, MY 2012 PRIUS C, BOUGHT NEW, HAS NOT STARTED FROM IN A STOPPED POSITION, WITH ALL

-30-



THE WARNING LIGHTS ON THE DASHBOARD ACTIVATING &, **MANY TIMES, THE HYBRID SYSTEM SHUTTING DOWN WHILE I'M TRYING TO EXIT A DRIVEWAY OR GARAGE, CITY STREET OR PARKING THE VEHICLE, CREATING A SUDDEN STALL & LEAVING ME IN THE PATH OF ONCOMING TRAFFIC. TOOK TO DEALERSHIP MANY TIMES & THEY INSIST MY CAR CAN'T BE DOING WHAT IT'S DOING BECAUSE THEY SEE NO CODES & IGNORE MY SCREENSHOTS, PICS & VIDEO. WHEN I ASK THEM WHY MY CAR HAS SAME "SYMPTOMS" AS OTHERS OF THE SAME MAKE, MODEL & YEAR, THEIR REPLY IS THAT MY SPECIFIC CAR HAS NOT BEEN RECALLED. THEY WILL NOT EVEN LOOK TO SEE IF THERE ARE PROBLEMS WITH THE SENSOR, INVERTER OR SOFTWARE. MY CAR HAS ONLY 8700 MILES ON IT. I AM AFRAID TO DRIVE IT CAUSE I HAVE NO CLUE WHAT IT'S GOING TO DO & THE DEALERSHIP IS UNCONCERNED. IT SEEMS NEITHER THE NHTSA NOR TOYOTA GIVES A DAMN ABOUT SAFETY.** I THINK THE ISSUE IS THE SOFTWARE IN THE ELECTRONIC CONTROLS OF THE CAR, WITH CURRENT SETTINGS THAT COULD CREATE HEAT IN SOME OF THE TRANSISTORS. 2012 TOYOTA PRIUS ELECTRICAL SYSTEM: SOFTWARE, HYBRID PROPULSION SYSTEM: INVERTER NHTSA CAMPAIGN #14V053000. SUMMARY: IN THE AFFECTED VEHICLES, THE INTELLIGENT POWER MODULE (IPM) INSIDE THE INVERTER MODULE (A COMPONENT OF THE HYBRID SYSTEM) CONTAINS TRANSISTORS THAT MAY BECOME DAMAGED FROM HIGH OPERATING TEMPERATURES. IF THIS OCCURS, VARIOUS WARNING LAMPS WILL BE ILLUMINATED ON THE INSTRUMENT PANEL. CONSEQUENCE: THE VEHICLE MAY ENTER A FAIL-SAFE/LIMP-HOME MODE THAT LIMITS THE DRIVABILITY OF THE VEHICLE. THE HYBRID SYSTEM COULD ALSO SHUT DOWN COMPLETELY RESULTING IN A VEHICLE STALL, INCREASING THE RISK OF A CRASH. **JUST CAUSE MY SPECIFIC CAR WAS NOT INCLUDED IN THE RECALL DOESN'T MEAN IT SHOULDN'T HAVE BEEN WHEN IT IS DOING THE EXACT SAME THING THAT THE OTHER RECALLED CARS ARE**

-31-

**DOING**.

99. Similarly, in December 2017, the driver of a 2010 model-year Prius reported to NHTSA that the vehicle had stalled while driving and that its IPM had failed, but was not repaired because the vehicle was excluded from the recall:

> THE CONTACT OWNS A 2010 TOYOTA PRIUS. THE CONTACT STATED THAT THE **VEHICLE EXPERIENCED A LOSS OF ENGINE POWER. THE CHECK HYBRID SYSTEM WARNING INDICATOR ILLUMINATED.** THE VEHICLE WAS TOWED TO TOYOTA OF GREENVILLE LOCATED AT 2686 LAURENS RD, GREENVILLE, SC WHERE IT WAS **DIAGNOSED AS AN IPM FAILURE AND THE INVERTER WOULD NEED TO BE REPLACED. THE CONTACT REFERENCED NHTSA CAMPAIGN NUMBER: 14V053000 (HYBRID PROPULSION SYSTEM, ELECTRICAL SYSTEM) HOWEVER THE DEALER INFORMED THE CONTACT THE VIN WAS NOT INCLUDED. THE VEHICLE WAS NOT REPAIRED.** THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 132,000.

100. And in a report that was submitted to NHTSA in February 2016, a 2012 model-year Prius that was excluded from the safety recall stalled on a Southern California freeway, which resulted in an injury to the driver and the total loss of the vehicle:

> On Sunday evening, Dec 6, at around 8:30 p.m. I was driving south on Hwy 5 near Dana Point when my 2012 Prius suddenly lost power. When I pushed on the gas I heard beeps and I think lights flashed on the dashboard. The lights and electrical system worked, but it had no power. I immediately pressed on my emergency blinkers and pulled to the far right lane as I lost speed.
>
> Along the edge of the road the shoulder was blocked by reddish small "poles" in the ground to prevent cars from pulling into that apparent construction area. Ahead I could see where they ended and figured I could coast that far, but when I got past the poles the shoulder was blocked by

-32-



large cement barriers rather than a space to pull off. I coasted to a stop and pressed the start button several times but the car didn't start.

My main concern was behind me as I watched my rear vew [*sic*] mirror. I saw at least a dozen cars speed up to me from ?100 or so yards back, slowdown and swerve at the last minute to miss me. the traffic was heavy, but flowing along between 60 and 70 mph.

I think I was stopped there no more than a minute or two when I saw a set of headlights approaching and not slowing or swerving. I turned forward and sort of braced myself. I didn't hear any tire squeal as she hit me from the rear.

I don't know if I was out for maybe a couple of seconds but the car was pushed forward and the back caved in with the other drivers car a few feet behind my left with glass and car fragments scattered everywhere. The driver came up to me and asked if I was ok, and I asked her the same, and we thanked God we were ok.

101. The Prius's owner repeatedly requested that Toyota inspect it and determine what caused the vehicle to stall. Toyota ignored those requests and, three months after the stalling incident, Toyota destroyed the vehicle.

**E.   TOYOTA SUBVERTS THE PURPOSE OF A SAFETY RECALL BY REPLACING DEFECTIVE IPMS ONLY AFTER THEY FAIL**

102. In September 2013, Toyota acknowledged that the solder used to attach the IPM transistors (*i.e.,* IGBTs) to the control board was still cracking, which resulted in Toyota repeating and expanding its recall of Highlander/RX400 hybrids for the purpose of replacing the defective IPMs in those vehicles with IPMs that were assembled with non-defective IPMs.  But Toyota failed to even mention the issue in the Defect Information Reports it submitted to NHTSA in connection with Safety Recalls E0E and F0R that it conducted in February 2014 and July 2015, respectively.  Instead, Toyota knowingly misrepresented that

-33-



the ECU software "re-flash" would eliminate the IPM Defect.

103. In an apparent effort to keep complaints to a minimum as IPMs continued to fail at an average rate of 15 per day *after* the "re-flash," Toyota notified Prius drivers that, in its

> continuing efforts to ensure the best in customer satisfaction, Toyota is announcing a Warranty Enhancement Program to extend the warranty coverage for repairs related failure of the Intelligent Power Module (IPM). The vehicles covered under this Warranty Enhancement Program must first have Safety Recall E0E (launched in mid-February 2014) performed (if applicable).

104. Toyota offered the same "Warranty Enhancement Program" to customers who owned or leased a Prius V that was the subject of the July 2015 safety recall (F0R).[4]

105. In keeping with its efforts to actively conceal the existence, nature, scope, and safety risks posed by the IPM Defect, Toyota falsely represented to Prius owners and lessees that, by "re-flashing" the ECU software, the "majority of vehicles will not experience failure of the IPM" and that Toyota was "offering the New Vehicle Warranty Extension to assure you that we stand behind our product."

106. In other words, after falsely representing to Prius drivers that the ECU software modification eliminated the IPM Defect, Toyota cynically announced that it was extending the warranty that applied to IPMs as a means of ensuring "customer satisfaction."

---

[4] Toyota conditioned eligibility to participate in these "Warranty Enhancement Programs" on the vehicle exhibiting specific Diagnostic Trouble Codes (DTC): P0A94, P324E, P3004, and/or P0A1A. Toyota instructed its dealers to refer to two of the same DTCs (P0A94 and P90A1A) in connection with the Highlander/RX400 recalls. Moreover, all but one of these DTCs (P324E) also appear in the warranty data Toyota collected to respond to the Information Requests NHTSA propounded in the Highlander stalling investigation (PE11-005).

