1  Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
   Dina E. Micheletti (184141) (dem@fazmiclaw.com)
2  **FAZIO | MICHELETTI LLP**
   1111 Broadway, Suite 400
3  Oakland, CA  94607
   T: 925-543-2555
4  F: 925-369-0344

5  Louis R. Miller (54141) (smiller@millerbarondess.com)
   Amnon Z. Siegel (234981) (asiegel@millerbarondess.com)
6  Casey B. Sypek (291214) (csypek@millerbarondess.com)
   **MILLER BARONDESS, LLP**
7  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
8  T: (310) 552-4400
   F: (310) 552-8400cl

9
   *Co-Lead Class Counsel*
10 Additional Counsel Listed at End of Document

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14 KATHLEEN RYAN-BLAUFUSS,          No. 8:18-cv-00201-JLS-KES
   CATHLEEN MILLS, and KHEK
   KUAN,                           **PLAINTIFFS' OPPOSITION TO**
15                                 **DEFENDANTS' MOTION TO**
                                   **COMPEL ARBITRATION**
16            Plaintiffs,
                                   **DATE**: August 21, 2020
17       v.                        **TIME**:  10:30 a.m.
                                   **PLACE**: Courtroom 10A
18                                 **FACT DISCOVERY CLOSES**:
   TOYOTA MOTOR CORPORATION,       September 17, 2021
19 TOYOTA MOTOR SALES USA, INC.,   **FINAL PRETRIAL CONFERENCE**:
   and DOES 1-10, inclusive,       September 17, 2021
20                                 **TRIAL DATE**: Not Set
            Defendants.
21
                                   Hon. Josephine L. Staton
22 STEPHEN KOSAREFF and LAURA
   KAKISH, on behalf of themselves and
23 all others similarly situated,

24          Plaintiffs,

25       v.

26 TOYOTA MOTOR CORPORATION,
   TOYOTA MOTOR SALES USA, INC.,
27 and DOES 1-10, inclusive,

28          Defendants.

1
2

## **<u>TABLE OF CONTENTS</u>**

<u>PAGE</u>

3    I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

4    II.    ARGUMENT................................................................................................ 1

5           A.    Judicial Estoppel Precludes TMS from Seeking Arbitration.................. 2

6           B.    Defendants Made Nearly Every Argument They Make Here
                  to the Ninth Circuit, Which Rejected Each One of Them ....................... 3

7
                  1.    Plaintiffs and Toyota Did Not Agree to Arbitrate Arbitrability ... 4

8
                  2.    Equitable Estoppel is Inapplicable to Plaintiffs' Claims ............. 5
9
            C.    Kosareff's Loan Agreement Was Superseded by an Integrated RISC ... 7
10
            D.    Defendants' Third-Party Beneficiary Theories are Baseless................... 9
11
                  1.    TMC and TMS are Not "Assigns" .............................................. 13
12
                  2.    TMC and TMS are Not "Affiliates" ........................................... 14
13
            E.    Defendants Have Waived Any Right to Arbitration............................... 17
14
                  1.    Defendants Knew About the Arbitration Clauses ....................... 18
15
                  2.    Defendants Engaged in Two Years of Inconsistent Acts........... 20
16
                  3.    Plaintiffs Have Been Prejudiced by Defendants' Delay ............. 23
17
            F.    Claims for Public Injunctive Relief Are Not Subject to Arbitration ..... 25
18

19   II.    CONCLUSION ........................................................................................... 25

20
21
22
23
24
25
26
27
28



# TABLE OF AUTHORITIES

## *Cases*

*Adolph v. Coastal Auto Sales, Inc.*, 1
    84 Cal. App. 4th 1443 (2010) .................................................................... 20

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)............................................................................. 1

*Augusta v. Keehn & Assoc.*,
    193 Cal. App. 4th 331 (2011) ........................................................ 24

*Berman v. Health Net*,
    80 Cal. App. 4th 1359 (2000) ...................................................... 24

*Butcher's Union v. Farmers Market*,
    67 Cal. App. 3d 905 (1977)........................................................... 21

*Cadena v. America Honda Motor Co.*. No. CV 18-4007-MWF-(PJWx),
    2020 U.S. Dist Lexis 104165, (C.D. Cal. June 10, 2020)............................ 20

*Chartwell Staffing v. Atl. Sol. Grp. Inc.*,
    2020 U.S. Dist. Lexis 24640 (C.D. Cal. Jan. 8 2020)................................... 21

*Chavez v. Bank of Am.*.
    2011 U.S. Dist. Lexis 116630  (N.D. Cal. Oct. 7, 2011) ........................... 10

*Duval Motors Co. v. Rogers,*
    73 So. 3d 261 (Fla. App. 2011).................................................... 8, 9

*Fikham v. BMW of N. Am. LLC*,
    2019 U.S. Dist. LEXIS 216891 (C.D. Cal. Oct. 15, 2019)................... 15, 16

*Flintkote Co. v. Gen Acc. Assur. Co.*,
    410 F. Supp. 2d 875 (N.D. Cal. 2006)........................................... 16, 17

*Foti v. Toyota Motor Sales U.S.A. Inc.*,
    2017 N.J. Super. Unpub. LEXIS 1001
    (N.J. Super. Ct. App. Div. April 24, 2017) ........................................... 15, 16

*Garcia v. GM LLC*,,
    2019 U.S. Dist. LEXIS 8678  ((S.D. Cal. Jan 17, 2019) ........................... 15

*Goldman v. KPPMG LLP*,
    173 Cal. App. 4th 209 (2009) ....................................................... 5

*Gonzalez v. Consumer Portfolio Servs.*,
    66 Va. Cir. 43, 44-55, 2004 Va. Cir. LEXIS 336  (Va. Cir. Ct. 2004) ..... 8, 9

*Goonewardene v. ADP, LLC*,
    6 Cal. 5th 817 (2019).......................................................... 11, 13, 16

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010).................................................................... 1

FAZIO | MICHELETTI LLP
*Attorneys*

*Guess?, Inc. v. Superior Court,*
79 Cal. App. 4th 553 (2000) ...................................................21, 22, 24

*Gutierrez v. Wells Fargo Bank,*
704 F. 3d. 712 (9th Cir. 2012).................................................25

*Holt v. HHH Motors,*
2013 Fl. Cir. Lexis 14930 (Fla. Cir. Ct. Aug. 21, 2013).........................8, 9

*Hooper v. Advance America Cash Advance Centers of Missouri, Inc.,*
589 F.3d 917 (8th Cir. 2009)...................................................22

*In re Ford Motor Co. Dps6 Powershift Transmission Prods. Liab. Litig,*
No. 18-ML-02814- AB (FFMx),
2020 U.S. Dist. Lexis 119791 (C.D. Cal. July 2, 2020) ......................11, 16

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig,*
2011 U.S. Dist. Lexis 162846 (C.D. Cal. Dec. 20, 2011)...............19, 21, 22

*In re Toyota Motor Corp. Unintended Accel. Mktg. Litig.,*
838 F. Supp. 2d 967 (C.D. Cal. 2012)...............................19, 23, 24

*Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.,*
957 F.3d 1038 (9th Cir. 2020)....................................................1

*Jurosky v. BMW of N. Am,* No. 19-cv-706-JM(BGS),
2020 U.S. Dist. Lexis 38866 (Feb. 27, 2020).........................7, 12

*Katz v. BMW of N. Am., LLC,*
2019 US Dist. Lexis, 159285 (C.D. Cal. Sep. 17, 2019) ....................15, 16

*Kejejian v. BMW,*
No. 2:20-cv-00407-GW (C.D. Cal. March 26, 2020)............................7, 14

*Kelly v. Pub. Util. Dist. No. 2 of Grant County,*
552 Fed. Appx. 663 (9th Cir. 2014) ....................................22, 24

*Kramer v. Toyota Motor Corp.,*
705 F.3d 1122 (9th Cir. 2013),
*cert. denied sub nom. Toyota Motor Corp. v. Choi,*
571 U.S. 818 (2013)...............................................passim

*Lanning v. BMW of N. Am., LLC,*
2019 U.S. Dist. LEXIS 193118 (S.D. Cal. Nov. 5, 2019) .....................14

*Lewis v. Fletcher Jones Motor Cars, Inc.,*
205 Cal. App. 4th 436 (2012) ....................................................22

*Martin v. Yasuda,*
829 F.3d 1118 (9th Cir. 2016)........................17, 21, 22, 24

*McGill v. Citibank, N.A.,*
2 Cal. 5th 945 (2017)........................................................25

*Murphy v. DirecTV, Inc.,*
724 F.3d 1218 (9th Cir. 2013)..............................................passim

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)............................................................................. 3

*Nguyen v. Tesla, Inc.*, No. 8:19-cv-01422-JLS-JDE,
   2020 U.S. Dist. LEXIS 80784 (C.D. Cal. April 6, 2020) ............................ 25

*Ontiveros v. Zamora*.
   2013 U.S. Dist. LEXIS 20408 (E.D. Cal. Feb. 13, 2013)........................ 17

