1  Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
   Dina E. Micheletti (184141) (dem@fazmiclaw.com)
2  **FAZIO | MICHELETTI LLP**
   1111 Broadway, Suite 400
3  Oakland, CA  94607
   T: 925-543-2555
4  F: 925-369-0344

5  Amnon Z. Siegel (234981) (asiegel@millerbarondess.com)
   Casey B. Sypek (291214) (csypek@millerbarondess.com)
6  **MILLER BARONDESS, LLP**
   1999 Avenue of the Stars, Suite 1000
7  Los Angeles, California 90067
   T: (310) 552-4400
8  F: (310) 552-8400

9  *Interim Co-Lead Class Counsel*

10           UNITED STATES DISTRICT COURT

11           CENTRAL DISTRICT OF CALIFORNIA

12
   KATHLEEN RYAN-BLAUFUSS,            No. 8:18-cv-00201-JLS-KES
13 CATHLEEN MILLS, and KHEK
   KUAN,
14                                    **NOTICE OF PLAINTIFFS'**
          Plaintiffs,                 **UNOPPOSED MOTION AND**
15                                    **MOTION FOR PRELIMINARY**
              *v.*                    **APPROVAL OF SETTLEMENT**
16
   TOYOTA MOTOR CORPORATION,          **DATE**:  TBD
17 TOYOTA MOTOR SALES USA, INC.,      **TIME**:  TBD
   and DOES 1-10, inclusive,          **PLACE**: Courtroom 10A
18
          Defendants.
19
   STEVEN KOSAREFF and LAURA          Hon. Josephine L. Staton
20 KAKISH, on behalf of themselves and
   all others similarly situated,
21
          Plaintiffs,
22
              *v.*
23
   TOYOTA MOTOR CORPORATION,
24 TOYOTA MOTOR SALES USA, INC.,
   and DOES 1-10, inclusive,
25
          Defendants.
26

27

28



## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that as soon as the matter may be heard by the Honorable Josephine L. Staton at Courtroom 10A of the United States District Court for the Central District of California, Southern Division, 411 West Fourth Street, Santa Ana, California, 92701, Plaintiffs in the above-captioned consolidated class actions will and hereby do move the Court pursuant to Federal Rule of Civil Procedure ("Rule") 23 for for preliminary approval of their Settlement Agreement with Defendants Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc. (collectively, "Toyota"), along with an order approving the proposed forms and methods of notice set forth in the Settlement Agreement and for conditional approval, for settlement purposes, of the following proposed class:

> All persons, entities or organizations (a) who own or lease a 2010 to 2015 model year Prius hatchback and/or a 2012 to 2017 model year Prius *v* wagon that was the subject of Safety Recall E0E, F0R, J0V, and/or 20TA10 (collectively, "Subject Vehicles") as of the date of the entry of the Preliminary Approval Order, or (b) who, at any time before the entry of the Preliminary Approval Order, owned or leased a Subject Vehicle. Excluded from the Class are: (a) Toyota, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Toyota Dealers and Toyota Dealers' officers and directors; (b) Plaintiffs' Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly exclude themselves from the Class as provided in this Settlement Agreement.

Plaintiffs bring this motion on the grounds that the proposed settlement is within the range that warrant final approval as fair, adequate, and reasonable; that

the proposed forms and methods of notice satisfy due process and are reasonably calculated to reach the Settlement Class Members and apprise them of the essential terms of the Settlement Agreement and their rights with respect thereto; and that the proposed settlement class satisfies the requirements for class certification of Rules 23(a) and (b)(3).

Plaintiffs base this motion on this Notice of Unopposed Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Settlement Agreement, the Declarations of Jeffrey L. Fazio, Amnon Z. Siegel, and Jeanne Finegan and the exhibits appended thereto, any of the evidence on file with the Court in support of this motion during the hearing, and on such other written and oral argument presented to the Court.

DATED:  December 4, 2021     **FAZIO | MICHELETTI LLP**

by /s/ *Jeffrey L. Fazio*
Jeffrey L. Fazio

Jeffrey L. Fazio (146043)
Dina E. Micheletti (184141)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA  94607
T:  925-543-2555
F:  925-369-0344

**MILLER BARONDESS, LLP**

by /s/ *Amnon Z. Siegel*
Amnon Z. Siegel

Amnon Z. Siegel (234981)
Casey B. Sypek (291214)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

*Interim Co-Lead Class Counsel*



# TABLE OF CONTENTS

PAGE

NOTICE OF MOTION ...................................................................................................... i

I. INTRODUCTION ................................................................................................ 1

II. SUMMARY OF PERTINENT FACTS AND PROCEDURAL HISTORY ..... 2

    A. The Nature of the IPM Defect ................................................................ 2

    B. The Commencement of This Litigation .................................................. 4

    C. Settlement Negotiations and Litigation on Parallel Tracks .................... 7

    D. The Parties Reach a Settlement Agreement ............................................ 9

III. ARGUMENT ......................................................................................................

    A. The Proposed Settlement Warrants Preliminary Approval .................... 14

        1. The Purpose of Preliminary Approval ......................................... 14

        2. The Proposed Settlement is the Product of Serious, Non-Collusive Negotiation, Entitling It to a Presumption of Fairness ...................................................................................... 16

        3. The Settlement Has No Obvious Deficiencies and Does Not Improperly Grant Preferential Treatment .................... 18

        4. The Settlement Falls Within the Range of Possible Approval ........................................................................ 23

    B. The Court Should Certify the Settlement Class .................................... 23

        1. The Settlement Satisfies All Rule 23(a) Criteria ........................ 23

            a. Numerosity is Satisfied ...................................................... 23

            b. Commonality is Satisfied .................................................... 24

            c. Typicality is Satisfied ......................................................... 25

            d. Adequacy of Representation is Satisfied ............................ 25

        2. The Proposed Settlement Satisfies the Requirements of Rule 23(b) ................................................................................... 26

    C. Interim Lead Class Counsel and the Proposed Class Representatives Should be Appointed for the Settlement Class ......................................... 28

    D. The Proposed Class Notice Distribution Plan and Content Satisfies Due Process and Rule 23 ......................................................................... 29

**NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT**

1

      C.      The Court Should Issue a Preliminary Injunction to Avoid Confusion, Protect the Interests of the Class and the Court's Jurisdiction................34

IV.     CONCLUSION.........................................................................................35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT

# <u>TABLE OF AUTHORITIES</u>

PAGE

### *Cases*

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. May 31, 2007) ............................................ 16, 24

*Adoma v. Univ. of Phoenix, Inc.*,
   913 F. Supp. 2d 964 (E.D. Cal. 2012) ...................................................... 19

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................... 29

*Audrey Heredia v. Sunrise Senior Living LLC*,
   No. 8:18-cv-01974, 2021 WL 819159 (C.D. Cal. Feb. 10, 2021) ............. 21

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ...................................................................... 22

*Comcast Corp. v. Behrend*,
   569 U.S. 27. (2013). .................................................................................. 20

*Duncan v. JPMorgan Chase Bank, N.A.*,
   No. SA-14-CA-00912-FB,
   2015 WL 11623393 (W.D. Tex. Oct. 21, 2015) ....................................... 36

*Edwards v. Ford Motor Co.*,
   603 F. App'x 538 (9th Cir. 2015) ............................................................. 26

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .............................................................. 25, 28

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .................................................................... 26

*Harris v. Vector Mktg. Corp.*,
   2011 WL 1627973 (N.D. Cal. 2011) ........................................................ 16

*Hodson v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) .................................................................... 21

*In re Baldwin-United Corp.*,
   770 F.2d 328 (2d Cir. 1985) ...................................................................... 36

*In re Bluetooth Headset Prod. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .................................................................... 18

*In re Cathode Ray Tube Antitrust Litig.*,
   2016 WL 721680 (N. D. Cal. Jan. 28, 2016) ............................................ 23

*In re Cendant Corp. Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002) .......................................................... 22

*In re Diet Drugs*,
   282 F.3d 235 (3d Cir. 2002) ..................................................................... 36



*In re Heritage Bond Litig.*,
  2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................................... 15

*In re Linerboard Antitrust Litig.*,
  361 Fed. Appx. 392 (3d Cir. 2010) ......................................................... 36

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) .......................................................... 22, 23

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................. 21

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997),
  *aff'd*, 148 F.3d 283 (3d Cir. 1998) ....................................................... 36

*In re Tableware Antitrust Litig.*,
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) .............................................. 15, 31

*In re Vizio, Inc. Consumer Priv. Litig.*,
  No. 816ML02693-JLS-KES,
  2019 WL 12966639 (C.D. Cal. Jan. 4, 2019) ........................................... 16

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ................................................................ 18

*McCarthy v. Toyota Motor Corp.*,
  No. 8:18-cv-00201, 2018 WL 6318841 (C.D. Cal. Sept. 14, 2018) ........... 21

*McRary v. Elations Co, LLC*,
  2015 WL 12746707 (C.D. Cal. Aug. 31, 2015) ....................................... 25

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ...................................................... 16, 19

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................... 14, 15

*Shlensky v. Dorsey*,
  574 F.2d 131 (3d Cir. 1978) ................................................................. 22

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ....................................... 31

*Sonner v. Premier  Nutrition Corp.*, 971 F. 3d. 834 (9th Cir. 2020) .................. 21

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016) ................... 14, 15

*Stratton v. Glacier Ins. Admin'rs, Inc.*,
  No. 1:02CV06213 OWWDLB,
   2007 WL 274423 (E.D. Cal. Jan. 29, 2007) .......................................... 37

*Tran v. Sioux Honey Ass'n, Coop.*,
  No. 8:17-CV-00110-JLS-SS,
  2020 WL 905571 (C.D. Cal. Feb. 24, 2020) .......................................... 24



*Uschold v. NSMG Shared Serv., LLC*,
    333 F.R.D. 157 (N.D. Cal. Oct. 8, 2019)......................................................... 15

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) ........................................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................................... 25

## *Statutes*

28 U.S.C. § 1651(a) ............................................................................................. 34

28 U.S.C. § 2283.................................................................................................. 34

## *Rules*

Fed. R. Civ. P. 23(a) ......................................................................................i, 25

Fed. R. Civ. P. 23(a)(1) ..................................................................................... 23

Fed. R. Civ. P. 23(b)(3) ..................................................................................... 28

Fed. R. Civ. P. 23(c)(1)(B) ................................................................................ 28

Fed. R. Civ. P. 23(c)(2)(B) ..........................................................................29, 33

Fed. R. Civ. P. 23(e)(1)(B) ................................................................................ 29

Fed. R. Civ. P. 23(e)(2) ..................................................................................... 15

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv)..................................................................... 26

