Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA 94607
T: 925-543-2555
F: 925-369-0344

Louis R. Miller (54141) (smiller@millerbarondess.com)
Amnon Z. Siegel (234981) (asiegel@millerbarondess.com)
Casey B. Sypek (291214) (csypek@millerbarondess.com)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

*Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN RYAN-BLAUFUSS, CATHLEEN MILLS, and KHEK KUAN,<br><br>Plaintiffs,<br><br>*v.*<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES USA, INC., and DOES 1-10, inclusive,<br><br>Defendants. | No. 8:18-cv-00201-JLS-KES<br><br>**NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**<br><br>**DATE**: January 13, 2023<br>**TIME**: 10:30 a.m.<br>**PLACE**: Courtroom 10A<br><br>Hon. Josephine L. Staton |
| STEVEN KOSAREFF and LAURA KAKISH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>*v.*<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES USA, INC., and DOES 1-10, inclusive,<br><br>Defendants. | |



## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that at 10:30 a.m. on January 13, 2023, or as soon thereafter as the matter may be heard by the Honorable Josephine L. Staton at Courtroom 10A of the United States District Court for the Central District of California, Southern Division, 411 West Fourth Street, Santa Ana, California, 92701, Plaintiffs in the above-captioned consolidated class actions will and hereby do move the Court pursuant to Federal Rule of Civil Procedure ("Rule") 23 for an order (1) awarding attorneys' fees and litigation expenses to Class Counsel; and (2) approving service awards for each of the Plaintiffs who have been appointed as Class Representatives in this action.

This motion is brought pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2), the Order Granting Motion for Preliminary Approval of Class Settlement (ECF 233), and the proposed Settlement Agreement with Defendants Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc. (collectively, "Toyota").

Plaintiffs base this motion on this Notice of Unopposed Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Settlement Agreement, the Declarations of Jeffrey L. Fazio, Dina E. Micheletti, Amnon Z. Siegel, William Audet, Jeffrey Koncius, Donald Pepperman, Michael Flannery, Kirk Kleckner, Kathleen Ryan-Blaufuss, Cathleen Mills, Khek Kuan, Steven Kosareff, and Laura Nawaya (nee Kakish), and the exhibits appended thereto, any of the evidence on file with the Court, any additional evidence that may be introduced in support of this motion during the hearing, and on such other written and oral argument presented to the Court.

DATED: September 27, 2022    **FAZIO | MICHELETTI LLP**

by /s/ *Jeffrey L. Fazio*
Jeffrey L. Fazio

Jeffrey L. Fazio (146043)
Dina E. Micheletti (184141)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA  94607



T:   925-543-2555
F:   925-369-0344

**MILLER BARONDESS, LLP**

by /s/ *Amnon Z. Siegel*
      Amnon Z. Siegel

Louis R. Miller (54141)
Amnon Z. Siegel (234981)
Casey B. Sypek (291214)
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
T: (310) 552-4400
F: (310) 552-8400

*Co-Lead Class Counsel*



# GLOSSARY OF TERMS[1]

| Term | Description |
|------|-------------|
| Audet Decl. | Declaration of William M. Audet in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| *Bhandari* case | *Bhandari v. Toyota Motor Sales U.S.A., Inc.*, No. 2:18-cv-06184-JLS-KES (C.D. Cal.) |
| DIR | Defect Information Report (filed with NHTSA in connection with Safety Recalls) |
| ECF | Electronic Case Filing system docket citations (*e.g.,* ECF 1 refers to docket entry No. 1) |
| ECU | Electronic Control Unit, which sends power transistor actuation signals to the boost converter in the IPM |
| Ex. | Exhibits appended to the Fazio Decl., unless otherwise indicated |
| Fazio Decl. | Declaration of Jeffrey L. Fazio in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Flannery Decl. | Declaration of Michael J. Flannery in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| IGBT | Insulated-Gate Bipolar Transistor, a power semiconductor used primarily as an electronic switch in the boost converters of IPMs in Subject Vehicles |
| Inverter | Hybrid inverter with converter assembly, which is a key component of the Toyota Hybrid System II |
| IPM | Intelligent Power Module, the "electronic brain" of Toyota hybrid vehicles, which is housed in the Inverter |
| Kleckner Decl. | Declaration of Kirk Kleckner |
| Koncius Decl. | Declaration of Jeffrey A. Koncius in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |

---

[1] All capitalized terms used herein that do not appear in the Glossary of Terms have the same meaning as those defined in the Settlement Agreement. *See* ECF 219-2 at 6-14 § II.



| TERM | DESCRIPTION |
|---|---|
| Kosareff Decl. | Declaration of Steven Kosareff in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Kuan Decl. | Declaration of Khek Kuan in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| *McCarthy* case | *McCarthy v. Toyota Motor Corp.*, No. 8:18-cv-0201-JLS-KES (C.D. Cal.) |
| Micheletti Decl. | Declaration of Dina E. Micheletti in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Mills Decl. | Declaration of Cathleen Mills in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Nawaya Decl. | Declaration of Laura Nawaya (nee Kakish) in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| NHTSA | National Highway Traffic Safety Administration |
| Pepperman Decl. | Declaration of Donald R. Pepperman in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| *Rexhepi* case | *Rexhepi v. Toyota Motor Sales U.S.A., Inc.*, No. BC692528 (Cal. Super. Ct., Los Angeles Cty.) |
| Ryan-Blaufuss Decl. | Declaration of Kathleen Ryan-Blaufuss in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Siegel Decl. | Declaration of Amnon Z. Siegel in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards |
| Subject Vehicles | 2010 to 2015 model year Prius hatchbacks, and 2012 to 2017 model year Prius *v* wagons that were the subject of Safety Recall E0E, F0R, J0V, and/or 20TA10 |
| WEP | Warranty Enhancement Program, which Toyota issued in connection with Safety Recall E0E (WEP ZE3), Safety Recall F0R (WEP ZF5), and Safety Recall TA10 (WEP 20TE10) |



# **TABLE OF CONTENTS**

PAGE

NOTICE OF MOTION ...................................................................................... i

GLOSSARY OF TERMS ................................................................................. iii

I.     INTRODUCTION ..................................................................................1

II.    SUMMARY OF PERTINENT FACTS...................................................2

    A.     SAFETY RECALLS E0E AND F0R ..............................................2

    B.     SAFETY RECALL J0V ...................................................................

    C.     SAFETY RECALL 20TA10 ............................................................

    D.     SETTLEMENT NEGOTIATIONS .....................................................

III.   ARGUMENT ........................................................................................11

    E.     THE AWARD OF ATTORNEYS' FEES RECOMMENDED BY THE SPECIAL MASTER IS FAIR AND REASONABLE, REGARDLESS OF THE METHOD USED TO CALCULATE IT  .................................11

        1.     The Monetary Value of the Settlement Benefits Exceeds $180 Million ..........................................................................14

        2.     The Fee Award Recommended by the Special Master is Fair and Reasonable Under the Percentage Method  .................15

            a.     *Class Counsel Achieved Excellent Results for the Class*..........................................................17

            b.     *The Tremendous Risks and Challenges Posed by Continued Litigation Also Support the Proposed Fee* ......17

            c.     *The Proposed Fee Award is Well Below the 25%, Which Demonstrates That It is Fair and Reasonable* .......19

            d.     *The Contingent Nature of Class Counsel's Recovery Supports the Proposed Award* .............................19

            e.     *The Burdens Class Counsel Faced Support the Proposed Award*..................................................20

        3.     A Lodestar Cross-Check Confirms That the Proposed Fee Award is Fair and Reasonable  .................................20

    F.     THE SERVICE AWARD REQUESTED FOR EACH CLASS REPRESENTATIVE IS FAIR AND REASONABLE ..........................................................24

IV.    CONCLUSION .....................................................................................25



1

## <u>TABLE OF AUTHORITIES</u>

2

<span style="float:right">**PAGE**</span>

### *Cases*

3

*Alyeska Pipeline Serv. Co. v. Wilderness Soc.,*
421 U.S. 240 (1975) ................................................................................ 16

4

*Ballen v. City of Redmond.*
466 F.3d 736 (9th Cir. 2006) ................................................................ 22

5

6

*Blum v. Stenson,*
465 U.S. 886 (1984)................................................................................ 24

7

*Buckhannon Board & Home Care, Inc. v. W. Va. Dept. of Health and Human Servs.,*
532 U.S. 598 (2001)................................................................................ 13

8

9

*City of Shreveport v. Louisiana Proteins Inc.,* No. CV 08-00342,
2008 WL 11387104 (W.D. La. June 17, 2008) .................................... 15

10

*Close v. Sotheby's, Inc.,*
909 F.3d 1204 (9th Cir. 2018).............................................................. 11

11

12

*Edwards v. First Am. Corp.,* No. CV0703796SJOFFMX,
2016 WL 8999934 (C.D. Cal. Oct. 4, 2016)........................................ 26

