UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN RYAN-BLAUFUSS, CATHLEEN MILLS and KHEK KUAN, on behalf of themselves and all others similarly situated, | CASE NO. 8:18-cv-00201-JLS-KES |
| Plaintiffs, | |
| vs. | **ORDER GRANTING (1) PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 248); and (2) PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS (Doc. 240)** |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and DOE DEFENDANTS 1-10, | |
| Defendants. | |
| STEVEN KOSAREFF and LAURA KAKISH, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| vs. | |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES U.S.A., INC., and DOES 1-10, inclusive, | |
| Defendants. | |

1

Before the Court are two unopposed Motions filed by Plaintiffs: one seeking final approval of the class action settlement and one seeking approval of the requested attorneys' fees, costs, and Class Representative service payments.  (Final Approval Mot., Doc. 248; Final Approval Mem., Doc. 249; Fees Mot., Doc. 240.)  Having reviewed the papers, held a fairness hearing, and taken the matter under submission, the Court GRANTS the Motion for Final Approval of Class Action Settlement and GRANTS the Motion for Award of Attorneys' Fees, Costs, and Service Payments.

## I.   **BACKGROUND**

### A.   **Procedural History**

Plaintiffs in this class action bring claims on behalf of themselves and current and former owners and lessees of 2010 to 2015 model year Prius vehicles and 2012 to 2017 model year Prius V vehicles that were the subject of certain Safety Recalls.  (Doc. 219-2 II.6, 47.)  Plaintiffs' allegations include claims for violations of consumer protection statutes and breaches of warranties, regarding allegedly defective Intelligent Power Modules ("IPMs"), a component of inverters, in certain Prius vehicles.  The IPM defect at the center of this case refers to degradation due to thermal stress that caused the IPMs in these vehicles to malfunction or fail.   (Prelim. Approval Order, Doc. 233 at 2.)  IPM malfunction or failure caused inverter failure, which in turn would cause vehicles to stall or suddenly decelerate while driving.  (*Id.*)  Although Toyota issued recalls and modified the software in the Electronic Control Unit of certain Prius vehicles, drivers continued to report issues with the affected vehicles, leading to the litigation at hand.  (*Id.*)  The Court will briefly describe the history of the case; a fuller account is provided in its Preliminary Approval Order.  (*See id.*)

The instant action was filed by Plaintiff Remy McCarthy on February 5, 2018. (Doc. 1.)  A class action complaint regarding the same alleged defect filed in Los Angeles

Superior Court on January 31, 2018, *Rexhepi v. Toyota Motor Sales, U.S.A.*, No. BC692528, was voluntarily dismissed after the state court stayed the case pending the outcome of this action.  (Doc. 219-2 I.A, E.)  The next day, Rajdave Bhandari and Jevdet Rexhepi filed a federal class action complaint, *Bhandari et al v. Toyota Motor Sales, U.S.A.*, No. 18-cv-6183 (C.D. Cal.) making similar allegations to the *Rexhepi* case.  (*Id.* I.E.)  On October 5, 2018, the Court granted the parties' stipulation to consolidate the *McCarthy* and *Bhandari* cases.  (Doc. 38.)

The parties engaged in several years of active litigation, during which time Defendants Toyota Motor Corporation and Toyota Motor Sales, U.S.A. (collectively, "Toyota") moved to compel arbitration and for summary judgment, and Plaintiffs moved for class certification.  (*See* Docs. 109, 162, 196.)  The parties began conducting settlement negotiations around June 2020, with the assistance of Settlement Special Master Patrick Juneau.  (Final Approval Mem. at 9-10.)  The parties ultimately reached a settlement, which the Court preliminarily approved on May 19, 2022.  (Prelim. Approval Order.)