FAZIO | MICHELETTI LLP
Attorneys

107.  Toyota reinforced this message after the filing of the original Complaints were filed in the *Rexhepi* action in Los Angeles Superior Court (on January 31, 2018) and in the *McCarthy* action (on February 5, 2018), when it issued a bulletin to its dealers on February 6, 2018. There, Toyota advised its dealers that although they may read news reports that question the effectiveness of the software "remedy" employed in the Prius recalls, "Toyota believes that these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) *are the appropriate measures for customer safety and satisfaction*." (Emphasis added.) The bulletin went on to instruct dealers that, if they "are contacted by a Prius or Prius V driver concerned about these reports," *the dealers should "[e]xplain that the Safety Recall remedy addresses the safety defect.*" (Emphasis added.)

108.  Toyota knew these representations were false when it made them. Toyota's rationale for "re-flashing" the ECU software was predicated on the baseless contention that the Prius V hybrids did not suffer from the IPM Defect, which Toyota was forced to admit was false just over a year later when it recalled over 100,000 Prius V hybrids— ostensibly to correct the IPM Defect. But even after it knew the rationale for deploying a software update to correct a hardware problem was erroneous, Toyota continued to represent to NHTSA and to its customers that software was the solution.

109.  Toyota's purpose in making these representations was to ensure the effectiveness of its fraudulent concealment of the true nature and scope of the IPM Defect. Toyota knew at all relevant times that the software "re-flash" did not and could not correct the IPM Defect, and that the so-called "Warranty Enhancement Program" was merely a ruse

-35-

1  to make it appear that Toyota was confident that the software "re-flash"
2  actually solved the problem.

3  110.  The false nature of these representations was demonstrated
4  by the astronomically high replacement rate of IPMs in vehicles whose
5  ECU software had been "re-flashed." Despite the ongoing failure of
6  IPMs on a massive level, however, Toyota *still* refused to replace the
7  defective IPMs with non-defective IPMs *before* they fail.

8  **F.   2018:  TOYOTA CONDUCTS A SECOND RECALL OF THE 800,000-**
9  **PLUS PRIUS HYBRIDS THAT IT RECALLED IN 2014 AND 2015,**
10  **ACKNOWLEDGING THAT THEY CONTINUE TO STALL AFTER THE**
11  **SOFTWARE "RE-FLASH"**

12  111.  Despite its repeated representations that the software "re-
13  flash" eliminated the IPM Defect, after this litigation was commenced
14  Toyota was forced to admit that the vehicles that were the subject of
15  Safety Recalls E0E and F0R continued to stall while driving.

16  112.  Stalling events occurred so frequently after the vehicles had
17  their ECU software "re-flashed" in connection with the safety recalls
18  that, on October 4, 2018, Toyota announced it was recalling *all* of the
19  more than 800,000 Class Vehicles that it had recalled in 2014 and 2015
20  because they remained prone to IPM failure, which could "result[] in the
21  hybrid system shutting down rather than going into fail-safe mode."

22  113.  Toyota's announcement to NHTSA and to the public (in a
23  separate press release issued on October 5, 2018) implied that it would
24  not have recalled those vehicles again if they had entered "fail-safe"
25  mode instead of stalling while being driven. This is deliberately false
26  and misleading.

27  114.  When the IPM transistors in a Toyota hybrid are damaged
28  due to thermal stress, the damaged transistor can result in a sudden

-36-

1  and unexpected system shutdown that causes the vehicle to stall.

2  Alternatively, the vehicle may decelerate and, if the battery has a

3  sufficient charge, continue driving at a reduced rate of speed until the

4  battery dies.

5      115. Toyota euphemistically and misleadingly characterizes this

6  condition as "fail-safe" mode, implying that it somehow ensures the

7  safety of the vehicle's occupants (and those who happen to be driving

8  near the vehicle when the failure occurs). It does not. When a Toyota

9  hybrid enters "fail-safe" mode—or "limp-home" mode, as Toyota also

10  refers to the condition—the vehicle abruptly reduces its speed and

11  prevents the driver from accelerating.

12      116. Thus, for example, if a Prius was being driven on the

13  freeway at the 70-mile-per-hour speed limit, entering "fail-safe" mode

14  would cause the vehicle to suddenly and unexpectedly decelerate to

15  approximately 20 miles per hour or less and the driver would be unable

16  to increase the speed of the vehicle beyond that limit, thereby

17  drastically increasing the likelihood of a crash. This is only one of many

18  scenarios in which the sudden decrease in speed and the inability to

19  accelerate endangers the lives of people who are in or around a Prius

20  when its IPM malfunctions or fails.

21      117. Moreover, the software "re-flash" made Class Vehicles

22  perform more sluggishly, which created additional safety risks and

23  reduced gas mileage. Nonetheless, Toyota refused to provide its

24  customers with cost-free IPM replacements even after it was forced to

25  admit publicly that, although recalled Class Vehicles received the ECU

26  software "re-flash," those vehicles "may not enter a failsafe driving

27  mode as intended. If this occurs, the vehicle could lose power and stall."

28      118. This renewed, massive recall was prompted only by the filing

of the lawsuits that gave rise to this Consolidated Master Complaint. But even in 2018 Toyota still refuses to meaningfully address the problem. Rather than replacing the defective IPMs with non-defective IPMs, Toyota announced that it was offering yet another cheap, useless ECU software "reflash."

119. As Toyota is well aware, the IPM Defect would still pose a serious safety risk even if every Prius entered "fail-safe" mode. The hybrid system's ability to propel the vehicle is drastically reduced in fail-safe/limp-home mode and lasts only as long as the battery holds a charge; after that, the entire hybrid system shuts down completely. In short, "fail-safe" mode is not safe. Thus, rather than telling Class Members to continue to "limp" home, Toyota instructs customers to pull over to the side of the road immediately when the vehicle enters limp-home mode.

120. By refusing to replace defective IPMs until **after** they fail, Toyota has succeeded in circumventing the very purpose of a safety recall: Correcting a known safety issue **before** it results in conditions that can lead to serious injuries or fatalities.

## G.   POST-REFLASH IPM FAILURES

121. Customers all over the country have experienced post-Safety Recall E0E or post-Safety Recall F0R IPM failures, and the number of post-"re-flash" failures increase as the Class Vehicles age. The breadth and scope of the problem is staggering. Below are a few examples of dangerous IPM failures that have occurred based on reports from Toyota dealers, media accounts, internet posts, and consumer complaints, including these, publicly filed with NHTSA:

a.     In or about February 2011, a driver of a 2010 Prius experienced an IPM failure while driving on the interstate highway.

1   Four different warning lights illuminated on the dashboard, and the
2   vehicle lost power. The Prius had only 3,400 miles on it.

3          b.      In March 2013, a Toyota Prius driver experienced an
4   inverter failure while attempting to accelerate onto a two-lane highway.
5   The Prius emitted a loud sound, became unresponsive, could not gain
6   additional speed, and the panel showed "Check Hybrid System."  The
7   driver had to act quickly to avoid traffic and pull on to the grass at the
8   side of the road.

9          c.      In May 2013, a Toyota Prius driver experienced an
10  IPM failure while driving about 35 miles per hour.  The driver reported
11  that the car decelerated to about 4 miles per hour in less than 5
12  seconds.  The car limped about 50 feet before stopping completely; it
13  had to be towed.

14         d.      In July 2013, a Toyota Prius driver experienced an
15  IPM failure while driving in the middle lane of a surface street at about
16  30 miles per hour.  The Prius slowed down and could not be accelerated.
17  Once the driver was able to drift to the side of the road, the driver
18  turned off the engine and tried to restart the car but was unable.  The
19  car had to be towed to a Toyota dealership.

20         e.      In February 2014, a Toyota Prius driver experienced
21  an IPM failure while driving, and the car suddenly stopped.   The
22  dashboard was illuminated with "Check Hybrid System."  The driver
23  had the car towed to the nearest Toyota dealer.

24         f.      In July 2014, a Toyota Prius driver experienced an
25  IPM failure while trying to accelerate from a stop onto a rural highway
26  in Northern California.  Approximately two months earlier, the driver
27  had received the software re-flash that Toyota claimed would prevent
28  IPM failures.

g.     In or about April 2015, another Toyota Prius driver experienced an IPM failure while driving, causing the car to lose power. The driver had the car towed to the nearest Toyota facility.

h.     In May 2015, another Toyota Prius driver experienced an IPM failure while driving at highway speed.  "Check Hybrid System" displayed on the dash, and the IPM had to be replaced.

i.     In December 2015, a Toyota Prius driver experienced an IPM failure while traveling on a bridge at 30 miles per hour.  The Prius decelerated to less than 20 miles per hour, at which speed the driver took it to an independent repair shop.   The problem was diagnosed as an IPM failure.

j.     In August 2016, a Toyota Prius driver experienced an IPM failure while going from the right lane to the left lane on a highway with two young children in the car.  The driver had to use the car's hazards and pull through three lanes of high-speed traffic in order to get to a breakdown lane next to an on ramp.  The driver evacuated the young children and then waited in 90 degree heat for a tow truck.

k.     In September 2016, a Toyota Prius driver experienced an IPM failure while driving approximately 50 miles per hour.  The vehicle was towed to a dealership where it was determined that the electrical system fried the inverter and shut down the system.