*Oregel v. PacPizza, LLC*,
   237 Cal. App. 4th 342 (2015) ................................................21, 22, 24, 25

*Oxford Preparatory Academy v. Edlighten Learning Solutions*,
   34 Cal. App. 5th 605 (2019) ........................................................... 9

*Patton v. Jeff Wyler Eastgate, Inc.*,
   608 F. Supp. 2d 907 (S.D. Ohio 2007)............................................. 8

*Pleitz v. BMW of N. Am., LLC*,
   2020 U.S. Dist. LEXIS 79088 (C.D. Cal. Feb. 27, 2020).......................... 15

*Quraishi v. Keylex, Inc.*,
   No. 19STCV20537 (L.A. Super. Ct.)................................................. 2

*Reynard v. Bank of Am., N.A.*,
   551 B.R. 835, 839 (Bankr. D. Idaho 2016) ......................................... 8

*Ronay Family Ltd. P'ship v. Tweed*,
   216 Cal. App. 4th 830 (2013) ....................................................... 14

*Saint Agnes Med. Ctr. v. PacifiCare of Cal.*,
   31 Cal. 4th 1187 (2003) .............................................................. 17

*Savagne v. Fairfield Ford, Inc.*,
   794 F. Supp. 2d 826, 828 (S.D. Ohio 2010) ...................................... 8

*Sobremonte v. Superior Court*,
   61 Cal. App. 4th 980 (1998) ..................................................22, 23

*Soto v. City of Concord*,
   103 F.R.D. 603  (N.D. Cal. 1995) ................................................. 19

*Stafford v. Rite Aid Corp.*,
   2020 U.S. Dist. Lexis 32051 (S.D. Cal. Feb. 25, 2020).....................20, 22

*TD Auto Fin. LLC v. Reynolds*,
   842 S.E.2d 783 (W. Va. 2020)...................................................... 8

*Tourgeman v. Collins Financial Services, Inc.*,
   2010 U.S. Dist. LEXIS 60551 (S.D. Cal. May 25, 2010) ......................... 19

*Van Ness Townhouses v. Mar Industries Corp.*,
   862 F.2d 754 (9th Cir. 1989);.................................................22, 27

*Victoria v. Superior Court*,
   40 Cal. 3d 734 (1985) ................................................................ 12

–iv–

FM
FAZIO | MICHELETTI LLP
Attorneys

*Wayans v. BMW of N. Am. LLC,*
    2020 U.S. Dist. LEXIS 77167 (C.D. Cal. Jan. 7, 2020) ............................ 15

*Waymo LLC v. Uber Techs, Inc.,*
    870 F.3d 1342 (Fed. Cir. 2017) .................................................................. 10

*Wheeler v. SPS Techs., LLC,* No. 8:17-CV-01788-JLS-KES,
    2018 U.S. Dist. LEXIS 224181 (C.D. Cal. October 24, 2018) ...................... 3


### *Statutes*

9 U.S.C. § 1 .................................................................................................... 1

Cal. Pen. Code § 502 .................................................................................... 22

Code Civ. Proc., § 1856(a) ............................................................................ 8


### *Rules*

Fed. R. Civ. Proc. 8(c)(1) ............................................................................ 21



## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Two days after the Court adopted the parties' *second* modified Scheduling Order—and only weeks before announcing a *fourth* IPM-defect safety recall—Defendants announced they were moving to compel arbitration. The motion should be denied for several reasons. First, the arguments Defendant Toyota Motor Sales U.S.A., Inc. ("TMS") recently used to *defeat* a motion to compel arbitration by one of its dealers and judicial estoppel preclude it from making polar opposite arguments here. Second, both TMS and Defendant Toyota Motor Corporation ("TMC") lost a motion to compel arbitration in a case that involved the same claims, the same vehicle, and the same contract involved here, and the Ninth Circuit rejected every argument Defendants made on appeal, which are equally applicable here. Third, Defendants single out Plaintiff Kosareff, claiming his lease agreement provide the basis for third-party beneficiary theories that were not available in the case before the Ninth Circuit, but they fail to mention that Mr. Kosareff entered into a new, integrated contract with no arbitration clause when his lease agreement expired in 2013 and Defendants' third-party beneficiary theories are factually baseless in any event. Fourth, Defendants have waived any right to arbitration by acting in a manner that is wholly inconsistent with the right to arbitrate and is highly prejudicial to Plaintiffs. Fifth, the public injunctive relief Plaintiffs seek is not arbitrable.

## II.    ARGUMENT

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*., reflects the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 366 (2011). Nonetheless, "'[a]rbitration is strictly a matter of consent, and thus is a way to resolve . . . *only those disputes*. . . the parties have agreed to submit to arbitration.'. . . In sum, the federal policy favoring arbitration is no substitute for party agreement, or lack thereof." *Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1041 (9th Cir. 2020) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)).

**A.      Judicial Estoppel Precludes TMS from Seeking Arbitration**

Less than one year ago, TMS opposed a motion to compel arbitration in *Quraishi v. Keylex, Inc.,* No. 19STCV20537 (L.A. Super. Ct.), which was based on a Retail Sales Installment Contract ("RISC") whose arbitration clause is materially identical to those in the Kakish and Kuan RISCs and similar to the arbitration clause in the Kosareff lease agreement. *Compare* Request for Judicial Notice in Opposition to Motion to Compel Arbitration ("RJN"), Ex. J at 4-5 & Ex. 1 (lease) *with* Amended Declaration of Lisa R. Weddle ("AWD"), Exs. A-B.

*Quraishi* involved claims for fraud and CLRA violations against TMS and a Lexus dealer (a Toyota brand).  *See* RJN, Ex. B. In addition to disclaiming any preexisting relationship with the dealer that could bind it to the same arbitration clauses at issue here, *see* RJN, Ex. A at 3:21-23, TMS made two other admissions: **(1)** that it is just "the distributor of the subject vehicle and provided certain warranty coverage to plaintiff, ***apart from the purchase contract***" (emphasis added) (contradicting its estoppel argument that claims involving fraud, CLRA violations, and warranty are intertwined with dealer contracts), *see* Am. Opening Brief (ECF 110) ("AOB") at 20:7-21:2; and **(2)** that it "did not agree at any point to be bound by any of the provisions of the contract, including the provision to arbitrate" (contradicting its estoppel argument, and its assign/affiliate arguments which are based on the notion that TMS and TMC are intended third-party beneficiaries of contracts with similar language, including the reference to "assigns"). *Id.* at 3:23-28.

In the minute order that issued after the hearing, the court granted the motion with respect to the plaintiff and the dealership and ordered them to arbitration, but TMS was permitted to litigate its claims in court. *See* RJN, Ex. C. Consequently, TMS is judicially estopped from taking an inconsistent position here.  "Judicial estoppel 'protects the integrity of the judicial process' by preventing 'a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *Wheeler v. SPS Techs., LLC*, No. 8:17-CV-01788-

1  JLS-KES, 2018 U.S. Dist. LEXIS 224181, at *11-12 (C.D. Cal. October 24, 2018)
2  (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). To determine "'the
3  applicability of judicial estoppel,' courts generally consider the following factors: (1)
4  whether a party's current position is clearly inconsistent with its previous position;
5  (2) whether the party has succeeded in a previous proceeding based on its earlier
6  position; and (3) whether the party seeking to assert an inconsistent position would
7  reap an unfair advantage or impose an unfair detriment on the opposing party." *Id.*
8  Each of these factors are present here.

9      **B.**    **Defendants Made Nearly Every Argument They Make Here to the**
10     **Ninth Circuit, Which Flatly Rejected Each One of Them**

11        Defendants concede that the arbitration provisions in the Kakish and Kuan RISCs
12 are materially the same. *See* AOB at 4:9-5:20. Defendants do not mention,
13 however, that the Kakish RISC is ***identical*** to a RISC that was at issue when TMC
14 and TMS appealed an order denying their motion to compel arbitration to the Ninth
15 Circuit in *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), *cert. denied*
16 *sub nom. Toyota Motor Corp. v. Choi,* 571 U.S. 818 (2013)[1]—a case that is on all
17 fours with this one.

18        In *Kramer,* the plaintiffs alleged that TMC and TMS were aware of a safety
19 defect (there, in the anti-lock braking system ("ABS")) in the 2010 model-year Prius
20 before they began selling those vehicles, "but failed to disclose the defect and
21 continued to manufacture and sell vehicles with defective ABS," and that Defendants
22 were liable for, *inter alia*, violations of the CLRA, the UCL, and breaches of implied
23 warranty—notwithstanding that Defendants conducted a safety recall "to update the

24
25     [1] In *Kramer*, plaintiff Michael Choi, like Ms. Kakish, purchased a 2010 model-
year Prius from Longo Toyota and both executed the same boilerplate RISC.
26 *Compare* AWD, Ex. B *with* RJN, Ex. E. Mr. Kuan's RISC is materially the same as
the Kakish and Choi RISCs. *See* AWD, Ex. C. And although the Kosareff agreement
27 is not identical to the others, *see* AWD, Ex. B, the *Kramer* decision has equal
application to all of them.
28



1   ABS software." 705 F.3d at 1124-25. With the exception of the nature of the defect

2   and the scope of the class, the allegations are essentially the same as the allegations in

3   the present case. *Compare* RJN, Ex. D (*Kramer* complaint) ¶¶ 1-15, 87-115 *with*

4   ECF 73 ¶¶ 1-26,159-64, 215-29.

5            **1.**    *Plaintiffs and Toyota Did Not Agree to Arbitrate Arbitrability*

6         Although Defendants cite different cases (and do not mention *Kramer*),

7   Defendants make the same arguments about arbitrability that it lost in *Kramer. See*

8   AOB at 14:1-2 ("The Court need only determine whether there is 'clear and

9   unmistakable' evidence that the parties agreed to arbitrate the question of

10   arbitrability") (citations omitted). Defendants accurately state the rule, but then urge

11   the Court to adopt an incorrect application.