Fed. R. Civ. P. 23(h)(1)...................................................................................... 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Interim Co-Lead Class Counsel and Plaintiffs Kathleen Ryan-Blaufuss, Cathleen Mills, Khek Kuan, Steven Kosareff, and Laura Nawaya (nee Kakish) are pleased to report that, after nearly five years of hard-fought litigation that involved extensive discovery, motions to dismiss, a motion to compel arbitration, and multiple discovery motions as well as 17 months of negotiations and mediation with the assistance of the Court-appointed Settlement Special Master, the parties have reached a settlement of the consolidated class actions. The key components of the parties' Settlement Agreement are as follows:

- a $20 million non-reversionary Settlement Fund that will be replenished to the extent necessary to pay all valid claims for reimbursement for the repair or replacement of Intelligent Power Modules ("IPMs") and hybrid Inverter assemblies ("Inverters") in any of the 1.1 million Subject Vehicles, and for the cost of towing and rental cars associated with those repairs;

- a consumer-friendly process that provides for the payment of up to $250 (and possibly more) if there is a residual balance in the Settlement Fund after reimbursement claims are paid, which will be distributed on a *pro rata* basis to all Class Members who have repaired or replaced an IPM or Inverter in a Subject Vehicle (payments will be made directly, without having to submit a claim form, to those Class Members for whom Toyota has a current postal address to which a check can be mailed, and to all other eligible Class Members who submit a valid claim form online or by mail);

- a towing and loaner-car program by which Class Members will receive complimentary towing if their Subject Vehicle's IPM or Inverter requires repair or replacement and, if the repair or replacement takes more than four hours to complete, a complimentary rental car as well;

1   • a program that provides all current owners, subsequent purchasers and/or
2   transferees of Subject Vehicles extended warranty coverage for 20 years from
3   the date of First Use of the Subject Vehicles and broadens existing conditions
4   to eligibility for coverage;

5   • the right to appeal to the Settlement Claims Administrator the denial of a
6   claim for any benefit provided by the Settlement Agreement;

7   • Toyota will bear the full cost of a comprehensive notice program that
8   provides Class Members with notice of the settlement by direct mail, by
9   publication in conventional media, social media, banner notifications on
10  various websites, and on a website created for the sole purpose of providing
11  Class Members with relevant documents and information concerning the
12  implementation of the Settlement Agreement, including a toll-free telephone
13  number that will be staffed by personnel who are trained to respond to
14  questions concerning the settlement, claim status, and other settlement-
15  related issues; and

16  • Toyota will pay, separately from any of the benefits and funds paid to the
17  Class, the amounts the Settlement Special Master proposed for Plaintiffs'
18  attorneys' fees and litigation expenses and service awards for each proposed
19  Class Representative—$19.6 million and $5,000, respectively—if those
20  awards are approved by the Court, and any amount not awarded will revert
21  to the Settlement Fund for the benefit of Class Members.

22  Plaintiffs respectfully submit that the terms of the Settlement Agreement are
23  fair, adequate, and reasonable and warrant preliminary approval and notice to the
24  Class.

25  **II.   SUMMARY OF PERTINENT FACTS AND PROCEDURAL HISTORY**

26  **A.   THE NATURE OF THE IPM DEFECT**

27  On February 12, 2014, Toyota announced it was conducting Safety Recall E0E

28  to address a defect in IPMs—a critical component that is housed in the hybrid Inverter

-2-

1   assemblies Toyota installed as original equipment in more than 700,000 2010 through

2   2014 model-year Prius hatchbacks. *See generally* ECF 164-21. Inverter failures were

3   causing the vehicles to suddenly decelerate or stall while driving because the solder

4   attaching the Insulated-Gate Bipolar Transistors ("IGBTs") to circuit boards inside

5   the IPM degraded due to exposure to thermal stress, and the degraded solder

6   connection created even more heat, which deformed the IGBTs and caused the IPM

7   to malfunction or fail (the "IPM defect"). *See id.* at 842.

8       Rather than replacing the Inverters in the vehicles that were subject to Safety

9   Recall E0E with non-defective Inverters,[1] however, Toyota decided to modify the

10  software in the Electronic Control Unit ("ECU") of each of those vehicles. *See id.* at

11  843. Toyota claimed that the modified ECU software would eliminate the IPM defect

12  in two ways: (1) by reducing amount of thermal stress produced by the IPM's boost

13  converter to prevent damage to the IGBTs; and (2) by revising the program logic to

14  ensure that the vehicles would enter fail-safe mode in the event of an IGBT

15  malfunction or failure instead of stalling. *See id.* at 842-43.

16      Approximately 17 months later (in July 2015), Toyota announced that it was

17  recalling approximately 108,000 2012 to 2014 model-year Prius *v* wagons, which are

18  virtually identical to the third-generation Prius hatchbacks that were the subject of

19  Safety Recall E0E, to eliminate the IPM defect by installing modified ECU software

20  in those vehicles as well. *See generally* ECF 164-40.

21      Several months after it conducted recalls E0E and F0R, Toyota advised owners

22  and lessees that it would extend warranty coverage for the IPMs and Inverters under

23  two Warranty Enhancement Programs ("WEPs")—WEP ZE3 for the Prius

24  hatchbacks involved in Safety Recall E0E and WEP ZF5 for the Prius *v* wagons

25  involved in Safety Recall F0R. Under both WEPs, Toyota offered to provide cost-free

26  _____

27      [1] Several months after Safety Recall E0E, Toyota developed an IPM kit that

28  allowed for the replacement of the IPM separately, rather than the entire Inverter
    assembly, if the damage was limited to the IPM.



1   replacement of IPMs and Inverters for 15 years (with no mileage limitation) when

2   presented to a Toyota dealer for repair, but only  if those vehicles displayed one or

3   more of the following Diagnostic Trouble Codes ("DTCs"): P0A94, P0A1A, P3004,

4   and/or P324E. *See* ECF 164-54 at 1, 164-55 at 1.

5   Even after the modified ECU software was installed, however, there were

6   reports that IGBT failure continued to occur and the revised software logic did not

7   prevent stalling. And when the vehicle did enter fail-safe (or, more aptly, "limp-

8   home") mode instead of stalling, Prius drivers reported that their vehicles would

9   decelerate to between 10 and 30 miles per hour. *See, e.g.,* ECF 164-19 at 830.

10   **B.   COMMENCEMENT OF LITIGATION**

11   On January 31, 2018, Plaintiff Jevdet Rexhepi filed a class-action complaint in

12   the Los Angeles Superior Court alleging that the software Toyota installed in Safety

13   Recalls E0E and F0R did not eliminate the IPM defect, that Toyota engaged in

14   common-law fraudulent concealment of the IPM defect, and that the same conduct

15   resulted in violations of the California Consumers Legal Remedies Act ("CLRA"),

16   Cal. Civ. Code §§ 1750-1784, and the Unfair Competition Law ("UCL"), Cal. Bus. &

17   Prof. Code §§ 17200-17209, and in Toyota's unjust enrichment. *See* Declaration of

18   Jeffrey L. Fazio in Support of Motion for Preliminary Approval of Class-Action

19   Settlement ("Fazio Decl."), Ex. C.

20   On February 5, 2018, Plaintiffs Remy McCarthy and Robert Phillips filed a

21   class-action complaint against Toyota with this Court, alleging that Safety Recalls

22   E0E and F0R did not eliminate the IPM defect and that Toyota's conduct constituted

23   common-law fraudulent concealment and negligent misrepresentation, violated the

24   UCL, the CLRA, the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§

25   17500-17509, and breached express and implied warranties. *See* ECF 1.

26   On February 6, 2018, Toyota distributed a notice to its dealers throughout the

27   United States, advising them that the allegations in Plaintiffs' class actions were

28   baseless, that Safety Recalls E0E and F0R had addressed the safety defect, that WEPs

1  ZE3 and ZF5 were the "appropriate measures for customer safety and satisfaction,"
2  and that there would be "no changes" to the recalls or the WEPs. *See* ECF 113-22.

3  Eight months later, however, Toyota announced Safety Recall J0V, which
4  included all 807,000 vehicles that were the subject of Safety Recalls E0E and F0R
5  because they were still at risk of stalling. *See* ECF 164-47. According to Toyota, the
6  updated version of the ECU software it would install in connection with Safety Recall
7  J0V (the "Updated Recall Software") would not allow the vehicles to stall or suddenly
8  decelerate if the IGBTs were exposed to excessive thermal stress and/or excessive
9  current and voltage; instead, the vehicles would enter an improved set of fail-safe
10 modes that allowed the vehicles to be driven up to about 60 miles per hour, regardless
11 of an IPM malfunction or failure. *See id.*; ECF 164-46 ¶¶ 2-3, 5, 7.

12 This appeared to be the same approach Toyota had used to avoid replacing the
13 Inverters in the 807,000 vehicles included in Safety Recall J0V. *See, e.g.,* ECF 73 ¶¶
14 69-71, 111-120. Plaintiffs also refused to believe Toyota had eliminated the IPM
15 defect because they had determined that the modified ECU software Toyota had
16 installed in the 2010-2014 model-year Prius hatchbacks and 2012-2014 model-year
17 Prius *v* wagons included in Safety Recalls E0E and F0R was the same software Toyota
18 had installed in the 2013-2015 model-year Prius hatchbacks and 2014-2017 Prius *v*
19 wagons, respectively—and that the latter groups of vehicles were ***not*** included in J0V
20 recall notwithstanding that the earlier version of the ECU software in those vehicles
21 equired replacement. *See* ECF 113-21 ¶¶ 14-16.[2]

22 When Plaintiffs' counsel inquired about this issue during a telephonic meet-
23 and-confer session in January 2020, Toyota's counsel confirmed that all third-
24 generation Prius hatchbacks and all Prius *v* wagons were equipped with the same ECU

25 ――――――――――――――――――

26 [2] In other words, Plaintiffs had ascertained that ***all*** third-generation Prius
27 hatchbacks and Prius *v* wagons were equipped with the same ECU software Toyota
   had developed in connection with Safety Recalls E0E and F0R. *Id.* Yet Toyota had
28 not replaced the defective software with the Updated Recall Software in the vehicles
   that were excluded from the E0E and F0R recalls. *Id.*



1  software that had been developed for Safety Recalls E0E and F0R, and that Toyota

2  had declared that software defective when it announced Safety Recall J0V. *See id.*

3  Plaintiffs' counsel never received an explanation, however, as to why only the

4  Prius hatchbacks that were the subject of Safety Recall E0E and the Prius *v* wagons

5  that were the subject of Safety Recall F0R had received the Updated Recall Software

6  in Safety Recall J0V—or, put differently, why more than a quarter million 2013 to