13

*Edwards v. Ford Motor Co.,* No. 11CV1058–MMA,
2016 WL 1665793 (S.D. Cal. Jan. 22, 2016),
*aff'd* 727 F. App'x 233 (9th Cir. 2018)............................................... 15

14

15

*Farrell v. Bank of Am. Corp., N.A.,*
827 F. App'x 628 (9th Cir. 2020) ........................................................ 13

16

17

Feller v. Transamerica Life Ins. Co.. No. 16-CV-01378-CAS (GJSx),
2019 WL 6605886 (C.D. Cal. Feb. 6, 2019) ...................................... 27

18

*Graham v. Capital One Bank (USA), N.A.,* No. SACV1300743JLSJPRX,
2014 WL 12579806 (C.D. Cal., Dec. 8, 2014) .................................... 17

19

20

*Graham v. DaimlerChrysler Corp.,*
34 Cal. 4th 553 (2004) ......................................................................... 13

21

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998),
*overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)........................................................................ 16, 22

22

23

*Hartless v. Clorox Co..*
273 F.R.D. 630 (S.D. Cal. 2011) ......................................................... 18

24

25

*Hensley v. Eckerhart,*
461 U.S. 424 (1983)........................................................................ 12, 22

26

*Herrera v. Wells Fargo Bank, N.A.,* No. 818CV00332JVSMRW,
2021 WL 9374975 (C.D. Cal. Nov. 16, 2021)..................................... 27

27

28



*Hurtado v. Rainbow Disposal Co.*, No. 817CV01605JLSDFM,
2021 WL 2327858 (C.D. Cal. May 21, 2021) ............................................. 26

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ....................................................... 12, 16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST,
2017 WL 5969318 (N.D. Cal. Feb. 28, 2017) ............................................. 17

*In re Hyundai & Kia Fuel Economy Litigation*,
926 F.3d 539 (9th Cir. 2019) ......................................................... 20

*In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC,
2019 WL 6877477 (N.D. Cal. Dec. 17, 2019) ............................................. 24

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW,
2017 WL 6040065 (N.D. Cal. Dec. 6, 2017),
*aff'd*, 768 F. App'x 651 (9th Cir. 2019) ............................................... 21

*In re Online DVD-Rental*,
779 F.3d 934 (9th Cir. 2015) ........................................... 17, 19, 20

*In re Philips/Magnavox Television Litig.*, No. CIV.A. 09-3072 CCC,
2012 WL 1677244 (D.N.J. May 14, 2012) ................................................ 24

*In re Prudential Ins. Co. Am. Sales Practice Litig.*,
148 F.3d 283 (9th Cir. 1998) ......................................................... 27

*In re Vitamins Antitrust Litig.*.
398 F. Supp. 2d 209 (D.D.C. 2005) .................................................... 18

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) ......................................................... 21

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
845 F. App'x 563 (9th Cir. 2021) .................................................... 20

*Ingram v. Oroudiian*.
647 F.3d 925 (9th Cir. 2011) ......................................................... 25

*Keegan v. Am. Honda Motor Co, Inc.*, No. CV1009508MMMAJWX,
2014 WL 12551213 (C.D. Cal. Jan. 21, 2014) ........................................... 11

*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975) .......................................................... 22

*Laffitte v. Robert Half Int'l Inc.*,
1 Cal. 5th 480 (2016) ................................................................ 12

*MacDonald v. Ford Motor Co.*,
142 F. Supp. 3d 884 (N.D. Cal. 2015) ................................................. 15

*Makaeff v. Trump Univ., LLC*, No. 10CV0940 GPC WVG,
2015 WL 1579000  (S.D. Cal. Apr. 9, 2015) ............................................ 26

*Marshall v. Northrop Grumman Corp.*, No. 16-CV-6794 AB (JCX),
   2020 WL 5668935 (C.D. Cal. Sept. 18, 2020),
   *appeal dismissed,* No. 20-56096,
   2021 WL 1546069 (9th Cir. Feb. 16, 2021) ................................................ 26

*Parkinson v. Hyundai Motor Am.*.
   796 F. Supp. 2d 1160 (C.D. Cal. 2010) ........................................................ 27

*Risto v. Screen Actors Guild*,
   No. 2:18-cv-07241-CAS-PLA (C.D. Cal. Nov. 6, 2018) ........................... 26

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................ 28

*Silveira v. M&T Bank*, No. 2:19-CV-06958-ODW-KS,
   2021 WL 4776065 (C.D. Cal. Oct. 12, 2021) .............................................. 27

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ...................................................................... 17

*Skinner v. Ken's Foods, Inc.*,
   53 Cal. App. 5th 938 (2020) ......................................................................... 13

*Spann v. J.C. Penney Corp.*,
   211 F. Supp. 3d 1244 (S.D. Cal. 2016) ................................................. 12, 27

*Stanger v. China Elec. Motor, Inc.*,
   812 F.3d 734 (9th Cir. 2016) ........................................................................ 14

*Steiner v. Am. Broad. Co.*.
   248 F. App'x 780 (9th Cir. 2007) ................................................................. 27

*Trew v. Volvo Cars of N. Am., LLC,* No. 05-cv-1379-RFB,
   2007 WL 2239210 (E.D. Cal. July 31, 2007) ............................................. 15

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   896 F.2d 403 (9th Cir. 1990) ........................................................................ 25

*Vandervort v. Balboa Cap. Corp.*,
   8 F. Supp. 3d 1200 (C.D. Cal. 2014) ........................................................... 27

*Viceral v. Mistras Group, Inc*., No. 15-cv-02198-EMC,
   2017 WL 661352 (N.D. Cal. Feb. 17, 2017) ............................................... 28

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ............................................................. passim

*Woodland Hills Residents Assn., Inc. v. City Council*,
   23 Cal. 3d 917 (1979) ................................................................................... 13



1

### *Statutes*

2

49 U.S.C. § 30102(a)(9) ............................................................................. 1

3

Cal. Code Civ. Proc. § 1021.5 ................................................................... 13

4

5

### *Other Authorities*

6

Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (4th ed. 2004) ....... 12

7

### *Rules*

8

Fed. R. Civ. P. 23(a) .................................................................................. i

9

Fed. R. Civ. P. 23(h) ................................................................................ 11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MPAS ISO MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS



## I.      INTRODUCTION

As the Settlement Special Master has found, Class Counsel's efforts on behalf of the Class catalyzed two automotive recalls that eliminated serious safety risks in well over a million Subject Vehicles, protecting their drivers from the "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(9). The monetary value of this extraordinary benefit exceeds $90 million. In addition, Class Counsel negotiated a settlement that concluded nearly five years of hard-fought litigation that produced additional benefits: a $20 million non-reversionary, evergreen settlement fund; a Customer Confidence Program that provides 20 years of extended warranty coverage that significantly expands the nature and scope of existing coverage; a Towing/Loaner Program for Subject Vehicles that require an IPM or Inverter repair or replacement; and a complementary rental car if the repair or replacement requires more than four hours to complete; and, in the event that the settlement fund is not exhausted notwithstanding all efforts to distribute any residual to Settlement Class Members, distribution *cy pres* to Texas A&M University's Transportation Institute.

In sum, Class Counsel's efforts have produced more than $180 million in monetary and non-monetary benefits. Pursuant to the Special Master's recommendation following a mediation session that occurred after the parties had reached agreement on the material terms of the settlement, Class Counsel seek an award of $19,000,000 in fees and $600,000 in litigation expenses, which is ***less than*** the amount of hard costs Class Counsel actually incurred in this litigation. Class Counsel also respectfully request that the Court approve service awards to each Class Representative in the amount of $5000 in recognition of their service to and hard work on behalf of the Class. Toyota has agreed to pay Plaintiffs' fees and costs and the service awards separately, thus they will not reduce any of the benefits available to the Class.

At bottom, Class Counsel and each Class Representative have truly earned the awards that the Special Master has recommended, which Toyota has agreed to pay,

1   and the amounts of those awards are fair and reasonable, regardless of the method

2   used to assess them. Accordingly, Class Counsel respectfully request that the Court

3   grant this motion.

4   **II.      RELEVANT PROCEDURAL HISTORY**

5       **A.      SAFETY RECALLS E0E AND F0R**

6       In the DIRs Toyota submitted to NHTSA in February 2015 and July 2015,

7   Toyota explained that it was recalling over 700,000 2010 to 2014 model-year Prius

8   hatchbacks in Safety Recall E0E and nearly an additional 110,000 2012 to 2014

9   model-year Prius *v* wagons in Safety Recall F0R, respectively. *See* Ex. 1 at 2 ¶ 3;

10   Ex. 2 at 2 ¶ 3. Toyota conducted both recalls for the same reason: the IPMs—a

11   critical component of those vehicles' Inverters—were malfunctioning and failing

12   due to thermal stress, which caused those vehicles to suddenly decelerate or stall

13   while being driven (the "IPM defect").