## B.    The Settlement Agreement

The settlement provides class members with monetary and non-monetary benefits. Toyota will set up a non-reversionary settlement fund, initially funded with $20 million, to be used for reimbursement of class members' out-of-pocket expenses relating to a qualifying vehicle's IPM or Inverter.  (Final Approval Mem. at 10.)  Any funds remaining after claims have been paid out will either be redistributed to certain class members in redistribution checks, or, if such redistribution is administratively infeasible, sent to a *cy pres*.  (*Id.*)  Toyota has also agreed to institute a Customer Confidence Program which provides for certain repairs, or replacement, of the IPM or inverter at no cost to class members or subsequent owners or transferees of class vehicles for twenty years from the date the class vehicle was first put to use.  (*Id.*)  Finally, as part of the Customer

1    Confidence Program, Toyota will provide free loaner vehicles and towing of class vehicles

2    in certain situations.  (*Id.*)

3          Moreover, while not part of the settlement, Plaintiffs argue that this litigation

4    catalyzed Toyota's Safety Recalls J0V and 20TA10, both of which took place as litigation

5    was ongoing and are applicable to class vehicles.  (*See* Doc. 219-2 II.47.)  In 2015, prior to

6    the initiation of this litigation, Toyota had announced two recalls of approximately 810,000

7    Prius vehicles due to the IPM defect.  (Fees Mot. at 12.)  Toyota claimed that its recalls

8    replacing certain software would resolve the problem.  (*Id.*)   However, as the litigation

9    was ongoing, on October 5, 2018, Toyota announced that vehicles subject to the earlier

10   recalls still posed a safety risk because they "may not enter a failsafe driving mode as

11   intended.  If this occurs, the vehicle could lose power and stall."  (*Id.* at 13-14.)  Safety

12   Recall J0V was announced that day for the purpose of updating software in vehicles

13   subject to the prior recalls.  (Doc. 219-2 at I.G.)  Toyota then publicly announced Safety

14   Recall 20TA10 on June 24, 2020, for the purpose of installing the same software deployed

15   in Safety Recall J0V to certain other Prius vehicles.  (*Id.* at I.M.)

16

17        **C.**     **Notice and Response**

18

19               **1.**     **Notice to Class Members**

20        Notice was sent by the Settlement Notice Administrator, Kroll Settlement

21   Administration LLC ("Kroll") to Class Members in a form and method compliant with the

22   Court's Orders.  (*See generally* Finegan Decl., Doc. 251-8; *see also* Preliminary Approval

23   Order.)

24        Beginning July 25, 2022, Kroll started mailing Direct Mail Notices via First Class

25   Mail to class members.  (*Id.* ¶¶ 8-11.)  Toyota provided records of class vehicle

26   identification numbers ("VINs"), and Kroll sent the VINs to S&P Global Automotive to

27   obtain the names of the current and former owners or lessees based on state DMV records.

28   (*Id.* ¶¶ 9-10.)  About fifty-five thousand class members who, according to Toyota's

4

records, already had an IPM or inverter replaced in a class vehicle, were notified that they were entitled automatically to receive a redistribution check in the event such checks issue. (*Id.* ¶ 9, 11.)  In total, Kroll mailed around 1.8 million Direct Mail Notices, excluding re-mailed and forwarded notices.  (*Id.* ¶ 12.)  The Publication Notice was published once in *People Magazine* and *Time Magazine*; four times in *USA Today,* Los Angeles edition; in digital ads in English and Spanish targeting people in the United States, U.S. Territories, and New Hampshire[1] who were identified as Prius owners; in social media ads; through retargeting ads directed at people who visited the settlement website; in four U.S. Territory newspapers; and in a press release.  (*Id.* ¶¶ 16, 19, 21, 25, 28, 29, 32.)  Kroll also established a toll-free informational telephone line to provide information about the settlement and a settlement website where class members can file claims, opt out, and obtain information about the settlement, including viewing filings and orders in this action. (*Id.* ¶¶ 38-41.)  Kroll estimates that the Class Notice reached over 98% of class members an average of 5.7 times, with the Direct Mail Notice alone reaching an estimated 94% of class members.  (*Id.* ¶ 3.)

As of November 9, 2022, Kroll had received thirty-one Claim Forms in the mail and 2,303 Claim Forms electronically filed through the settlement website.  (*Id.* ¶ 42.)  The deadline to submit claims is May 12, 2023, so there will likely be additional timely-filed Claim Forms.  (*Id.* ¶ 43.)  As of November 9, Kroll received 116 timely opt-out requests, one hundred of which were submitted electronically through the settlement website, and one untimely request.  (*Id.* ¶ 44.)  Kroll also received two objections to the settlement as of November 9.  (*Id.* ¶ 15.)