l.     In or about October 2015, a Toyota Prius driver experienced an IPM failure while driving, causing her car to completely stop working.

m.     In or about December 2015, another Toyota Prius driver experienced an IPM failure while driving in the rain.  Although her car had the software "re-flash" under Safety Recall E0E in April 2014, the car lost power and would not restart.

n.     In or about January 2017, another Toyota Prius driver experienced an IPM failure that caused his car to suddenly enter "limp-home" mode while driving 65 miles per hour on a California highway.

o.     In July 2017, another Toyota Prius driver experienced an IPM failure while driving on the freeway at about 70 miles per hour. The "Check Hybrid System" light came on and the car lost power and ability to accelerate.  The car lost speed and, within two minutes, came to a complete shutdown.  The driver reported that the car could have easily been rear ended had it not been able to move to the side of the freeway quickly.

p.     In October 2017, Martha Anderson had a dangerous, life-threatening experience while driving her Toyota Prius on a major road.  Although her car had Safety Recall E0E completed in 2014 and only had 31,222 miles on it, she experienced an IPM failure that caused her car to shut down while driving.  The dashboard flashed with lights telling her to turn off the engine and park the car immediately.  She lost power and was lucky to avoid a crash.  She had her Prius towed to the nearest Toyota dealer.[5]

q.     Ms. Anderson reported her story to CBS News and was featured in a nationwide television story about defective Prius IPMs, which      aired      on      CBS      Morning      News      on      April      5, 2018:      https://www.cbsnews.com/news/california-dealership-refuses-to-sell-certain-toyota-prius-models-over-safety-issues/.

r.     Plaintiff Ms. Ryan, whose IPM failure experience is described above, was also featured in that CBS Morning News story.

---

[5] Photographs of Ms. Anderson's failed IPM, which show extensive damage due to overheating, are attached hereto as **Exhibit A.**



1  Ms. Ryan described her IPM failure, while driving on a busy Los
2  Angeles freeway, as "terrifying" and stated that "it felt like someone
3  pulled the emergency brake [on the car]."

4          s.    In August 2017, Margaret Long, driving her 2010 Prius
5  in Florida, was seriously injured when she suddenly lost power on a
6  busy four-lane highway and was rear-ended at about 55 mph, driving
7  her car into the center median.

8          t.    In January 2018, another Toyota driver, Mrs. Lozado,
9  experienced IPM failure in her 2012 Toyota Prius while driving
10  approximately 50 miles per hour on a major road in Southern
11  California.  This was after her car had Safety Recall E0E completed in
12  2014.  Her vehicle lost power, and the dashboard and airbag lights
13  flashed.  She was able to avoid an accident but was too afraid to drive
14  the car again, so she and her husband sold her Prius to CarMax.

15          u.    On March 29, 2018, two Priuses with IPM failures,
16  both of which had previously received the E0E recall in 2014, were
17  towed into the same Southern California Toyota dealership (Claremont
18  Toyota) for service.  Both drivers reported the dashboard lighting up
19  with "Check Hybrid System" and other warning lights as well as
20  sudden, unexpected deceleration and power loss.  In addition to power
21  loss, the vehicles also lost their antilock brakes, Brake Assist, Vehicle
22  Stability Control, and Traction Control systems, which occurs in the
23  vast majority of vehicles that experience post-E0E IPM failures.

24          v.    Tanya Carter, a 2011 Prius driver, previously had the
25  E0E reflash.  But in January 2018, she experienced an IPM failure
26  while driving on the freeway.  The vehicle shut down, lights on the
27  dashboard began flashing and her speed suddenly reduced to
28  approximately 15 mph.  It was a horrific moment, according to

-42-

FAZIO | MICHELETTI LLP

1   Ms. Carter.  She was lucky to be able to coast off the freeway with no
2   acceleration.    The  vehicle  had  to  be  towed  to  Capistrano  Toyota.
3   Ms. Carter does not feel safe driving the Prius and when her child asks
4   to drive one of the two cars, she directs her to the Honda.

5         w.    Cecily Frank, a 2013 Prius V driver, previously had the
6   F0R reflash. On August 7, 2018, she and her mother were in the car,
7   accelerating on to an entrance to the 110 freeway in Los Angeles when
8   the car went into "limp-home" mode.  The vehicle decelerated to 5 miles
9   per hour, and she could not increase its speed.  She was lucky not to be
10  rear-ended, and pulled off into a pullout on the freeway, after which the
11  car completely shut down.  She and her mother were both terrified.  The
12  car had to be towed to a Toyota dealership in Glendale, where it was
13  confirmed that her inverter had failed. Ms. Frank had purchased her
14  Prius V new from Marina Del Rey Toyota in 2013.

15      122.  Toyota has also learned about failed IPMs when it has
16  replaced them under Toyota's ZE3 and ZF5 "Warranty Enhancement"
17  programs under which it extended the original emissions warranty in
18  connection with Safety Recalls E0E and F0R.

19      123.  IPM failure has also  been discussed extensively in online
20  forums, including PriusChat.com, which contains tens of thousands of
21  comments, many of which relate to the defective IPMs.

22      124.  The issue has caught the attention of safety advocates,
23  including  those  in  Congress.  Senator  Jerry  Moran,  for  example,
24  chairman  of  the  Senate  Commerce  Subcommittee  on  Consumer
25  Protection, Product Safety, Insurance, and Data Security, has begun
26  looking into the Prius IPM failures.

27      125.  Despite all of this, Toyota has still not issued a safety recall
28  to replace the defective IPMs.  Toyota's concealment of this safety defect

-43-



has diminished the value of the vehicles and continues to endanger Toyota drivers, passengers, and others on the road.

126. Toyota has information about many other IPMs and inverters that have failed across the country because it has received thousands of manual allocation email requests for replacement parts from dealers when an IPM fails.  Inverters or inverter component replacement parts are not kept in stock at Toyota dealerships. Rather, each time an IPM fails, Toyota requires its dealers to send an email to Toyota at Quality_Compliance@Toyota.com to request a new inverter or inverter component and explain the reason for the request (*e.g.*, IPM failure).

127.  Shortly after Plaintiffs filed their original complaints against Toyota, Toyota instructed its dealers to preserve all inverters and IPMs that they remove from recalled Prius hybrids and send them to Toyota or its third-party consulting firm, Exponent.  Exponent's research has come under fire from critics, including engineers, attorneys and academics who say the company tends to deliver to clients the reports they need to mount a defense.[6] There are sound reasons for the opprobrium. For example, Toyota hired Exponent during the sudden unintended acceleration crisis, and Exponent provided an opinion that there was nothing wrong with Toyota vehicles. Exponent's paid-for opinion was directly contradicted by the formal admissions Toyota later made after being charged criminally with fraud and entering into a

---

[6] Exponent's research in defending tobacco companies was used to argue that secondhand smoke does not cause cancer. *See, e.g.,* Andrew Celani, "DeflateGate: NFL Hired Same Research Firm That Denied Secondhand Smoke Causes Cancer," *CBS Boston* (May 6, 2015), available at https://boston.cbslocal.com/2015/05/06/deflategate-nfl-hired-same-research-firm-that-denied-secondhand-smoke-causes-cancer/.



Deferred Prosecution Agreement with the U.S. Department of Justice.

**H.  AN ONGOING PATTERN OF FRAUD:  TOYOTA'S FRAUDULENT CONCEALMENT OF SUDDEN UNINTENDED ACCELERATION IN MILLIONS OF VEHICLES[7]**

128. In 2007, Toyota became aware that sudden unintended acceleration was occurring in Toyota and Lexus vehicles, but the company insisted there was no need to recall those vehicles. Ex. B, Att. C ¶¶ 16-19. Instead, Toyota negotiated an agreement with NHTSA by which Toyota would conduct a limited recall of the floor mats in certain Toyota Camry and Lexus ES350 vehicles, which Toyota claimed to have been the cause of sudden unintended acceleration incidents. *See id.* ¶ 19.

129. Two years later, in August 2009, a California Highway Patrol officer and his family were on a San Diego freeway when the sudden unintended acceleration phenomenon occurred in the Lexus ES350 the officer was driving, which resulted in a crash that killed the entire family. *Id.* ¶¶ 9-10, 22; Debbi Baker, "CHP releases 911 call in officer's fiery crash," *The San Diego Union-Tribune* (Sept. 10, 2009), available at http://www.sandiegouniontribune.com/sdut-bn10-911call-fatal-crash-2009sep10-htmlstory.html.