12         Defendants contend that because the scope of the arbitration clauses

13   encompass any claim or dispute as well as the arbitrability of the dispute, the

14   arbitrator must decide arbitrability. *See id.* at 14:15-15:7. As the Ninth Circuit

15   explained in *Kramer,* however, "courts should not assume that the parties agreed to

16   arbitrate arbitrability unless there is clear and unmistakable evidence that they did

17   so." 705 F.3d at 1127 (inner quotation marks, brackets, and citation omitted). But the

18   court then found that the agreements before it—including one that is identical to the

19   Kakish RISC and one that is materially the same as the Kuan RISC—"do ***not*** contain

20   clear and unmistakable evidence that Plaintiffs and Toyota agreed to arbitrate

21   arbitrability[]" because "the terms of the arbitration clauses are ***expressly limited to***

22   ***Plaintiffs and the Dealerships***." *Id.* (emphasis added). In other words, ***"[t]he***

23   ***language of the contracts thus evidences Plaintiffs' intent to arbitrate arbitrability***

24   ***with the Dealership and no one else. The Dealerships are not a party to this***

25   ***action***." *Id.* (emphasis added). Because there was no clear and unmistakeable

26   evidence that the plaintiffs had agreed to arbitrate arbitrability with a nonsignatory,

27   the arbitrability issue was for a court to decide. *Id.*

28         The contracts here are either identical to or materially the same as those *in*

FM

FAZIO | MICHELETTI LLP

1  *Kramer* and the dealerships are not parties to this action, so *Kramer* controls, but

2  Defendants ignore *Kramer* in this section of their brief. *See* AOB at 13:26:15-28.

3  Although Defendants attempt to make much of the fact that the Kosareff lease

4  agreement extends to nonsignatories because it contains affiliate and assignment

5  language, *see id.* at 22:7-15, there is no evidence—much less clear and

6  unmistakeable evidence—that those terms pertain to either Defendant. *See* Sections

7  II.C., II.D.1.-2., below. Indeed, the *Kramer* agreements also included assignment

8  language, but Defendants concede that "Toyota did not claim a right to compel

9  arbitration as an assignee" in *Kramer,* and do not claim that right as to the Kakish and

10  Kuan RISCs, either.  AOB at 22:11-12.

11  ### 2.    *Equitable Estoppel is Inapplicable to Plaintiffs Claims*

12  Equitable estoppel prevents a party from using the terms of a contract with a

13  signatory defendant as the basis for that party's claims against a nonsignatory while

14  refusing to abide by an arbitration clause in the same contract. *Kramer,* 705 F.3d at

15  1129. In other words, "parties should only be estopped 'if their own conduct renders

16  assertion of those rights contrary to equity.'" *Id.* at 1134 (quoting *Goldman v.*

17  *KPPMG LLP,* 173 Cal. App. 4th 209, 221 (2009)) (internal quotation marks

18  omitted). Accordingly, the underlying contract may be deemed the basis of the

19  plaintiff's claims if they are "***intimately founded in and intertwined with the***

20  ***underlying contract obligations***." *Id.* (citation and internal quotation marks omitted;

21  emphasis added); *see also Murphy v. DirectTV, Inc.,* 724 F.3d 1218, 1230-31 (9th

22  Cir. 2013) ("The plaintiffs were not seeking to enforce the customer agreements

23  against the retailer; their claims relied solely on state consumer protection laws

24  against misrepresentation"). Equitable estoppel also applies where a signatory to the

25  agreement alleges that a signatory and a nonsignatory engaged in "substantially

26  interdependent and concerted misconduct" that is founded in or intimately connected

27  with the obligations of the underlying agreement." *Id.* at 1129 (citation and internal

28  quotation marks omitted). Thus, the focus of the analysis is ***the connection between***

1   *the allegations and the terms of the entire agreement, not merely the arbitration*

2   *clause*. *See id.* ("Merely making reference to an agreement with an arbitration clause

3   is not enough. Equitable estoppel applies when the signatory to a written agreement

4   containing an arbitration clause must rely *on the terms of the written agreement in*

5   *asserting its claims against the nonsignatory*") (brackets, citations, and internal

6   quotation marks omitted; emphasis added). But "[b]ecause generally only signatories

7   to an arbitration agreement are obligated to submit to binding arbitration, equitable

8   estoppel of third parties in this context is narrowly confined." *Murphy,* 724 F.3d at

9   1229.

10      As they do here, Defendants argued in *Kramer* that equitable estoppel allowed

11   them to enforce the arbitration clauses in the underlying contracts because the

12   plaintiffs alleged that Defendants had failed to disclose and actively concealed a

13   safety defect and had materially misrepresented "the characteristics, uses, benefits,

14   and qualities of Toyota vehicles," but the court found the requisite nexus to be

15   lacking: "For purposes of this claim, we discern no reliance by Plaintiffs on the

16   Purchase Agreements." *Id.* at 1130. And, as here, the UCL claim was based on

17   Defendants' fraudulent conduct regarding the concealed safety risks, so it, too, lacked

18   the required connection. *Id.* at 1130-31. And although Defendants argued that "the

19   implied warranty arose by operation of the Purchase Agreements and is therefore

20   intertwined with the Purchase Agreements[,]" the court disagreed with that argument

21   as well: "The Purchase Agreements expressly differentiate dealer warranties from

22   manufacturer warranties." *Id.* at 1331. The same is true of the Kosareff lease

23   agreement and the Kakish and Kuan RISCs. *See* AWD, Ex. A at 7 ¶ 17, Ex. B at 14 ¶

24   4, Ex. C at 19 ¶ 4.

25      Trading on the court's reference to "sparse portions" of the plaintiffs'

26   complaint, Defendants contend that *Kramer* is distinguishable by claiming the

27   plaintiffs there did not sufficiently allege fraudulent concealment and contrasting that

28   with the "ample" allegations here. *See* AOB at 21:16-27 (citing *Kramer,* 705 F.3d at



1133). This is misdirection. In *Kramer*, Defendants argued that the plaintiffs' fraud claims claims were inextricably intertwined with the purchase and lease agreements because the plaintiffs alleged **collusion** between Toyota and the dealerships (which the plaintiffs denied). *See* 705 F.3d at 1132-33. The court found that, even assuming collusion had been alleged, it was insufficient to establish the required nexus beween the plaintiffs' fraud claims and the underlying contracts. *See id.* at 1133 & n. 7. *See also Jurosky v. BMW of N. Am*, No. 19-cv-706-JM(BGS), 2020 U.S. Dist. Lexis 38866, *10-11 (Feb. 27, 2020) (relying on *Kramer* to reject application of equitable estoppel to claims involving common-law and statutory fraudulent concealment). Here, Plaintiffs do not even suggest the dealers had any involvement in Defendants' fraud, much less that they colluded with one another. *See* ECF 73.

If the claims do not rely on or use the underlying contract's terms or obligations and do "not even mention the agreement[,]" equitable estoppel does not apply. *Kramer*, 705 F.3d at 1129-30. Moreover, "equitable estoppel is particularly inappropriate where plaintiffs seek the protection of consumer protection laws against misconduct that is unrelated to any contract except to the extent that a customer service agreement is an artifact of the consumer-provider relationship itself." *Murphy,* 724 F.3d at 1231 n. 7; *see also id.* (noting that many California cases permitting equitable estoppel involve contract-based claims such as tortious interference or breach of contract).[2]

**C.    Kosareff's Loan Agreement was Superseded by an Integrated RISC**

Defendants seek to enforce the arbitration clause in the Kosareff lease agreement without mentioning that the lease agreement was superseded by the RISC Mr. Kosareff entered into when he bought his Class Vehicle at the end of his lease in

---

[2] *See also Kejejian v. BMW*, Case No. 2:20-cv-00407-GW (C.D. Cal. March 26, 2020), RJN Ex. G at 5-6 (recent decision applying *Kramer* and other authotiries and refuting each of Defendants' arguments).



1    2013. Declaration of Steven J. Kosareff ("KD"), Ex. 1. The RISC contains an

2    integration (or merger) clause, *see id.* at 1380, which renders the arbitration clause in

3    the Kosareff lease agreement a legal nullity. *See* Code Civ. Proc., § 1856(a).