7  2015 model-year Prius hatchbacks and 2014 to 2017 model-year Prius *v* wagons did

8  not. *See id.* ¶ 17. Therefore, Plaintiffs sought answers through formal discovery, and

9  on March 16, 2020, Toyota confirmed Plaintiffs' hypothesis in response to their

10  requests for admissions; that is, that all third-generation Prius and Prius *v* hybrids had

11  been equipped with the same ECU software. *See id.* ¶ 18; ECF 113-25 (responses to

12  RFA Nos. 1-4).

13  Two months later (on May 22, 2020), Toyota moved to compel Plaintiffs to

14  adjudicate their claims in arbitration, *see* ECF 109, which the Court denied, *see* ECF

15  131. A month after that, Toyota provided confirmation that only the 807,000 vehicles

16  that were the subject of Safety Recalls E0E and F0R had received the Updated Recall

17  Software: On June 24, 2020, Toyota announced Safety Recall 20TA10 for the purpose

18  of installing Updated Recall Software in the 266,637 third-generation Prius

19  hatchbacks and Prius *v* wagons that Toyota did not include in Safety Recall J0V. *See*

20  ECF 164-48.

21  Toyota claimed that, like the J0V software, the update installed in Safety Recall

22  20TA10 would not only prevent stalling, but included two fail-safe modes that would

23  enable the vehicles to continue driving at speeds of approximately 60 miles per hour

24  despite an IGBT malfunction or failure. *See* ECF 164-50 at 1146:2-22. Shortly

25  thereafter, Toyota announced it was offering another WEP (20TE10), which, like

26  WEPs ZE3 and ZF5, extended warranty coverage for the IPMs and Inverters to 15

27  years with no mileage limitation if the vehicle displayed at least one of four DTCs

28  described above.

### C.    SETTLEMENT NEGOTIATIONS AND LITIGATION ON PARALLEL TRACKS

Toyota initiated settlement negotiations shortly before announcing Safety Recall 20TA10, but negotiations proceeded haltingly, in part because Toyota's motion to compel arbitration was still pending before the Court, *see* Fazio Decl. ¶ 19, and because Plaintiffs had a substantial amount of discovery to complete in addition to preparing their motion for class certification, *see* ECF 125. In addition, deposition discovery remained in doubt due to pandemic-related shelter-in-place and travel restrictions, which precluded Plaintiffs from deposing Toyota engineers and other Japan-based personnel, *see* ECF 126. Thus, the week after they appeared for the hearing of the motion to compel arbitration, the parties submitted a stipulation proposing to modify the Scheduling Order by extending case deadlines for the purpose of meeting and conferring about possible ways to proceed with Plaintiffs' motion for class certification despite these restrictions. *See* ECF 127.

On September 21 and 25, 2020, the parties jointly submitted reports concerning a proposal by which Rule 30(b)(6) depositions would be postponed while Plaintiffs propounded interrogatories in accordance with procedures intended to expedite the discovery process as it related to class certification. *See* ECF 128-129. The Court adopted the parties' proposal on September 30, 2020, and scheduled the class-certification motion to be filed by January 29, 2021. ECF 130.

Plaintiffs propounded dozens of interrogatories in connection with the stipulation, in addition to multiple sets of requests for admissions and nearly two dozen sets of requests for production of documents. Fazio Decl. ¶ 18j-k. Included among the discovery Plaintiffs propounded were requests for information verifying the efficacy of the Updated Recall Software that Toyota installed in connection with Safety Recalls J0V and 20TA10. *See id.* Plaintiffs also served multiple sets of requests for admissions relating to the same or similar issues, and moved to compel the production of documents relating to Class Vehicles and to resolve disputes over the

1   propriety of Toyota's responses to interrogatories. *See id.*; ECF 132, 145.[3]

2   Settlement negotiations continued during the same period, and the parties

3   stipulated to the appointment of an experienced mediator, Patrick Juneau, as

4   Settlement Special Master pursuant to Federal Rule of Civil Procedure 53. *See* ECF

5   134.

6   By mid-January 2021, Toyota advised Plaintiffs that it would not have

7   responses to Plaintiffs' discovery until late February 2021, so Plaintiffs moved *ex*

8   *parte* to extend the deadline for filing their class-certification motion from January 29

9   to April 9, 2021. *See* ECF 147-148. The Court granted the motion, *see* ECF 153, and

10  for the next several months Plaintiffs' counsel and their experts continued to review

11  and analyze the evidence obtained in discovery and from their own research while

12  preparing Plaintiffs' motion for class certification. *See* Fazio Decl. ¶ 18d, v-w. By the

13  time Plaintiffs filed that motion on April 9, however, Toyota had yet to produce or

14  identify the testing materials Plaintiffs sought regarding the efficacy of the Updated

15  Recall Software. *See* ECF 162 at 21-22 & n. 14.

16  _____

17  [3] Plaintiffs' litigation efforts have been substantial, and include, but are not

18  limited to, the following: drafting and analyzing the responses to 17 sets of document demands, multiple sets of specially-prepared interrogatories and three sets of requests

19  for admissions; responding to five sets of interrogatories from Toyota; issuing document subpoenas to third parties and responding to the subpoenas Toyota served

20  on Plaintiffs' experts; reviewing hundreds of thousands of pages of documents produced by Toyota—including a large volume of technical documents that required

21  translation from Japanese—in addition to a large volume of documents obtained as a result of investigation efforts by Plaintiffs' counsel; engaging in myriad, lengthy meet-

22  and-confer sessions pertaining to nearly every set of discovery requests; engaging in discovery motion practice; researching and analyzing an array of legal and technical

23  issues presented by this litigation, which included working with engineers and other experts retained by Plaintiffs' counsel in connection with the preparation of pleadings,

24  briefs in support of and in opposition to various motions, and reports submitted to the Court in support of class certification, and assessing the reports prepared by Toyota's

25  experts in opposition to class certification; deposing Defendants' expert, Sarah Butler; preparing for and defending the depositions of each of the five named Plaintiffs and

26  Plaintiffs' experts, Michael Pecht and Stephen Boyles; and engaging in confirmatory discovery with the assistance of Plaintiffs' experts. *See id.* ¶ 18a-y. If this motion is

27  granted, Plaintiffs will submit a motion for final approval that will include a more thorough explanation of the litigation efforts in which Plaintiffs' counsel have

28  engaged, as well as the work performed by the named Plaintiffs on behalf of Class Members.



The absence of such evidence was the principal reason the parties had been negotiating for a full year without reaching a settlement. Fazio Decl. ¶¶ 19-22. Ultimately, however, the results of Toyota's testing of the Updated Recall Software (which Toyota produced in opposition to class certification) ended the stalemate. According to those tests, the Updated Recall Software prevented stalling in third-generation Prius hatchbacks and Prius *v* wagons, and allowed them to be driven at speeds of more than 60 miles per hour despite IGBT malfunction or failure. *See, e.g.,* ECF 193-9 at 28-41; 194-30 at 3-19; ECF 195, Exs. 1-5.

But that evidence did not end the negotiation deadlock because it was conclusive proof that the Updated Recall Software functioned as intended in every Subject Vehicle; rather, Toyota provided Plaintiffs with confirmation under oath that the Updated Recall Software performs as designed and that Toyota is aware of no evidence involving a Subject Vehicle equipped with the Updated Recall Software that was unable to travel ~60 miles per hour after entering a fail-safe mode. *See* ECF 164-50 at 1147-49 (No. 7); Fazio Decl. ¶ 23.

Nonetheless, the purpose of the Updated Recall Software is to address the safety issue, not to reduce IPM or Inverter malfunction or failure. Thus, Subject Vehicles will continue to need towing, to replace failed IPMs (and Inverters if IGBT failure results in damage that extends beyond the IPM), and a loaner vehicle while the repair or replacement is underway. Moreover, current and former owners of Subject Vehicles who have borne the cost of towing, repairing or replacing an IPM or Inverter, and/or a rental car due to the IPM defect need compensation for those expenditures.

## D.   THE PARTIES REACH A SETTLEMENT AGREEMENT

Although it required another five months of negotiations with the assistance of Settlement Special Master Juneau, the parties addressed each of these issues in a detailed, compendious Settlement Agreement ("SA"). *See* Fazio Decl. ¶¶ 19-30 & Ex. A (copy of SA and exhibits thereto). For example, Special Master Juneau helped

the parties resolve issues stemming from efforts to ascertain the number of IPM and Inverter repairs and replacements at customer expense and the total dollar amount attributable to them (and to the attendant towing and rental car charges) for the purpose of creating a fund from which Class Members would be reimbursed for such expenses. Fazio Decl. ¶ 25.

Special Master Juneau also assisted the parties with determining whether this litigation and the efforts made by Plaintiffs' counsel catalyzed the development of the Updated Recall Software that was installed in the Subject Vehicles via Safety Recalls J0V and 20TA10 as well as WEP 20TE10, which Toyota created after the latter recall. *Id.* As discussed in Section II.B., above, a week after this litigation began, Toyota announced publicly that the ECU software it installed in Safety Recalls E0E and F0R addressed the safety risks created by the IPM defect, but eight months later Toyota developed the Updated Recall Software and conducted Safety Recall J0V to install it in the 807,000 vehicles that were the subject of recalls E0E and F0R. Then, six months after Plaintiffs' counsel pointed out that the 267,000 third-generation Prius and Prius *v* hybrids that were excluded from the J0V recall were equipped with the same defective ECU software, Toyota announced Safety Recall 20TA10 to install the Updated Recall Software in those vehicles and to provide their owners with extended warranty coverage via WEP 20TE10. The matter was submitted to the Settlement Special Master, who issued findings in favor of Plaintiffs. *See* SA, Ex. 10 (catalyst findings).[4]

The parties filed a Notice of Settlement with the Court on November 11, 2021, *see* ECF 216, and finalized a formal Settlement Agreement that was fully executed on November 15, 2021, *see generally* SA. There are three core

---

[4] Plaintiffs have retained experts who are conducting an analysis of the monetary value of the development and installation of the Updated Recall Software and each of the other benefits conferred by the Settlement Agreement, which will be presented to the Court at a later point in these proceedings.



components of the benefits conferred by the Settlement Agreement, each of which is described below.

*First*, the Settlement Agreement provides for a $20 million non-reversionary fund that will be replenished to the extent required to pay all valid claims for reimbursement for the repair or replacement of IPMs and Inverters in any of the 1.1 million Subject Vehicles, and for the cost of towing and rental cars associated with those repairs. *See* SA §§ III.A.1-4, III.D.