14       Rather than replacing the IPMs or Inverters in those vehicles, however,

15   Toyota claimed that replacing the software that governs the vehicles' ECU would

16   solve the problem. *See* Ex. 1 at 3-4 ¶¶ 6-7; Ex. 2 at 2-4 ¶¶ 6-7. Several months after

17   each of these recalls, Toyota announced a WEP that provided the owners of the

18   vehicles subject to Safety Recalls E0E and F0R with cost-free replacement of IPMs

19   and Inverters if they displayed certain Diagnostic Trouble Codes when presented for

20   repair. *See generally* Exs. 3-4.

21       In short, Toyota was offering to provide a cost-free correction of a safety

22   defect only ***after*** it became manifest while driving the affected vehicle ran counter

23   to the very purpose of a safety recall—to eliminate the defect ***before*** it can do harm.

24   Accordingly, after offering Toyota an opportunity to correct the problem, *see* Exs.

25   5-6, Class Counsel filed a class-action complaint in the Superior Court for Los

26   Angeles County on January 31, 2018 (the *Rexhepi* case), *see* Fazio Decl. ¶ 25, and a

27

28

1  class-action complaint in the *McCarthy* case with this Court on February 5, 2018,
2  ECF 1.[2]

3  On February 6, 2018, only days after the litigation began, Toyota distributed
4  a bulletin to advise its dealers throughout the United States about news reports
5  concerning "class-action lawsuits and specific concerns related to the effectiveness
6  of the remedy for Safety Recalls E0E and F0R; involving the Prius and Prius V" and
7  to instruct them to tell the owners of those vehicles "that ***the Safety Recall remedy***
8  ***addresses the safety defect. It is designed to ensure that the vehicle will enter a***
9  ***fail-safe driving mode in the unlikely event of an intelligent power module***
10 ***failure***." Ex. 7 at 1 (emphasis added).

11 In July 2018, Toyota moved to dismiss the *McCarthy* complaint and to strike
12 portions of it. ECF 22-23. The *McCarthy* Plaintiffs vigorously opposed both
13 motions, ECF 26-27, and the parties appeared for a hearing after Toyota replied,
14 ECF 28-31, 33. The Court denied the motion to strike and granted in part and denied
15 in part the motion to dismiss with leave to amend. ECF 35. On October 5, 2018, the
16 Court consolidated the *McCarthy* and *Bhandari* cases. ECF 38.

17 **B.   SAFETY RECALL J0V**

18 The same day (October 5)—in a complete reversal of the position it had taken
19 in the February dealer bulletin—Toyota announced that the vehicles that were the
20 subject of Safety Recalls E0E and F0R continued to pose a safety risk due to the

21

22

23 [2] Before and after the *Rexhepi* case was filed, Class Counsel expended a substantial
amount of time researching and analyzing publicly available information pertaining
to Toyota's awareness of the IPM defect well before it began selling third-generation
24 Prius hybrids to consumers. Fazio Decl. ¶¶ 20-23. During the initial case
management conference in the *Rexhepi* case on July 13, 2018, however, the court
25 announced its intention to stay the action until the federal litigation was finally
resolved, notwithstanding that the *Rexhepi* case had been filed first. *Id.* ¶ 33.
26 Accordingly, the *Rexhepi* case was voluntarily dismissed, *Id.* Class Counsel filed an
action with this Court on behalf of another Prius owner as well as Mr. Rexhepi
27 together with a Notice of Related Case on July 17, 2018, and the case was transferred
to Judge Staton for consolidation with *McCarthy* on July 18, 2018. *See Bhandari*
28 case, ECF1-2, 6-7, 12.

defective nature of the ECU software that had been installed during those recalls, and that it was recalling those vehicles for a second time in Safety Recall J0V because they "*may not enter a failsafe driving mode as intended. If this occurs, the vehicle could lose power and stall*." *See* ECF 164-47 at 1. According to Toyota, when the ECU software became available in Safety Recall J0V, it would prevent sudden deceleration and stalling due to excessive thermal stress and would enable the vehicles to enter an improved set of fail-safe modes, allowing them to continue being driven up to 60 miles per hour even after an IPM malfunction or failure. *See id.*; ECF 164-46 ¶¶ 2-3, 5, 7.

Plaintiffs remained deeply skeptical that Toyota had corrected the safety risk with another software update, however, for two basic reasons. First, Toyota had made the same assurances when it updated the ECU software in Safety Recalls E0E and F0R. *See* Fazio Decl. ¶¶ 38, 42. Second, the new J0V software ("Updated Recall Software") was supposed to have eliminated the safety defect by replacing the defective ECU software Toyota had installed in the E0E and F0R recalls, but Toyota chose not to install the Updated Recall Software in hundreds of thousands of 2013 to 2015 model-year Prius and 2014 to 2017 model-year Prius *v* vehicles, even though appeared to be equipped with the same defective ECU software that Toyota installed during Safety Recalls E0E and F0R and, thereafter, on the production line in later model-year Prius and Prius *v* vehicles. *See id.* ¶¶ 49-54.

Thus, when Toyota moved to dismiss Plaintiffs' consolidated complaint in January 2019, ECF 44, Plaintiffs noted that Toyota had "finally admitted that the software reflash did not work[,]" yet "urge[d] the Court to take its word that ***another*** software reflash, which it announced last October (before the software had even been developed), will address the ongoing safety risks posed by defective IPMs." ECF 56 at 2:3-5 (emphasis in original). The Court granted Toyota's motion to the extent that it dismissed Plaintiffs' express-warranty and trespass-to-chattels claims with leave to amend, but denied the motion as to all other claims. *See generally* ECF 59.

1  Rather than attempting to revive the claims that were dismissed, Plaintiffs
2  continued to focus on determining why later model-year Prius hatchbacks and Prius
3  *v* wagons—and indeed, certain of the ***same*** 2013 and 2014 model-year vehicles—
4  had been excluded from Safety Recalls E0E and F0R, and were excluded again from
5  Safety Recall J0V, even though all vehicles appeared to be virtually identical. Fazio
6  Decl. ¶¶ 49-54.[3]

7  Class Counsel discussed the matter with Toyota's counsel in early 2020, who
8  confirmed that ***all*** 2010 to 2015 model-year Prius hatchbacks and 2012 to 2017
9  model-year Prius *v* wagons had been equipped with the same ECU software that
10  Toyota installed in Safety Recalls E0E and F0R before Safety Recall J0V was
11  conducted. *See* ECF 113-21 ¶¶ 14-18. When asked about the hundreds of thousands
12  of later model-year vehicles that were excluded from the J0V recall, however,
13  Toyota's counsel could not explain why nothing was done to replace the defective
14  ECU software in those vehicles. *See id*. Nonetheless, Toyota confirmed that fact (and
15  others) in response to formal requests for admission in March 2020. *See* ECF 113-
16  25 at 3-4 (Nos. 1-4).

17  **C.   SAFETY RECALL 20TA10**

18  In May 2020, Toyota filed a motion to compel arbitration. ECF 109. A month
19  later, Toyota announced that it was conducting yet another recall relating to Prius
20  Inverters, Safety Recall 20TA10, to replace the defective ECU software in the
21  vehicles Toyota had not included in Safety Recall J0V, *see* Ex. 10 at 2 ¶ 5; Toyota
22  also issued another WEP (20TE10) that extended the warranty coverage for those
23  vehicles, *see* Ex. 11. Thus, Toyota claimed that, like the Updated Recall Software
24  installed in Safety Recall J0V, the Updated Recall Software installed in Safety

25

26  _____
   [3] Plaintiffs' efforts to determine the true nature and scope of the IPM defect began
27  at the outset of this litigation with the assistance of engineering experts, including
   Michael G. Pecht, Ph.D., and continued. *See id.* ¶¶ 4-6, 22, 30. Plaintiffs submitted
28  Dr. Pecht's report, which describes the product of much of that work, in support of
   their motion for class certification. *See generally* ECF 173-3.

Recall 20TA10 eliminated the safety risk in those vehicles and extended warranty coverage for the IPMs and inverters to 15 years with no mileage limitation. *Compare* Ex. 1 at 4 ¶ 7 *and* Ex. 2 at 4 ¶ 7 *with* Ex. 10 at 5 ¶ 7.

Toyota initiated settlement discussions in late June 2020, just prior to announcing Safety Recall 20TA10. Fazio Decl. ¶ 60. Negotiations proceeded sporadically, however, for two reasons: (1) there could be no settlement without proof that the Updated Recall Software functioned as Toyota claimed; and (2) the litigation not only continued unabated, but became even more intensive. *Id.*

For example, in addition to preparing their opposition to Toyota's motion to compel arbitration (which the Court denied in late October 2020, *see* ECF 131), Class Counsel had to devise a set of procedures that would allow Plaintiffs to obtain necessary discovery despite the inability to take depositions of Toyota's Japan-based personnel as a result of domestic shelter-in-place rules and international travel restrictions stemming from the COVID-19 pandemic, as well as stipulations and a proposed order by which the Scheduling Order was modified to enable the implementation of these discovery procedures, *see* ECF 126-130.