_____

[1] Kroll had concerns about timely obtaining class member records in New Hampshire due to restrictions of the New Hampshire Driver Privacy Act.  Though Kroll ultimately did obtain the data and was able to mail out Direct Mail Notices to New Hampshire class members, it also implemented a supplemental notice plan geotargeted to New Hampshire vehicle owners.  (*Id.* at 4 n.4, ¶¶ 34-37.)

### 2. CAFA Notice

Kroll provided notice of the proposed settlement under 28 U.S.C. § 1715(b) to the appropriate state and federal government officials on December 10, 2021.  (Finegan Decl. ¶¶ 7-8.)

## II. <u>CONDITIONAL CERTIFICATION OF THE CLASS</u>

In its Preliminary Approval Order, the Court preliminarily certified the class for settlement purposes.  (*See* Prelim. Approval Order at 23.)  The Court also found adequate, and therefore appointed Jeffrey L. Fazio and Dina E. Micheletti of Fazio Micheletti LLP and Amnon Z. Siegel of Miller Barondess LLP as Class Counsel and Plaintiffs Kathleen Ryan-Blaufuss, Cathleen Mills, Khek Kuan, Steven Kosareff, and Laura Kakish as Class Representatives.  (*See id.*)  The Court sees no reason to depart from its previous conclusions regarding the existence of a proper settlement class, its appointment of Class Representatives, or its appointment of Class Counsel.  The Court therefore incorporates its class certification analysis from the Preliminary Approval Order into the current Order.

## III. <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

### A. <u>Legal Standard</u>

Before approving a class-action settlement, Rule 23 of the Federal Rules of Civil Procedure requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2).  "To determine whether a settlement agreement meets these standards, a district court must consider a number of factors, including: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the

1   stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

2   governmental participant[2]; and (8) the reaction of the class members to the proposed

3   settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (numbering added)

4   (citations and internal quotation marks omitted). "The relative degree of importance to be

5   attached to any particular factor will depend upon and be dictated by the nature of the

6   claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances

7   presented by each individual case." *Officers for Just. v. Civil Serv. Comm'n*, 688 F.2d 615,

8   625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual

9   component parts, that must be examined for overall fairness, and the settlement must stand

10  or fall in its entirety." *Staton*, 327 F.3d at 960 (cleaned up).

11         In addition to these factors, where, as here, "a settlement agreement is negotiated

12  *prior* to formal class certification," the Court must also satisfy itself that the settlement is

13  not "the product of collusion among the negotiating parties." *In re Bluetooth Headset*

14  *Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (quotations omitted).

15  Accordingly, the Court must look for explicit collusion and "more subtle signs that class

16  counsel have allowed pursuit of their own self-interests and that of certain class members

17  to infect the negotiations." *Id.* at 947 (citation omitted). Such signs include (1) "when

18  counsel receive a disproportionate distribution of the settlement, or when the class receives

19  no monetary distribution but class counsel are amply rewarded" (2) "when the parties

20  negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees

21  separate and apart from class funds," and (3) "when the parties arrange for fees not

22  awarded to revert to defendants rather than be added to the class fund[.]" *Id.* (internal

23  citations and quotation marks omitted).

24

25

26

27  _____

28         [2] This factor does not apply in this case.

7

**B.    Discussion**

In its Preliminary Approval Order, the Court evaluated each of the factors identified above to determine whether the Settlement Agreement is fair, reasonable, and adequate under Rule 23.  (*See* Prelim. Approval Order at 14-18.)  The Court determined that the following factors weighed in favor of approval: (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the amount offered in settlement; (4) the extent of discovery completed, and the stage of the proceedings; and (5) the experience and views of counsel.  (*Id.*)  The Court was also satisfied that there were no signs of collusion between the parties.  (*Id.* at 18-19.)  The Court sees no reason to depart from its previous conclusion as to these factors.  The Court therefore incorporates its analysis from the Preliminary Approval Order into the instant Order.

As for the reaction of class members to the settlement, the notice process has concluded with two objections to the Settlement and only 116 opt-outs, in a class of over a million.  (Finegan Decl. ¶¶ 44-45.)  "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotations omitted).  The Court considers each of the objections in turn.