130. On the same day the CHP officer and his family died, an internal memorandum describing a second cause of sudden unintended

---

[7] The facts set forth herein pertaining to sudden unintended acceleration and the resulting investigation and criminal charges against Toyota are based on formal admissions Toyota made in Appendix C to a Deferred Prosecution Agreement into which Toyota entered with the United States Attorney for the Southern District of New York on March 19, 2014, a true and correct copy of which is attached hereto as **Exhibit B.**



acceleration—sticking accelerator pedals or "sticky pedal"—was sent to a group located in Japan called "Customer Quality Engineering" (or "CQE-J"). *See* Ex. B, App. C ¶¶ 5, 23-24.[8] According to that memorandum, on August 4, 2009—more than three weeks before the involving the CHP officer—a dealer had reported a "critical" sudden unintended acceleration incident attributed to a "sticky pedal" in a Toyota Camry had occurred in Arizona, but Toyota failed to disclose what it knew to NHTSA. *Id.* ¶ 24. In addition, NHTSA's investigation revealed that Toyota had received

> [r]eports of the same sticky pedal problem in Europe in or about 2008 and early 2009, where the problem had become apparent earlier, reflected, among other things, instances of "uncontrolled acceleration" and unintended acceleration to "maximum RPM," and customer concern that the condition was "extremely dangerous."

*Id.* ¶ 26.

131. Despite the extreme danger it posed and despite designating it internally as a problem of the highest priority, Toyota refused to acknowledge the existence of a defect and resisted conducting a recall until NHTSA threatened to open an investigation. *Id.* ¶¶ 27-35. Toyota then agreed to recall only eight vehicle models that NHTSA had identified as posing the greatest risk. *Id.* ¶¶ 33, 35-36.

132. At the same time, however, Toyota engineers and CQE-J

---

[8] CQE-J was composed of a leadership group within Toyota that decided "whether and when to conduct recalls of Toyota and Lexus vehicles . . . ." *Id.* ¶ 5. Moreover, CQE-J "had regional arms responsible for monitoring vehicle quality issues in the 'field' (that is, for vehicles already on the road) in their respective regions" and that the regional arm responsible for monitoring field reports in the United States was located in Torrance, California. *Id.*



cancelled plans for design changes that had solved the sticky pedal problem in Europe in an effort to prevent NHTSA from discovering that the sticky pedal problem existed.  *Id.* ¶¶ 37-38.  For the same reason, Toyota also ordered its personnel to refrain from discussing the problem in writing and to cancel the design changes without leaving a "paper trail." *Id.* ¶¶ 38-39.

133.  For months, Toyota fraudulently concealed from regulators and consumers the existence of the "sticky pedal" problem, the identity of the company that supplied the accelerator pedals that were causing the problem, and the true scope of the problem in terms of the models and number of vehicles that were affected by it.  *Id.* ¶¶ 40-60.  On January 19, 2010, Toyota gave a presentation to NHTSA in which it "downplayed the seriousness of reports of sticky pedal in Europe" after which a Toyota employee exclaimed "'Idiots! Someone will go to jail if lies are repeatedly told. I can't support this.'" *Id.* ¶ 61.

134.  Two days later, Toyota submitted a Defect Information Report to NHTSA in which it announced that it was recalling every vehicle in which it had installed sticky accelerator pedals. *Id.* ¶ 61. Due to the life-threatening safety risk it posed, Toyota was ultimately forced to conduct a safety recall of millions of vehicles affected by the sudden unintended acceleration problem, and to issue a global "stop-sale" order that prevented the sale of millions of other vehicles that had yet to be sold by its dealers.

135.  In the same Defect Information Report, however, Toyota represented to NHTSA that it had been receiving field reports about sticky pedals since October 2009—even though Toyota had actually been receiving those reports no later than August 2009. *Id.* Toyota then made the same misrepresentations to Congress. *Id.* ¶ 62.

136.  Ultimately, Toyota was charged criminally as a result of its fraudulent conduct. Four years later, on March 19, 2014, Toyota entered into a Deferred Prosecution Agreement by which it agreed to admit the facts set forth above, to pay a $1.2 billion penalty, and to submit to an independent monitor to ensure that (a) its statements regarding motor vehicle safety were true and accurate; (b) it properly reported information relating to collisions occurring in its vehicles in the United States; and (c) it complied with its obligations under 49 C.F.R. Part 579 regarding the generation of field technical reports. *See generally* Ex. B at 1-6.

137.  In October 2017, the United States District Court Judge William H. Pauley III stated on the record that Toyota's misleading statements "represented a reprehensible picture of corporate misconduct." "Regrettably," Judge Pauley continued, "the payment of a $1.2 billion fine and the appointment of a monitor concluded the government's investigation into this tragic episode." Judge Pauley also expressed concern that Toyota and its executives were not held accountable for misleading the public and regulators.

138.  Judge Pauley concerns were well founded. On February 12, 2014, Toyota had engaged in precisely the same sort of fraudulent conduct that led to the Deferred Prosecution Agreement it had signed in March 2014. This time, Toyota issued a Defect Information Report in which it falsely represented that "re-flashing" the software in hundreds of thousands of Toyota Prius hybrid vehicles would correct their inordinate propensity to suddenly and unexpectedly stall at highway speeds.

139.  As discussed below, the Prius hybrids stall due to a defective hybrid system component becoming damaged as a result of exposure to

-48-

1   thermal stress. And although the software "re-flash" allowed Toyota to
2   avoid spending billions to replace the defective components, it did
3   nothing to prevent those vehicles from suddenly and unexpectedly
4   stalling at highway speeds.

5                          **STATUTES OF LIMITATION**

6          140. Any applicable statutes of limitation have been tolled by
7   Toyota's knowing and active concealment of the information it
8   possessed about the true nature and characteristics of the defective
9   IPMs it installed in Class Vehicles and by Toyota's false and misleading
10  representations regarding Class Vehicles' safety and performance.
11  Toyota has kept Plaintiffs and the members of the proposed class
12  ignorant of vital information essential to the pursuit of these claims,
13  without any fault or lack of diligence on their part.  Plaintiffs and
14  members of the proposed class could not reasonably have discovered
15  information vital to their claims or what Toyota knew about any of the
16  issues and facts described herein.

17         141.  Toyota was, and is, under a duty to disclose the true nature,
18  purpose, and characteristics of the IPM Defect, which arises regardless
19  of the existence of privity with Plaintiffs or members of the proposed
20  class. *See*, *e.g.,* Cal. Civ. Code § 1711. Despite that duty, Toyota
21  knowingly, affirmatively, and actively concealed the facts alleged
22  herein, and the concealment is ongoing. Because, *inter alia*, Toyota took
23  steps to conceal such information, Plaintiffs and members of the
24  proposed class did not discover and could not have discovered these
25  facts through the exercise of reasonable diligence.

26         142. For years, Toyota has marketed Class Vehicles as safe,
27  efficient and environmentally-friendly, while concealing what it actually
28  knows about the dangerous nature, cause, and scope of IPM Defect.



Specifically, as alleged more fully above, prior to selling the very first Class Vehicles, Toyota knew that the IPM Defect has an inordinate propensity to put the occupants of Class Vehicles, as well as those who drive near Class Vehicles, at an inordinate and unacceptable risk of injury and death when Class Vehicles enter limp-home mode or stall. Toyota also knows that the software "re-flash" Toyota offered in conjunction with Safety Recall Nos. E0E and F0R served to mask the existence, nature, and scope of the IPM Defect and to allow Toyota to avoid the multi-billion-dollar cost of replacing defective IPMs in Class vehicles with non-defective IPMs.

143.  More specifically, as alleged above, Toyota has been aware of the IPM Defect from the time it began selling the first Class Vehicles as a result of its experiences with the Highlander and RX400 hybrid vehicles and its access to multiple sources of other information not available to proposed Class Members, including but not limited to, pre-release testing of Class Vehicles, Failure Mode Effects Analyses (FMEAs) and other analytical tools.

144. Toyota had—and continues to have—a duty to disclose information about the existence and nature and scope of the IPM Defect to Class Members who purchased their Class Vehicles new or used by virtue of, *inter alia,* **(a)** Toyota's knowledge that proposed Class Members were not reasonably likely to discover the true facts about the existence, nature, and scope of IPM Defect because those material facts were known by and accessible only to Toyota; **(b)** Toyota's conduct and its active concealment of those facts from proposed Class Members and related affirmative misrepresentations made by Toyota (including, but not limited to, "re-flashing" the ECU software as a means of masking the IPM Defect, representing that the "re-flash" would adequately address

the IPM Defect, and lulling Class Members into a false sense of security); **(c)** Toyota's statutory and common-law obligations to disclose product defects to the consumers of those products;  and **(d)** because the IPM Defect is a material defect that jeopardizes proposed Class Members' safety.

145.  Based on the foregoing, Toyota is estopped from relying on any statutes of limitation in defense of this action. The causes of action alleged herein did or will accrue only upon discovery of the facts alleged herein and Toyota's fraudulent concealment thereof.

## CLASS-ACTION ALLEGATIONS

146.  Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated pursuant to the provisions of Federal Rule of Civil Procedure 23 and California Civil Code section 1781.

147.  Plaintiffs seek to represent a class composed of: **(a)** all residents of the United States who currently own or lease a Class Vehicle; and **(b)** all residents of the United States who formerly owned or leased a Class Vehicle and paid to replace or repair an IPM and/or inverter assembly in those vehicles.