4         Mr. Kosareff's 36-month, closed-end lease agreement with Santa Monica

5    Toyota ("SMT") matured on September 18, 2013. *See* AWD, Ex. A at 6-7. On

6    September 13, 2013, Mr. Kosareff entered into a RISC for the purchase of the same

7    vehicle from SMT, which does not include an arbitration clause, but does include an

8    integration clause, *see* KD, Ex. 1 at 2, and the binding effect of the ***same*** clause with

9    the ***same*** language has been confirmed by several courts, *see, e.g., TD Auto Fin. LLC*

10   *v. Reynolds,* 842 S.E.2d 783, 786 (W. Va. 2020) ("the document contains what is

11   commonly known as a 'merger' or 'integration' clause . . ." (quoting language of

12   integration clause at issue here)); *Reynard v. Bank of Am., N.A.*, 551 B.R. 835, 839,

13   841 (Bankr. D. Idaho 2016) (same) *Patton v. Jeff Wyler Eastgate, Inc.,* 608 F. Supp.

14   2d 907, 909, 914 (S.D. Ohio 2007) (same).[3]

15        Consequently, the Kosareff RISC superseded the Kosareff lease agreement,

16   and because the RISC has no arbitration provision, Defendants cannot enforce the

17   arbitration provision in the lease agreement—even if they were third-party

18   beneficiaries or assignees of that agreement (and they are not). Other cases involving

19   the same dispute over ***the same integration clause*** illustrate the point.

20        For example, the plaintiffs in *TD Auto* bought a truck after submitting a credit

21   application that included an arbitration agreement before they signed an RISC that

22   contained the integration clause quoted above, which the dealer then assigned to the

23   defendant finance company. *See* 842 S.E.2d at 786-87. The plaintiffs defaulted on

24

25        [3] *Accord, Holt v. HHH Motors,* 2013 Fl. Cir. Lexis 14930, at * (Fla. Cir. Ct. Aug. 21, 2013); *Savagne v. Fairfield Ford, Inc.,* 794 F. Supp. 2d 826, 828, 831-35

26   (S.D. Ohio 2010); *Duval Motors Co. v. Rogers,* 73 So. 3d 261, 263 (Fla. App. 2011); *Gonzalez v. Consumer Portfolio Servs.*, 66 Va. Cir. 43, 44-55, 2004 Va. Cir.

27   LEXIS 336, at *4-5 (Va. Cir. Ct. 2004).

28

1    their loan, the defendant's harassment allegedly violated consumer-protection

2    statutes, and when the plaintiffs sued the defendant moved to compel arbitration,

3    arguing that the arbitration agreement applied because it was executed

4    contemporaneously with the RISC. *See id.* at 787-88. West Virginia's highest court

5    disagreed, explaining that the credit application and the RISC dealt with different

6    subject matters and were not executed contemporaneously, so they could not be

7    viewed "as part of a single transaction. Therefore, the RISC and its merger clause—

8    stating that it represents the entire agreement between the parties as pertains to the

9    purchase of the vehicle—must govern." *Id.* at 79. Other courts have reached the same

10   conclusion about the same integration clause. *See, e.g., Holt,* 2013 Fla. Cir. Lexis

11   14930, at *17; *Duval Motors,* 73 So. 3d at 263-65; *Gonzalez,* 66 Va. Cir. at 45.

12       Mr. Kosareff decided to buy his Class Vehicle in 2013 (while Defendants were

13   actively concealing the IPM defect) after the lease agreement expired on its own

14   terms, the RISC contained no arbitration provision and, as each of the decisions

15   discussed above make clear, the RISC's integration clause precludes any reliance on

16   the arbitration provision from another agreement.[4]

17       **D.    Defendants' Third-Party Beneficiary Theories are Baseless**

18       Bedrock "[c]ontract law principles hold that non-parties to a contract are

19   generally not bound by the contract. A contract to arbitrate is not an exception."

---

20
21   [4] In *Oxford Preparatory Academy v. Edlighten Learning Solutions*, 34 Cal.
     App. 5th 605 (2019), the court held that an integrated termination agreement did
22   not supersede the arbitration clause in a prior employment agreement. *Id.* at 610-
     11. That holding has no bearing on the issue here because, as the court noted,
23   "[n]othing in the Termination Agreement waives, extinguishes, excuses, or
     releases any right or obligation of either party accruing before June 17, 2016. One
24   set of rights and obligations were extant before June 17, 2016 . . . ." *Id.* at 610. The
     Kosareff RISC contains no such language. *See generally* KD, Ex. 1. The court also
25   noted that the plaintiff asserted claims that had been preserved by the foregoing
     quoted language, "but then, relying on an expansive and overly broad
26   interpretation of the 'subject matter' of the Termination Agreement, inconsistently
     asserts the Arbitration Clause was extinguished with respect to pretermination
27   disputes. Plaintiff cannot have it both ways." *Id.* at 611. Mr. Kosareff has done no
     such thing here.

28



1  *Waymo LLC v. Uber Techs, Inc.*, 870 F.3d 1342, 1345 (Fed. Cir. 2017). To prevail

2  under a third-party beneficiary ***exception*** to this basic rule of law, Defendants cannot

3  merely point to words in the arbitration clause, assign hand-picked meanings to those

4  words, and claim that Defendants were the intended beneficiaries of the contract all

5  along, even though they are not identified anywhere in it. If prevailing were that easy,

6  there would be no need for a third-party beneficiary doctrine.

7       The law places the burden on Defendants to establish that "[California]

8  contract law allows [them] to enforce the agreement[,]" *Murphy*, 724 F.3d at 1229

9  (internal quotation marks omitted), and policies favoring arbitration under the FAA

10 have no bearing on the analysis, *id*. at 1233-34. As one of Defendants' cases states

11 (*see* OB at 16:10-12), "[w]hen evaluating a motion to compel arbitration, courts

12 treat the facts as they would when ruling on a motion for summary judgment,

13 construing all facts and reasonable inferences that can be drawn from those facts in

14 a light most favorable to the non-moving party." *Chavez v. Bank of Am.*, 2011 U.S.

15 Dist. Lexis 116630. at *9 (N.D. Cal. Oct. 7, 2011).

16      The mere fact that a "literal contract interpretation would result in a benefit to

17 the third-party is not enough to entitle that party to demand enforcement." *Murphy,*

18 724 F.3d at 1234. Yet here, Defendants' entire argument rests solely on fiction and

19 definitions they have carefully chosen to suit that argument. To establish that they are

20 third-party beneficiaries under the Kosareff lease, Defendants must prove that "the

21 express provisions of the contract at issue, as well as all of the relevant circumstances

22 under which the contract was agreed to," satisfy ***each*** of these three elements of

23 California's third-party beneficiary doctrine: "(1) whether the third-party would in

24 fact benefit from the contract, but also (2) whether a motivating purpose of the

25 contracting parties was to provide a benefit to the third party; and (3) whether

26 permitting a third party to bring its own breach of contract action against a

27 contracting party is consistent with the objectives of the contract and the reasonable

28 expectations of the contracting parties." *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817,

1   829-30 (2019).[5]

2       As for the first factor, there is no question that Defendants would benefit from

3   using an arbitration clause to avoid a class-action jury trial, but that is not enough to

4   entitle them to enforcement. *Murphy*, 724 F.3d at 1234. The second *Gonnewardene*

5   factor is ***not*** satisfied, either. Given that it is an adhesion contract that was never

6   negotiated with Mr. Kosareff, nothing even remotely suggests that the parties to that

7   contract were "motivated" to provide Defendants with benefits under it. *See*, *e.g.*,

8   *Ford DpS6 Litig*, 2020 U.S. Dist. Lexis 119791, at *19-20 (the "Arbitration

9   Agreement is contained in a form Lease, and the Court cannot find that 'a motivating

10  purpose of the contracting parties' was to benefit Ford as either the manufacturer or

11  parent corporation of one of the signatories'"). Mr. Kosareff himself confirms this.

12  *See* Kosareff Decl., ¶¶ 4-8. Moreover, the Kosareff lease identifies "Covered Parties"

13  in the arbitration clause as

14          including, without limitation, claims in contract, tort, pursuant to statute,

15          regulation, ordinance or in equity or otherwise, and claims asserted by

16          you against us, ***and*** the following Covered Parties: Toyota Lease Trust,

17          Toyota Motor Credit Corporation and/or any of our or its affiliates

18          and/or any of our or their employees, officers, successors, assigns or

19          against any third party providing any product or service in connection

20          with the Lease ***that you name as a co-defendant in any action against***

21          ***any of the foregoing.***

22  AWD, Ex. A ¶ 48 (emphasis added).

23      Like Toyota Lease Trust and TMCC, TMC and TMS could have been

24  identified as "Covered Parties," but they were not—even though, as Defendants point

25  _____

26  [5] *See also In re Ford Motor Co. Dps6 Powershift Transmission Prods. Liab.*

27  *Litig*, No. 18-ML-02814- AB (FFMx), 2020 U.S. Dist. Lexis 119791, at *19 (C.D. Cal. July 2, 2020) (hereinafter "*Ford DpS6 Litig*.") (all three *Gonnewardene* factors must be satisfied).