In the event that all reimbursement claims are paid before the fund is exhausted, the remaining balance will be distributed *pro rata* to all Class Members who have had an IPM or Inverter repaired or replaced in a Subject Vehicle, regardless of whether they had to bear the cost of the repair or replacement, up to $250 (or more, depending on whether the Parties agree to larger amount and that amount is approved by the Settlement Special Master). *Id.* § 3(a)-(c).[5]

To the extent that any remaining amount is deemed administratively infeasible to distribute to Class Members (*e.g.,* because the cost of distributing the funds exceeds the amounts to be distributed), the remainder will be distributed *cy pres* to the Texas A&M Transportation Institute ("TTI"). *Id.* § III.A.3(d).[6]

---

[5] Class Members who receive a reimbursement payment will be given a minimum of 180 days to cash those checks, and will be advised that, if those checks are not cashed within this timeframe, the uncashed checks will revert to the Settlement Fund to be redistributed to Class Members who received and cashed checks pursuant to this settlement ("Redistribution Checks"). *See* SA § III.A.3.a. At or about the 90th day following the issuance of reimbursement payments to Class Members, the Settlement Notice Administrator will seek to contact those Class Members who have not yet cashed their checks to remind them that they will expire as of the date printed on the checks and advise them once again of the consequences of not cashing the checks. *See id.*

[6] TTI has expertise in such things as engineering, environmental sciences, and data sciences, and TTI researchers play a key role in educating the next generation of transportation professionals, training students both in the laboratory and in the classroom. *See* https://tti.tamu.edu/about/. These qualifications make TTI a well-rounded, appropriate *cy pres* recipient for this automotive class-action. Should a *cy pres* distribution become necessary, the parties anticipate submitting a specific proposal for the use of *cy pres* funds. *See* Fazio Decl. ¶ 26. At that time, the parties

*Second,* the Settlement Agreement includes a towing and loaner-car program by which Class Members will receive complimentary towing if their Subject Vehicle's IPM or Inverter requires repair or replacement and, if the repair or replacement takes more than four hours to complete, a complimentary rental car as well. *See* SA § III.B.

*Third,* the Settlement Agreement establishes a "Customer Confidence Program" in which all Class Members, subsequent purchasers and/or transferees of Subject Vehicles are entitled to an extension of the warranty coverage under the existing WEPs for 20 years from the date of First Use of the Subject Vehicles. *See* SA § III.C. In addition to extending the duration of pre-existing coverage and guaranteeing that Class Members' rights and Toyota's obligations will not be diminished, the Customer Confidence Program improves WEP coverage in the following manner:

- IPMs will be repaired and replaced at no cost without regard to whether they display one of the four DTCs enumerated in the WEPs;

- Inverters that experience a Thermal Event (*i.e.,* IGBT failure that results in damage to casings or other parts of an Inverter) will be repaired or replaced at no cost; and

- Inverters will be repaired or replaced at no cost if the Subject Vehicle displays one of the four DTCs enumerated in the WEPs plus DTCs P0A7A and P0A78.

*See* SA § III.C.1(a)-(f).

After the parties reached agreement as to the substantive terms of the Settlement Agreement, they began negotiating the details of notice to the Class, the procedures

---

will craft a proposal that ensures the settlement "retains some connection to the plaintiff class and the underlying claims and, to the extent possible, serves as the next best distribution' to giving the funds directly to class members." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (citation and internal quotation marks omitted).



1  relating to the administration of claims for reimbursement and benefits, appeal

2  procedures, and the attorneys' fees and litigation expenses incurred by Plaintiffs'

3  counsel, service awards for the proposed Class Representatives. *See* Fazio Decl. ¶ 27.

4       As Plaintiffs have alleged from the outset, Prius drivers have complained that

5  they have been denied coverage despite the existence of warranties mandated by law

6  and despite the existence of extended coverage provided by the WEPs Toyota issued

7  in the wake of safety recalls. *See, e.g.,* ECF 73 ¶¶ 94-99. To address this issue, the

8  Settlement Agreement provides that Class Members and/or subsequent purchasers or

9  transferees of a Subject Vehicle who are denied coverage or other benefits under the

10  Customer Confidence Program and/or the Loaner/Towing Program will have the right

11  to appeal any denial of coverage or other settlement benefits to the Settlement Claims

12  Administrator. *Id.* § III.C.2.

13       Additionally, the Settlement Agreement establishes a comprehensive notice

14  program that provides Class Members with notice of the settlement by direct mail,

15  by publication in conventional media, social media, banner notifications on various

16  websites, and on a website created for the sole purpose of providing Class Members

17  with relevant documents and information concerning the implementation of the

18  Settlement Agreement, including a toll-free telephone number that will be staffed

19  by personnel who are trained to respond to questions concerning the settlement,

20  claim status, and other settlement-related issues. *See generally* SA § IV.

21       Finally, the Settlement Agreement provides that Toyota will pay Class

22  Counsel's attorneys' fees and litigation expenses and services awards to each

23  proposed Class Representatives in amounts recommended by the Settlement Special

24  Master. *See* SA § VIII. After reaching agreement on the material terms of the

25  Settlement Agreement, the parties engaged in a series of discussions over the course

26  of several days with Special Master Juneau, who issued a mediator proposal in the

27  amount of $19.6 million for attorneys' fees and litigation expenses, and $5,000 for

28  each Class Representative's service award. *Id.* § VIII.A.

1   The parties agreed to the Special Master's mediator proposal. *Id.* § VIII.B.

2   The parties also agreed that, in the event the Court awards less than the full amount

3   of attorneys' fees recommended by the Settlement Special Master, the difference

4   will be deposited into the Settlement Fund and distributed to Class Members. *Id.* §

5   VIII.C.

6   **III.    ARGUMENT**

7       **A.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL**

8           **1.    *Purpose of Preliminary Approval***

9   The Ninth Circuit has long recognized a strong judicial policy favoring

10  settlement, particularly of complex class actions and has "long deferred to the private

11  consensual decision of the parties." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 323-

12  24 (C.D. Cal. 2016) (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th

13  Cir. 2009)) (internal quotation marks omitted). Indeed, "the court's intrusion upon

14  what is otherwise a private consensual agreement negotiated between the parties to a

15  lawsuit must be limited to the extent necessary to reach a reasoned judgment that the

16  agreement is not the product of fraud or overreaching by, or collusion between, the

17  negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and

18  adequate to all concerned." *Id.* at 323.

19  Stated differently, a fair, reasonable, and adequate class-action settlement is

20  preferable to the time, cost, and uncertainty of lengthy litigation. *See, e.g., Officers for*

21  *Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary

22  conciliation and settlement are the preferred means of dispute resolution. This is

23  especially true in complex class action suits . . ."), *cert. denied*, 459 U.S. 1217 (1983);

24  *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976). "Preliminary

25  approval is thus appropriate if 'the proposed settlement appears to be the product of

26  serious, informed, noncollusive negotiations, has no obvious deficiencies, does not

27  improperly grant preferential treatment to class representatives or segments of the

28  class, and falls within the range of possible approval.'" *Uschold v. NSMG Shared*

1   *Serv., LLC*, 333 F.R.D. 157, 169 (N.D. Cal. Oct. 8, 2019) (quoting *In re Tableware*

2   *Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)). *See also Staton v.*

3   *Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("It is the settlement taken as a whole,

4   rather than the individual component parts, that must be examined for overall

5   fairness") (brackets, ellipses, internal quotation marks and citation omitted).

6   "The Ninth Circuit does not follow the approach of other circuits that requires

7   district courts to 'specifically weigh[] the merits of the class's case against the

8   settlement amount and quantify the expected value of fully litigating the matter."

9   *Spann*, 314 F.R.D. at 323-24 (quoting *Rodriguez*, 563 F.3d at 965). Instead, courts

10  in the Ninth Circuit examine "whether the settlement is 'the product of an arms-

11  length, non-collusive, negotiated resolution.'" *Id.* at 324 (quoting *Rodriguez*, 563

12  F.3d at 965). When it is, courts afford the parties the presumption that the settlement

13  is fair and reasonable." *Id.* (citing *In re Heritage Bond Litig.*, 2005 WL 1594403, at

14  *9 (C.D. Cal. June 10, 2005) ("A presumption of correctness is said to attach to a

15  class settlement reached at arm's length negotiations between experienced capable

16  counsel after meaningful discovery")).

17  The process of approving a proposed class-action settlement as "fair,

18  reasonable, and adequate" under Rule 23(e)(2) takes place in two stages, the first of

19  which begins with this motion for preliminary approval. *See, e.g., Nat'l Rural*

20  *Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)

21  ("the Court first determines whether a proposed class action settlement deserves

22  preliminary approval and then, after notice is given to class members, whether final

23  approval is warranted").  "At the preliminary approval stage, 'the settlement need only

24  be potentially fair.'" *Id.* (quoting *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386

25  (C.D. Cal. May 31, 2007)). "Closer scrutiny is reserved for the final approval hearing."

26  *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, *7 (N.D. Cal. 2011).

27  As this Court has explained, "[a]t this preliminary stage and because class

28  members will receive an opportunity to be heard on the Settlement Agreement, 'a full

1  fairness analysis is unnecessary. Instead, preliminary approval and notice of the

2  settlement terms to the proposed Settlement Class are appropriate where '[1] the

3  proposed settlement appears to be the product of serious, informed, non-collusive

4  negotiations, [2] has no obvious deficiencies, [3] does not improperly grant

5  preferential treatment to class representatives or segments of the class, and [4] falls

6  within the range of *possible* approval . . . ." *In re Vizio, Inc. Consumer Priv. Litig.*,

7  No. 816ML02693JLSKES, 2019 WL 12966639, at *8 (C.D. Cal. Jan. 4, 2019)

8  (emphasis in original; citations and internal quotation marks omitted).

9      Plaintiffs respectfully submit that the proposed settlement satisfies the criteria

10  for preliminary approval, each of which is discussed below.

11      **2.**    ***The Proposed Settlement is the Product of Serious, Non-***

12      ***Collusive Negotiation, Entitling it to a Presumption of Fairness***

13      As explained in Sections II.C.-D., above, the proposed settlement is the product

14  of a lengthy negotiation process conducted by experienced class-action counsel.

15  Settlement discussions did not commence until June 2020, after Plaintiffs' counsel

16  had conducted substantial investigation and discovery. The parties continued to

17  engage in extensive formal and informal discovery efforts, multiple discovery

18  motions, and the briefing of motions to compel arbitration and for class certification

19  and summary judgment on a parallel track for nearly a year before Plaintiffs filed their

20  motion for class certification, during which the parties also continued discussing

21  settlement with the help of Special Master Juneau. *See* Fazio Decl. ¶¶ 25-28.[7]

22      As a result of their extensive efforts during the litigation, the parties (each of

23  whom are represented by experienced, capable counsel) were well-informed about the

24

25  _____

26      [7] Special Master Juneau was apprised of the legal and factual issues in this case by way of, *inter alia*, relevant pleadings, targeted settlement-related

27  memoranda and other settlement-related communications, discussions with the parties, formal mediation sessions, and the briefs submitted in connection with Plaintiffs' class-certification motion and Toyota's motion for summary judgment.