Accordingly, Plaintiffs served Toyota with dozens of interrogatories, multiple sets of requests for admissions, and nearly two dozen sets of document requests by which Plaintiffs sought (among other things) information concerning the efficacy of the updated ECU software Toyota installed in connection with Safety Recalls J0V and 20TA10. *See, e.g.,* Fazio Decl. ¶¶ 61, 72.h. Although the purpose of the stipulations was to simplify, expedite, and avoid disputes over discovery while preparing for class certification, *see* ECF 128-129, disputes over that discovery arose nonetheless, making it necessary to prepare and file discovery motions and attend

conferences before Magistrate Judge Scott to resolve the disputes, *see, e.g.,* ECF 132, 135-137, 145, 149-152, 154-55, 180, 203.[4]

For similar reasons, Plaintiffs also prepared an *ex parte* application to continue the class-certification briefing schedule and related deadlines after Toyota advised Plaintiffs that it needed several more months to produce the information Plaintiffs sought in discovery. *See* ECF 147. The Court granted the *ex parte* application on January 19, 2021, extending the deadline to file the class-certification motion to April 9, 2021. *See* ECF 153 at 1. But Toyota had yet to produce much of that information, including that pertaining to the efficacy of the J0V/20TA10 ECU software, when Plaintiffs filed their motion for class certification (ECF 162-168). *See* Fazio Decl. ¶¶ 49, 62.

### D. SETTLEMENT NEGOTIATIONS

During all of this, Class Counsel also sought to negotiate a settlement. *Id.* ¶¶ 40-67. The parties made little progress during the first several months of negotiations, but eventually they decided that the assistance of a special master might help to get beyond the impasse, and in November 2020 they agreed that

---

[4] In short, the efforts made to prosecute this action have been sizeable, and include, but are not limited to, the following: extensive investigation of the underlying facts, including Toyota's pre-sale knowledge of the IPM defect; drafting and analyzing the responses to 17 sets of document demands, multiple sets of specially-prepared interrogatories for each named Plaintiff/Class Representative, and three sets of requests for admissions; responding to five sets of interrogatories from Toyota; issuing document subpoenas to third parties and responding to the subpoenas Toyota served on Plaintiffs' experts; reviewing hundreds of thousands of pages of documents produced by Toyota, in addition to a large volume of documents obtained as a result of investigation efforts by Plaintiffs' counsel; engaging in myriad, lengthy meet-and-confer sessions pertaining to nearly every set of discovery requests; engaging in discovery motion practice; researching and analyzing an array of legal and technical issues presented by this litigation, which included working with engineers and other experts retained by Plaintiffs' counsel in connection with the preparation of pleadings, briefs in support of and in opposition to various motions, and reports submitted to the Court in support of class certification, and assessing the reports prepared by Toyota's experts in opposition to class certification; deposing Defendants' expert, Sarah Butler; preparing for and defending the depositions of each of the five named Plaintiffs and three Plaintiffs' experts, Michael Pecht, Stephen Boyles, and Christopher Nosalek; and engaging in confirmatory discovery with the assistance of Plaintiffs' experts. *See, e.g.*, Fazio Decl. ¶ 72.



1    Patrick Juneau possessed the skills and experience required. *Id.* ¶ 46-52. The parties
2    submitted a stipulation and proposed order appointing Mr. Juneau as Settlement
3    Special Master. *See* ECF 134, 143. The Court granted the request in February 2021.
4    ECF 160.

5        Months of difficult negotiations followed, which were guided not only by
6    Toyota's insistence that the Updated Recall Software eliminated the safety risk
7    posed by the IPM defect, but by its admission that the Updated Recall Software
8    would not reduce the potential for IPM or Inverter malfunction. Fazio Decl. ¶¶ 62-
9    68. In other words, IPMs and Inverters could still malfunction and require
10   replacement even though the new fail-safe mode included in the Updated Recall
11   Software eliminated the risk of sudden deceleration and stalling. *Id.* Ultimately, the
12   parties agreed to the following essential terms, albeit with the understanding that a
13   final agreement was not possible until Plaintiffs had proof of the Updated Recall
14   Software's efficacy:

15   •    Toyota would deposit $20 million into a non-reversionary settlement
16        fund, which would reimburse Class Members who paid to repair or
         replace an IPM or Inverter, towing and/or a rental car, with any funds
17        that remain after all claims are paid to be distributed to Class Members
         who had to replace an IPM or Inverter in a Subject Vehicle;[5]

18   •    Toyota would provide cost-free towing if a Subject Vehicle requires an
19        IPM or Inverter repair or replacement and a complimentary rental car
         if the repair or replacement requires more than four hours to complete;
20        and

21   •    Toyota would establish a "Customer Confidence Program" by which

22        o    all Class Members, subsequent purchasers and/or transferees of
23             Subject Vehicles receive warranty coverage under the relevant
               WEP for 20 years from the date of the Subject Vehicles' First
24             Use;

25   _____

     [5] Despite the parties' best efforts, it was not possible to determine with any degree
26   of accuracy the number of IPMs and Inverters that had been replaced at Class
     Members' expense by third-party service providers. Fazio Decl. ¶¶ 53-55. Therefore,
27   the parties agreed that Toyota would make an initial deposit of $20 million into a
     non-reversionary fund and, if the fund were exhausted before all claims were paid,
28   Toyota would increase the fund by the amount necessary to pay all valid claims. *See*
     ECF 219-2 § III.A.3.-4.



o     IPMs are repaired and replaced at no cost, regardless of whether they display any of the four DTCs listed in the WEPs;

o     Inverters that experience a Thermal Event will be repaired or replaced at no cost, regardless of whether they display any of the four DTCs listed in the WEPs;

o     Inverters will be repaired or replaced at no cost if the Subject Vehicle displays one of the four DTCs enumerated in the WEPs plus DTCs P0A7A and P0A78.

*See* ECF 219-2 § III.

Having reached agreement as to the material terms of a settlement, the parties mediated the issues pertaining to attorneys' fees, litigation, and service awards with the assistance of the Special Master. *See* ECF 219-2 at 45 § VIII.A. By then, Plaintiffs had incurred thousands of hours of attorney and paralegal time. As a result of those efforts, Class Counsel was able to negotiate a settlement that produced a $20 million non-reversionary restitutionary fund in addition to conferring a variety of warranty-related benefits on Class Members.

In addition, Class Counsel's efforts caused the litigation itself to confer an extraordinary, even more valuable benefit: *two* Safety Recalls (J0V and 20TA10), which eliminated the safety risk in 1,084,999 Subject Vehicles. *Id*. The Special Master found that "Safety Recalls J0V and 20TA10 have achieved the primary relief Plaintiffs sought in the Litigation, and that the Litigation was a catalyst in Toyota providing that relief, as well as an extended warranty (WEP 20TE10) that extends coverage to 20 years from first use with no mileage limitation, which has been modified to provide additional benefits by virtue of the Settlement Agreement the parties negotiated." ECF 219-2, Ex. 10 at 2.

Although the monetary value of the warranty-related benefits had yet to be determined at that point, the value of the two Safety Recalls was readily quantifiable: installing the Updated Recall Software in nearly 1.1 million vehicles that were subject to Safety Recalls J0V and 20TA10 cost Toyota an average of $85 per vehicle, hence the monetary value of this benefit alone exceeds $90 million. *See* Fazio Decl.

¶ 51, 74 & Ex. 12 at 2; Ex. 9 at 2 ¶ 3; ECF 10 at 2 ¶ 3.[6] Thus, when they considered the value of the Updated Recall Software in light of their lodestar (which was close to $8 million at that time) and the $89 million value of the settlement benefits (including the $20 million settlement fund), Class Counsel concluded their fee request was justified, whether calculated by the lodestar-multiplier method or by applying the Ninth Circuit's 25% benchmark to only part of the settlement's monetary value. *See* Fazio Decl. ¶ 74.

Ultimately, the Special Master proposed a $19,000,000 award of attorneys' fees, $600,000 for litigation expenses, and $5,000 service awards for each named Plaintiff/Class Representative. *See* ECF 219-2 at 45 § VIII.A. The parties agreed to the Special Master's proposal. *Id.* The parties also agreed that, to the extent that the Court awards less than the requested amount of attorneys' fees, the difference will not return to Toyota; rather, it will be distributed to Class Members. *Id.*[7]

At the time the parties sought a mediator's proposal from the Settlement Special Master, Plaintiffs had incurred hundreds of thousands of dollars in litigation expenses (*e.g.*, process-server fees, filing fees and other court-related expenses,

---

[6] Rates of completion for Safety Recalls J0V and 20TA10 are 74% and 81%, respectively, thus Toyota has expended $69,138,951.55 to date on the installation of Updated Recall Software. *See* Fazio Decl. ¶ 75 at 24 & n. 1.