Class member Warren objects to the settlement on four grounds: (1) Toyota is "apparently providing another defective part to replace" the defective parts in class vehicles and "it is not clear if multiple failures (if the replacement fails) will be covered"; (2) in a phone call with a Toyota representative he was told that the "maximum fail safe driving mode speed would be 35 miles per hour for an unknown (short) distance" while the settlement documentation states that the fail safe driving mode speed is approximately sixty miles per hour; (3) there is no allowance in the settlement for housing expenses during replacement of the failed part; and (4) the settlement "allows the fox to guard the hen house" in that Toyota does not allow customers to observe work performed on their

1    vehicles when brought in to dealers.  (Warren Objection, Doc. 251-4.)  In response,

2    Plaintiffs assert that Warren's first objection is based on incorrect information: rather than

3    replacing parts, Toyota has issued several recalls for software updates to address the

4    IPM/inverter issues.  (Supp. Mem., Doc. 251 at 5-6.)  As to Warren's concerns about

5    multiple failures, the settlement also provides for expanded warranty for inverter failure

6    caused by the IPM defect.  (*Id.* at 6-7.)  As to Warren's second objection, Plaintiffs assert

7    Warren may have been given information relating to fail safe mode prior to the J0V and

8    20TA10 recalls; Toyota has confirmed that class vehicles with the updated software can be

9    safely driven at speeds "above approximately 60 mph while in the fail-safe mode of

10   operation."  (*Id.* at 7.)  Finally, Plaintiffs argue that Warren's third and fourth objections to

11   the settlement are not valid grounds for objection because they do not implicate the overall

12   fairness of the settlement, but rather are simply items that this objector would prefer to

13   have included.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("It is

14   the settlement taken as a whole, rather than the individual component parts, that must be

15   examined for overall fairness.  Neither the district court nor this court have the ability to

16   delete, modify or substitute certain provisions." (quotations and citation omitted)).  The

17   Court agrees.  This objection is therefore OVERRULED.

18        Class member Maria states that she owned a class vehicle that she no longer owns

19   because it stalled twice "due to malfunction of the IPM," and that "three of the four

20   benefits for the case" do not serve her.  She states that she would like to receive payment

21   for "the risk of driving a car that can stop out of the blue," "aggravation and towing I

22   experienced," "getting rid of the Prius because of its unsafe status," and "the unplanned

23   cost of buying a new car" rather than "receiving services for a car I don't own anymore."

24   (Maria Objection, Doc. 251-5.)  Plaintiffs argue that Maria has not shown that the stalling

25   she experienced was due to the IPM defect.  (Supp. Mem. at 8-9.)  Moreover, they point

26   out that she will receive a benefit from the settlement; because she had her IPM replaced

27   under warranty, she is pre-registered to receive a potential redistribution check, and, if her

28   car was towed in connection with the IPM replacement, the settlement would entitle her to

reimbursement for that (and rental car expenses) as well.  (*Id.* at 9-10.)  Finally, they argue that even if Maria could show her stalling was caused by the IPM defect, "such a failure in one out of more than [a] million Subject Vehicles would not warrant withholding final approval of the Settlement."  (*Id.* at 10.)  Though there are some benefits that will only go to class members who still own their vehicles, the Court does not find that this renders the settlement unfair.  Class members who have incurred expenses related to the defect are still eligible for reimbursement whether or not they own their vehicles, and some, like Maria, are entitled to automatic redistribution checks if funds remain after claims have been paid out.  Moreover, Maria has not put forth evidence that the defect at issue in the case caused the stalling problem in her vehicle.  Accordingly, this objection is OVERRULED.

Considering the small number of objections and requests for exclusion, this factor, too, then, weighs in favor of approval.

Considering all the factors together, the Court concludes that the Settlement Agreement is fair, reasonable, and adequate.  Accordingly, the Court GRANTS Plaintiff's Motion for Final Approval of Class Action Settlement.

## IV.   **ATTORNEYS' FEES**

### A.   **Legal Standard**

In accordance with the Settlement Special Master's proposal, Plaintiffs seek an award of $19 million in attorney's fees, $600,000 for litigation expenses, and service awards of $5,000 for each of the Class Representatives.  (Fees Mot. at 20.)

Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth*, 654 F.3d at 941.  In the Ninth Circuit, the benchmark for a reasonable fee award in common-fund cases is 25%

of the recovery obtained.  *See id*. at 942.  Courts must "justify any increase or decrease from this amount based on circumstances in the record."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).

The Ninth Circuit has identified a number of factors the Court may consider in assessing whether an award is reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, and (4) the contingent nature of the fee and the financial burden carried by the plaintiffs.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  Counsel's lodestar may also "provide a useful perspective on the reasonableness of a given percentage award."  *Id*. at 1050.  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican Workers*, 904 F.2d at 1311.

This settlement provides for a mix of monetary and non-monetary benefits, and Plaintiffs argue that the value of the settlement is $181,224,915, making their requested award of $19 million 10.49% of that amount.  (Fees Mot. at 25.)  This valuation is based on three types of benefits: (1) the $20 million cash fund, whose monetary value is self-evident; (2) their expert's valuation of the Loaner/Towing Program and Customer Confidence Program at $69 million; and (3) the cost of Safety Recalls J0V and 20TA10, recalls which Plaintiffs argue should be added to the value of the settlement because they were catalyzed by this litigation.  (*Id.* at 24-25.)

Though Safety Recalls J0V and 20TA10 are not part of the settlement, Plaintiffs argue this lawsuit caused Toyota to implement them.  California law permits an award of attorneys' fees to a "successful party" in an action resulting in the enforcement of an important right affecting the public interest where a significant benefit has been conferred on a large class of persons.  *See* Cal. Code Civ. P. § 1021.5.  Under the "catalyst theory," "courts look to the practical impact of the public interest litigation in order to determine

whether the party was successful, and therefore potentially eligible for attorney fees." *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 566 (2004). California courts "take[] a broad, pragmatic view of what constitutes a 'successful party.'" *Id.* at 565. "To be a catalyst, a plaintiff's lawsuit need not be the sole cause of the defendant's conduct, but it must be a substantial causal factor." *Edwards v. Ford Motor Co.*, No. 11-1058, 2016 WL 1665793, at *5 (S.D. Cal. Jan. 22, 2016); *see also MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 890 (N.D. Cal. 2015) ("To be entitled to an award of attorneys' fees under section 1021.5, a plaintiff need not obtain a court-ordered change in the defendant's behavior; it is enough when a plaintiff's action motivates the defendant to provide the primary relief sought."). Plaintiffs sought, and obtained, a finding from the Special Master that this action catalyzed the two safety recalls. (Fee Mot. at 24; *see also* Doc. 219-2 at 172-74.) The Court agrees that this litigation was at least a substantial factor, if not the primary motivator, in Toyota's decision to install updated recall software in the vehicles at issue. Accordingly, it is appropriate to include the value of the two recalls in the value of the settlement.

The average cost to Toyota to update the software under Safety Recalls J0V and 20TA10 is $85. (Doc. 240-13 at 2-3.) Plaintiffs multiplied this cost by the 1,084,999 class vehicles to reach a valuation of this benefit of $92,224,915. (Fee Mot. at 24.) Accepting the Plaintiffs' expert's valuation of the Loaner/Towing Program and Customer Confidence Program of $69 million and adding it to the settlement fund of $20 million and the cost of the recalls yields a valuation of $181,224,915. The $19 million fee award is roughly 10.5% of that amount, well below the Ninth Circuit's 25% benchmark. The Court notes that even disregarding any value added by the Loaner/Towing Program and Customer Confidence Program, and only taking into account the cash fund and the amount Toyota has actually expended on recalls so far of $69,138,951.55 (*see* Fees Mot. at 20 n.6), the value is $89,138,951.55, of which $19 million in fees represents approximately 21.3%, still below the benchmark.

1   For the following reasons, the Court finds the requested award reasonable and

2   therefore GRANTS Plaintiff's request.

3

4   **B.**   **Results Achieved**

5

6   Plaintiffs argue that the litigation has conferred "substantial monetary and non-

7   monetary benefits above and beyond the significant benefits resulting from the two Safety

8   Recalls catalyzed, including a $20 million non-reversionary evergreen fund that will

9   satisfy *all* valid reimbursement claims for out-of-pocket expenses to repair or replace and

10  IPM or inverter, related towing and rental car charges, and a simple and straightforward

11  claims process." (Fee Mot. at 27.) The Court finds that counsel achieved a good result for

12  the class, especially considering the low opt-out rate and few objections to the settlement.