148.  Plaintiffs also seek to represent three subclasses composed of all United States residents who own or have owned or leased a Class Vehicle **(a)** and are citizens of the State of California (the "California Subclass); **(b)** for personal or family (*i.e.,* non-business) use (the "CLRA Subclass") and **(c)** that Toyota included in the recall it announced in February 2014 and expanded in July 2015 and had its ECU software updated in connection with that recall (the "Recall Subclass").

149.  Excluded from the class are the following:

a.  Toyota, its subsidiaries, affiliates, officers, directors, and employees;



b.      The judge assigned to preside over this action;

c.      Persons who have claims for personal injuries as a result of the IPM Defect;

d.      Persons who have filed separate, non-class legal actions against Toyota asserting consumer-fraud claims based on the IPM Defect in Class Vehicles; and

e.      Persons who have pursued a claim and obtained a verdict against or settled with and validly released Toyota from individual claims substantially similar to those alleged in this Complaint with respect to Class Vehicles.

150. The proposed class comprises thousands of persons throughout the United States who own or lease, or have owned or leased, one or more Class Vehicles. The proposed class is, therefore, so numerous and geographically dispersed that joinder of all members in one action is impracticable, if not impossible.

151. As alleged more fully in paragraphs 29 through 139, above, Toyota has acted with respect to Plaintiffs and proposed Class Members in a manner generally applicable to each of them. There is a well-defined community of interest in the questions of law and fact involved, which affect all proposed Class Members. The questions of law and fact common to the class predominate over the questions that may affect individual proposed Class Members include, but are not limited to, the following:

a.      whether Class Vehicles are affected by the IPM Defect;

b.      whether Toyota knew or reasonably should have known of the IPM Defect in Class Vehicles before it sold or leased them to proposed Class Members;

c.      whether Toyota knew or reasonably should have known that the IPM Defect is a safety hazard;

d.    whether Toyota actively concealed the IPM Defect from Plaintiffs and proposed Class Members;

e.    whether Toyota actively concealed material facts concerning the ECU software updates from Plaintiffs and proposed Class Members;

f.    whether the information Toyota concealed is material to prospective purchasers and lessees of Class Vehicles;

g.    whether Toyota wrongfully profited from causing the distribution and sale or lease of Class Vehicles under false pretenses, by failing to inform Plaintiffs and proposed Class Members about the IPM Defect;

h.    whether, under the circumstances alleged herein, Toyota wrongfully profited from the sale of replacement IPMs and/or hybrid inverter assemblies;

i.    whether Toyota's conduct, as alleged in this Complaint, constitutes fraudulent concealment;

j.    whether Toyota's conduct, as alleged in this Complaint, has violated the CLRA;

k.    whether Toyota's conduct, as alleged in this Complaint, has created an express warranty under California Commercial Code sections 2313 and/or 2314, which was then violated;

l.    whether Toyota's conduct, as alleged in this Complaint, violated the Song-Beverly Warranty Act;

m.    whether Toyota's conduct, as alleged in this Complaint, violated the Magnusson-Moss Warranty Act;

n.    whether Toyota's conduct, as alleged in this Complaint, constitutes an unlawful, fraudulent, and/or unfair business act or practice under the UCL;



1    o.    whether Toyota's conduct, as alleged in this Complaint,

2    has led to its unjust enrichment;

3    p.    whether Toyota should be required to repair or replace

4    the IPMs in Class Vehicles or otherwise rectify the IPM Defect in those

5    vehicles;

6    q.    whether proposed Class Members are entitled to

7    recover statutory damages under the CLRA;

8    r.    whether proposed Class Members are entitled to

9    recover compensatory damages;

10    s.    whether proposed Class Members are entitled to an

11    award of restitution under the UCL; and

12    t.    whether Toyota's willful, fraudulent conduct warrants

13    the imposition of punitive damages.

14    152. The class is readily ascertainable, and prosecution as a class

15    action will eliminate the possibility of repetitious litigation and will

16    provide redress for claims too small to support the expense of individual,

17    complex litigation. Absent a class action, proposed Class Members will

18    continue to suffer losses, Toyota's violations of law will be allowed to

19    proceed without remedy, and Toyota will retain revenue as a result of its

20    wrongdoing. A class action, therefore, provides a fair and efficient method

21    for adjudicating this controversy.

22    153. Plaintiffs are asserting claims that are typical of the proposed

23    class in that Plaintiffs own a Class Vehicle; each of the two named

24    Plaintiffs is a "consumer" and a "buyer" as those terms are defined in the

25    CLRA and that Plaintiffs have lost "money" or "property" as a result of

26    Toyota's conduct, as those terms are defined in the UCL.

27    154. Plaintiffs will fairly and adequately represent and protect the

28    interests of the proposed class, and have no interests that are

-54-

antagonistic to or in conflict with those they seek to represent.

155. Plaintiffs have retained competent counsel who have considerable experience and success in the prosecution of class actions involving the sale of defective consumer products, including motor vehicles, and other forms of complex litigation.

156. In view of the complexity of the issues and the expense that an individual proposed Class Member would incur if he or she attempted to obtain relief from a large corporation such as Toyota, the claims of individual proposed Class Members do not involve monetary amounts that are sufficient to support separate actions. Because of the size of individual proposed Class Member's claims, no proposed Class Members could afford to seek legal redress for the wrongs complained of in this Complaint.

157. The prosecution of separate claims by individual proposed Class Members would create a risk of inconsistent or varying adjudications with respect to at least thousands of individual proposed Class Members, which would, as a practical matter, dispose of the interests of the proposed Class Members not parties to those separate actions, or would substantially impair or impede their ability to protect their interests and enforce their rights.

158. The proposed class meets the requirements of Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), and, to the extent applicable, California Civil Code section 1781 and the cases construing and applying both.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF THE UCL
### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

159.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

160.  By committing the acts and practices alleged in this Complaint, Toyota has violated the UCL (Bus. & Prof. Code §§ 17200-17209).  The UCL is a strict liability statute and it is not necessary to show that the defendant intended to injure or harm anyone.  Plaintiffs allege that Toyota violated the unlawful, fraudulent and/or unfair conduct elements of the UCL.

a.   **Unlawful Conduct**:  As a result of engaging in the conduct alleged in this Complaint**,** Toyota has violated the UCL's proscription against engaging in unlawful conduct—specifically, violations of any civil or criminal, federal, state or municipal, statutory, regulatory or court-made or local law—by virtue of, among others, Toyota's **(i)** fraudulent and deceitful conduct in violation of California Civil Code sections 1709 through 1711, as alleged herein, for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members and its violations of the CLRA (Civil Code sections 1770(a)(5), (a)(7), and (a)(14)), for the purpose of conceal material facts about the IPM Defect from Plaintiffs and the proposed Class Members; **(ii)** trespass to chattels and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFFA") and California Penal Code section 502, by exceeding any authorization Toyota may have had to modify the ECU software in connection with the safety recalls of Class Vehicles without disclosing material facts pertaining to the

-56-

adverse effects that modifying the ECU software would have on Class Vehicles; **(iii)** violations of California Commercial Code section 2313, by falsely representing "that the Safety Recall remedy addresses the safety defect," which Toyota made to Prius drivers via Toyota dealers, thereby making that representation a material basis of the bargain and creating an express warranty that Class Vehicles would perform in accordance with those representations when they did not; **(iv)** violations of California Commercial Code section 2314 by breaching the implied warranty of merchantability; and **(v)** failure to comply with its obligations to remedy safety defects pursuant to 49 U.S.C. sections 30118(c), 30120(a) and 30120(c), and 49 C.F.R. sections 573.5, 573.6, and 573.11.   Toyota made inadequate repairs to Class Vehicles in violation of the Safety Act, which requires Toyota to replace the vehicles or refund the purchase price less depreciation.

b.   **Unfair Conduct**: Toyota has violated the UCL's proscription against unfair conduct as a result of engaging in the fraudulent and deceptive conduct alleged in this Complaint, which violates the legislative policies underlying **(i)** the CLRA; **(ii)** the statutory provisions against the commission of fraud; **(iii)** the CFFA; **(iv)** California Penal Code section 502; and **(v)** the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") Act, as codified at 49 U.S.C. §§ 30101, 30112, 30115-30120. An "unfair" practice may be any conduct that is deemed immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

c.   **Fraudulent Conduct**: Toyota has violated the UCL's proscription against fraud as a result of engaging in the fraudulent and deceitful conduct alleged in paragraphs 29 through 139, above.

161.   Toyota has engaged in unfair acts and practices based on the

-57-

acts and practices set forth in the Complaint, including the manufacture, sale, lease, and ineffective repair of vehicles with an inverter defect that causes vehicles to shut down while driving or enter into "limp-home" mode. Defendants' failure, over a long period of time, to adequately disclose the inverter defect or adequately address it, caused and causes excessive, undue harm and risk to consumers.