28



**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

1  out, they "are likely targets of suits arising from or relating to Toyota vehicles." AOB
2  at 18:16-19. Under Ninth Circuit case law, that alone is fatal to Defendants' third-
3  party beneficiary claim: "To the extent the Customer Agreement is ambiguous with
4  respect to the parties' intent to benefit Best Buy, the rule of construction militates
5  against concluding Best Buy is a third-party beneficiary, in light of the fact that
6  DirectTV clearly knew how to provide for a third-party beneficiary if it wished to do
7  so." *Murphy*, 724 F.3d at 1234.[6]

8      Even if Defendants ***had*** been explicitly identified in the contract, however,
9  they would not be covered by the arbitration provision unless Mr. Kosareff had sued
10 the dealer ***and*** one or more of the Covered Parties had been "***name[d] as a co-***
11 ***defendant" in this action***. But the dealer is not, and never has been, a co-defendant
12 in this action, nor is either Defendant identified in the lease contract in ***any*** capacity,
13 and the defined terms on the front of the lease agreement do ***not*** include TMC or
14 TMS. Instead, the words "we" "us" and "our" are defined to mean the "lessor and
15 after assignment, the Toyota Lease Trust ('TLT') and any subsequent assignee."
16 AWD, Ex. A ¶ 1. TMCC is identified as the entity that "will be servicing the lease on
17 behalf of TLT." *Id*.   TMC and TMS are also absent from the provision titled
18 "Agreement to Arbitrate", which Mr. Kosareff was required to initial. *See id.* ¶ 20.

19     Defendants insist that they are logical third-party beneficiaries because they
20 "are likely targets of suits arising from or relating to Toyota vehicles." AOB at 18:16-
21 19. But this atually proves ***Plaintiffs'*** point: the dealer's decision to ***exclude*** these
22 two self-described "likely targets" from the arbitration agreement while ***including***

23

24     [6] *See also Jurosky,* 2020 U.S. Dist. Lexis 38866, at *25 ("if it had been the
25 intent of the parties—or at the option of the dealership—to have BMW included
   under the arbitration language, ***this could have been expressly referenced in the***
   ***'you and us' clause or the 'third parties' clause of the purchase agreement. No***
26 ***such intention is apparent***") (emphasis added); *Victoria v. Superior Court*, 40 Cal.
   3d 734, 739 (1985) (***ambiguities in standard form contracts are to be construed***
27 ***against the drafter***") (emphasis added).

28



-12-                                                    18-cv-00201-JLS-KES

1   other third parties by name was intentional; that is, "taking into account the language
2   of the contract and all of the relevant circumstances under which the contract was
3   entered into" (as required by the third *Goonewardene* factor), the plain language of
4   the lease agreement shows that SMT intended to cover only a very limited group of
5   third parties as beneficiaries (and only when named as co-defendants with SMT), and
6   Defendants are not among those "Covered Parties."

7      Conceding that their names are nowhere to be found in the SMT arbitration
8   agreement, Defendants contend they should be allowed to enforce it as undisclosed
9   "assigns" and "affiliates." AOB at 16-19.

10            **1.    *TMC and TMS are Not "Assigns"***

11      According to Defendants, they are "assigns"—as that term is used in the SMT
12   agreement—***not*** because the lease was ever actually assigned to either Defendant, but
13   because the lease "was assigned to TLT to be serviced by TMCC, which as indicated
14   above, is a subsidiary of TFSA, which is a subsidiary of TFSC, which is a subsidiary
15   of Defendant TMC." *Id.* at 19:9-15. First of all, there is ***no*** evidence to support these
16   assertions. While Defendants cite the Boyd Declaration as support, Ms. Boyd does
17   not offer foundational facts or testimony to support Defendants' statements of
18   corporate entanglements, nor does she even testify that TLT assigned the lease to
19   TMCC (through which TMC ostensibly, eventually becomes the assign). TMCC is
20   imply tasked with servicing the lease. *See* Boyd Decl. ¶¶ 5-6; *see also* Objections to
21   Evidence ("Obj. Evid.") at 1-8. Second, while Defendants claim this "explanation"
22   pertains to TMC **and** TMS, ***TMS is not mentioned in it, so TMS cannot be***
23   ***considered an assign even under Defendants' approach.*** As for TMC, Defendants'
24   explanation that it is an assign because its subsidiary's subsidiary's subsidiary is an
25   'assign' of the Lease is nonsensical for the reasons Judge Birotte recently explained
26   in response to an identical argument in another auto case:

27      ***in the absence of corporate veil-piercing—an equitable remedy to***
28      ***prevent injustice—parent and subsidiary corporations are distinct***

1  *entities, with distinct obligations and liabilities*. . . . **Thus, in seeking to**

2  **enforce the Arbitration Provision as an 'assign' based on its**

3  **subsidiary's subsidiary being an 'assign,' Ford implicitly takes the**

4  **bizarre position that its own corporate veil should be pierced, thereby**

5  **also implying that there is some abuse of the corporate form in its own**

6  **chain of ownership, from which, incidentally, it should benefit**. This is

7  nonsensical and the Court rejects this argument without further

8  discussion.

9  *Ford DpS6 Litig.*, 2020 US Dist. Lexis 119791, at *18 n. 2 (citations omitted); *see*

10  *also Kejejian,* RJN, Ex. G at 3-5 (explaining the showing Defendants' must make to

11  support third-party beneficiary argument).

12       Put simply, if Judge Briotte was unable to make sense of this explanation, even

13  after having it explained to him by skilled attorneys, it is asking too much to expect

14  that an ordinary consumer had it in mind, let alone was motivated by it, when he

15  signed his contract. Indeed, Mr. Kosareff testifies this was not anything he considered

16  when he signed his lease. *See* KD ¶¶ 3-8 .[7]

17           **2.     TMC and TMS are Not "Affiliates"**

18       Relying on selected definitions of "affiliates," Defendants also contend that

19  that they are third-party beneficiaries of the SMT agreement because "'Covered

20  Parties' includes 'affiliates' of . . . TMCC . . . [and] [b]oth TMS and TMC are

21  affiliates of TMCC because they are part of the same organization, and TMC is the

22

23       [7] Nor do the cases to which Defendants cite support their assignment
    argument. *See* AOB at 18:23-19:8. In *Lanning  v. BMW of N. Am., LLC*, 2019 U.S.
24  Dist. LEXIS 193118, at *10-12 (S.D. Cal. Nov. 5, 2019), the Court adopted,
    without analysis the same "assignment" argument Judge Briotte rejected. Plaintiffs
25  submit that Judge Briotte's well-reasoned dismissal of the argument is more
    persuasive than the *Lanning* Court's unexplained adoption of it. And *Ronay Family*
26  *Ltd. P'ship v. Tweed*, 216 Cal. App. 4th 830 (2013) (AOB at 19), is not an
    assignment case. Rather, *Ronay* involves known, identified entities with whom the
27  plaintiff directly did business, not unidentified assigns and unnamed corporate
    entanglements. *See id*. at 834-39.

28



-14-                                    18-cv-00201-JLS-KES

1  parent company of TMCC and TMS."   AOB at 17:11-21 (citing the Boyd Decl.).

2  Again, this testimony is objectionable, *see* Obj. Evid. at 1-8, and proves nothing.

3  Moreover, to the extent the cases to which Defendants cite contain any substantive

4  analysis that bears on the meaning of "affiliates" (most do not), they actually support

5  Plaintiffs' position, not Defendants'.

6       For example, in *Katz v. BMW of N. Am., LLC*,  2019 US Dist. Lexis, 159285 at

7  *3 (C.D. Cal. Sep. 17, 2019), there is no substantive analysis of the meaning of

8  "affiliate," which led Judge Briotte to dismiss *Katz* as unpersuasive on that issue. *See*

9  *Ford Dps6 Litig.*, 2020 US Dist. Lexis 119791 at *18-19.[8] And although the *Katz*

10  court decided that merely showing that an undisclosed company has undisclosed

11  management duties is enough to confer third-party beneficiary status (a contention

12  with which Plaintiffs do not agree), BMW did at least provide some evidentiary

13  support for its claim. *See Katz*, 2019 US Dist. Lexis, 159285 at * 7. Here, Defendants

14  have not made even the limited evidentiary showing proffered in *Katz*,

15  notwithstanding that Defendants and BMW were represented by the same counsel.

16  *See id.* at *1 (identifying Lisa R. Veasman-Weddle).[9]

17       Moreover, the BMW arbitration agreements also contain materially different

18  language than the SMT agreement. Specifically, the arbitration clauses in those cases

19  cover claims, disputes, etc., "between me and you *or* your . . . affiliates." *See, e.g,*

20

21       [8] The other cases Defendants cite in support of this argument also lack

22  analysis (AOB at 17-18). *See Pleitz v. BMW of N. Am., LLC*, 2020 U.S. Dist.
LEXIS 79088, at *7-8 (C.D. Cal. Feb. 27, 2020) (no analysis); *Wayans v. BMW of*

23  *N. Am. LLC*, 2020 U.S. Dist. LEXIS 77167, at *6-8 (C.D. Cal. Jan. 7, 2020) (no
analysis); *Fikham v. BMW of N. Am. LLC*, 2019 U.S. Dist. LEXIS 216891, at *5-7

24  (C.D. Cal. Oct. 15, 2019) (no analysis); *Foti v. Toyota Motor Sales U.S.A. Inc.*,
2017 N.J. Super. Unpub. LEXIS 1001 (N.J. Super. Ct. App. Div. April 24, 2017)

25  (no analysis).