28  *See id.*



issues in this case before and during settlement discussions. *See id.* ¶ 20. The parties came to the bargaining table with vastly different views of the merits and value of the claims and defenses, which is only part of the reason settlement negotiations took 17 months to complete. Consequently, every material issue underwent intensive scrutiny and discussion before it became part of the Settlement Agreement, *id.,* and the time, effort, and resources expended on those efforts paid off. The Settlement Agreement provides Class Members and subsequent owners of Subject Vehicles with an array of substantial monetary and other benefits, including the creation of an evergreen, non-reversionary Settlement Fund from which all valid claims for reimbursement of enumerated expenses will be paid, with any remaining funds to be redistributed to eligible Class Members or *cy pres* (or possibly both, depending on the circumstances). *See* SA § III.

After reaching agreement on all material terms of the relief to the proposed Class, the parties began negotiating the attorneys' fees and litigation expenses incurred by Plaintiffs' counsel, service awards for the proposed Class Representatives, and a number of other, related issues over the course of the next several months. *See id.* ¶¶ 27-29. As discussed in Section III.D., above, the Settlement Special Master not only participated in various aspects of the negotiations, he resolved the issues pertaining to Plaintiffs' attorney fees and costs and service awards for the proposed Class Representatives by making a mediator's proposal that both sides agreed to accept, and if the award differs from Special Master Juneau's recommendation, the difference will not revert to Toyota; it will be deposited into the Settlement Fund for distribution to the Class.[8] *See* SA § VIII at 45. Thus, in addition to being devoid of overt signs of

---

[8] This settlement would not exist were it not for the proposed Class Representatives pursuing these class actions and seeing them through to a successful conclusion by having diligently fulfilled their duties and responsibilities to Class Members. Plaintiffs propose to file their motion for attorneys' fees, litigation expenses, and service awards for Class Representatives 30 days before objections



1  collusion, the proposed settlement also lacks any "subtle signs" of collusion that

2  concerned the Ninth Circuit in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d

3  935, 947 (9th Cir. 2011), and, more recently, in *Briseno v. Henderson*, 998 F.3d 1014,

4  1027 (9th Cir. 2021) and *Kim v. Allison*, 8 F.4th 1170 (9th Cir. 2021).

5      Thus, the proposed settlement is the product of well-informed, arms'-length,

6  hotly-contested negotiations, not collusion. And the absence of collusion, the amount

7  of discovery, and the arm's-length nature of the negotiation resulting in this proposed

8  settlement entitle it to a presumption of fairness. *See, e.g., Adoma v. Univ. of Phoenix,

9  Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) ("'A settlement following sufficient

10  discovery and genuine arms-length negotiation is presumed fair'") (quoting *Nat'l

11  Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal.

12  2004)).

13      **3.  *The Settlement Has No Obvious Deficiencies and Does Not

14      Improperly Grant Preferential Treatment***

15      As discussed in section II.D., above, the proposed Settlement provides real,

16  substantial benefits to Class Members in an easy-to-understand, straightforward

17  manner, without subjecting Class Members to any undue burden with respect to

18  claiming or receiving those benefits. The claims process itself is simple and

19  straightforward.  For example, claims can be filed as late as three months after the

20  Final Effective Date, *see* SA at 7 ¶ 4 (defining "Claim Period"), and completed

21  entirely on-line, *see id*. § III.D.4. Moreover, Class Members who no longer have

22  receipts are still eligible to receive reimbursement for valid claims. *See* SA at 14 ¶

23  49 (defining "Supporting Documentation" as including "a sworn statement

24  establishing the nature and amount of an expenditure for repairing or replacing an

25

26

27  are due, *see* SA, Ex. 5 at 15, which will provide Class Members with an ample opportunity to review Plaintiffs' motion before objections and opting out are due to

28  be filed, *see id*. At that time, Plaintiffs will provide the Court with detailed factual and legal support for that motion.



IPM or Inverter or an associated towing or car rental expense"). Moreover, the Settlement Agreement provides a mechanism by which Class Members may appeal if they believe they have been wrongfully deprived of a benefit. *See* SA § III.C.2.

The strength of Plaintiffs' case and the absence of any obvious deficiency in the Settlement Agreement is demonstrated, in part, by the fact that the litigation withstood two motions to dismiss and catalyzed not one, but two safety recalls (J0V and 20TA10) whose sole purpose was to install the Updated Recall Software Toyota developed after this litigation began. Nonetheless, at the time the parties entered into the Settlement Agreement, a motion for class certification was pending (*see* ECF Nos. 162-64 (Plaintiffs' initial moving papers) and ECF 194 (Toyota's opposition)), as was Toyota's motion for summary judgment (*see* ECF No. 196), both of which present significant hurdles for Plaintiffs.

In its opposition to Plaintiffs' class-certification motion and in its motion for summary judgment, Toyota continues to vigorously deny the factual allegations in the operative complaint, as well as any legal liability arising from those claims, and has asserted numerous defenses on the merits. For example, in opposition to Plaintiffs' class-certification motion, Toyota argued that Plaintiffs will be unable to prove with common evidence that the IPM defect exists in Subject Vehicles, let alone that Toyota knew about it prior to the sale of those Vehicles. *See, e.g*, ECF No. 194 at 12:17-17:17.[9]

Moreover, in its motion for summary judgment, Toyota argues that the economic loss rule bars Plaintiffs' fraudulent concealment claims, that Plaintiffs'

---

[9] With respect to the latter, Toyota correctly observes that "[t]his Court has held previously that each Plaintiff must allege facts to show that Toyota knew of the Inverter defect prior to his or her date of purchase.'" *See id*. at 15:11-14 (citing ECF 35 at 6). Should Toyota prevail on this issue, Plaintiffs would be unable to establish their fraud claims at trial, even if they are able to certify those claims. Toyota also challenges Plaintiffs' ability to certify their damages model, arguing, *inter alia*, that, it is "inherently flawed" and fails to satisfy any of the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27. (2013). *See* ECF 194 at 22-29.

1   implied warranty claims fail because their vehicles are fit for ordinary use, and that

2   the applicable statutes of limitations bars nearly all of Plaintiffs' claims.  *See* ECF 196

3   at 11-24. If Toyota were to prevail on these arguments, it would dispose of some or

4   all the claims in this class action. And although Plaintiffs firmly believe that the claims

5   asserted in this action have substantial merit and are suitable for certification, and that

6   Plaintiffs will prevail at trial,[10] recovery would be delayed for years (compounded

7   further by the ongoing pandemic) even if Plaintiffs were to prevail at trial and on

8   appeal.

9        Plaintiffs' counsel have deep experience in this area of law, *see See* Fazio Decl.

10  ¶¶ 3-15 & Exhibit B; Siegel Decl. ¶¶ 3-15 & Ex. 1, and they are well aware that there

11  are no certainties in litigation or jury trials, particularly in cases involving consumer

12  fraud. They are also aware that Plaintiffs face substantial risk at each stage of this

13  litigation: Plaintiffs could prevail on certification, defeat Toyota's summary judgment

14  motion, and succeed at trial, but they could still risk a loss on appeal—not only if

15  Toyota were to persuade an appellate panel that it had the better argument, but because

16  intervening changes in existing law could favor Toyota. *See, e.g., In re Omnivision*

17  *Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) ("The recommendations of

18  plaintiffs' counsel should be given a presumption of reasonableness") (citation and

19  internal quotation marks omitted).[11]

20

---

21      [10]  Toyota contends that Class Members were made whole by its

22  implementation of the various safety recalls. *See id.* at 28:14-26. Plaintiffs disagree that any of the recalls made Class Members whole, but there is no question that addressing the safety risks posed by the IPM defect as a result of installing the Updated

23  Recall Software in Safety Recalls J0V and 20TA10 (which, as Special Master Juneau has found, was the result of Plaintiffs' efforts in this litigation) changes the nature of

24  the case Plaintiffs would have to prove at trial. *See, e.g., Hodson v. Mars, Inc.,* 891

25  F.3d 857, 862-63 (9th Cir. 2018).

    [11] For example two years after this Court rejected Toyota's effort to bar

26  Plaintiffs from simultaneously litigating legal and equitable claims/remedies (*see McCarthy v. Toyota Motor Corp.,* No. 8:18-cv-00201. 2018 WL 6318841. *6 (C.D.

27  Cal. Sept. 14. 2018). the Ninth Circuit decided *Sonner v. Premier  Nutrition Corp.,* 971 F. 3d. 834, 842 (9th Cir. 2020), which this Court and others have interpreted as

28



**PLAINTIFFS' MPAS ISO UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

1    The Settlement Agreement also meets the standard for determining whether it

2    is fair, reasonable and adequate, regardless of whether Plaintiffs could have done

3    better if they achieved a complete victory on the merits at trial. *See, e.g., In re Mego*

4    *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("It is well-settled law that a

5    cash settlement amounting to only a fraction of the potential recovery does not *per se*

6    render the settlement inadequate or unfair. Even assuming that Nadler's methodology

7    was more sound, the Settlement amount of almost $2 million was roughly one-sixth

8    of the potential recovery, which, given the difficulties in proving the case, is fair and

9    adequate") (internal quotation marks and citation omitted).[12]

10   Nor does any Class Member receive preferential treatement under the

11   Settlement Agreement. All Class Members who bore the cost of repairing or replacing

12   an IPM or Inverter are subject to the same criteria for reimbursement, and all Class

13   Members (as well as transferees and subsequent owners) are treated equally in terms

14   of their entitlement to participate in the prospective benefits conferred by the

------

requiring plaintiffs to demonstrate that they have an inadequate remedy at law in
order to continue pursuing their equitable claims/remedies. *See, e.g., Audrey
Heredia v. Sunrise Senior Living LLC*, No. 8:18-cv-01974, 2021 WL 819159, at *4
(C.D. Cal. Feb. 10, 2021) ("To the extent this Court previously ruled differently,
those rulings do not survive Sonner, which made clear that a plaintiff's failure to
plead inadequate remedies at law dooms the claim for equitable relief at any stage").
Toyota relies on *Sonner* in seeking summary judgment of Plaintiffs' claims for
violation of the UCL and unjust enrichment, and for equitable relief under the
CLRA. *See* ECF 196 at 10:5-11:19.