[7] Although the parties managed to agree on the essential terms of a settlement, the agreement could not be made final in the absence of hard evidence that the Updated Recall Software Toyota installed in Safety Recalls J0V and 20TA10 performed as Toyota claimed it did. Fazio Decl. ¶¶ 66-67. Consequently, even after the parties reached agreement in principle, Class Counsel continued to seek relevant information through their own research and continued to review and analyze the evidence obtained in discovery with the assistance of Plaintiffs' experts. *Id.* It was not until Toyota filed its opposition to class certification that Plaintiffs obtained the results of its Updated Recall Software testing—which showed that J0V/20TA10 software prevented sudden deceleration and stalling and allowed the vehicles to continue traveling at speeds of more than 60 miles per hour, regardless of whether an IGBT malfunctioned or failed. *Id.* ¶ 67. The agreement became final after Toyota confirmed under penalty of perjury that the software eliminated the safety risk posed by the IPM defect and that Toyota is unaware of any evidence that a 2010 to 2015 Prius hatchback or 2012 to 2017 Prius *v* wagon equipped with the J0V/20TA10 software that was unable to travel ~60 miles per hour after entering fail-safe mode. *Id.*; ECF 164-50; ECF 219-2 at 6 § I.T.



copying costs, expert and consultant fees), but did not expect the total amount to exceed $600,000. *Id.* As it turned out, Plaintiffs have incurred more than that amount ($632,460.45) to date. *See* Siegel Decl. ¶ 33. Class Counsel also incurred additional out-of-pocket expenses that they paid themselves, not through the litigation fund. *See id.* ¶ 43; Micheletti Decl. ¶ 71 & Ex. B; Audet Decl. ¶ 21 & n. 6 & Ex. E; Flannery Decl. ¶ 7 & Ex. 3; Koncius Decl. ¶ 9 & Ex. C; Pepperman Decl. ¶ 18 & Ex. 2. Class Counsel is nonetheless limiting their request for reimbursement of litigation expenses to $600,000.

## III.   ARGUMENT

### A.   THE AWARD OF ATTORNEYS' FEES RECOMMENDED BY THE SPECIAL MASTER IS FAIR AND REASONABLE, REGARDLESS OF THE METHOD USED TO CALCULATE IT

In a class-action settlement, a court may award reasonable attorney's fees and costs as authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). "In class actions, statutory provisions and the common fund exception to the 'American Rule' provide the authority for awarding attorneys' fees." *Keegan v. Am. Honda Motor Co, Inc.*, No. CV1009508MMMAJWX, 2014 WL 12551213, at *19 (C.D. Cal. Jan. 21, 2014). In cases that are based on diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332, and raise claims under California state law, California law governs the method of calculating attorney fees. *Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1208 (9th Cir. 2018)).

In California, "[t]wo primary methods of determining a reasonable attorney fee in class action litigation have emerged and been elaborated in recent decades. The percentage method calculates the fee as a percentage share of a recovered common fund or the monetary value of plaintiffs' recovery. The lodestar method, or more accurately the lodestar-multiplier method, calculates the fee by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 489 (2016) (cleaned up). *See also Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1262–63 (S.D. Cal. 2016) (discussing

1    same). Thus, in the Ninth Circuit, "[c]ourts may use two methods to calculate

2    attorneys' fees: the lodestar method or the percentage-of-recovery method." *In re*

3    *Facebook Biometric Info. Priv. Litig.*, No. 21-15553, 2022 WL 822923, at *1 (9th

4    Cir. Mar. 17, 2022).

5        Under both methods, "the most critical factor is the degree of success

6    obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also In re Bluetooth*,

7    654 F.3d at 942 ("Foremost among these considerations . . . is the benefit obtained

8    for the class."); Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION at 336

9    § 27.71 (4th ed. 2004) (the "fundamental focus is on the result actually achieved for

10   class members").

11       Here, the results achieved for class members are truly extraordinary. As

12   discussed above, the principal purpose of this litigation was to rectify Toyota's

13   failure to correct a safety defect in more than a million Prius hybrid vehicles that

14   continued to have a propensity to suddenly decelerate or completely stall while being

15   driven even after Toyota recalled them in 2014 and 2015. *See, e.g.,* ECF 73 ¶¶ 164,

16   226. Plaintiffs not only achieved that objective by causing Toyota to install Updated

17   Recall Software in every one of those vehicles in late 2018, they persisted until

18   Toyota installed Updated Recall Software in each and every one of the remaining

19   third-generation Prius hatchbacks and Prius *v* wagons on the road in mid-2020.

20       In short, Toyota decided to conduct Safety Recalls J0V and 20TA10 "'by

21   threat of victory, not by dint of nuisance and threat of expense.'" *Graham v.*

22   *DaimlerChrysler Corp.,* 34 Cal. 4th 553, 574 (2004) (quoting *Buckhannon Board &*

23   *Home Care, Inc. v. W. Va. Dept. of Health and Human Servs.,* 532 U.S. 598, 628

24   (2001) (Ginsburg, J., dissenting)). Thus, the Special Master found that this litigation

25   was the catalyst for Toyota's decision to conduct those safety recalls. *See* ECF 219-

26   2, Ex. 10 at 2. His finding has ample support from the law. *See, e.g., Graham,* 34

27   Cal. 4th at 572 ("it is difficult to fathom why a plaintiff cannot be considered a

28   prevailing or successful party when it achieves its litigation objectives by means of

1  defendant's 'voluntary' change in conduct in response to the litigation"); *see also id.*

2  at 565-66.[8]

3        Again, however, the results Class Counsel have achieved extend well beyond

4  catalyzing Safety Recalls J0V and 20TA10. Class Counsel negotiated an agreement

5  that requires Toyota reimburse every Class Member who paid for the repair or

6  replacement of an IPM or Inverter and for the cost of related towing and rental-car

7  expenses, which will be paid out of a $20 million fund that will increase to the extent

8  necessary to pay all valid claims; alternatively, if funds remain at the conclusion of

9  the reimbursement process, the remaining funds will be distributed *pro rata* to all

10  Class Members who had to repair or replace an IPM or Inverter—regardless of

11  whether the repair was covered under an existing warranty. *See* ECF 219-2 §

12  III.A.3.(c). And, to the extent that an IPM or Inverter should malfunction in a Subject

13  Vehicle in the future, Plaintiffs have ensured that the repair will be covered under a

14  far more generous warranty for 20 years from the Subject Vehicles' first purchase

15  ***and*** that those Class Members receive free towing and a free loaner vehicle if the

16  repair takes more than four hours. *Id.* § III.C.1.(a). Accordingly, the $19 million fee

17  award recommended by the Special Master is demonstrably fair and reasonable,

18  regardless of the method used to calculate it.

19

20  _____

21  [8] *See also id.* at 565-66 (finding that the private attorney general doctrine codified at California Code of Civil Procedure section 1021.5 is an essential tool for the

22  effectuation of "fundamental public policies embodied in constitutional or statutory provision . . . by providing substantial attorney fees to successful litigants in such

23  cases[,]" the court held that the catalyst theory serves "to determine whether the party was successful, and therefore potentially eligible for attorney fees"); *Farrell v.

24  Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) ("we do not struggle to conclude, as the district court did, that counsel 'generated benefits' far beyond the

25  cash settlement fund'"); *Skinner v. Ken's Foods, Inc.*, 53 Cal. App. 5th 938, 947-48 (2020) (rejecting contention that plaintiffs did not obtain primary relief when

26  defendant changed labels in false-advertising case in which plaintiffs' "primary" relief was economic); *Woodland Hills Residents Assn., Inc. v. City Council*, 23 Cal.

27  3d 917, 938 (1979) ("the trial court, utilizing its traditional equitable discretion (now codified in s 1021.5), must realistically assess the litigation and determine, from a

28  practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award under a private attorney general theory").



1. **The Monetary Value of the Settlement Benefits Exceeds $180,000,000**

As the Court explained in its order granting preliminary approval of the settlement,

> [t]he Ninth Circuit's benchmark for fees for common fund settlements is 25% of the total fund. *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016). Class Counsel's application for attorney fees must, therefore, make a sufficient showing justifying any upward departure from the Ninth Circuit's benchmark. This shall include quantifying the non-monetary benefits conferred upon the settlement Class.

ECF 233 at 28.

Plaintiffs do not request an upward departure from the Ninth Circuit's benchmark because the fee award recommended by the Special Master is substantially lower than 25% of the total value of the benefits conferred upon the settlement Class.