13  Accordingly, this factor weighs in favor of approval of the requested fee award.

14

15  **C.**   **Risk of Litigation**

16

17  The risks Plaintiffs set forth in the fees Motion are risks generally inherent to

18  litigating class actions. While nothing about the risks Plaintiffs present sets this case apart

19  from other automotive class actions against large corporate defendants, Plaintiffs'

20  recitation of the ordinary risks attendant to such class actions leaves the Court satisfied that

21  a fee award within the normal range is appropriate here.

22

23  **D.**   **Skill Required and Quality of Work**

24

25  Class Counsel provided skillful, quality work, including litigating a motion to

26  dismiss the consolidated class action complaint and defeating a motion to compel

27  arbitration. (*Id.* at 14-16.) Conducting discovery in this case required devising procedures

28  to accommodate domestic shelter-in-place rules and international travel restrictions due to

1  COVID-19 that made them unable to take depositions of Toyota's Japan-based personnel.

2  (*Id.* at 16.)  Counsel engaged in "[m]onths of difficult negotiations" to reach an agreement

3  on settlement terms.  (*Id.* at 18.)

4      Plaintiffs assert that Class Counsel achieved "excellent results for the class."  (*Id.* at

5  27.)  The Court is satisfied that this factor also weighs in favor of granting the fees award

6  as requested.

7

8      **E.      Contingent Nature of the Fee**

9

10      Class Counsel took this case on a contingency-fee basis, with no retainer fees or

11  allowance for litigation expenses.  (Fee Mot. at 29.)  They "have spent nearly five years

12  during which they have committed more than 11,000 hours" to the case.  (*Id.* at 30.)

13  "Courts have long recognized that the attorneys' contingent risk is an important factor in

14  determining the fee award and may justify awarding a premium over an attorney's normal

15  hourly rates."  *Monterrubio*, 291 F.R.D. at 457 (citing *In re Wash. Pub. Power Supply Sys.*

16  *Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)).  The Court notes, however, that nothing

17  about the risk of non-recovery in this case is unique as compared to that risk in other class

18  actions.  Still, a benchmark fee award is justified based on this factor.

19

20      **F.      Lodestar Crosscheck**

21

22      "Calculation of the lodestar, which measures the lawyers' investment of time in the

23  litigation, provides a check on the reasonableness of the percentage award."  *Vizcaino*, 290

24  F.3d at 1050.

25

26

27

28

Here, attorneys for Plaintiffs have worked a combined 11,012.48 hours on this case, for a claimed total lodestar of $8,762,302.[3]  (Fees Mot. at 31.)  For Fazio Micheletti LLP, Jeffrey L. Fazio and Dina E. Micheletti, charging rates of $895 and $795 respectively, devoted a total of 4,123.38 hours for a lodestar of $3,521,498.  (Micheletti Decl., Doc. 240-18 ¶ 66.)  For Miller Barondess, LLP, seven attorneys and one paralegal devoted a combined 2,395.4 hours, for a lodestar of $2,022,020 (hourly rates ranged from $350 to $1,300).  (Siegel Decl., Doc. 240-22 ¶ 27.)  For Waymaker LLP, three attorneys and one legal assistant worked a combined 1,282.8 hours for a lodestar of $887,226 (hourly rates ranged from $295 to $945).  (Pepperman Decl., Doc. 240-23 ¶ 15.)  For Audet & Partners, LLP, four attorneys and one paralegal devoted a combined 818.4 hours, for a lodestar of $509,985.50 (hourly rates ranged from $150 to $995).  (Audet Decl., Doc. 240-24 ¶ 14.)  For Cuneo, Gilbert, & LaDuca, LLP, eight attorneys and three paralegals devoted a combined 1,044 hours, for a lodestar of $905,089.50 (hourly rates ranged from $175 to $950).  (Ex. 1 to Flannery Decl., Doc. 240-25 at 5.)  For Kiesel Law LLP, nine attorneys devoted a total of 1,348.7 hours, for a lodestar of $925,394.50 (hourly rates ranged from $395 to $1,400).  (Ex. A. to Koncius Decl., Doc. 240-27 at 13.)