162. Defendants have engaged in unfair acts and practices because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with an inverter defect that causes vehicles to shut down while driving or enter into "limp-home" mode, and Defendants' failure, over a long period of time, to adequately disclose the defect or address it, offend public policy.

163. Plaintiffs and proposed Class Members have suffered injury in fact and have lost money and functional property as a result of Toyota's actions, as alleged herein.

164. Plaintiffs seek an order of this Court pursuant to section 17203 of the UCL, requiring Toyota: **(a)** to notify the proposed Class Members of the existence, nature, and scope of the IPM Defect in Class Vehicles; **(b)** to replace defective IPMs in Class Vehicles at its expense; and **(c)** to make full restitution of all monies wrongfully obtained directly or indirectly from Plaintiffs and the proposed Class Members as a result of the conduct described in this Complaint.

### SECOND CLAIM FOR RELIEF
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**UNDER THE UNIFORM COMMERCIAL CODE**
**ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS**

165. Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

166. Plaintiffs assert this claim on behalf of themselves and the

-58-



1  Nationwide Class or, alternatively, on behalf of the California Sub-
2  Class.

3  167. Plaintiffs and members of the Classes purchased or leased
4  the Class Vehicles from Toyota by and through Toyota's authorized
5  agents for retail sales, or were otherwise expected to be eventual
6  purchasers of the Class Vehicles when bought from a third party.  At all
7  relevant times, Toyota was a manufacturer, distributor, warrantor,
8  and/or seller of Class Vehicles.  Toyota knew or had reason to know of
9  the specific use for which the Class Vehicles were purchased or leased.

10  168. Toyota is and was at all relevant times a merchant and
11  seller of motor vehicles within the meaning of the Uniform Commercial
12  Code.

13  169. With respect to leases, Toyota is and was at all relevant
14  times a lessor of motor vehicles within the meaning of the Uniform
15  Commercial Code.

16  170. The Class Vehicles are and were at all relevant times goods
17  within the meaning of the Uniform Commercial Code.

18  171. Toyota impliedly warranted that the Class Vehicles were in
19  merchantable condition and fit for the ordinary purpose for which
20  vehicles are used.

21  172. The Class Vehicles, when sold or leased and at all times
22  thereafter, were not in merchantable condition and were and are not fit
23  for the ordinary purpose of providing safe and reliable transportation.
24  The Class Vehicles contained and contain an inherent defect in their
25  IPMs and inverter assemblies, key components in the Prius hybrid
26  engine, at the time of sale or lease and thereafter, and therefore present
27  an undisclosed safety hazard to drivers and occupants.  This risk is
28  present from the moment a Class Vehicle is turned on and whenever

1  and wherever it is driven.

2    173.  Toyota cannot disclaim its implied warranty as it knowingly
3  sold or leased a defective product.  Any attempt by Toyota to disclaim or
4  limit the implied warranty of merchantability to its consumers is
5  unconscionable and unenforceable in this case.  Toyota's warranty
6  limitation is unenforceable because it knowingly sold or leased a
7  defective product without informing consumers about the IPM Defect.
8  The time limits contained in Toyota's warranty periods were also
9  unconscionable and inadequate to protect Plaintiffs and members of the
10  Classes.  The time limitations contained in Toyota's warranty period
11  were determined unilaterally by Toyota and unreasonable favored
12  Toyota.  A gross disparity in bargaining power existed between Toyota
13  and members of the Classes, and Toyota knew or should have known
14  that the Class Vehicles were defective at the time of the sale or lease
15  and that the inverter defect posed a safety hazard.

16    174.  Toyota was provided notice of its defective inverters by
17  numerous consumer complaints made to its authorized dealers
18  nationwide, complaints to NHTSA, and through its own testing.  Toyota
19  acknowledged the inverter defect and its associated safety hazards in
20  writing more than four years ago.  Affording Toyota a reasonable
21  opportunity to cure its breach of implied warranties would be
22  unnecessary and futile here because Toyota has known of and concealed
23  the inverter defects and has refused to repair or replace the defective
24  IPMs free of charge within a reasonable time.

25    175.  As a direct and proximate cause of Toyota's breach of the
26  implied warranty of merchantability, Plaintiffs and members of the
27  Classes have been damaged in an amount to be proven at trial.

28    176.  Plaintiffs and members of the Classes have been excused

from performance of any warranty obligations as a result of Toyota's conduct described herein.

### THIRD CLAIM FOR RELIEF
#### BREACH OF WARRANTY IN VIOLATION OF CAL. COMM. CODE § 2313
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

177.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

178.  Toyota has made affirmative representations of fact about 2010 through 2014 model-year Class Vehicles to Plaintiffs and the proposed Class Members who owned or leased those vehicles, including, but not limited to, statements in a letter that accompanied the Safety Recall E0E notice (the "Recall Letter") that the defective performance of the IPMs in Class Vehicles would be corrected by updating the software in the Motor Generator Electronic Control Unit and Power Management Electronic Control Unit of their Class Vehicles. Toyota also announced, in a separate letter to Plaintiffs and the proposed Class Members, a "Warranty Enhancement Program" by which the warranty on IPMs in certain Class Vehicles to 15 years with no mileage limitation.

179.  In a bulletin that Toyota distributed to dealers on or about February 6, 2018, Toyota stated that "Toyota believes that ***these Safety Recall remedy actions and related Warranty Enhancement Programs (ZE3 and ZF5) are the appropriate measures for customer safety and satisfaction***." (Emphasis added.)

180.  In the same bulletin, despite knowing that the software update did not eliminate the IPM Defect, Toyota instructed its dealers that ***if they "are contacted by a Prius or Prius V driver concerned about these reports," they should "[e]xplain that the Safety Recall remedy addresses the safety defect.***" (Emphasis added.)



181.  The statements Toyota made to Prius drivers were made a part of the basis of the bargain and created an express warranty that Class Vehicles would conform to those statements. Contrary to those statements, Toyota knew, but fraudulently concealed from Plaintiffs and proposed Class Members, that Class Vehicles were equipped with defective IPMs that create an unreasonable safety risk and the potential to cause Class Vehicles to use more fuel and release more exhaust emissions than Toyota represented they would. Toyota also knew that many Class Vehicles were affected by the IPM Defect, but excluded them from the recall of 2010 through 2014 model-year Class Vehicles that Toyota announced in February 2014 and expanded in July 2015.

182.  Plaintiffs, through their counsel, took reasonable steps to notify Toyota that Class Vehicles were not as Toyota represented them in the Notice that Plaintiffs' counsel sent to Toyota (as described in paragraph 235, below).

183.  Toyota failed to take reasonable steps to repair or otherwise rectify the IPM Defect.

184.  As a direct and proximate cause of Toyota's breaches, Plaintiffs and members of the proposed class have been harmed in an amount to be determined at trial.   (Has this cured the defect in the express warranty claim that was addressed in the order?)

**FOURTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTY IN VIOLATION**
**OF CAL. COMM. CODE § 2314**
**ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS**

185.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

186.  Plaintiffs assert this claim on behalf of themselves and on

-62-



behalf of any person or entity that purchased or leased a Class Vehicle.

187. Toyota US is and was at all relevant times a merchant with respect to the Class Vehicles under California Commercial Code § 2104.

188. A warranty that the Class Vehicles were in merchantable condition was implied by law in all contracts for their sale or lease, pursuant to California Commercial Code § 2314(1).

189. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles were and are defective in that there were and are defects in their inverters that cause the cars to shut down while driving or to enter "limp-home" mode; the Class Vehicles do not have an adequate fail-safe to protect against such events; the Class Vehicles were sold with software that was not programmed according to industry standards; the inverters were not adequately designed, manufactured and tested; and Defendants issued inadequate repairs for these dangerous defects.

190. Defendants were and are aware of these issues. Toyota admitted in its Defect Information Report submitted to the NHTSA that it's failing inverters were "increasing the risk of a crash." Toyota also has notice of these issues based on the many other inverters that have failed across the country. Toyota has received thousands of email requests for replacement parts from dealers when inverters fail. Toyota has issued recalls, acknowledging awareness of these issues, but it has failed to issue any proper fixes.

191. Plaintiffs have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and Defendants.



192.  Privity is not required in this case because Plaintiffs are intended third-party beneficiaries of contracts between Defendants and their dealers.   Plaintiffs are the intended beneficiaries of Toyota's implied warranties.

193.  As a direct and proximate result of Defendants' breaches of the warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

<div align="center">

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE SONG-BEVERLY WARRANTY ACT**
**(CAL. CIV. CODE § 1791, *et seq.*)**
**ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS EXCEPT PLAINTIFFS KUAN AND MILLS**

</div>

194.  Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

195.  Plaintiffs assert this claim on behalf of themselves and members of the California Sub-Class.

196.  The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

197.  Defendants are "manufacturers" within the meaning of Cal. Civ. Code § 1791(j).

198.  Defendants impliedly warranted to Plaintiffs that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

199.  Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a.    Pass without objection in the trade under the contract description.

b.    Are fit for the ordinary purposes for which such goods

<div align="center">-64-</div>

1  are used.