26       [9] Should Defendants use their reply brief to rectify this omission, and
thereby prevent Plaintiffs from responding to it, that evidence must be disregarded.

27  *See, e.g., Garcia v. GM LLC,*, 2019 U.S. Dist. LEXIS 8678, at *1 n. 1 (S.D. Cal.
Jan 17, 2019) (rejecting argument made for fist time on reply).

28



**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

1   *Katz*, 2019 US Dist. Lexis, 159285 at *3 (emphasis supplied). By contrast, Mr.

2   Kosareff's arbitration agreement states that it extends to "claims asserted by you

3   against us, ***and*** the following Covered Parties . . . ." AWD, Ex. A at 10 (emphasis

4   supplied). *See Fikham*, 2019 U.S. Dist. LEXIS 216891, at *6-7 ("The use of 'or'

5   rather than 'and' contemplates that Plaintiff could bring a claim against an affiliate of

6   *BMW* Financial Services without also naming *BMW* Financial Services."). Although

7   language similar to the Kosareff contract was at issue in *Foti*, this argument was not

8   discussed by the New Jersey court.

9   To support their contention that "affiliates" has a commonly understood

10   meaning, Defendants also cite cases in which courts have attempted to define

11   "affiliate" under very different circumstances. *See* AOB at 17 n. 6. Defendants do

12   not, however, draw any link between those definitions and the circumstances

13   surrounding the lease formation, as required by *Goonewardene*, which is fatal. *See,*

14   *e.g., Ford DpS6 Litig.*, 2020 US Dist. Lexis 119791, at *19 (Ford failed to establish

15   that the dictionary definitions of "affiliate" are "accepted in California ***under the***

16   ***circumstances of this case***") (emphasis supplied); *see also id.* at *20 (given

17   "vagueness of the term affiliate" Court could not find that Plaitiff could have

18   reasonably expected it to encompass vehicle manufactuer.)

19   Even the cases Defendants cite underscore that the word "affiliate" is

20   ambiguous and that, as a matter of black-letter law, any ambiguity is to be construed

21   against the drafter, which is certainly not Mr. Kosareff. For example, Defendants cite

22   *Flintkote Co. v. Gen Acc. Assur. Co.*, 410 F. Supp. 2d 875 (N.D. Cal. 2006), in which

23   the court reviewed several definitions of "affiliated" and concluded that "[g]iven the

24   range of possible meanings . . . ***the term is not unambiguous*** without consideration

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

1  of the remainder of the policy and its context." *Id.* at 888 (emphasis supplied).[10]

2  Here too, it is not at all clear what "affiliate" means in the context of the Kosareff

3  agreement, which ends Defendants' arguments that "affiliate" has a "plain" meaning.

4      Again though, even if there is a definition that helps Defendants among the

5  many that apply, ***the signatories' intent***, ***not a literal contract interpretation***,

6  controls the analysis. *See Murphy*, 724 F.3d at 1234. Here, the signatories are (1) a

7  consumer leasing a car, presented with form clause that does not mention

8  Defendants, and (2) the dealer itself, which drafted the clause ***that says nothing at all***

9  ***about incorporating these self-described "likely targets*****,**" showing a clear intent to

10  ***exclude*** them. For this analysis, circumstances count, Defendants bear the burden of

11  proof, and the evidence must be viewed in the light most favorable to Mr. Kosareff.

12      **E.**    **Defendants Have Waived Any Right to Arbitration**

13      The right to seek arbitration is waived where, as here, the party moving to

14  compel (1) has knowledge of the right to seek arbitration, (2) acts inconsistent with

15  that right, and (3) the opposing party has suffered prejudice. *E.g.*, *Martin v. Yasuda*,

16  829 F.3d 1118, 1124 (9th Cir. 2016). *See also Saint Agnes Med. Ctr. v. PacifiCare*

17  *of Cal.*, 31 Cal. 4th 1187, 1196 (2003) (bad faith may justify refusal to compel

18  arbitration); *Ontiveros v. Zamora*, 2013 U.S. Dist. LEXIS 20408, at *28-33 (E.D.

19  Cal. Feb. 13, 2013) ("This court will not countenance sandbagging").

20      Each of these criteria are present here. Defendants were investigating the

21  prospect of compelling arbitration ***more than two years ago*** (in May 2018), *see*

22

23      [10] The *Flintkote* court ultimately ruled in favor of the broader application of

24  the word "affiliated," but only after conducting a rigorous analysis of the language,
   purpose, and circumstances of the contract. *Id.* at 881-882, 888-890. Such an

25  analysis compels a different result here. A search of internet sources also makes
   clear that there is no such thing as a one-size-fits-all definition of "affiliate." *See,*

26  *e.g.,* https://www.investopedia.com/terms/a/affiliatedcompanies.asp ("There is no
   single bright-line test to determine if one company is affiliated with another. In

27  fact, the criteria for affiliation changes from country to country, state to state, and

28  even between regulatory bodies").



Declaration of Jeffrey L. Fazio ("FD") ¶¶ 6-8 & Ex. 2; RJN, Ex. F at 8, 14, 17, yet they waited until last May—after two merit-based motions to dismiss; after participating in thousands of hours of other motion practice, discovery, and other litigation activity; after trying and failing to prevent the depositions of key Toyota witnesses; after negotiating a second stipulation modifying the Scheduling Order, and after the Court adopted the stipulation as an order on May 5, 2020 (ECF 106), to announce their intention to move to compel arbitration on May 7, 2020, Declaration of Dina E. Micheletti ("MD") ¶¶ 71-75; FD ¶ 19 & Ex. 5. Defendants' sudden decision to move to compel arbitration began to make sense soon thereafter, when they announced a ***fourth*** safety recall due to the IPM defect—the ***second*** one since this litigation began. *See* FD ¶¶ 4,  & Exs. 1, 3-4, 6.

### 1. *Defendants Knew About the Arbitration Clauses*

Defendants advised Plaintiffs that TMS was investigating the prospect of moving to compel arbitration in ***May 2018***. FD ¶ 8 & Ex. 3. Yet, Defendants cite to the Weddle declaration as support for the notion that Defendants became aware of the right to seek arbitration only after the Kakish and Kosareff contracts were produced in discovery. *See* AOB at 23:26-24:1. The declaration says no such thing —it merely provides document-production dates, and counsel cannot speak to Defendants' corporate knowledge, thus it is objectionable for that reason (and others) as well. *See* AWD ¶¶ 3-4; Obj. to Evid. at 8-10.[11]

Defendants have had access to Plaintiffs' agreements through a variety of sources, which they ***admit*** in two initial disclosures, in which Defendants state ***they*** would produce the sales and lease contracts. *See* MD ¶¶ 16-17 & Exs. 3-4.  For example, TMS's franchise agreement with Claremont Toyota (where Mr. Kuan bought his Class Vehicle, *see* AWD, Ex. C) allow TMS to inspect and copy sales

---

[11] The Kakish RISC produced on December 9 is not blank and the arbitration clause can be read easily. *See* MD ¶ 37 & Ex. 16.



1    records and other documents held by Toyota dealers "without notice and for any

2    reason whatsoever." RJN, Ex. H at 1002.023. Thus, these documents are in TMS's

3    possession, custody, and/or control. Moreover, these terms are "Standard

4    Provisions," so they are not unique to Claremont. RJN, Ex. H at 1002.006.

5    Defendants have known the identity of the Kakish and Kosareff dealers since they

6    joined the case in November 2018 (*see* ECF 43 ¶¶ 38-39), so they have had access to

7    their contracts since day one. Documents produced by Defendants show they knew

8    Mr. Kuan bought his Prius at Claremont as of June 2019, *see* MD, Ex. 2, but they

9    could have learned any of this by asking, which they did not do. *See* FD ¶¶ 7-10 &

10   Ex. 3.[12]

11       Furthermore, Defendants' third-party beneficiary arguments are based on the

12   notion that TMC is the parent company of TMCC and TLT, and that TMS and TMC

13   are assigns and/or affiliates of these entities because of this relationship. If any of this

14   is true, then the Kosareff lease has been accessible to TMC all along, thus

15   ***Defendants*** should be equitably estopped from disclaiming knowledge of the

16   arbitration clauses while simultaneously asserting that these affiliations confer

17   third party benefits. *See Tourgeman v. Collins Financial Services, Inc.,* 2010 U.S.