[12] *See also Shlensky v. Dorsey*, 574 F.2d 131, 147-48 (3d Cir. 1978) ("This
figure, which is approximately 15% of the maximum amount of unlawfully disbursed
corporate funds alleged to be involved in the suit, can hardly be said to provide a
grossly inadequate benefit to Gulf in view of the uncertainties of this litigation"); *City
of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) ("The fact that a
proposed settlement may only amount to a fraction of the potential recovery does not,
in and of itself, mean that the proposed settlement is grossly inadequate and should be
disapproved"); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336
(D.N.J. 2002) ("The settlement of $54 million represents less than two percent of that
amount, a small percentage. This amount may be justifiable, however, given the fact
that the Settling Defendants appear to have significant defenses that increase the risks
of litigation").

1  Settlement Agreement.[13]

2  Class Members who did not suffer any harm (*i.e.,* those who bought and sold

3  Subject Vehicles in which the IPM defect did not manifest) will be subject to the

4  release if they choose to remain in the Class, but that does not constitute preferential

5  treatment. *See In re Mego,* 213 F.3d 454, 461 (9th Cir. 2000) (affirming order

6  overruling objection that large portion of class would not recover from defendant).[14]

7  Moreover, the release is specifically "limited to, and does not extend beyond,

8  issues pertaining to the Subject Matter of the Action, and does not extend to failure

9  of or damage to the Inverter or IPM caused by anything other than Thermal Stress."

10  SA § III.C.1.d ("Release and Waiver"). Importantly, the Release carves out claims

11  for "(1) personal injury, (2) death, (3) property damage arising from an accident

12

---

13  [13] As discussed in Section II.D., above, the proposed settlement provides Class
14  Members with substantial monetary and non-monetary benefits, which are above and
   beyond the significant benefits resulting from the two safety recalls this litigation has
15  already catalyzed. Among other things, a $20-million dollar, non-reversionary,
   evergreen fund is available to satisfy ***all*** valid reimbursement claims for expenses to
16  repair or replace an IPM or Inverter, and related towing and rental car charges; the
   claims process is simple and straightforward; if Redistribution Checks are issued, they
17  will be sent to the majority of intended recipients without the need to submit a
   Registration and Reimbursement Claim Form; the fully-transferable extended
18  warranty coveraged provided by the Customer Confidence Program and
   Loaner/Towing Program provide meaningful benefits to owners and lessees of the
19  Subject Vehicles; the implementation of those programs will occur immediately after
   the Final Effective Date; resources are in place to assist Class Members with any
20  questions they may have; an appeals process has been created in the event settlement
   benefits are denied; all costs of administering the settlement, as well as Plaintiffs'
21  counsels' attorneys' fees and costs and incentive awards to the Class Representatives
   are to be paid separately, by Toyota, with any amounts not awarded reverting to the
22  Settlement Fund.

23  [14] *See also In re Cathode Ray Tube Antitrust Litig.,* 2016 WL 721680, *21-25
   (N. D. Cal. Jan. 28, 2016) (same: "if such claims were worth little or nothing,
24  releasing them without compensation does not render the Proposed Settlement
   unfair, unreasonable or inadequate"); *Nwabueze v. AT&T, Inc.*, No. C 09–01529,
25  2013 WL 6199596, at *8 (N.D. Cal. Nov. 27, 2013) ("That a settlement could
   potentially have reached a more favorable result for certain individuals in the class
26  does not demonstrate that the agreed-upon settlement is not fair, adequate, and
   reasonable"); *Glass v. UBS Fin. Servs., Inc.*, No. 06-4068, 2007 WL 221862, at *8
27  (N.D. Cal. Jan. 26, 2007) (rejecting objection that settlement failed to fully
   compensate the class, reasoning that objector "misunderstands the purpose of the
28  settlement, which is not to provide full compensation . . ., but to compensate class
   members for the value of their legal claims").

-22-                                              18-cv-00201-JLS-KES

FAZIO | MICHELETTI LLP
Attorneys

involving a Subject Vehicle, (4) property damage to the Subject Vehicle arising from Inverter or IPM failure, other than damage to the Inverter or IPM itself, or (5) subrogation." *Id.*

### 4.    *The Settlement Falls Within the Range of Possible Approval*

To determine whether a settlement falls within the range of approval for the purposes of preliminary approval, "the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on the Final Approval, after such time as any party has had a chance to object and/or opt out." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007) (italics in original).

At bottom, the parties' decision to submit the proposed settlement for Court approval reflects their informed consideration of the fact that it provides very real benefits conferred by the Settlement Agreement *now*, weighed against the risks and uncertainty of continuing to litigate this case. Bringing about a fair and reasonable resolution of this litigation and an end to the delay and expense of continuing it demonstrates the absence of any deficiencies in the Settlement Agreement, it augurs strongly in favor of preliminary approval. *E.g.*, *Officers for Justice,* 688 F.2d at 625.

### B.    **The Court Should Certify the Settlement Class**

#### 1.    *The Settlement Class Satisfies All Rule 23(a) Requirements*

##### a.    *Numerosity is Satisfied*

Rule 23(a)(1) requires that the class be so numerous, joinder of all would be "impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no fixed numerical threshold, "[i]n general, 'classes of forty or more are considered sufficiently numerous.'" *Tran v. Sioux Honey Ass'n, Coop.*, No. 8:17-CV-00110-JLS-SS, 2020 WL 905571, at *3 (C.D. Cal. Feb. 24, 2020) (internal citations omitted).  Here, the proposed settlement class consists of current and former owners and lessees of roughly 1.1 million Subject Vehicles. *See* ECF 164-45 at 1124 ¶ 3, ECF 164-48 at 1133 ¶ 3.

1    Thus, numerosity is satisfied.[15]

2                    **b.    *Commonality is Satisfied***

3          Rule 23(a)(2) requires that "there are questions of law or fact common to the

4    class." Fed. R. Civ. P. 23(a)(2). "All questions of fact and law need not be common to

5    satisfy the rule. The existence of shared legal issues with divergent factual predicates

6    is sufficient, as is a common core of salient facts coupled with disparate legal remedies

7    within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).

8    Quantitatively, "even a single question of law or fact common to the members of the

9    class will satisfy the commonality requirement." *Wal-Mart Stores, Inc. v. Dukes*, 564

10   U.S. 338, 369 (2011) (internal brackets and citations omitted). Qualitatively, the

11   inquiry is whether, at the proper time, the common question is "capable of classwide

12   resolution—which means that determination of its truth or falsity will resolve an issue

13   that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

14         Here, Plaintiffs' causes of action raise several questions common to the

15   settlement class, including but not limited to, the following: (1) whether Subject

16   Vehicles suffer from the IPM Defect; (2) whether Toyota knew or reasonably should

17   have known that the IPM defect existed before it sold or leased Subject Vehicles to

18   Class Members; (3) whether the information Toyota concealed is material; (4)

19   whether Toyota had a duty to disclose the IPM Defect; and (5) whether Toyota's

20   conduct violated California consumer protection statutes. *See* ECF 73 ¶ 151. These

21   shared legal and factual issues are more than sufficient to satisfy the commonality

22   requirement. *See, e.g.*, *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir.

23   2015) ("The district court correctly concluded that whether a defect existed and

24

25   _____

26   [15] The class definition in the operative Complaint included only the vehicles that were subject to Safety Recalls E0E, F0R, and J0V *see* ECF 73 ¶¶ 1, 147-48, whereas the Class defined in the Settlement Agreement includes the vehicles that

27   were the subject of Safety Recall 20TA10 as well, *see* SA § II ¶ 47. Expanding the Class is entirely appropriate in the context of a settlement. *See, e.g., McRary v.*

28   *Elations Co, LLC,* 2015 WL 12746707, *1, 5 (C.D. Cal. Aug. 31, 2015).



1  whether Ford had a duty to disclose the defect were both questions common to the

2  class under Rule 23(a)(2)")"; *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168,

3  1172 (9th Cir. 2010) (commonality "easily satisf[ied]" where claims "involve the

4  same alleged defect, covered by the same warranty, and found in vehicles of the same

5  make and model").

6  ### d.  *Typicality is Satisfied*

7  Rule  23(a)(3) requires that "the claims or defenses of the representative parties

8  are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The test

9  for typicality "'is whether other members have the same or similar injury, whether the

10  action is based on conduct which is not unique to the named plaintiffs, and whether

11  other class members have been injured by the same course of conduct.'" *Hanon v.*

12  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation omitted).

13  Typicality does not require that the representatives' claims be identical, but only that

14  they are "reasonably co-extensive with [the claims] of absent class members." *Hanlon*,

15  150 F.3d at 1020. The named Plaintiffs and Class Members each owned or leased a

16  Subject Vehicle during the relevant timeframe; each Subject Vehicle suffers from the

17  same IPM defect; and the named Plaintiffs' claims arise from the same set of facts and

18  legal issues as the claims of other Class Members. As a result, the Settlement Class

19  satisfies typicality under Rule 23(a)(3). *See, e.g.,* ECF 73 ¶¶ 30-34, 36, 38-41.

20  ### e.  *Adequacy of Representation is Satisfied*

21  "Adequacy" requires that a class representative "fairly and adequately protect

22  the interests of the class." Fed. R. Civ. P. 23(a)(4). Two questions are relevant to the

23  analysis: "(1) Do the representative plaintiffs and their counsel have any conflicts of

24  interest with other class members, and (2) will the representative plaintiffs and their

25  counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at

26  957. Here, the answers to these questions are "No" and "Yes," respectively.

27  *First*, for the reasons discussed in Section II.B1.d., above, the named Plaintiffs'

28  interests do not conflict with those of other Class Members. *See* ECF 162-1, 162-2,

-25-

FAZIO | MICHELETTI LLP

1    162-5, 162-6.

2        **Second**, Plaintiffs have retained experienced class-action counsel who have no

3    conflicts with class members. *See generally* Fazio Decl. ¶¶ 3-15 & Ex. B; Declaration

4    of Declaration of Amnon Z. Siegel in Support of Motion for Preliminary Approval of

5    Settlement ("Siegel Decl.") ¶¶ 3-15 & Ex. 1. *See also* ECF 74 (order appointing

6    Interim Co-Lead Class Counsel). To assess counsel's adequacy, the Court must

7    consider the following factors:

8        '(i) the work counsel has done in identifying or investigating potential

9        claims in the action; (ii) counsel's experience in handling class actions,

10       other complex litigation, and the types of claims asserted in the action;

11       (iii) counsel's knowledge of the applicable law; and (iv) the resources that

12       counsel will commit to representing the class.'