As discussed above, the Special Master found that this litigation catalyzed Toyota to conduct two separate Safety Recalls (J0V and 20TA10) for the purpose of installing the Updated Recall Software in 1,084,999 Subject Vehicles to eliminate the safety risks posed by the IPM defect. *See* ECF 219-2, Ex. 10.[9] Installing the Updated Recall Software cost Toyota an average of $85 per vehicle, *see* Ex. 12, which amounts to $92,224,915 for this benefit alone.[10]

---

[9] Indeed, Plaintiffs have established that the catalytic effect was due to the prospect of victory, but the litigation need only be a substantial causal factor, "not the sole cause of the defendant's conduct" in any event, *Edwards v. Ford Motor Co.*, No. 11CV1058–MMA, 2016 WL 1665793, at *5 (S.D. Cal. Jan. 22, 2016), *aff'd* 727 F. App'x 233 (9th Cir. 2018). *See also MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 891 (N.D. Cal. 2015); *Trew v. Volvo Cars of N. Am., LLC,* No. 05-cv-1379-RFB, 2007 WL 2239210, at *4 (E.D. Cal. July 31, 2007).

[10] When assessing the amount in controversy for purposes of diversity jurisdiction, some courts have held that the value of injunctive relief should be measured from

In addition, the Settlement Agreement establishes a $20 million non-reversionary cash fund and a Customer Confidence Program that provides Class Members with 20 years of warranty coverage for IPMs and Inverters that malfunction, free towing, and a free rental car if the repair takes four or more hours to complete. *See* ECF 219-2 § III.B. The monetary value of the Loaner/Towing Program and the Customer Confidence Program is $69 million, *see* Kleckner Decl. ¶ 6.d.i., which was assessed by an inherently conservative formula that assumes over 400,000 fewer Subject Vehicles will still be on the road at the end of the 20-year coverage period, *see* Kleckner Decl., Exs. C-D. Thus, the total value of the monetary and non-monetary benefits that Class Counsel's efforts have conferred upon the settlement Class is $181,224,915, and the recommended award of attorneys' fees is 10.49% of that amount.

### 2. The Fee Award Recommended by the Special Master is Fair and Reasonable Under the Percentage Method

Courts in the Ninth Circuit have applied the percentage method to monetary compensation as well as to non-monetary benefits where, as here, the monetary value of non-monetary benefits can be readily and accurately ascertained. *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 8:10ML 02151 JVS (FMOx), 2013 WL 12327929, at *29 & n.7 (C.D. Cal. July 24, 2013) ("*Toyota SUA*") (citing *Staton v. Boeing Co.*, 327 F.3d 938, 973-74 (9th Cir. 2003), and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)) (holding that plaintiffs' experts appropriately included non-

---

the plaintiff's perspective. *See City of Shreveport v. Louisiana Proteins Inc.*, No. CV 08-00342, 2008 WL 11387104, at *1 (W.D. La. June 17, 2008) ("the proper measure is the benefit or value to the plaintiff, not the cost to the defendant"). For the present purposes, Plaintiffs will use Toyota's cost as the basis for the Updated Recall Software's value rather than the presumably greater value to Settlement Class Members.



**MPAS ISO MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**

1  monetary benefits in calculating total value of common fund).[11]

2  As discussed above, the recommended fee of $19 million is 10.49% of the

3  $181,224,915 in monetary and non-monetary benefits conferred by Class Counsel's

4  efforts, which is well below the Ninth Circuit's 25% benchmark. Indeed, even if the

5  value of the benefits conferred on Settlement Class Members were to be cut *in half*,

6  an award of $19 million would still be considerably lower than the Ninth Circuit

7  benchmark. The fairness and reasonableness of this fee request is made even more

8  evident when assessed in light of the factors District Courts may consider when

9  assessing a fee award under the percentage method in the Ninth Circuit, such as the

10  results achieved for the class; the skill required to prosecute the action; the risk,

11  expense and complexity involved the risk of maintaining class certification and

12  prevailing at trial; and the contingent nature of the fee. *In re Online DVD-Rental*, 779

13  F.3d 934, 944 (9th Cir. 2015); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50

14  (9th Cir. 2002) (*en banc*).[12]

15

16

17

18  [11] *See also In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (attorneys' fees and litigation expenses may be awarded to a prevailing plaintiff

19  where "'the successful litigants have created a common fund for recovery or extended a substantial benefit to a class'") (quoting *Alyeska Pipeline Serv. Co. v. Wilderness*

20  *Soc.*, 421 U.S. 240, 275 (1975) (Brennan, J., dissenting)); *Graham v. Capital One Bank (USA), N.A.*, No. SACV1300743JLSJPRX, 2014 WL 12579806, at *3 (C.D.

21  Cal., Dec. 8, 2014) (Staton, J.) ("the amounts to be received by the Class under this Settlement are in addition to the significant results already attained, and the costs

22  and fees authorized by the Amended Agreement serve to reimburse counsel for achieving both this Settlement and the prior reimbursement. The Settlement

23  therefore offers a substantial benefit to the Class").

24  [12] Class Counsel have agreed that, unless the Court awards a specific amount to each firm, Co-Lead Class Counsel will allocate the award in a fair and equitable manner.

25  *See, e.g., Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (district courts need not specify counsel's share of common fund);

26  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 5969318, at *1 (N.D. Cal. Feb. 28, 2017) ("'[F]ederal courts . . . have recognized

27  that lead counsel are better suited than a trial court to decide the relative contributions of each firm and attorney'") (quoting *Hartless v. Clorox Co.*, 273

28  F.R.D. 630, 646 (S.D. Cal. 2011)); *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (same). Should the Court decide to allocate the award, Class Counsel respectfully request the opportunity to brief the issues.

### a. Class Counsel Achieved Excellent Results for the Class

As Plaintiffs explained more fully in their motion for preliminary approval, this litigation has provided Settlement Class Members with substantial monetary and non-monetary benefits above and beyond the significant benefits resulting from the two Safety Recalls the litigation catalyzed, including a $20 million non-reversionary evergreen fund that will satisfy *all* valid reimbursement claims for out-of-pocket expenses to repair or replace an IPM or inverter, related towing and rental car charges, and a simple and straightforward claims process. If funds remain after all claims are paid, Redistribution Checks will be sent to most of the recipients without the need to submit a Registration and Reimbursement Claim Form. The Customer Confidence Program provides fully-transferable and robust extended warranty coverage and the Loaner/Towing Program provides cost-free towing and free rental cars, and both programs will be implemented immediately after the Final Effective Date. The Notice Administrator and the Claims Administrator will answer Settlement Class Members questions, and an appeals process is available if settlement benefits are denied. Moreover, Toyota is paying all costs associated with settlement administration, the service awards to the Class Representatives, and Class Counsel's litigation expenses and attorneys' fees—and any amounts not awarded will revert to the Settlement Fund for distribution to Settlement Class Members, not to Toyota.

### b. The Tremendous Risks and Challenges Posed by Continued Litigation Also Support the Proposed Fee

The results described above were achieved despite the enormous risks, complexities, and challenges presented by this case, which also support the proposed fee award. *Online DVD*, 779 F.3d at 955. At the time the parties entered into the Settlement Agreement, Plaintiffs' motion for class certification was pending, ECF 162-168, 194, as was Toyota's motion for summary judgment, ECF 196, both of which present significant hurdles for Plaintiffs.

1    In short, Toyota continued to vigorously deny the factual allegations in the
2  operative complain, has denied any legal liability arising from Plaintiffs' claims with
3  equal vigor, and has asserted numerous defenses on the merits. For example, in
4  opposition to Plaintiffs' class-certification motion, Toyota argues that Plaintiffs will
5  be unable to prove with common evidence that the IPM defect exists in Subject
6  Vehicles, let alone that Toyota was aware of a defect before it began selling those
7  vehicles. ECF No. 194 at 12:17-17:17; *see also id.* at 15:11-14 ("[t]his Court has held
8  previously that 'each Plaintiff must allege facts to show that Toyota knew of the
9  inverter defect prior to his or her date of purchase'") (quoting ECF 35 at 6). Toyota
10 also challenged Plaintiffs' damages model, arguing, *inter alia*, that, it is "inherently
11 flawed" and fails to satisfy the certification requirements of *Comcast Corp. v.*
12 *Behrend*, 569 U.S. 27. (2013). ECF 194 at 22-29.[13]

13   If Toyota were to prevail on these arguments, it would dispose of some or all
14 the claims in this class action. And although Plaintiffs firmly believe that the claims
15 asserted in this action have substantial merit and are suitable for certification, and that
16 Plaintiffs would prevail at trial, recovery would be delayed for years (particularly in
17 light of the ongoing pandemic, which has caused significant delays in this litigation)
18 even if Plaintiffs were to prevail at trial and on appeal.