The lodestar crosscheck first requires the Court to determine whether the hourly rates sought by counsel are reasonable.  "[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees."  *Chalmers v. City of L.A.*, 796 F.2d 1205, 1210 (9th Cir. 1986).  This determination "is not made by reference to rates actually charged [by] the prevailing party."  *Id*.  The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980

---

[3] The Court notes that "Class Counsel anticipate conducting significant uncompensated work following" the filing of the Fees Motion, including overseeing administration of the settlement and responding to class members' questions and concerns.  (Fees Mot. at 32 n.14.)  The Court expects the case will continue to require effort from counsel and factors this into its determination of the reasonableness of the fee award.

(9th Cir. 2008) (citation omitted).  "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Courts may also "rely on [their] own familiarity with the legal market."  *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  As a general rule, the forum district represents the relevant legal community.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

The Court does not find all of the rates to be reasonable based on the supporting evidence submitted and its own familiarity with the local legal market.  According to the Real Rate Report submitted in support of the Fees Motion, the median partner hourly rate in Los Angeles for litigation is $715, with the majority charging between $475 and $1,042. (Doc. 240-15 at 18.)  As explained above, while this was a lengthy case and the Court appreciates the skill and experience of Plaintiffs' attorneys, this type of litigation does not typically command rates of over $1,000 an hour.  Moreover, in reviewing the documentation, the Court has a concern that efficient billing practices were not always followed, and partners did work that lower-billing associates could have completed at a more reasonable cost.  Accordingly, the Court will cap hourly rates at $1,000 for its lodestar calculation and impose a 5% haircut to partner rates in general for failing to efficiently use associates.

The $1,000 rate cap affects the following attorneys and firms:

| Attorney | Firm | Hours | New Lodestar ($) | New Firm Lodestar ($) |
|---|---|---|---|---|
| Amnon Siegel | Miller Barondess, LLP | 548.8 | 548,800 | |
| Skip Miller | Miller Barondess, LLP | 144.4 | 144,400 | 1,923,820 |
| Paul Kiesel | Kiesel Law LLP | 23.8 | 23,800 | |
| Jeffrey Koncius | Kiesel Law LLP | 344.6 | 344,600 | 864,128.50 |

The 5% reduction in partner billing reduces the lodestar thus:

| Firm | Partner Lodestar ($) / Non-Partner Lodestar ($) | Reduced Partner Lodestar ($) | Reduced Firm Lodestar |
|---|---|---|---|
| Fazio Micheletti, LLP | 3,521,498 / N/A | 3,345,423.10 | 3,345,423.10 |
| Miller Barondess, LLP | 1,384,275 / 539,545 | 1,315,061.25 | 1,854,606.25 |
| Waymaker LLP | 604,989 / 282,237 | 574,739.55 | 856,976.55 |
| Audet & Partners LLP | 268,550.50 / 241,435 | 255,122.98 | 496,557.98 |
| Cuneo, Gilbert & LaDuca LLP | 880,864.50 / 24,225 | 836,821.28 | 861,046.28 |
| Kiesel Law LLP | 368,400 / 495,728.50 | 349,980 | 845,708.50 |
| | | Total | 8,260,318.66 |

The Court therefore calculates the lodestar at $8,260,318.66.  A fee request of $19 million results in a lodestar multiplier of about 2.3.  As a 2.3 multiplier is generally considered reasonable, *see Vizcaino*, 290 F.3d, at 1051 & n.6 (approving a multiplier of 3.65 and noting that in a survey of 24 cases, 83% had multipliers falling between 1.0 and 4.0), the lodestar crosscheck does not undermine the requested fee award.

## V.     LITIGATION COSTS

Plaintiffs ask the Court to approve the reimbursement of $600,000 in fees, though they have incurred $632,460.45 ($611,406.08 from the litigation fund and $21,054.37 out of pocket) to date.  (*See* Fees Mot. at 21; Seigel Decl. ¶¶ 33, 44.)  "Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."  *In re Omnivision*, 559 F. Supp. 2d at 1048.  Class Counsel has

17

1  documented the expenditures for expert services, settlement special master services,

2  electronic discovery, and other costs.  (*See* Seigel Decl. ¶¶ 31-44.)  The Court finds the

3  various expenses adequately documented and reasonable.

4       Accordingly, the Court GRANTS the Motion for Award of Attorneys' Fees as to

5  Plaintiffs' request for litigation costs.

6

7  **VI.   CLASS REPRESENTATIVE ENHANCEMENT AWARD**

8

9       Plaintiffs seek service awards of $5,000.  (Fees Mot. at 35.)  Service awards are

10  "discretionary . . . and are intended to compensate class representatives for work done on

11  behalf of the class, to make up for financial or reputational risk undertaken in bringing the

12  action, and, sometimes, to recognize their willingness to act as a private attorney general."

13  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (internal citation

14  omitted).  "To assess whether an incentive payment is excessive, district courts balance

15  'the number of named plaintiffs receiving incentive payments, the proportion of the

16  payments relative to the settlement amount, and the size of each payment.'"  *Monterrubio*,

17  291 F.R.D. at 462 (quoting *Staton*, 327 F.3d at 975).  Courts "must 'evaluate [such] awards

18  individually' to detect 'excessive payments to named class members' that may indicate

19  'the agreement was reached through fraud or collusion.'"  *Monterrubio*, 291 F.R.D. at 462

20  (quoting *Staton*, 327 F.3d at 975).

21       Here, there are five named plaintiffs.  They estimate that they have spent between

22  30 and 95 hours on the case performing tasks including gathering documents, meeting and

23  communicating with the attorneys, preparing for deposition and being deposed, and

24  reviewing filings and deposition transcripts.  (*See* Ryan-Blaufuss Decl., Doc. 247-1 ¶¶ 7-8

25  (estimated 50 hours fulfilling duties as Class Representative); Mills Decl., Doc. 247-2

26  ¶¶ 7-8 (40 hours); Kuan Decl., Doc. 240-31 ¶¶ 7-8 (30 hours); Kosareff Decl., Doc. 240-32

27  ¶¶ 9-10 (77 hours); and Kakish Decl., Doc. 240-33 ¶¶ 9-10 (95 hours).)  In light of the

28  work the named Plaintiffs have done on behalf of the class in advancing the litigation, a

18

service award is appropriate.  The Court also finds that the relatively modest amount of the requested award does not raise concerns of collusion or of a conflict of interest between named Plaintiffs and other class members, particularly because the service awards will not be taken from the cash fund.

In sum, upon weighing the services rendered, the structure of the settlement, and the amount requested, the Court finds a service award of $5,000 reasonable under the circumstances and therefore awards Plaintiffs that amount.

## VII.  **CONCLUSION**

The Court finds the settlement to be fair, adequate, and reasonable.  Accordingly, the Court GRANTS the Motion for Final Approval of Class Action Settlement.  The Court also GRANTS the Motion for Award of Attorneys' Fees, Costs, and Service Awards.  The Court awards Class Counsel $19 million in attorneys' fees and $600,000 in litigation costs. The Court also awards a service award of $5,000 to each of the Class Representatives.

The Court also finds that the initial, proposed $250 cap on Redistribution Checks – which the parties agreed to remove and the Settlement Special Master approved on November 4, 2022 - should be removed to enable the Settlement Fund residual to be distributed pro rata to those Class members entitled to receive Redistribution Checks under the Settlement Agreement. Based on the number of Out-of-Pocket Claims submitted to date, it appears likely that a majority of the Settlement Fund will remain after all valid Out-of-Pocket Claims are paid. Accordingly, each eligible Class Member entitled to receive a Redistribution Check under the terms of the Settlement Agreement, will be sent a pro rata share of the Settlement Fund's residue as a Redistribution Check.

Without affecting the finality of this Final Order or the accompanying Final Judgment, the Court retains continuing and exclusive jurisdiction over the Action and all matters relating to the administration, consummation, enforcement, and interpretation of

the Settlement Agreement and of this Final Order and the accompanying Final Judgment,
to protect and effectuate this Final Order and the accompanying Final Judgment.


        DATED: February 03, 2023

                                        JOSEPHINE L. STATON
                                        _____

                                        HON. JOSEPHINE L. STATON
                                        UNITED STATES DISTRICT JUDGE