2         c.    Are adequately contained, packaged, and labeled.

3         d.    Conform to the promises or affirmations of fact made
4  on the container or label.

5      200.  The Class Vehicles would not pass without objection in the
6  automotive trade because the Class Vehicles do not conform with
7  federal and California standards, and were sold with an IPM Defect, as
8  described above.

9      201.  The Class Vehicles are not fit for ordinary purposes for
10  which they are used.

11      202.  The Class Vehicles are not adequately labeled because the
12  labeling misrepresents that the vehicles are compliant with federal and
13  California standards or fails to disclose such noncompliance.  The Class
14  Vehicles are not adequately labeled because the labeling misrepresents
15  their fuel efficiency.

16      203.  The Class Vehicles do not conform to the promises or
17  affirmations of fact made on their label because their label
18  misrepresents their fuel efficiency.

19      204.  Defendants' conduct deprived Plaintiffs of the benefit of their
20  bargain, caused Plaintiffs to spend more on fuel for the Class Vehicles,
21  and have caused the Class Vehicles to be worth less than what
22  Plaintiffs paid.

23      205.  As a direct and proximate result of Defendants' conduct,
24  Plaintiffs received goods whose condition substantially impairs their
25  value. Plaintiffs have been damaged by the diminished value of the
26  vehicles, the additional costs of fuel, the vehicles' malfunctioning, and
27  actual and potential increased maintenance and repair costs.

28      206.  Plaintiffs have complied with all obligations under the



1   warranty, or otherwise have been excused from performance of said

2   obligations as a result of Defendants' conduct.

3   207. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs are

4   entitled to damages and other legal and equitable relief including, but

5   not limited to the purchase price of the Class Vehicles or the

6   overpayment or diminution in value of the Class Vehicles, and attorney

7   fees and costs.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR,**
**ALTERNATIVELY, THE CALIFORNIA SUBCLASS EXCEPT PLAINTIFF REID**

</div>

8

9

10

11  208. Plaintiffs reallege and incorporate by reference each of the

12  allegations set forth in paragraphs 29 through 139, above.

13  209. Plaintiffs assert this claim on behalf of themselves and on

14  behalf of the Nationwide Class, or, alternatively, on behalf of the

15  California Sub-Class.

16  210. This Court has jurisdiction to decide claims brought under

17  15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

18  211. The Class Vehicles are "consumer products" within the

19  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

20  212. Plaintiffs are "consumers" under the Magnuson-Moss

21  Warranty Act, 15 U.S.C. § 2301(3).

22  213. Defendants are "suppliers" within the meaning of the

23  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4).

24  214. Defendants are "warrantors" within the meaning of the

25  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(5).

26  215. 15 U.S.C. § 2310(d)(1) provides a cause of action for any

27  consumer who is damaged by the failure of a warrantor to comply with

28  an implied warranty.

216. The Class Vehicles' had implied warranties within the meaning of 15 U.S.C. § 2301(7).

217. Defendants breached the implied warranties on the Class Vehicles as described above, including by not repairing or adjusting the defective IPMs; providing Class Vehicles not in merchantable condition and which present an unreasonable risk of sudden shut down or entering "limp-home" mode, and not fit for the ordinary purpose for which the Class Vehicles are used; providing Class Vehicles that were not fully operational, safe or reliable; and inadequately repairing and not curing defects and nonconformities once they were identified.

218. Plaintiffs have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and Defendants.

219. Privity is not required in this case because Plaintiffs are intended third-party beneficiaries of contracts between Defendants and their dealers. Plaintiffs are the intended beneficiaries of Toyota's implied warranties.

220. Affording Defendants an opportunity to cure their breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle, Defendants knew of the Class Vehicles' inability to perform as warranted and lower fuel efficiency based on the IPM Defect, but nonetheless failed to rectify the situation and/or disclose the IPM Defect. Defendants have still failed to rectify the situation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

221.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

222.  As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages and continue to suffer damages, including but not limited to the difference between the value of the vehicle paid and the actual value of the vehicle.  Plaintiffs are entitled to legal and equitable relief against Defendants, including damages, costs, attorneys' fees, and other relief as appropriate.  Plaintiffs, individually and on behalf of members of the Classes, seek all damages permitted by law.

## SEVENTH CLAIM FOR RELIEF
### FRAUDULENT CONCEALMENT
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS OR, ALTERNATIVELY, THE CALIFORNIA SUBCLASS

223.  Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 29 through 139, above.

224.  As alleged more fully herein, at the time Toyota sold or leased Class Vehicles to Plaintiffs and proposed Class Members, Toyota knew they were equipped with defective IPMs.

225.  At all times relevant herein, Toyota made misrepresentations of material fact to Plaintiffs and the other proposed Class Members as a means of concealing the true nature and scope of the IPM Defect, claiming that the stalled engines it was causing could be solved by a software update that Toyota would perform in the context of a sham recall that began in or about February 2014.

226.  Toyota has concealed material facts from Plaintiffs and the other proposed Class Members, including but not limited to:

a.      the existence, nature, and scope of the IPM Defect;

b.      that updating the IPM software in Class Vehicles did not cure the IPM Defect;

c.      that the IPM Defect could only be remedied by replacing the IPM with a non-defective IPM; and

d.      that IPM concealed the foregoing facts from Plaintiffs and the proposed Class Members as a means for Toyota to avoid the expense involved with replacing IPM at no cost to the proposed Class Members.

227.  Toyota had a duty to disclose these facts by virtue of: **(a)** Toyota's exclusive knowledge about the nature and scope of the IPM Defect; **(b)** Toyota's awareness that Plaintiffs and the proposed Class Members were not reasonably likely to discover these facts; **(c)** Toyota's active concealment of those facts from Plaintiffs and the proposed Class Members (by, among other things, making the false representations described above); and **(d)** Toyota's statutory and common-law obligations to disclose material information to the consumers who own or formerly owned Class Vehicles, as alleged herein. Plaintiffs and the proposed Class Members would have acted differently had Toyota disclosed this information to them and allowed them to make fully-informed decisions before purchasing or leasing a Class Vehicle.

228.  The facts Toyota has concealed from Plaintiffs and the proposed class are material and uniform in nature.

229.  Toyota made misrepresentations of material fact in an effort to conceal the existence, nature, and scope of the IPM Defect and to prevent proposed Class Members from becoming aware of the true nature and scope of the IPM Defect. Plaintiffs and members of the proposed class would have either purchased a different vehicle or paid significantly less for their Class Vehicles had Toyota disclosed the facts

1    it concealed from them.

2    230. As a proximate result of Toyota's concealment and
3    suppression of material facts, Plaintiffs and the proposed Class Members
4    have sustained damage by, among other things, paying more for their
5    Class Vehicle than they were actually worth; and bearing the cost of
6    repairs or purchasing replacement IPMs due to the IPM Defect.

7    231. Because Toyota engaged in the conduct alleged herein
8    deliberately and with willful and malicious intent, Plaintiffs and the
9    proposed Class Members are entitled to an award of punitive damages,
10   the total amount of which shall be proven at trial.

11                          **EIGHTH CLAIM FOR RELIEF**
     **DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF THE CLRA**
12   **ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE CLRA SUBCLASS**

13   232. Plaintiffs reallege and incorporate by reference each of the
14   allegations set forth in paragraphs 29 through 139, above.

15   233. The acts and practices described in this Complaint were
16   undertaken by Toyota in connection with a "transaction" that was
17   intended to and did result in proscribed practices as a result of the sale or
18   lease of a motor vehicle to Plaintiffs, each of whom are a "consumer," as
19   those terms are defined in Civil Code sections 1761(d) (defining
20   "consumer"), 1761(e) (defining "transaction") and 1770(a) (describing "list
21   of proscribed practices"). Motor vehicles are "goods" as that term is
22   defined in Civil Code section 1761(a). Toyota's acts and practices, as
23   alleged herein, violated, and continue to violate, the CLRA in at least the
24   following respects:

25        a.    Representing that Class Vehicles have characteristics,
26   uses or benefits that they do not have, in violation of section 1770(a)(5) of
27   the CLRA;

28        b.    Representing that Class Vehicles are of a particular

                                    **-70-**

standard, quality or grade when they are of another, in violation of section 1770(a)(7) of the CLRA; and

c.      Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law in violation section 1770(a)(14) of the CLRA.

234.  Plaintiffs seek and are entitled to equitable relief in the form of an order: **(a)** enjoining Toyota from continuing to engage in the deceptive business practices described in this Complaint; **(b)** requiring Toyota to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; **(c)** requiring Toyota to disgorge all ill-gotten gains flowing from the conduct described in this Complaint; and **(d)** requiring Toyota to provide public notice of the true nature and scope of the IPM Defect

235. Pursuant to section 1782 of the CLRA, Plaintiffs notified Toyota in writing of the particular violations of section 1770 of the CLRA (the "Notice") and has demanded that Toyota correct, repair, replace, or otherwise rectify the IPM Defect on February 12 and July 16, 2018, by certified mail.