18   Dist. LEXIS 60551, at *18-19 (S.D. Cal. May 25, 2010) (where subsidiary collected

19   debt on behalf of parent, subsidiaries' documents are in parent's possession, custody

20   or control); *Soto v. City of Concord*, 103 F.R.D. 603, 619-620 (N.D. Cal. 1995)

---

[12] Defendants have known that Longo Toyota's contract for the sale of a 2010 Prius contains an arbitration clause, because the same contract was at issue there. *See* Section II.B., above. Defendants' counsel in the present case is listed as co-counsel in *Kramer*, so at least one of Defendants' lawyers knew the Longo contract included an arbitration clause well before seeking arbitration. *See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig,* 2011 U.S. Dist. Lexis 162846, *7-8 (C.D. Cal. Dec. 20, 2011) ("*Hybrid Litig.*") (Cary Slobin of Bowman and Brooke); *see also In re Toyota Motor Corp. Unintended Accel. Mktg. Litig.*, 838 F. Supp. 2d 967, 979-80 (C.D. Cal. 2012) ("*UA Litig.*") (discussing waiver of arbitration rights).



1   ("The term 'control' includes the "legal right of the producing party to obtain
2   documents from other sources upon demand").[13]

3       Where, as here, the circumstances provide enough information for Defendants
4   to suspect an arbitration agreement, it is incumbent on them to demonstrate diligence
5   in seeking that information. *See Stafford v. Rite Aid Corp.*, 2020 U.S. Dist. Lexis
6   32051, at *15-17 (S.D. Cal. Feb. 25, 2020) (finding that defendant had reason to
7   suspect arbitration clause and referred to arbitration agreements in joint discovery
8   plan: "even if Rite Aid was unaware of its arbitration rights, it was Rite
9   Aid's duty to diligently investigate whether its own contract with a third-party
10  contained an arbitration provision"). That Longo and other Toyota dealer contracts
11  contain arbitration clauses is no mystery to Defendants. *See* footnote 12, above. And,
12  once again, Defendants **admitted** they were investigating arbitration issues in ***mid-***
13  ***2018***, while the *Rexhepi* case was in state court. *See* FD, Ex. 3; RJN, Ex. F at 8.[14]

14          **2.      *Defendants Engaged in Two Years of Inconsistent Acts***

15      When Defendants filed their Answers in June and August 2019, their
16  arbitration defense was raised as to the claims of putative class members only (*see*
17  ECF 70 at 38 ¶ 4; ECF 77 at 37 ¶ 4), which, perhaps, explains why Defendants

18  _____

19      [13] In August 2018, Plaintiffs propounded discovery to obtain documents
20  pertaining to each plaintiff, *see* MD, ¶¶, 3-4, Ex. 1 at RFP 62, thus obligating
    Defendants to obtain documents in their posession, custody or control, including
21  the contracts. *See* Fed. R. Civ. P. 34. If it is true that Defendants never sought
    them, they ignored their discovery obligations and cannot be rewarded for this.
22  *See, e.g., Adolph v. Coastal Auto Sales, Inc.*, 184 Cal. App. 4th 1443, 1452
    (2010) (waiver resulting from withholding arbitration agreement from discovery).

23      [14] Defendants may argue that *Cadena v. America Honda Motor Co.*, No. CV
24  18-4007-MWF-(PJWx), 2020 U.S. Dist Lexis 104165, at *9-11 (C.D. Cal. June 10,
    2020), shows they have no duty to investigate, but it does not. *Stafford* is better
25  reasoned and *Cadena* is distinghishable in that TMS admitted it was already
    investigating arbitration issues in ***May 2018***. *See* FD ¶¶ 6-7 & Ex. 2; RJN, Ex. E at
26  8:19-22. And  to the extent *Cadena* suggests litigants may ignore information in
    their possession, custody or control, it would not only contradict Rule 34, it would
27  permit Defendants to claim the benefits of being affiliates or assigns while
    disclaiming all attendant duties.

28



1  replaced the words "putative class members" with ellipses when discussing this in

2  their brief. *See* AOB at 6:18-22.[15] Defendants' failure to raise arbitration as a defense

3  is inconsistent with the right to arbitration, and amounts to waiver. *See, e.g.*, Fed. R.

4  Civ. Proc. 8(c)(1) (requiring arbitration to be raised as defense); *Oregel v. PacPizza*,

5  *LLC*, 237 Cal. App. 4th 342, 355-56 (2015) (not raising arbitration agreement in two

6  answers is inconsistent with assertion of right to arbitrate); *Butcher's Union v.*

7  *Farmers Market*, 67 Cal. App. 3d 905, 913 (1977) (failing to raise is waiver);

8  *Guess?, Inc. v. Superior Court*, 79 Cal. App. 4th 553, 558 (2000) (same).[16]

9  Before filing Answers, Defendants filed a motion to strike (ECF 23) and two

10  substantive motions to dismiss (ECF 22, 44) (collectively, "MTDs"), both of which

11  were filed after Mr. Kuan jointed the case (ECF 20) and the latter was filed months

12  after Kakish and Kosareff had joined (ECF 43). This litigation has involved

13  intensive, virtually non-stop activity—before and after Kuan, Kosareff, and Kakish

14  became parties. *See generally* MD. Separately or in combination, these actions are

15  entirely inconsistent with Defendants' right to arbitrate. *Martin*, 829 F.3d at 1128.

16  Unlike the motion discussed in *Chartwell Staffing v. Atl. Sol. Grp. Inc.*, 2020

17  U.S. Dist. Lexis 24640, at * 24 (C.D. Cal. Jan. 8 2020), a recent case before this

18  Court, these Defendants challenged the merits of Plaintiffs' claims in both MTDs.

19  The opposition to both MTDs required extensive legal and factual research to, *inter*

20  *alia*, address Defendants' arguments concerning equitable and legal claims (common

21  law and stautory); demonstrate pre-sale knowledge of the IPM defect (to include in

22

23  [15] Defendants define "Plaintiffs" to mean the named Plaintiffs in their
Answer, *see e.g.*, ECF 77 at 2:1-6, and make a clear distinction between Plaintiffs
24  and putative class members, *see, e.g., id.* at 37 ¶ 3.

25  [16] If Defendants ***had*** raised arbitration as a defense to the named Plaintiffs'
claims, that would undercut their argument that they had no knowledge of the
26  arbitration agreements. *See, e.g., Martin*, 829 F.3d at 1125 (raising arbitration as
defense not enough to defeat waiver); *Hybrid Litig.*, 828 F. Supp. 2d at 1163
27  (noting Toyota would not have asserted arbtration as defense unless it had some
legal basis to arbitrate Plaintiffs' claims).

28



the amended complaint that followed the first MTD, and to brief in the second); brief
esoteric engineering and other technical issues; brief other complex issues such as
claims based on the Computer Fraud and Abuse Act and its state analog, Cal. Pen.
Code § 502, and other novel issues (ECF 56). *See* MD ¶¶ 6-13. Motions of this
nature are acts that are inconsistent with the right to arbitrate, which result in waiver.
*See, e.g., Martin*, 829 F. 3d at 1125-26 (collecting cases discussing differences
between merits and non-merits MTD as they pertain to waiver); *Hooper v. Advance
America Cash Advance Centers of Missouri, Inc.*, 589 F.3d 917, 921-23 (8th Cir.
2009) (waiver occurred where merits-based MTD presented complex, first-
impression issues; prejudice shown after four months despite absence of discovery
and expenditures).[17]

Even if Defendants' clock did not start ticking until Kakish and Kosareff
produced their agreements in November and December 2019, an ***enormous*** amount
of litigation activity has occurred since then, including the vast majority of review
and analysis of Defendants' documents (most of which were produced after those
dates); working with retained experts on technical and other issues; and preparing for
class certification, all of which continues to this day. *See* MD ¶¶ 53-81. Twice during
this period, Defendants renegotiated the entire case schedule, and they did this the
second time knowing they planned to spring arbitration on Plaintiffs the day after that
schedule was adopted as an order. MD ¶¶ 57, 71-75.[18]

---

[17] *See also Kelly v. Pub. Util. Dist. No. 2 of Grant County*, 552 Fed. Appx.
663, 664 (9th Cir. 2014); *Van Ness Townhouses v. Mar Industries Corp.*, 862 F.2d
754 (9th Cir. 1989); *Stafford*, 2020 U.S. Dist. LEXIS 32051 at *19-20; *Hybrid Litig.*,
828 F. Supp. 2d at 1163-65; *Plows v. Rockwell Collins, Inc.*, 812 F. Supp. 2d 1063,
1066-68 (C.D. Cal. 2011); *Oregel*, 237 Cal. App. 4th at 355-56 (342, 355-56 (2015);
*Lewis v. Fletcher Jones Motor Cars, Inc.*, 205 Cal. App. 4th 436, 448-451 (2012);
*Guess?, Inc.,* 79 Cal. App. 4th at 556-58; *Sobremonte v. Superior Court*, 61 Cal.
App. 4th 980, 993-94 (1998).

[18] Defendants have also used substantial amounts of judicial resources,
separately and jointly with Plaintiffs, by filing three case management plans with
comprehensive proposed case schedules (ECF 32, 60, 66); obtaining an extension

These inconsistent acts alone are sufficient to establish waiver.