13   Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

14       Interim Co-Lead Class Counsel have decades of experience successfully

15   litigating class actions and/or other forms of complex litigation, including a successful

16   jury trial involving the same defect at issue in the present action. *See* Fazio Decl. ¶¶

17   3-15 & Ex. B; Siegel Decl. ¶¶ 3-15 & Ex. 1. Counsel have also devoted considerable

18   time effort, and resources to the prosecution of this lawsuit since its inception, and

19   will continue to devote the necessary resources and diligence required to bring this

20   action to a successful conclusion. *See* Fazio Decl. ¶¶ 18a-aa; Siegel Decl. ¶ 9.

21   Accordingly, Plaintiffs respectfully submit that adequacy is satisfied.

22       **2.      The Proposed Settlement Class Satisfies the Requirements of**

23               **Rule 23(b)**

24       A settlement class may be certified if the proponent demonstrates that common

25   questions "predominate over any questions affecting only individual members." Fed.

26   R. Civ. P. 23(b). The ultimate question in that regard is "'whether proposed classes

27   are sufficiently cohesive to warrant adjudication by representation." *Wolin*, 617 F.3d

28   at 1172 (citation and internal quotation marks omitted). Thus, "[w]hen common

1  questions present a significant aspect of the case and they can be resolved for all

2  members of the class in a single adjudication, there is clear justification for handling

3  the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d

4  at 1022 (citation and internal quotation marks omitted).

5  Here, the settlement Class is comprised of current and former owners and

6  lessees of two nearly identical lines of hybrid vehicles; namely 2010 to 2015 model-

7  year Prius hatchbacks and 2012 to 2017 model-year Prius *v* wagons that were the

8  subject of Safety Recalls E0E, F0R, J0V, and/or 20TA10. *See* SA at 13 ¶ 47 (defining

9  "Subject Vehicles"). All Subject Vehicles are equipped with virtually the same hybrid

10 Inverter assemblies and the same ECU software and, as Toyota itself made clear when

11 it conducted Safety Recalls J0V and 20TA10, all Subject Vehicles were recalled for

12 the same reason: to install the Updated Recall Software to eliminate the safety risks

13 posed by the IPM defect. *See generally* ECF 164-46, 164-48. Moreover, each of

14 Plaintiffs' fraud-based claims are based on the same conduct: Toyota's uniform failure

15 to disclose the existence of the IPM defect. Thus, the proposed settlement Class is

16 clearly cohesive and their claims can be resolved on a representative, rather than on

17 an individual, basis.

18 Accordingly, the predominance standard prescribed by Rule 23(b)(3) is satisfied.

19 Rule 23's superiority requirement tests whether "the class action is the most

20 efficient and effective means of resolving the controversy. Where recovery on an

21 individual basis would be dwarfed by the cost of litigating on an individual basis, this

22 factor weighs in favor of class certification." *Wolin*, 617 F.3d at 1175-76 (internal

23 citations omitted). Whether a class action is superior to other available methods for

24 the fair and efficient adjudication of the controversy involves an assessment of the

25 following factors: (a) the class members' interest in individually controlling separate

26 actions; (b) the extent and nature of any litigation concerning the controversy already

27 begun by or against class members; (c) the desirability or undesirability of

28 concentrating the litigation of the claims in the particular forum; and (d) the likely

1   difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).[16]

2   Here, the cost to replace a defective Inverter can exceed $3,000. *See* ECF 165-

3   1 ¶ 33. While this amount is material to an individual consumer, it is not nearly enough

4   to justify the enormous cost of litigating an individual case against Toyota, which

5   possesses virtually unlimited resources to defend such an action. *See, e.g.*, *Amchem*

6   *Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the

7   class action mechanism is to overcome the problem that small recoveries do not

8   provide the incentive for any individual to bring a solo action prosecuting his or her

9   rights") (citation and internal quotation marks omitted). Indeed, according to Toyota,

10  this is why there are no cases involving the IPM defect pending in any other

11  jurisdiction.   These facts support a determination that Class Members have no

12  incentive to individually control the prosecution of separate actions, thereby satisfying

13  Rule 23(b)(3)(A) and 23(b)(3)(B), and the remaining criteria relate to the

14  manageability of a litigation class, which is inapplicable to the certification of a

15  settlement class because, "by definition, there will be no trial." *In re Hyundai & Kia*

16  *Fuel Econ. Litig.*, 926 F. 3d at 556. Accordingly, superiority is met as well.

17  **C.**   ***Interim Lead Class Counsel and the Proposed Class Representatives***

18  ***Should Be Appointed for the Settlement Class***

19  "An order that certifies a class action . . . must appoint class counsel under Rule

20  23(g)." Fed. R. Civ. P. 23(c)(1)(B). For the reasons set forth in Sections III.A.3 and

21  III.B.1.e, above, Plaintiffs respectfully request that this Court appoint Interim Co-Lead

22  Class Counsel, Jeffrey L. Fazio and Dina E. Micheletti of Fazio | Micheletti LLP and

23  Amnon Z. Siegel of Miller Barondess LLP, as Class Counsel pursuant to Rule

24

25  _____

26  [16] *See also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001). "[C]onsideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Id.* at 1190. *See also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (finding the superiority requirement satisfied where granting class certification "will reduce litigation costs and promote greater efficiency").

27

28

1  23(g)(1), and appoint Plaintiffs Ryan-Blaufuss, Cathleen Mills, Kuan, Kosareff, and

2  Nawaya as Class Representatives.

3       **D.     *The Proposed Class Notice Distribution Plan and Content Satisfies***

4            ***Due Process and Rule 23***

5       The parties propose that the Court approve their selection of Jeanne Finegan of

6  Kroll Notice Media ("Kroll") as Settlement Notice Administrator, and to approve the

7  parties' proposed Class Notice plan, as set forth in the Settlement Agreement. *See* SA

8  § IV; Declaration of Jeanne C. Finegan ("Finegan Decl."), Ex. B.[17]

9       The Court must "direct notice in a reasonable manner to all class members who

10 would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). With respect to the

11 ***method*** of notice, individual notice is required only as to those "[class] members who

12 can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Indeed, there

13 is no statutory or due process requirement that all Class Members actually receive

14 notice. *See, e.g., Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (Rejecting

15 argument that due process requires actual receipt of notice: "We therefore conclude

16 that the appropriate question remains, as we put it in *Victor Technologies,* 'what notice

17 is reasonably certain to inform the absent members of the plaintiff class,' and the

18 appropriate standard is the 'best notice practicable' . . .) (citations omitted). Where

19 individual notice to all is impracticable, publication notice may be the best notice

20 practicable.  *E.g.*, *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

21      The parties' proposed Class Notice distribution program includes, but is not

22 limited to, ***both*** first-class Direct Mail Notice ***and*** Publication Notice, thus it easily

23 satisfies due process and subparagraphs (c) and (e) of Rule 23. As Kroll explains, "the

24 direct mail outreach alone is estimated to reach at least 78% of targeted Class

25 Members residing in the 50 United States and the District of Columbia. When

26

27 ───────────────

28      [17] Kroll's proposed duties are described in the Settlement Agreement. *See* SA
§§ III.D.4-5, III.E.1., IV.



combined with the publication outreach, this notice program is estimated to reach at least 92% of this target audience over 3 times." *See* Finegan Decl., Ex. B at 3. Publication Notice is also distributed via "a mix of newspaper, magazines, online display, social media and press releases to target Class Members in the United States and the United States Territories of American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands." *See id. a*t 13.   Following is a summary of the Class Notice distribution program.[18]

• **Direct Mail Notice (SA, Exs. 6-7)**.  Kroll will provide Class Members with Direct Mail Notice in the form of postcards sent by first-class mail to all current and former owners and lessees of Subject Vehicles, whose contact information will be provided by IHS Markit (formally R.L. Polk & Co), using vehicle identification numbers supplied by Toyota.[19]  *See* Finegan Decl., Ex. B at 2.[20]  Prior to mailing, all addresses will be checked against the National Change of Address ("NCOA") database. *See id*. Additionally, Kroll will employ various methods to try to locate addresses for mail returned as undeliverable, and re-mail such Notices prior to the Fairness Hearing.  *See id*.

• **Publication Notice (SA, Ex. 8)**.  Kroll will cause the summary Publication Notice to appear one time in each of the following publications: *People Magazine*,

---

[18] Kroll will provide notice of the proposed Settlement to appropriate state and federal government officials pursuant to the requirements of CAFA, 28 U.S.C. § 1715(b).  *See id.*, Ex. B at 6. Additional details are set forth in the Settlement Agreement and in the Finegan Declaration. *See* SA at 29-36; Finegan Decl., Ex. B.

[19] The postcards vary slightly because, as discussed above, some Class Members have been identified as eligible to receive Redistribution Checks in the event such checks are issued. Accordingly, those Class Members will be sent a postcard notifying them that they need not do anything to claim a possible Redistribution Check. *See* SA, Ex. 6. All other Class Members will receive a postcard advising them that, if they believe they are entitled to a Redistribution Check, they must submit a Registration and Reimbursement Claim Form. *See* SA, Ex. 7.

[20] The Direct-Mail Notice and Publication Notice will advise Class Members of the ability to obtain Spanish-language copies of the Direct Mail Notice and Long Form Notice. *See* SA, Exs. 6-8.



*Time Magazine*, the Los Angeles Edition of *USA Today*, *Samoa News* (American Samoa), *Pacific Daily News* (Guam), *Saipan Tribune* (Mariana Islands), and *El Nuevo Dia* (Puerto Rico), and others. *See* Finegan Decl., Ex. B at 3-5.[21]

• **Long Form Notice (SA, Ex. 4)**. The parties have prepared a detailed Long Form Notice, which will be available for download on the Settlement Website (discussed below). Kroll will also send the Long Form Notice by first-class mail to persons who request it. *See* SA § IV.E.

• **Online Display/Banner Advertising and Social Media**. Display ads will be targeted to people who have been identified as Prius owners through the use of cutting edge technology and data. *See* Finegan Decl., Ex. B at 4-5. Among other things, an algorithm will be used to show a specific ad to a specific visitor in a specific context where Class Members are visiting across an "allowed" list of approximately 4,000 websites. *See id.* at 4. Social media and display ads will run in the United States and United States Territories, and, if possible, will include popular Prius websites. *See id. at 1-2.* Additionally, social media ads will follow the targeted Class Members' social media journey across users' newsfeeds, stories and videos. *See id.* at 4. Display and social media ads will also target the intended audience through re-targeting, or reminder ads for those who visit the settlement website. *See id.* at 4-5.