19   At bottom, class certification is never a certainty, and if certification were
20 denied, the likelihood that Class Counsel could obtain significant monetary or other
21 relief would decrease precipitously if it remained at all. Class Counsel's ability to
22 obtain the benefits—from the two Safety Recalls to the evergreen settlement fund and
23 ongoing warranty, towing, and rental car benefits—in the face of these risks only
24 underscores the propriety of the proposed fee award. *See, e.g., In re Wells Fargo &*

---

26 [13] Similarly, Toyota contended in its motion for summary judgment that the economic
27 loss rule bars Plaintiffs' fraudulent concealment claims, that Plaintiffs' implied
   warranty claim fails because their vehicles are fit for ordinary use, and that the
28 applicable statutes of limitations bars nearly all of Plaintiffs' claims. *See* ECF 196 at
   11-24.



*Co. S'holder Derivative Litig.*, 845 F. App'x 563, 564 (9th Cir. 2021).

### c.   The Proposed Fee Award is Well Below the 25%, Which Demonstrates That It is Fair and Reasonable

As discussed above, the fee award recommended by the Special Master is 10.49% of the value of the benefits Class Counsel have obtained for the settlement Class—which is well below the market rate for contingency representation reflected in the 25% benchmark. This, too, demonstrates that the proposed fee award is both fair and reasonable. *See, e.g., In re Hyundai & Kia Fuel Economy Litigation*, 926 F.3d 539, 571 (9th Cir. 2019) ("We have affirmed fee awards totaling a far greater percentage of the class recovery than the fees here"; citing awards ranging from 28% to 33% of the class's recovery).

### d.   The Contingent Nature of Class Counsel's Recovery Supports the Proposed Award

As the Ninth Circuit has explained, fairness dictates that the contingent nature of a fee must also be considered when awarding attorneys' fees because attorneys should be compensated for the contingent risk they have assumed. *E.g., Online DVD*, 779 F.3d at 954-55 & n.14; *Vizcaino*, 290 F.3d at 1050; *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

In the present case, Class Counsel have prosecuted Plaintiffs' claims on a purely contingent basis from the outset, with no retainer fees and no allowance for litigation expenses. Fazio Decl. ¶ 76. Although the contingent nature of Class Counsel's remuneration and recovery of hundreds of thousands of dollars in litigation expenses provided incentives to prevail by producing excellent results in an efficient manner, it also presented a serious risk that Class Counsel would not receive no compensation for their time and no reimbursement of the funds they expended on experts and other litigation-related items. *Id.* Such circumstances only serve to underscore why the fee award that the Special Master recommended is both fair and reasonable. *See, e.g., In re NCAA Grant-in-Aid Cap Antitrust Litig.*, No.

1   4:14-MD-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017) ("because
2   contingent fees are almost always determined as a percentage of the client's
3   recovery, such fees are necessarily aligned with and proportional to the results
4   achieved for that client—in short, the client only pays for what it gets. Lest
5   contingent fees disappear altogether, the law must recognize both sides of the
6   bargain—namely, a significant upside fee for successful contingent
7   representations"), *aff'd*, 768 F. App'x 651 (9th Cir. 2019).

8                    **e.     *The Burdens Class Counsel Faced Support the Proposed
                                Award***
9            Courts in the Ninth Circuit must consider the burdens encountered as a result
10   of the litigation, including the expense involved, the amount of time and effort
11   committed to the case, and the need to forego other work. *See, e.g., Vizcaino*, 290
12   F.3d at 1048-50. As explained in more detail below, Class Counsel have spent nearly
13   five years during which they have committed more than 11,000 hours for a lodestar
14   of $8,762,302 as of August 31, 2022, while spending more than $600,000 (to date)
15   out of their own pockets on expenses as well as foregoing other litigation
16   opportunities. Fazio Decl. ¶ 76.

17                **4.     A Lodestar Cross-Check Confirms That the Recommended
                           Fee Award is Fair and Reasonable**
18
19           The lodestar is calculated by multiplying the number of hours reasonably
20   expended on the litigation by a reasonable hourly rate. *Hensley*, 461 U.S. at 433;
21   *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006); *Paul, Johnson, Alston
22   & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). "The district court may then
23   adjust the resulting figure upward or downward to account for various factors,
24   including the quality of the representation, the benefit obtained for the class, the
25   complexity and novelty of the issues presented, and the risk of nonpayment." *In re
26   Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (citing *Hanlon*,
27   150 F.3d at 1029, and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.
28   1975)).

Class Counsel's declaration sets forth the hours of work and billing rates used to calculate the lodestar here, including a tabulation of the hours spent on various categories of activities related to this action, *see* Ex. 15, and each firm has provided detailed, unredacted billing records in Microsoft Excel format, as the Court has instructed. *See* Judge's Procedures ¶ 26, https://www.cacd.uscourts.gov/honorable-josephine-l-staton.

As mentioned above, as of the end of August 2022 Class Counsel had devoted 11,012.48 hours to this litigation for a total lodestar of $8,762,302. *See* Ex. 15. Those numbers will increase through the Final Approval Hearing and conclusion of settlement administration and, as mentioned above, expenses that exceed the agreed-upon $600,000 will be reimbursed out of the fee award.

Specifically, Class Counsel performed a considerable amount of work investigating and researching the facts and technical issues underlying this litigation with the assistance of experts before the first complaint was filed. *See, e.g.,* Fazio Decl. ¶¶ 9-11. The investigation and analysis remained ongoing post-filing. Among other things, Class Counsel prepared an in-depth analysis of the factual and legal issues involved in the litigation, which served as a roadmap for discovery and the analysis of documents produced in discovery; developed procedures to overcome the limitations on overseas deposition discovery imposed by the pandemic; propounded hundreds of interrogatories, requests for admissions, and requests for production; reviewed and analyzed (with and without the assistance of experts) nearly 200,000 pages of documents obtained in the course of discovery, in the context of various motions, and from online research; prepared and reviewed voluminous discovery-related correspondence; participated in numerous meet-and-confer sessions that frequently consumed hours of time, frequently over the course of several days; successfully opposed two motions to dismiss and a motion to compel arbitration; researched and drafted a motion for class certification;  and motions to

1  resolve discovery disputes; defending Class Members and Plaintiffs' experts in

2  deposition and deposing Toyota's expert (Sarah Butler). *Id.* ¶ 72.a.-ff.[14]

3  At bottom, the number of hours Class Counsel have billed is reasonable in

4  light of the sheer volume of work performed over the course of nearly five years of

5  litigation and the objectives Class Counsel achieved through that effort. It also pales

6  in comparison to the amount of time approved in other automobile-defect class

7  actions. *See, e.g., In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC,

8  2019 WL 6877477, at *1 (N.D. Cal. Dec. 17, 2019) (66,189.15 hours, reported at

9  ECF No. 527 at 7:10).

10  Class Counsel's hourly rates are also reasonable. Class Counsel have decades

11  of experience in class actions and other forms of complex litigation, and their hourly

12  rates are "in line with those prevailing in the community for similar services by

13  lawyers of reasonably comparable skill, experience and reputation." *Blum v.*

14  *Stenson*, 465 U.S. 886, 895 n. 11 (1984). "Affidavits of the plaintiffs' attorney and

15  other attorneys regarding prevailing fees in the community, and rate determinations

16  in other cases, particularly those setting a rate for the plaintiffs' attorney, are

17  satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v.*

18  *Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). *See also Ingram v.*

19  *Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding that "the district court did

20  not abuse its discretion either by relying, in part, on its own knowledge and

21  experience" to determine reasonable hourly rates); *Vizcaino*, 290 F.3d 1043, 1051

22

23

24  [14] Class Counsel anticipate conducting significant uncompensated work following
this filing. In addition to responding to possible objectors and preparing for and
presenting Plaintiffs' position at the Final Approval Hearing and addressing any

25  appeals, Class Counsel will continue to oversee the administration of the settlement
and respond to questions or issues raised by Class Members. *See In re*

26  *Philips/Magnavox Television Litig.*, No. CIV.A. 09-3072 CCC, 2012 WL 1677244,
at *17 (D.N.J. May 14, 2012) (recognizing that time submitted in connection with a

27  fee petition filed before final approval "does not include the fees and expenses . . .
expended after [that date] on tasks such as preparing for and appearing at the fairness

28  hearing").



1  (9th Cir. 2002) ("Class counsel here have represented that they would not have taken

2  this case other than on a contingency basis. They perform little work on an hourly

3  basis, and the rates they submitted were what they took to be market rates, in other

4  words, rates that did not already reflect an expectation of excellent results").