236.  Toyota has declined this opportunity, hence Plaintiffs seek actual, statutory, and punitive damages to which Plaintiff and the proposed class are entitled as a result of the IPM Defect in amounts to be proven at trial, including, but not limited to, costs incurred in connection with the replacement or repair of IPMs and inverters in Class Vehicles.

237.  Accordingly, Plaintiffs hereby seek an order requiring Toyota to: **(a)** to notify the proposed Class Members of the existence, nature, and scope of the IPM Defect in Class Vehicles; **(b)** to repair, replace, or otherwise rectify defective IPMs in Class Vehicles at its expense; and **(c)** to make full restitution of all monies wrongfully obtained as a result of

-71-

the conduct described in this Complaint.

### NINTH CLAIM FOR RELIEF
#### TRESPASS TO CHATTELS
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED RECALL SUBCLASS

238.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 29 through 139, above.

239.  Plaintiffs and members of the proposed Recall Subclass own, lease or have owned or leased one or more Class Vehicles. Toyota exhorted Plaintiffs and each member of the proposed Recall Subclass to update the ECU software in their Class Vehicles. Plaintiffs and members of the proposed Recall Subclass complied with Toyota's exhortations in that regard, unaware that the ECU software update did not eliminate the safety risk that led to the recall and that Toyota had surreptitiously included algorithms that caused the engines in Class Vehicles to become sluggish and non-responsive, which created additional safety risks and reduced gas mileage. Had Plaintiffs known that updating the ECU software would have this effect, they would not have allowed Toyota to install it or would have sought another way to address the IPM Defect.

240.  At no time did Toyota advise Plaintiffs or members of the proposed Recall Subclass that the ECU software modification would not actually eliminate the safety risks posed by the IPM Defect or that it may adversely affect the performance of Class Vehicles. By effectuating such modifications without the knowledge or consent of Plaintiffs or members of the proposed Recall Subclass, Toyota intentionally trespassed on and interfered with their Class Vehicles, which were the property of Plaintiffs and members of the proposed Recall Subclass.

241.  Toyota's trespass was the actual, direct, and proximate

-72-



1  cause of injury to Plaintiffs and members of the proposed class by
2  compromising the functionality of the ECUs in Class Vehicles to the
3  point where it became difficult, if not impossible to use them for the
4  ordinary purposes for which they were intended. Toyota has admitted
5  that its surreptitious modification of the ECU software had specific
6  effects on the performance of Class Vehicles), which has significantly
7  impaired those Class Vehicles' condition, quality, and value.

8  242.  Plaintiffs are informed and believe that Toyota trespassed
9  and interfered with Class Vehicles for the purpose of perpetuating its
10 fraudulent concealment of the IPM Defect. Thus, Toyota knew and
11 intended that its conduct would cause injury to Plaintiffs and members
12 of the proposed class by adversely affecting the performance of Class
13 Vehicles, but leaving them at inordinate risk of injury and death
14 because the ECU software did not eliminate the IPM Defect. Thus,
15 Plaintiffs and members of the proposed Recall Subclass were harmed as
16 a direct result of Toyota's trespass and interference and without regard
17 to the rights of Plaintiffs or members of the proposed Recall Subclass.

18 243.  As a result of Toyota's trespass to, and interference with,
19 Class Vehicles, Plaintiffs and the members of the proposed class are
20 entitled to recover actual damages in amounts to be determined at trial.
21 And, because Toyota's conduct was malicious, oppressive and
22 fraudulent, Plaintiffs and members of the proposed class are entitled to
23 an award of punitive damages in an amount that will be determined at
24 trial.

### TENTH CLAIM FOR RELIEF
#### UNJUST ENRICHMENT
#### ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

27 244.  Plaintiffs   reallege   and   incorporate   by   reference   the
28 allegations set forth in paragraphs 29 through 139, above.

-73-



245. By engaging in the conduct described in this Complaint, Toyota has been unjustly enriched by their sale of Class Vehicles by concealing the IPM Defect.

246. As a proximate result of Toyota's unlawful, fraudulent, and unfair conduct, Toyota has obtained revenues by which it has become unjustly enriched at Plaintiffs' and members of the proposed class's expense. Under the circumstances alleged herein, it would be unfair and inequitable for Toyota to retain the profits it has unjustly obtained at the expense of the Plaintiffs and the proposed class.

247. Accordingly, Plaintiffs seek an order: **(a)** requiring Toyota to replace defective IPMs in Class Vehicles at no cost to Plaintiffs and the Class Members; **(b)** establishing Toyota as constructive trustee of the funds that served to unjustly enrich it, together with interest during the period in which Toyota has retained such funds, **(c)** requiring Toyota to make full restitution of those funds to Plaintiffs and the Class Members in a manner to be determined by the Court; and **(d)** requiring Toyota to provide public notice of the true nature and scope of the IPM Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally, pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action.

2. For an award of equitable relief as follows: (a) requiring Toyota to replace all defective IPMs in Class Vehicles; (b) requiring Toyota to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; and (c) requiring Toyota to provide public notice of the true nature and scope of the IPM

1    Defect.

2        3.    For damages sustained as a result of the IPM Defect in

3    amounts to be proven at trial, including, but not limited to, costs

4    incurred in connection with the replacement or repair of the IPM or

5    hybrid inverter assembly in Class Vehicles.

6        4.    For an award of statutory damages.

7        5.    For an award of punitive damages.

8        6.    For an award of attorneys' fees pursuant to, *inter alia*,

9    California Civil Code section 1780(d), California Code of Civil Procedure

10   section 1021.5, and the common-fund doctrine.

11       7.    For an award of costs.

12       8.    For pre- and post-judgment interest on any amounts

13   awarded.

14       9.    For such other relief as the Court deems just and proper.

15                          **JURY TRIAL DEMAND**

16       Plaintiffs hereby demand a trial by jury with respect to all issues

17   so triable.

18   DATED:  November 20, 2018  **MILLER BARONDESS, LLP**

19                          by:  /s/ *Louis R. Miller*
20                               Louis R. Miller

21                          Louis R. (Skip) Miller (54141)
                            (smiller@millerbarondess.com)
22                          Amnon Z. Siegel (234981)
                            (asiegel@millerbarondess.com)
23                          Casey B. Sypek (291214)
                            (csypek@millerbarondess.com)
24                          David I. Bosko (304927)
                            (dbosko@millerbarondess.com)
25                          **MILLER BARONDESS, LLP**
26                          1999 Avenue of the Stars, Suite 1000
                            Los Angeles, California 90067
27                          T: (310) 552-4400
                            F: (310) 552-8400
28

                                    **-75-**



1

Paul R. Kiesel (119854)
kiesel@kiesel.law

2

Jeffrey A. Koncius

3

(189803) koncius@kiesel.law
Nicole Ramirez (279017)

4

ramirez@kiesel.law
**KIESEL LAW LLP**

5

8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910

6

T: 310-854-4444

7

F: 310-854-0812

8

Attorneys for Plaintiffs

9

Remy McCarthy, Kathleen Ryan-Blaufuss,
Cathleen Mills, Jason Reid, Khek Kuan,

10

on behalf of themselves and all others
similarly situated

11

12

DATED:  November 20, 2018   **FAZIO | MICHELETTI LLP**

13

by:  /s/ *Jeffrey L. Fazio*

14

Jeffrey L. Fazio

15

Jeffrey L. Fazio (146043)

16

(jlf@fazmiclaw.com)
Dina E. Micheletti (184141)

17

(dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**

18

2410 Camino Ramon, Suite 315

19

San Ramon, CA  94583
T:  925-543-2555

20

F:  925-369-0344
Charles J. LaDuca (Admitted *pro hac vice*)

21

(charles@cuneolaw.com)
**CUNEO GILBERT & LADUCA, LLP**

22

4725 Wisconsin Ave. NW, Suite 200

23

Washington. D.C. 20016
T: 202-789-3960

24

F: 202-789-1813

25

Michael J. Flannery (196266)

26

(mflannery@cuneolaw.com)
**CUNEO GILBERT & LADUCA, LLP**

27

7733 Forsyth Boulevard, Suite 1675

28

St. Louis, MO  63105
T: 314-226-1015

William M. Audet (117456)
(waudet@audetlaw.com)
Gwendolyn R. Giblin (181973)
(ggiblin@audetlaw.com)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
T: 415-568-2555
F: 415-568-2556

Donald R. Pepperman (109809)
(dpepperman@bakermarquart.com)
**BAKER & MARQUART LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
**T:** 424-652-7804
**F:** 424-652-7850

Attorneys for Plaintiffs
Rajdave Bhandari and Jevdet Rexhepi, on behalf of themselves and all others similarly situated

## L.R. 5-4.3.4(a)(2)(i) Certification

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer of the document attests that concurrence in the filing of the document has been obtained from each of the other Signatories.

by: /s/ *David I. Bosko*
David I. Bosko