### 3.   *Plaintiffs have Been Prejudiced by Defendants' Delay*

If Plaintiffs Kosareff and Kakish's claims are dismissed, counsel for the *Rexhepi* group (who have been appointed interim co-lead class counsel) will no longer have clients with a case against Defendants, meaning the thousands of hours and substantial sums of money these counsel have devoted to this matter since 2018, *see, e.g.,* MD ¶¶ 77-81, will have been for nothing. Moreover, decisions have been made, theories have been developed, experts have been consulted, and money has been allocated in ways that would have significantly differed if these Plaintiffs' claims had been sent to arbitration before substantial litigation activity took place. *Id*. This is prejudice. *See, e.g., UA Litig.*, 838 F. Supp. 2d at 979-80 (vast differences between litigation and arbitration shape litigation strategy; finding prejudice where TMC and TMS's inaction caused counsel to expend "thousands of attorney hours prosecuting the present litigation in its present form"); *Sobremonte*, 61 Cal. App. 4th at 994 (prejudice includes using court to narrow claims, expansive discovery, motions to compel, time and expense).

If Defendants prevail on their theories, they will likely argue that all putative class members whose contracts contain similar language are also subject to

---

of time to file an Answer (ECF 64-65); obtaining a court order referring the case to mediation (ECF 69); filing two Answers (ECF 70, 77); negotiating stipulated protective order (ECF 71-72); stipulating to the inclusion of TMC as a Defendant in *Rexhepi* and to the filing of an amended complaint (ECF 73); stipulating to and submitting an order concerning the filing of an Answer (later denied) (ECF 75-76); stipulating to the dismissal of certain Plaintiffs (ECF 91-92); negotiating stipulation and proposed order modifying Scheduling Order due to substantial delay in Defendants' document production and submitting it to the Court for adoption as an order (ECF 93-94); submitting a joint status report to the Discovery Master and requesting a continuance of dates (ECF 95-96); and submitting three status reports/stipulations to extend time while they negotiated production of and produced (and Plaintiffs reviewed) documents in response to Plaintiffs; motion to compel the Prius C documents, resulting in two orders adopting those stipulations. (ECF 100-104); and negotiating stipulation and proposed order modifying Scheduling Order due to discovery delays (ECF 105-106).



1   arbitration (as their  affirmative defense indicates), meaning the size and scope of the

2   class could be significantly diminished. This very possibility has been found

3   sufficient to constitute prejudice in another case in which Defendants delayed seeking

4   arbitration (*UA Litig*., 838 F. Supp. 2d at 980), where the Court applied the

5   percentage of remaining named plaintiffs (there, 22-26%) to the class as a whole and

6   concluded that knowing a substantial percentage of class members' claims are

7   subject to arbitration "would have undoubtedly altered Plaintiffs' strategy and

8   allocation of resources." *Id*. Here, the number of remaining Plaintiffs is between 1-2

9   or just 20-40%, hence this is also prejudice.

10   Moreover, Plaintiffs Kosareff, Kakish, and Kuan will have wasted dozens of

11   hours of their time responding to discovery Defendants would not have been entitled

12   to obtain had they obtained an order compelling Plaintiffs to arbitration sooner. *See*

13   MD ¶¶ 28-34, 30-35; *Berman v. Health Net*, 80 Cal. App. 4th 1359, 1364 (2000)

14   (finding prejudice where defendant obtained discovery from plaintiffs resulting in

15   substantial document production prior to moving to compel arbitration). Moreover, if

16   Defendants succeed here, Plaintiffs will have incurred all the costs of litigation and

17   lost any benefits of arbitration. This, too, is prejudice. *See, e.g.*, *Martin,* 829 F.3d at

18   1127-28 (losing efficiencies of arbitration, spending  money and time conferring with

19   counsel re discovery and class certification and contesting motion to dismiss is

20   prejudice); *Kelly,* 552 Fed. Appx. at 664 (9th Cir. 2014) (prejudice arises where

21   plaintiff incur costs to educate arbitrator and relitgate matters); *Oregel,* 237 Cal. App.

22   4th at 450 (prejudice where conduct undermines policy of arbitration as inexpensive,

23   efficient dispute resolution); *Augusta v. Keehn & Assoc.*, 193 Cal. App. 4th 331, 341

24   (2011) (prejudice where where litgant gained information unavailable in arbitration)

25   *Guess?, Inc.,*  79 Cal. App. 4th at 558 (lost efficiency resulting from expensive

26   discovery; avoidable motions disclosure of trial tactics through discovery). Most of

27   Defendants' discovery, to which these Plaintiffs responded, is unavailable in

28   arbitration.  *See* MD, ¶¶ 28-35, 67-70 & Exs. 7-15, 18-19.

-24-                                                                18-cv-00201-JLS-KES

1    Chalking up Plaintiffs' material losses of time and money to "self-inflicted
2   wounds" (AOB at 24:20-25:5) that are irrelevant to the question of prejudice is
3   "nothing short of audacious." *Oregel,* 237 Cal. App. 4th at 451. The arbitration
4   clauses here are ***permissive***, not mandatory, and Plaintiffs sought a jury trial with no
5   reason to suspect Defendants would seek arbitration two years later. Any case law
6   discussing self-inflicted wounds is, therefore, wholly inapplicable. *See, e.g.,*
7   *Gutierrez v. Wells Fargo Bank*, 704 F. 3d. 712, 721-22 (9th Cir. 2012) (prejudice not
8   self-inflicted where contract does not require arbitration).

9       **F.     Claims for Public Injunctive Relief Are Not Subject to Arbitration**

10      Plaintiffs seek injunctive relief for Defendants' violations of the CLRA and the
11  UCL in the form of an order requiring Defendants to notify class members of the true
12  nature and scope of the IPM defect and to replace the defective IPMs at Defendants'
13  expense. *See* ECF 73 ¶¶ 164, 227-29, 232-33. Because the primary purpose and
14  effect of this request is to interdict unlawful conduct and prevent future injury to class
15  members and anyone in or around Class Vehicles when they suddenly decelerate or
16  stall, such redress is known as public injunctive relief.  *McGill v. Citibank, N.A.,* 2
17  Cal. 5th 945, 951 (2017). As this Court observed recently, "'[a]greements to arbitrate
18  claims for public injunctive relief under the CLRA, the UCL, or the false advertising
19  law are not enforceable in California.'" *Nguyen v. Tesla, Inc.*, No. 8:19-cv-01422-
20  JLS-JDE, 2020 U.S. Dist. LEXIS 80784, at *11 (C.D. Cal. April 6, 2020) (quoting
21  *McGill.,* 2 Cal. 5th at 956). Accordingly, even if Defendants had offered a valid
22  reason to arbitrate other claims (and they have not), Plaintiffs' claims for injunctive
23  relief under the CLRA and the UCL could not be adjudicated by an arbitrator.

24  **III.    CONCLUSION**

25      For the foregoing reasons, Plaintiffs respectfully request that this motion be
26  dismissed.

27

28



**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

| 1 | Dated:  July 31, 2020 | **Fazio | Micheletti llp** |

by      /s/ *Dina E. Micheletti*

Jeffrey L. Fazio
Dina E. Micheletti
**Fazio | Micheletti llp**
1111 Broadway, Suite 400
Oakland, CA 94607
T: 925-543-2555
F: 925-369-0344

**Miller Barondess, llp**

by____/s/ *Amnon Z. Siegel*_____

Louis R. (Skip) Miller
Amnon Z. Siegel
Casey B. Sypek
**Miller Barondess, llp**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

*Interim Co-Lead Class Counsel*

Paul R. Kiesel (119854)
(kiesel@kiesel.law)
Jeffrey A. Koncius (189803)
(koncius@kiesel.law)
Nicole Ramirez (279017)
(ramirez@kiesel.law)
**Kiesel Law llp**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
T: 310-854-4444
F: 310-854-0812

Charles J. LaDuca (*pro hac vice*)
(charles@cuneolaw.com)
Michael J. Flannery (196266)
(mflannery@cuneolaw.com)
**Cuneo Gilbert & LaDuca. llp**
4725 Wisconsin Ave. NW, Suite 200
Washington. D.C. 20016
T: 202-789-3960
F: 202-789-1813

Donald R. Pepperman (109809)
 (dpepperman@bakermarquart.com)
Emily Stierwalt (323927)
(estierwalt@bakermarquart.com)
**Baker & Marquart llp**



| | |
|---|---|
| 1 | 777 S. Figueroa Street, Suite 2850 |
| 2 | Los Angeles, CA 90017<br>T: 424-652-7804<br>F: 424-652-7850 |
| 3 | |
| 4 | William M. Audet (117456)<br>(waudet@audetlaw.com) |
| 5 | Clint Woods (246054)<br>(cwoods@audetlaw.com) |
| 6 | David Kuang (296873)<br>(lkuang@audetlaw.com) |
| 7 | **AUDET & PARTNERS, LLP**<br>711 Van Ness Avenue, Suite 500 |
| 8 | San Francisco, CA 94102-3275<br>T: 415-568-2555<br>F: 415-568-2556 |
| 9 | |
| 10 | *Attorneys for Plaintiffs* |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