• **Settlement Website**. Kroll will also establish a dedicated, interactive settlement website at www.toyotapriusInvertersettlement.com. *See id*. at 5-6. This website will serve as an important component of the notice program, while also performing other essential functions, such as providing a place where Class Members can electronically submit Registration and Reimbursement Claim Forms; seek answers to questions about the proposed Settlement; obtain litigation updates and

---

[21] A press release will also be issued over PR Newswire's U.S.1, Guam, Puerto Rico, U.S. Virgin Island and Pacific Islands Newslines. PR Newswire distributes to thousands of print and broadcast newsrooms, as well as websites, databases and online services including featured placement in the news sections of leading portals. *See id.* at 5.



relevant dates; download case materials, including court documents and orders; obtain information about the ongoing Customer Confidence Program and the Loaner/Towing Program for the duration of those programs; and download appeal forms in the event such coverage is denied.  *See id.* & SA at 31-32.[22]  The website will also serve as a landing page for the banner advertising.  *See* Finegan Decl., Ex. B at 6.  To ensure the settlement website remains active and responsive to search queries throughout the duration of the Customer Confidence Program and Loaner/Towing Program, it shall be subject to search-engine optimization.  *Id.*

- **Toll-Free Number**.  Kroll will establish and maintain a toll-free number staffed by personnel who are trained to respond to questions about the settlement, answer questions about the status of submitted claims, how to submit a claim, and other material aspects of the Settlement.  *See* SA at 33-34 & Finegan Decl., Ex. B at 6.  Live operators will be available Monday through Friday, from 5:00 am to 5:00 pm, PST.  *See* Finegan Decl., Ex. B at 6.  The phone number will also be configured to enable callers to leave a message after hours, which will be returned by the Settlement Notice Administrator on the next business day.  *See id*. Further, Kroll can receive calls transferred by Toyota for callers that have questions related to the Settlement, and Kroll will have the ability to transfer callers to Toyota for non-settlement related questions. *See id.*[23]

With respect to the ***content*** of class notice, it is sufficient if it "adequately apprise[s] class members of all material elements of the settlement agreement."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012). Moreover, notice must provide the following information, in "plain, easily understood language" describing

---

[22] Each Class Member who is mailed a direct notice will receive a unique identifier to use with the website.  See Finegan Decl., Ex. B at 6.

[23] Toyota is also obligated to take affirmative, reasonable steps to ensure that its customer service personnel and all Toyota dealerships are sufficiently notified of and educated about the terms of the Loaner/Towing Program and the Customer Confidence Program. *See* SA at 22.



1   (i) the nature of the action; (ii) the definition of the class certified; (iii) the

2   class claims, issues, or defenses; (iv) that a class member may enter an

3   appearance through an attorney if the member so desires; (v) that the

4   court will exclude from the class any member who requests exclusion;(vi)

5   the time and manner for requesting exclusion; and (vii) the binding effect

6   of a class judgment on members under Rule 23(c)(3).

7   Fed. R. Civ. P. 23(c)(2)(B). In addition, the notice must inform the class of class

8   counsel's request for an award of attorneys' fees and reimbursement of costs. Fed. R.

9   Civ. P. 23(h)(1).

10   Like the proposed distribution plan, the content of the proposed Class Notices

11   satisfies all requirements of Rule 23 and due process. The parties have drafted four

12   versions of the Class Notices:  The Long-Form Notice, two slightly different versions

13   of Direct-Mail Notice in the form of summary postcards, and a summary Publication

14   Notice. *See* SA, Exs. 4 & 6-8, respectively. The various versions differ in the amount

15   of detail they provide (with the Long Form Notice providing the most complete

16   information), but ***all*** versions of the Class Notices are written in plain English and

17   inform Class Members about the nature of the action; the amount of the Settlement

18   Fund; the definition of the settlement Class; the right to object or opt-out; the right to

19   appear at the Final Fairness Hearing; the fact that the Settlement will be legally

20   binding unless a Class Member opts out; and the amount of fees and costs sought by

21   Class Counsel.  *See id*. Thus, the Class Notices satisfy Rules 23(c)(2)(B) and 23(h)(1).

22   Additionally, each version of the summary notices (Direct-Mail Notice and

23   Publication Notice) direct Class Members to the dedicated settlement website, where

24   they can download or call a toll-free number to obtain a copy of the Long Form Notice,

25   which contains more detailed information about the proposed settlement and a copy

26   of the release.  *See* SA, Exs. 6-8.

27   Plaintiffs respectfully submit that the proposed Class Notice content and

28   distribution plan as described in the Settlement Agreement and in the Finegan

1    Declaration meet the requirements of due process and Rule 23, and constitute the best

2    notice practicable under the circumstances, thus warrant preliminary approval.

3        E.    *The Court Should Issue a Preliminary Injunction to Avoid Confusion,*

4              *Protect the Interests of the Class and the Court's Jurisdiction*

5        Federal courts have long recognized that injunctions against parallel actions are

6    appropriate in the context of complex litigation, where "[t]he threat to the federal

7    court's jurisdiction posed by parallel state actions is particularly significant where

8    there are conditional class certifications and impending settlements in federal actions."

9    *In re Diet Drugs*, 282 F.3d 235, 236 (3d Cir. 2002) (affirming issuance of an

10   injunction, after conditional certification and before the fairness hearing, to prevent

11   the mass opt out of class members pursuing a parallel Texas state court action).[24]

12       To avoid confusion and to protect the rights and interests of Class Members, as

13   well as its own jurisdiction, the Court should issue a preliminary injunction pending

14   final approval of the settlement to enjoin Class Members and their representatives

15   from pursuing claims that are similar to those alleged in the Amended Consolidated

16   Master Complaint. ECF 73.

17       Pursuant to the "necessary in aid of" exception to the Anti-Injunction Act, 28

18   U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651(a), pending the Court's

19   determination of whether the Settlement Agreement should be given final approval

20   this Court may (i) issue a preliminary injunction and stay all other actions and (ii)

21   enjoin potential Class Members from challenging in any action or proceeding any

22   matter covered by the proposed settlement, except for proceedings in this Court to

23   determine whether the Settlement Agreement will be finally approved. The "necessary

24

25   ───────────────

26   [24] *See also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp.
     450, 487–88 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *In re Baldwin-United*
     *Corp.*, 770 F.2d 328, 338 (2d Cir. 1985); *In re Linerboard Antitrust Litig.*, 361 Fed.
27   Appx. 392, 395 (3d Cir. 2010); *Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-
     CA-00912-FB, 2015 WL 11623393, at *6 (W.D. Tex. Oct. 21, 2015); *In re Diet*
28   *Drugs*, 282 F.3d at 235.

**PLAINTIFFS' MPAS ISO UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

1  in aid of" exception to the Anti-Injunction Act also allows a federal court to effectively

2  prevent its jurisdiction over a settlement from being undermined by pending parallel

3  litigation in state courts. *See, e.g. Stratton v. Glacier Ins. Admin'rs, Inc.*, No.

4  1:02CV06213 OWWDLB, 2007 WL 274423, at *1 (E.D. Cal. Jan. 29, 2007).[25]

5       Injunctive relief is appropriate where, as here, the parties have reached a

6  nationwide settlement and competing actions, if they are filed and/or allowed to

7  proceed, could jeopardize and/or interfere with the Court's ability to manage the

8  settlement, and potentially confuse Class Members. *Jacobs*, 2009 WL 1201996, at *3.

9  The present circumstances warrant the Court's issuance of a preliminary injunction

10 pursuant to the All Writs Act and an exception to the Anti-Injunction Act. If

11 preliminarily approved, notice will be disseminated to the Class and will discuss Class

12 Members' rights with respect to the proposed settlement.  The rights and interests of

13 Class Members and the jurisdiction of the Court will be impaired if, during the notice

14 period, parallel actions alleging virtually identical claims to those asserted in the

15 instant action were allowed to proceed. It is imperative that Class Members be allowed

16 to evaluate their options under the settlement without receipt of potentially confusing

17 competing notices or communications.

18 **IV.   CONCLUSION**

19      Plaintiffs respectfully request that the Court grant this motion, authorize Notice,

20 and set the schedule described at pages 15 and 16 of Exhibit 5 to the Settlement

21 Agreement for the process of final approval.

22

23

24
_____

25     [25] This Court also has the authority to issue the requested injunction under the

26 All Writs Act, 28 U.S.C. § 1651(a), which permits a federal district court to protect its jurisdiction by enjoining parallel actions by class members that would interfere with the court's ability to oversee a class action settlement. *See, e.g. Hartranft v. TVI, Inc.*,

27 No. 8:15-CV-01081-CJC-DFM, 2019 WL 1746137, at *6 (C.D. Cal. Apr. 18, 2019); *Jacobs v. CSAA Inter-Ins.*, No. 3:07-CV-00362-MHP, 2009 WL 1201996, at *2-3

28 (N.D. Cal. May 1, 2009).



1   DATED:  December 4, 2021    FAZIO | MICHELETTI LLP

2

3                    by    /s/ *Jeffrey L. Fazio*

4                  Jeffrey L. Fazio
                   Dina E. Micheletti

5                  **FAZIO | MICHELETTI LLP**
                   1111 Broadway, Suite 400

6                  Oakland, CA 94607
                   T: 925-543-2555

7                  F: 925-369-0344

8                  **MILLER BARONDESS, LLP**

9                    by    /s/ *Amnon Z. Siegel*

10                Amnon Z. Siegel
                   Casey B. Sypek

11                **MILLER BARONDESS, LLP**
                   1999 Avenue of the Stars, Suite 1000

12                Los Angeles, California 90067
                   T: (310) 552-4400

13                F: (310) 552-8400

14                *Interim Co-Lead Class Counsel*

15                Paul R. Kiesel (119854)
                   (kiesel@kiesel.law)

16                Jeffrey A. Koncius (189803)
                   (koncius@kiesel.law)

17                Nicole Ramirez (279017)
                   (ramirez@kiesel.law)

18                **KIESEL LAW LLP**
                   8648 Wilshire Boulevard

19                Beverly Hills, CA 90211-2910
                   T: 310-854-4444

20                F: 310-854-0812

21                Charles J. LaDuca (*pro hac vice*)
                   (charles@cuneolaw.com)

22                Michael J. Flannery (196266)
                   (mflannery@cuneolaw.com)

23                **CUNEO GILBERT & LADUCA, LLP**
                   4725 Wisconsin Ave. NW, Suite 200

24                Washington. D.C. 20016
                   T: 202-789-3960

25                F: 202-789-1813

26                Donald R. Pepperman (109809)
                   (dpepperman@waymakerlaw.com)

27                Emily R. Stierwalt (323927)
                   (estierwalt@waymakerlaw.com)

28                **WAYMAKER LLP**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
T: 424-652-7804
F: 424-652-7850

William M. Audet (117456)
(waudet@audetlaw.com)
Clint Woods (246054)
(cwoods@audetlaw.com)
David Kuang (296873)
(lkuang@audetlaw.com)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
T: 415-568-2555
F: 415-568-2556

*Attorneys for Plaintiffs*