5  The hourly rates sought by Class Counsel are consistent with the rates charged

6  by class counsel in other cases, *see* Audet Decl. ¶ 14 & Ex. D (ranging from $150

7  for paralegal to $995 for partner); Flannery Decl. ¶ 4 & Ex. 1 (ranging from $175

8  for paralegal to $950 for partner); Koncius Decl. ¶ 5 & Ex. A (ranging from $395

9  for associate to $1,400 for partner); Micheletti Decl. ¶ 66 ($795 and $895 for

10  partners); Pepperman Decl. ¶ 15 (ranging from $295 for legal assistant to $945 for

11  partner); Siegel Decl. ¶ 27 (ranging from $350 for paralegal to $1,300 for partner);

12  and with the rates discussed the Real Rate Report, *see* Ex. 13 (listing 2020 plaintiffs'

13  hourly rates for complex litigation in Los Angeles between $410 and $650 for

14  50.57% of those surveyed, and between $901 and $1,000 for 5.74% of those

15  surveyed).[15]

16  District Courts throughout California have found hourly rates similar to those

17  charged by Class Counsel to be reasonable and appropriate. *See, e.g., Hurtado v.*

18  *Rainbow Disposal Co.*, No. 817CV01605JLSDFM, 2021 WL 2327858, at *6 (C.D.

19  Cal. May 21, 2021) (rates of up to $900 per hour reasonable); *Marshall v. Northrop*

20  *Grumman Corp.*, No. 16-CV-6794 AB (JCX), 2020 WL 5668935, at *7 (C.D. Cal.

21  Sept. 18, 2020) ($490 and $1,060 per hour reasonable), *appeal dismissed,* No. 20-

22  56096, 2021 WL 1546069 (9th Cir. Feb. 16, 2021); *Alikhan v. Goodrich Corp.*, 2020

23  WL 4919382, at *8 (C.D. Cal. June 25, 2020) (rates of up to $950 per hour

24

25  [15] *See also RG Abrams Ins. v. L. Offs. of C.R. Abrams*. No.
26  221CV00194FLAMAAX, 2022 WL 3133293, at *47 n. 13 (C.D. Cal. July 1, 2022)
   ("The information provided by the Real Rate Report is persuasive because, rather
27  than using self-reported rates aggregated across all practice areas throughout the
   country, as appear in other surveys, it reflects actual legal billing through paid and
28  processed invoices disaggregated for location, experience, firm size, areas of
   expertise, industry, and practice areas").



1    reasonable); *Risto v. Screen Actors Guild*, No. 2:18-cv-07241-CAS-PLA, Dkt. 175-

2    2 ¶ 38; ECF 183 (C.D. Cal. Nov. 6, 2018) (approving rates up to $1,400/hour);

3    *Edwards v. First Am. Corp.*, No. CV0703796SJOFFMX, 2016 WL 8999934, at *5

4    (C.D. Cal. Oct. 4, 2016) (rates of up to $990 reasonable); *Makaeff v. Trump Univ.*,

5    *LLC*, No. 10CV0940 GPC WVG, 2015 WL 1579000, at *4 (S.D. Cal. Apr. 9, 2015)

6    ($250 to $825 per hour reasonable); *Toyota SUA,* 2013 WL 12327929, at *33 n. 13

7    ("The hourly rates of class counsel range from $150 to $950. Class counsel's

8    experience, reputation, and skill, as well as the complexity of this case, justify these

9    hourly rates").

10        Based on Class Counsel's lodestar (to date), the multiplier required to reach

11   the recommended fee award of $19 million is just under 2.17. This is well within the

12   range of multipliers applied to similar cases. *See, e.g., Vizcaino*, 290 F.3d at 1051

13   (upholding a lodestar multiplier cross-check showing a multiplier of 3.65); *see id.* at

14   1052-1054 (surveying multipliers in 23 class action suits and recognizing that courts

15   applied multipliers of 1.0 to 4.0 in 83% of surveyed cases).[16]

16

17

18

---

19   [16] *See also In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 341
20   (9th Cir. 1998) ("[W]e are cognizant that [m]ultiples ranging from one to four are
     frequently awarded in common fund cases when the lodestar method is applied")
21   (cleaned up); *Steiner v. Am. Broad. Co.,* 248 F. App'x 780, 783 (9th Cir. 2007)
     (multiplier of 6.85 "falls well within the range of multipliers that courts have
22   allowed"); *Herrera v. Wells Fargo Bank, N.A.,* No. 818CV00332JVSMRW, 2021
     WL 9374975, at *13 (C.D. Cal. Nov. 16, 2021) ("the requested multiplier of 2.13 is
23   within the range of typical lodestar multipliers in this circuit"); *Silveira v. M&T
     Bank*, No. 2:19-CV-06958-ODW-KS, 2021 WL 4776065, at *4 (C.D. Cal. Oct. 12,
24   2021) (multiplier of 2.8 "is within the acceptable range"); *Feller v. Transamerica
     Life Ins. Co.,* No. 16-CV-01378-CAS (GJSx), 2019 WL 6605886, at *13 (C.D. Cal.
25   Feb. 6, 2019) (2.97 multiplier "well-within the range of appropriate multipliers
     recognized by this Court and by other courts within the Ninth Circuit"); *Spann,* 211
26   F. Supp. 3d at 1265 (multiplier of 3.07 "well within the range of reasonable
     multipliers"); *Vandervort v. Balboa Cap. Corp.,* 8 F. Supp. 3d 1200, 1210 (C.D. Cal.
27   2014) (Staton, J.) (multiplier of 2.52 "well within the range of acceptable multipliers
     in a common fund case"); *Parkinson v. Hyundai Motor Am.,* 796 F. Supp. 2d 1160,
28   1170 (C.D. Cal. 2010) (observing that "multipliers may range from 1.2 to 4 or even
     higher").

### B.   THE SERVICE AWARD REQUESTED FOR EACH CLASS REPRESENTATIVE IS FAIR AND REASONABLE

"It is well-established in this circuit that named plaintiffs in a class action are eligible for reasonable incentive payments, also known as service awards." *Viceral v. Mistras Group, Inc.*, No. 15-cv-02198-EMC, 2017 WL 661352, at \*4 (N.D. Cal. Feb. 17, 2017) (citation omitted). Service awards, which are discretionary, "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

The Court should grant the modest service awards of $5,000 to each of the Class Representatives as compensation for the effort and risk entailed in pursuing this litigation. These Class Representatives have been enthusiastic and active, and have fought for the best interests of the Class. *See generally* Ryan-Blaufuss Decl.; Mills Decl.; Kuan Decl.; Kosareff Decl.; Nawaya Decl.; Micheletti Decl. ¶¶ 57-65; Fazio Decl. ¶¶ 79-80.    Each Class Representative contributed substantially to the investigated the matter by, among other things, reviewing and approving various pleadings and other documents; searching for documents and responding to discovery; remaining in contact with Class Counsel to monitor the progress of the litigation; preparing for and being deposed; and reviewing and communicating with Class Counsel regarding the Settlement Agreement and its exhibits. Each Class Representative also put their name and reputation on the line for the sake of the Class, and no recovery would have been possible without their efforts.

## IV.   CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court grant this motion.

DATED:  September 27, 2022    **FAZIO | MICHELETTI LLP**

by___/s/ *Jeffrey L. Fazio*_____



1  Jeffrey L. Fazio
2  Dina E. Micheletti
   **FAZIO | MICHELETTI LLP**
3  1111 Broadway, Suite 400
   Oakland, CA 94607
4  T: 925-543-2555
5  F: 925-369-0344

6  **MILLER BARONDESS, LLP**
7
8  by _____/s/ *Amnon Z. Siegel*_____

9  Louis R. Miller
10 Amnon Z. Siegel
   Casey B. Sypek
11 **MILLER BARONDESS, LLP**
12 1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
13 T: (310) 552-4400
14 F: (310) 552-8400

15 *Co-Lead Class Counsel*

16 Paul R. Kiesel (119854)
17 (kiesel@kiesel.law)
   Jeffrey A. Koncius (189803)
18 (koncius@kiesel.law)
19 Nicole Ramirez (279017)
   (ramirez@kiesel.law)
20 **KIESEL LAW LLP**
21 8648 Wilshire Boulevard
   Beverly Hills, CA 90211-2910
22 T: 310-854-4444
23 F: 310-854-0812

24 Charles J. LaDuca (*pro hac vice*)
25 (charles@cuneolaw.com)
   Michael J. Flannery (196 )
26 (mflannery@cuneolaw.com)
27 **CUNEO GILBERT & LADUCA, LLP**
28 4725 Wisconsin Ave, NW, Suite 200



1   Washington, D.C. 20016
    T: 202-789-3960
2   F: 202-789-1813

3
    Donald R. Pepperman (109809)
4   (dpepperman@waymakerlaw.com)
    Emily R. Stierwalt (323927)
5   (estierwalt@waymakerlaw.com)
    **WAYMAKER LLP**
6
    515 S. Flower St., Suite 350
7   Los Angeles, CA 90017
    T: 424-652-7804
8   F: 424-652-7850
9

10  William M. Audet (117456)
    (waudet@audetlaw.com)
11  David Kuang (296873)
    (lkuang@audetlaw.com)
12  **AUDET & PARTNERS, LLP**
13  711 Van Ness Avenue, Suite 500
    San Francisco, CA 94102-3275
14  T: 415-568-2555
    F: 415-568-2556
15

16

17  *Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

MPAS ISO MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS